**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
**Sarah Mooney on 11/03/2021**

1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
2                WEST PALM BEACH DIVISION

3
                         CASE NO.:  9:20-CV-82406-AMC
4

5    GREGORY RIDEAU,

6             Plaintiff,

7    vs.

8    CITY OF WEST PALM BEACH,
     a Florida municipal corporation,
9

10            Defendant.

11   _____/

12

13            VIDEO CONFERENCE DEPOSITION OF

14                   Sarah Mooney

15

16            Wednesday, November 3, 2021
                 1:00 p.m. - 3:15 p.m.
17

18                     Remote

19

20

21

22            Stenographically Reported By:
                  Karen Allen-Lewin
23

24

25

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Sarah Mooney on 11/03/2021                                    Page 2

```
 1   APPEARANCES:

 2   (All parties appeared via video conference.)

 3

 4   On behalf of Plaintiff:

 5        Rubin & Rubin
          2055 South Kanner Highway
 6        Stuart, Florida 34994
          (772)283-2004
 7        BY:  TODD NORBRATEN, ESQUIRE
          tnorbraten@rubinandrubin.com
 8

 9   On behalf of Defendant:

10        Ford & Harrison LLP
          1450 Centrepark Boulevard, Suite 325
11        West Palm Beach, Florida 33401
          (561)345-7512
12        BY:  DAVID M. GOBEO, ESQUIRE
          dgobeo@fordharrison.com
13

14   On behalf of Deponent:

15        Olds & Stephens, P.A.
          312 11th Street
16        West Palm Beach, Florida 33401
          (561)832-6814
17        BY:  DON STEPHENS, ESQUIRE
          dstephens@oslegal.com
18

19   ALSO PRESENT:

20        City of West Palm Beach
          City Attorney Office
21        P.O. Box 3366
          West Palm Beach, Florida 33401
22        (561)822-1350
          BY:  ZOE PANARITES, ESQUIRE
23        zpanarites@wbp.org

24

25
```

```
 1                    I N D E X

 2

 3  Examination                                Page

 4  Direct by Mr. Norbraten                       4

 5  Witness Signature Page                       82

 6  Certificate of Oath                          83

 7  Certificate of Reporter                      84

 8  Errata Sheet                                 85

 9

10

11

12                  E X H I B I T S

13              No Exhibits Marked

14

15

16

17

18

19

20

21

22

23

24

25
```

1  Thereupon,

2  the following video conference proceedings began at

3  1:00 p.m.:

4          THE STENOGRAPHER:  Raise your right hand for

5      me, please.

6          Do you swear or affirm the testimony you're

7      about to give will be the truth, the whole truth,

8      and nothing but the truth?

9          THE WITNESS:  Yes.

10 Thereupon:

11                      Sarah Mooney,

12 having first been duly sworn, testifies as follows:

13                  DIRECT EXAMINATION

14 BY MR. NORBRATEN:

15      **Q.   Good afternoon, Chief.**

16      A.   Good afternoon.

17      **Q.   Could you please state your name and spell it**

18 **for the record.**

19      A.   Sarah Mooney, S-a-r-a-h, M-o-o-n-e-y.

20      **Q.   And, Chief Mooney, my name is Todd Norbraten.**

21 **I'm with the law firm of Rubin & Rubin.  I am located**

22 **in Stuart, Florida.  I represent Lieutenant Gregory**

23 **Rideau in a lawsuit against the City of West Palm**

24 **Beach.  At one point I had named yourself and**

25 **Theodore Swiderski as defendants in the case.  You are**

 1  no longer defendants in the case, but I have asked to

 2  take your discovery deposition in the case to see

 3  what, if any, evidence you may have that supports my

 4  allegations or refutes the allegations we've made in

 5  the complaint.

 6          Is that your understanding as to why you're

 7  here today?

 8      A.   Yes.

 9      Q.   Okay.  I see you're represented by counsel

10  here today?

11      A.   Yes.

12      Q.   That's Mr. Stephens?

13      A.   Correct.

14      Q.   Okay.  And prior to today's deposition, did

15  you do anything in preparation for the deposition?

16      A.   I met with Mr. Stephens, and I reviewed the

17  complaint, and some IA records to refresh just on the

18  investigations that were involved in the complaint.

19      Q.   Okay.  And I assume you've given depositions

20  before, correct?

21      A.   Yes.

22      Q.   All right.  So if I ask you a question that

23  you don't know the answer to, it's perfectly fine for

24  you to say you don't know the answer to it.  But if I

25  ask you a question, and you believe you could know the

 1  answer if you were provided some sort of a document,

 2  please let me know and we'll see if we can get you

 3  that document.  Okay?

 4      A.   Sure.

 5      Q.   All right.  So when did you become an officer

 6  with the City of West Palm Beach?

 7      A.   In May of 1995.

 8      Q.   Okay.  And in May of 1995 was Gregory Rideau

 9  working as an officer in West Palm Beach?

10      A.   No.

11      Q.   Okay.  Do you know when he started?

12      A.   No.

13      Q.   Okay.  When did you become the chief of the

14  West Palm Beach Police Department?

15      A.   In February of 2017.

16      Q.   And when did it become apparent to you that

17  you were going to be stepping down as chief to be an

18  assistant chief as you are today?

19      A.   That I will be stepping down?

20      Q.   Yes.  When did it become apparent to you that

21  you were no longer going to be the chief of the police

22  department?

23      A.   When the mayor advised me that he was

24  bringing in a new chief in probably I think it was

25  April 2019.

1      Q.   Okay.  And during the course of your time as

2  the chief of the West Palm Beach Police Department

3  between February of '17 and April of '19, I'm asking

4  you questions about the investigations pertaining to

5  my client Mr. Rideau.  But I'm also interested in

6  generally kind of what your role was and involvement

7  with internal affairs.  Okay?

8      A.   During that time period?

9      Q.   Yes.  So I will preface my questions with

10  either a specific incident, or I will say generally

11  what happened.  And, you know, you answer to the best

12  of your ability either of those.  But I'm just letting

13  you know that's kind of where I'm going with some of

14  those.  Okay?

15      A.   Okay.

16      Q.   So generally as the chief of police what

17  would your involvement be in administrative

18  investigations that are occurring within the

19  department?

20      A.   Generally I would be in receipt of a

21  complaint or an allegation, and I would determine

22  whether or not internal affairs was going to complete

23  an investigation, so I would assign it to the internal

24  affairs unit.  And then upon completion of their

25  investigation, I would be responsible for the final

```
 1  disposition and disciplinary action that might be
 2  attached to that allegation or investigation.
 3      Q.   Okay.  So essentially there are two decisions
 4  that are at your discretion whether or not to initiate
 5  an investigation at all, correct?
 6      A.   Yes.
 7      Q.   And then once an investigation has concluded,
 8  what, if any, discipline or remedial action should
 9  take place?
10      A.   Yes.
11      Q.   Okay.  In between those two decisions there's
12  an investigation that may occur through internal
13  affairs, correct?
14      A.   Right.
15      Q.   During the course of the investigation of
16  these claims, is there any role of the chief of police
17  in the process of the investigation itself?
18           MR. GOBEO:  Objection.  You can answer.
19      A.   Not in the investigation itself.  Unless
20  something new comes to light that I become aware of
21  that might impact the investigation to make sure that
22  it's -- my concern is mostly about ensuring that the
23  investigation is actually occurring and they're
24  getting towards a resolution of it.
25      Q.   Okay.  And so when you say not unless you
```

 1  become aware of information, so is that -- if you

 2  become a witness yourself in the IA, or is that some

 3  other answer?

 4      A.   I don't understand your question.

 5      Q.   **So give me an example of what could occur**

 6  **during the course of an investigation that would cause**

 7  **you as the chief to have involvement during the**

 8  **investigation itself prior to the conclusion of the**

 9  **investigation by the investigating officer.**

10      A.   It would only be if something was -- if I

11  became aware of information that was relevant to that

12  investigation, say somebody drops an anonymous letter

13  on my desk referencing the investigation, I would

14  forward that to the internal affairs investigators to

15  become part of their investigation.

16      Q.   **Okay.  So you're not actively seeking out**

17  **information, but if you come across information that**

18  **would be part of the investigation, you forward it to**

19  **IA, and they do whatever they do with it?**

20      A.   Yes.

21      Q.   **Okay.  Does the chief of police, or when you**

22  **were chief of police, did you make determinations as**

23  **to who within internal affairs would investigate**

24  **specific allegations?**

25      A.   Not every time.  We had a captain that was in

1 charge of internal affairs, and depending on the

2 caseloads that the investigator had that captain would

3 typically -- they'd run a name by me, hey, so and so

4 is going to handle the case.  And short of it being

5 like a conflict, we try not to have a subordinate

6 level officer investigating a supervisor.  So that's

7 why we have different levels within the investigative

8 staff.  So like I wouldn't want a police officer

9 investigating a lieutenant.  I'd rather have a

10 lieutenant investigating a lieutenant.

11      **Q.   Understood.  And during the majority of your**

12 **time as the chief of police, was the captain over**

13 **internal affairs Ted Swiderski?**

14      A.   He was during my time period, yes.

15      **Q.   Okay.  And upon his rotating out of internal**

16 **affairs, it was Joseph Ahern that took over in his**

17 **absence, correct?**

18      A.   I'd have to refer to the record on it.  We

19 have a lot of rotation, so I'm not sure.

20      **Q.   Okay.  During the course of an internal**

21 **affairs investigation, are there periods of time where**

22 **you communicate with the captain in this case in most**

23 **of your -- during most of the period of time in which**

24 **you were the chief, Ted Swiderski?**

25           **Were there periods of time where you would**

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Sarah Mooney on 11/03/2021

Page 11

1  communicate with Captain Swiderski about specific

2  internal affairs investigations that had not yet

3  concluded?

4      A.   We would talk about the status of them, and

5  how close, or how many witnesses you might have left,

6  or what the process, or the progress of those

7  investigations was, yes.

8      Q.   Okay.  But as it would relate to evidence for

9  or against the subject officer, those discussions were

10  not had?

11      A.   I can't specifically recall any.

12      Q.   Okay.  The allegations that were raised

13  against Lieutenant Rideau that essentially take up the

14  majority of the time in which you're there as the

15  chief of police, all originated from an officer named

16  Ravelo Marte.

17          Can you tell me when you first met Officer

18  Ravelo Marte?

19      A.   Probably when she got hired.  I can't tell

20  you specifically.  I didn't know her before she became

21  a police officer at our agency.

22      Q.   Okay.  And my understanding is and the record

23  suggests that she was working under Gregory Rideau, he

24  was her supervisor in a specialized unit, correct?

25      A.   Yes.

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Sarah Mooney on 11/03/2021                                    Page 12

1      Q.   Prior to becoming aware of complaints that

2  she made against at the time Sergeant Rideau, had you

3  had any individual communications with

4  Officer Ravelo Marte for any reason whatsoever within

5  the department?

6      A.   I don't believe in person.  But I do know at

7  some point I was in the process of an approval for her

8  to take a leave of absence at some point when she was

9  an officer on the road.  Other than that, I don't

10 recall having -- I mean, if I pass her in the hallway

11 I'm going to say hello.  But as far as having direct

12 communications, I can't remember anything other than

13 what you would do in normal passing.

14     Q.   Okay.  So when you became aware of the

15 allegations that she made against Gregory Rideau, can

16 you describe for me how it was that you received that

17 information contained in the allegations that she had

18 made?

19     A.   She verbally advised her direct supervisors,

20 and they brought it up the chain of command verbally.

21 I had a discussion with Assistant Chief West also at

22 the time who was in that chain of command; they made

23 me aware of the allegations that there was an issue.

24 And then a couple days later I got a written complaint

25 from her.

1     Q.   Okay.  And if the record suggests this all

2  occurred in March of 2018, does that seem correct from

3  your recollection?

4     A.   Yes.

5     Q.   All right.  Chief Mooney, do you recognize

6  what is on the screen now as the written complaint

7  that you received?

8     A.   That's not what I was referring to.  There

9  was a typed out --

10    Q.   The typed one?

11    A.   Yes.

12    Q.   Okay.

13    A.   This one was something that was -- I got a

14  copy of this one I believe from human resources.  But

15  right around the same time that I got the other

16  written complaint.

17    Q.   Okay.  And so when you received a copy of the

18  written complaint, did you yourself read it?

19    A.   Yes.

20    Q.   Okay.  What, if anything, did you do

21  following your reading of the complaint?

22    A.   In what regard?  Can you be more specific on

23  what did I do?

24    Q.   Well, if you did anything.  You received this

25  complaint, did you make a decision to turn this over

 1  to internal affairs?

 2      A.   Yes.  We opened an investigation.

 3      **Q.   Okay.**

 4      A.   I also spoke with the other supervisors in

 5  the unit to determine whether or not while the

 6  investigation was open if there would be an issue with

 7  Sergeant Rideau and Officer Ravelo working together

 8  still.

 9      **Q.   And what was the resolution of that**

10  **question?**

11      A.   In speaking with both parties they both felt

12  that they could work in the same division still, but

13  not having direct contact.

14      **Q.   Okay.  And so following that determination,**

15  **when was your next interaction with any part of this**

16  **IA investigation into Gregory Rideau?**

17           MR. GOBEO:  Objection.

18      A.   Interaction, that's kind of vague.

19  BY MR. NORBRATEN:

20      **Q.   What was the next thing you did, if you did**

21  **anything else ever, concerning this internal affairs**

22  **investigation?**

23           MR. GOBEO:  Objection.

24      A.   I would have monitored the investigation

25  getting updates from my investigators.  I didn't do

1  anything specifically in regard to doing an

2  investigation.

3  BY MR. NORBRATEN:

4      **Q.    Okay.  In the IA report it indicates that you**

5  **asked Sergeant Lori Colombino to assist Officer Ravelo**

6  **during the course of this investigation.  Do you**

7  **recall that?**

8      A.   I inquired -- I didn't inquire.  I requested

9  that Lori Colombino be available for her kind of as an

10  advocate, because she was in our Special Victims Unit.

11  And based on the allegations she had more intimate

12  knowledge of how to interact with somebody who was

13  making allegations like that.

14      **Q.    Okay.  So at the time was Ms. Colombino part**

15  **of the internal affairs division?**

16      A.   No.

17      **Q.    So what went into your reasoning for**

18  **assigning her this role?**

19      A.   She was in charge of our Special Victims

20  Unit, and she has specific experience with dealing

21  with people who have made allegations of sexual abuse

22  or harassment, and has been a victim advocate, a very

23  good advocate for people who have made allegations

24  like that.  And I did not want to leave Officer Ravelo

25  without any kind of resource to talk to if she had any

1  issues or feelings that were going to impact her

2  ability to be at work.  So Colombino was an advocate

3  for her in case she was having any issues that would

4  need to be addressed down the road.

5      **Q.   Okay.  Had you assigned advocates to officers**

6  **had had complained of sexual harassment in the past?**

7      A.   I don't believe I had a case that was similar

8  to this that would have had similar allegations, so,

9  no.

10      **Q.   All right.  In any other internal affairs**

11  **investigation that occurred while you were the chief**

12  **of police, whether it was a sexual harassment**

13  **allegation or other kind of allegation, did you ever**

14  **assign any sort of an advocate to any of the other**

15  **complaining officers?**

16      A.   No.  Typically their advocates would be their

17  union representatives.  But in this case

18  Officer Ravelo had voiced that she was concerned that

19  she was going to be singled out and blackballed, and

20  the union was not necessarily the route she wanted to

21  go for representation.

22          So I utilized Colombino, who is a member of

23  the union.  And it doesn't necessarily have to be an

24  officer in the union that can represent somebody

25  that's involved in an internal affairs case.  But

1  Officer Ravelo was responsive to that and receptive to

2  that.

3      **Q.   Okay.  Sergeant Colombino is not an attorney,**

4  **correct?**

5      A.   No.

6      **Q.   Do you know if Officer Ravelo attempted to**

7  **get an attorney to work with her during the course of**

8  **IA 18-001?**

9          MR. GOBEO:  Objection.

10     A.   I believe she had an attorney, but not in

11  regard to the case specifically or the investigation

12  specifically.

13  BY MR. NORBRATEN:

14     **Q.   Okay.**

15     A.   She did not come in with an attorney that I'm

16  aware of.

17     **Q.   Okay.  During the course of this**

18  **investigation, did you have a one-on-one meeting with**

19  **Gregory Rideau to discuss the allegations that**

20  **Officer Ravelo had made?**

21     A.   I don't believe I ever had a one-on-one.  He

22  always had a union attorney with him when I spoke with

23  him.

24     **Q.   Okay.  Do you recall a meeting with**

25  **Gregory Rideau that occurred on the day that**

1  Officer Ravelo Marte gave her second interview to

2  IA?

3      A.   I know that I spoke with Sergeant Rideau and

4  his attorney.  I can't tell you what day that was.

5      Q.   Okay.

6      A.   I don't remember.

7      Q.   If the record suggests that it was the

8  morning of the day that Officer Ravelo gave her second

9  interview in the afternoon, would you agree with the

10 records if they suggest that?

11     A.   If that's in the record that's a probability.

12 I don't recall independently though.

13     Q.   Okay.  What was the basis of that

14 communication with Gregory Rideau and his attorney at

15 that time?

16     A.   I don't recall.  I believe that they came to

17 me just to --

18     Q.   I believe it's accurate they came to your

19 office.  That's true.  But are you disputing that your

20 assistant reached out to Gregory Rideau in an effort

21 to get a conversation started between you and him?

22     A.   No, I'm not disputing that.  I just don't

23 recall how that meeting came to be.

24     Q.   Okay.  Was it commonplace for you as the

25 chief of police to request meetings with officers that

1  were the subjects of ongoing internal affairs

2  investigations?

3      A.   I would never request it directly of the

4  officer without having their representative involved

5  in the conversation.

6      **Q.   Okay.  Is it commonplace for you to request a**

7  **meeting with officers who are represented by their**

8  **attorneys during an ongoing internal affairs**

9  **investigation?**

10      A.   I don't know that I would use the term

11  "commonplace."  It did occur.

12      **Q.   Okay.**

13      A.   But I don't know what commonplace -- how that

14  would equate.  Because there's so many different

15  investigations and different communications.  But I

16  can tell you that I never spoke with any of the

17  members that were involved in an investigation without

18  having their representation there with them.

19      **Q.   Okay.  Well, I'm not taking issue with the**

20  **fact that -- I'm not taking issue with anything.  I'm**

21  **just trying to determine what happened.**

22          **So do you recall why you wanted to speak with**

23  **Gregory Rideau and his attorney on April 13th of 2018,**

24  **during the course of this open internal affairs**

25  **investigation?**

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Sarah Mooney on 11/03/2021                                    Page 20

```
 1            MR. GOBEO:  Objection.

 2      A.   No, I don't recall why.

 3  BY MR. NORBRATEN:

 4      Q.   Okay.  Are you familiar with the group of

 5  officers within the department that refer to

 6  themselves as SEAL Team Six?

 7      A.   No.

 8      Q.   Have you heard the term "SEAL Team Six"

 9  thrown around the department, not describing the

10  actual Navy SEAL Team Six, but describing a group of

11  officers?

12      A.   No.

13      Q.   Is it your testimony that you did not know

14  that Lori Colombino was one of the officers that

15  associated herself with SEAL Team Six?

16            MR. GOBEO:  Objection.

17      A.   I don't know what SEAL Team Six is other than

18  the Navy SEALs.

19  BY MR. NORBRATEN:

20      Q.   Okay.  So you have no knowledge of

21  Lori Colombino being the person -- that was in a group

22  that called themselves that?  You don't have any

23  knowledge of that?

24            MR. GOBEO:  Objection.

25      A.   No.
```

1      MR. NORBRATEN:  Is the objection for asked

2    and answered?

3      MR. GOBEO:  Yes.

4      MR. NORBRATEN:  Okay.  Just making sure.

5  BY MR. NORBRATEN:

6    **Q.   Did Detective Cognetti -- do you have any**

7  **knowledge of her also referring to herself as someone**

8  **who was in SEAL Team Six within the department?**

9      MR. GOBEO:  Objection.

10    A.   I have never heard the term "SEAL Team Six"

11  used for anybody attached to the police department.

12  BY MR. NORBRATEN:

13    **Q.   Okay.  Do you recall meeting with**

14  **Gregory Rideau and his attorney, and verbalizing to**

15  **Gregory Rideau that you had to get this IA under**

16  **control before it got out of hand?**

17    A.   I remember meeting with him, but I don't

18  remember the content of the meeting.  I know we met --

19  I believe we met at least twice, and there was an

20  excessive amount of information that just kept coming

21  in, but it was all related.  But I don't recall using

22  those specific words.

23    **Q.   So all the information was related to this**

24  **internal affairs investigation?**

25    A.   There was a lot of information that was

 1  coming in to this investigation, trying to be

 2  submitted in regard to this investigation.

 3       **Q.   Okay.  Was that information coming to you**

 4  **personally as a chief, or you were just aware of the**

 5  **fact that that information was making its way to**

 6  **internal affairs?**

 7       A.   No, I don't recall if it came through me or

 8  through -- we sometimes have people that give

 9  anonymous letters, sometimes you have them go directly

10  to IA.  But the information -- anything that was

11  related to the case was forwarded to IA.

12       **Q.   Okay.  When did you become aware of the**

13  **existence of an audio recording that contained**

14  **Gregory Rideau having a conversation with a former**

15  **confidential informant of his that had been submitted**

16  **to the department by Agent Steinberg?**

17       A.   I don't remember the exact date, but it was

18  during the investigation at some point.  Towards the

19  end of the investigation, I believe.

20       **Q.   Okay.  And did you have an understanding at**

21  **the time of how the recording came to be in**

22  **existence?**

23       A.   It came to me from Agent Steinberg.

24       **Q.   Okay.  And at any point in time did you**

25  **listen to the recording?**

1      A.    I did.

2      Q.    Okay.  And it was an audio recording of a

3  phone call between Gregory Rideau and a confidential

4  informant, correct?

5      A.    That's how it was presented, yes.

6      Q.    Okay.  Did you have an understanding as to

7  whether or not Gregory Rideau knew he was being

8  recorded when the call was made?

9      A.    I did not know.

10      Q.    Do you have an understanding as to whether or

11  not the confidential informant had knowledge that he

12  was being recorded when the recording of the phone

13  call was made?

14      A.    I did not -- I can say that I have not had a

15  lot of experience with confidential informants.  I

16  conferred with -- this is after hearing it -- I

17  conferred with a former agent who was in the internal

18  affairs office staff at the time to inquire about it,

19  and that's when I learned that confidential informants

20  are issued phones that are recorded.  So they would

21  know it's recorded, and a handler or officer that

22  works with that person should know that it's recorded.

23  So that was given to me also.

24          But the understanding I had was somebody

25  knows that's a confidential informant as well as the

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Sarah Mooney on 11/03/2021

```
 1  confidential informant themselves would know that
 2  their phone calls are being recorded.
 3      Q.   So Gregory Rideau should have assumed his
 4  phone call was being recorded?
 5      A.   According to the information I got, yes.
 6      Q.   And who in internal affairs provided you with
 7  that information?
 8           MR. GOBEO:  Objection.
 9      A.   Brian McDaniel.
10           MR. NORBRATEN:  What was the base of the
11      objection?
12           MR. GOBEO:  She didn't say who the person who
13      gave it to her was in internal affairs.  So
14      speculation.
15           MR. NORBRATEN:  I apologize.  I thought she
16      said an agent provided you with information, and
17      that's what I was trying identify.
18  BY MR. NORBRATEN:
19      Q.   In your prior answer you said an agent
20  provided you information.
21      A.   A former agent, yes, who was in the Internal
22  Affairs Unit.  And, yes, it's Brian McDaniel.
23      Q.   Okay.  And when you spoke with Brian McDaniel
24  about the recording, did you have an understanding as
25  to why it was being presented to you?
```

1      A.   When I spoke to him, to Brian McDaniel, I

2   didn't have a discussion about that.  I just know that

3   it came to internal affairs.  Agent Steinberg brought

4   it to internal affairs.  To me, when it was presented

5   to me, he just seemed like he wasn't sure what he was

6   supposed to do with that information that was on his

7   recording so he brought it to internal affairs.

8           I believe that he worked under

9   Sergeant Rideau, and he was in that unit.  So he was

10  aware that there was an open investigation involving

11  members of his unit, including Sergeant Rideau.  So I

12  think he felt that he needed -- he was obligated to

13  bring that recording to internal affairs attention.

**14      Q.   Okay.  And did you question them about how**

**15  they obtained the recording?**

16      A.   I did not question them other than he

17  presented it as, the CI gave me this.  So however that

18  transpired coming to him from the CI, no, I did not.

**19      Q.   Well, do you have an understanding as to**

**20  whether or not they had a warrant to have a recorded**

**21  line in order to make this recording?**

22          MR. GOBEO:  Objection.

23      A.   I don't have any independent knowledge of

24  that.

25  BY MR. NORBRATEN:

1     Q.    Okay.  It is a third-degree felony in the

2  state of Florida to record someone without their

3  knowledge, correct?

4            MR. GOBEO:  Objection.

5     A.    It is.

6  BY MR. NORBRATEN:

7     Q.    It's a crime?

8     A.    It's a crime, yes.

9     Q.    And the way law enforcement gets around

10  committing that crime is they obtain warrants in the

11  process of conducting criminal investigations to get

12  recordings, correct?

13            MR. GOBEO:  Objection.

14     A.    Yeah.  If that's in the statute, yes.

15  BY MR. NORBRATEN:

16     Q.    It's not a trick question.  I mean, the way

17  you get evidence you're otherwise not entitled to is a

18  judge says you're allowed to get it this time.  That's

19  what a warrant is for, correct?

20     A.    Yes.

21     Q.    All right.  So you were advised that the

22  recording was obtained in a manner that you felt was

23  legal, that's what I'm gathering, correct?

24            MR. GOBEO:  Objection.

25     A.    I didn't have -- no, that did not even -- can

 1  you repeat the question?

 2  BY MR. NORBRATEN:

 3      Q.   Did you have any concerns about the legality

 4  of this recording, the fact that it existed, that it

 5  was legally obtained evidence?

 6      A.   I don't know that I considered it evidence.

 7  But the content and the manner of which it was

 8  presented was of concern to me, yes.

 9      Q.   Well, if it's illegally recorded it's

10  evidence of a crime.  If it's not illegally recorded

11  presumably it's being recorded for evidence and some

12  investigation, correct?

13      A.   I'm not aware of that.

14      Q.   Do you have any understanding as to why this

15  particular phone call was recorded?

16      A.   I do not.

17      Q.   Okay.  Have there been other phone calls that

18  you have been presented with, or you were presented

19  with when you were the chief of police, that involved

20  officers communicating with other individuals on a

21  recorded phone call?

22      A.   Not that I can recall, no.

23      Q.   Okay.  So I believe you mentioned McDaniel

24  brought this to you because he did not know what to do

25  with it, correct?

```
1      A.    Incorrect.  Steinberg brought it.

2      Q.    Okay.  So Steinberg brought it to you?

3      A.    Steinberg brought it to internal affairs.

4      Q.    Right.  Steinberg brought it to internal

5   affairs.  And then how was it presented to you

6   personally?

7      A.    From Steinberg in the internal affairs

8   office.

9      Q.    Okay.  And who else was present when it was

10  presented to you by Agent Steinberg?

11     A.    I don't recall specifically.  I know which

12  office I was in, and I don't recall specifically which

13  investigators were in that office.

14     Q.    Okay.  Were there other individuals besides

15  yourself and Agent Steinberg when this was presented

16  to you?

17     A.    Yes.

18     Q.    Okay.  And when it was presented to you, was

19  it played for you?

20     A.    Yes.

21     Q.    Okay.  So you, Agent Steinberg, and whatever

22  other officers may have been in the room at that time

23  would have heard the contents of the recording,

24  correct?

25     A.    Yes.
```

1      Q.   Okay.  And following it being presented to

2  you, what, if any, decision was asked of you as the

3  chief of police?

4      A.   By whom?

5      Q.   By anybody.  Why were they telling you about

6  this?

7      A.   Nobody asked me for a decision on anything.

8  They just presented it.

9      Q.   Okay.  Why were they presenting it to you?

10     A.   You have to ask them.

11     Q.   Okay.  After being played the recording,

12  what, if anything, did you do?

13     A.   I advised Captain Swiderski to retain a copy

14  of it.  And at that point they kept it.  I didn't open

15  an investigation or anything.  At the moment I wasn't

16  quite sure what we were going to do with it.

17     Q.   Okay.  And is the reason you told

18  Captain Swiderski to keep a copy of it because you

19  thought it could be used as evidence against Gregory

20  Rideau in the future?

21     A.   No.

22     Q.   So why did you tell Captain Swiderski to

23  retain a copy of it?

24     A.   Because I was concerned with the content on

25  it.

1      Q.    Okay.

2      A.    And I was not sure of the -- I was not sure

3  how that came about, so that was a concern for me.

4      **Q.    Not sure how the recording itself came about,**

5  **or not sure how what was spoken on the recording came**

6  **about?**

7      A.    Both.

8      **Q.    Okay.  So you mentioned you did not order any**

9  **investigation at that time based on it, correct?**

10     A.    I did not.

11     **Q.    Okay.  Did you make a determination as to**

12  **whether or not this recording was in any way tied to**

13  **the open internal affairs investigation sexual**

14  **harassment allegations by Officer Ravelo?**

15     A.    I determined that it was not related to the

16  allegations we were looking at that had been reported

17  months earlier.  I didn't believe the content on it

18  had anything to do with the allegations that were

19  being investigated, so it wasn't included with the

20  investigation.

21     **Q.    Okay.  So let me unpack that a little bit.**

22  **You made the decision that IA should not include that**

23  **in that investigation?**

24     A.    I did.

25     **Q.    Okay.  Were you asked to make that decision**

1  by internal affairs, or did you upon hearing this

2  order them that this is not part of that

3  investigation?

4      A.   I did not order them, but I told them I did

5  not believe it was involved in the investigation.  It

6  was not relevant to the allegations that they were

7  looking at.

8      Q.   Okay.  When was the last time you listened to

9  the recording?

10     A.   That day.

11     Q.   Okay.  Do you dispute that the recording has

12  Gregory Rideau denying that he committed any sexual

13  harassment to the female officer, Officer Ravelo?

14     A.   I don't recall specifically the content of

15  the tape.

16     Q.   Okay.  If the recording includes

17  Gregory Rideau denying he committed any sexual

18  harassment on Officer Ravelo, you would still believe

19  that that is not relevant or related to the

20  allegations of him committing sexual harassment on

21  Officer Ravelo?

22         MR. GOBEO:  Objection.

23     A.   There was no information on the tape that was

24  related to any kind of evidence that would indicate it

25  should be included in that investigation.  He went on

1   the record and told us he didn't do it also.  So I'd

2   rather have it in person on tape during the interview

3   directly from him than a recording that I don't know

4   where it originated.

5   BY MR. NORBRATEN:

6        Q.   That's a statement he was making when he

7   didn't know he was being recorded?

8        A.   No, no.  That's not what I said.

9        Q.   So the fact that it's an additional

10  consistent statement to his denial is not related to

11  the investigation?

12       A.   No, it's not.

13       Q.   You mentioned that you retained or directed

14  Captain Swiderski to retain a copy of the recording.

15  What did you plan to do with the copy of that

16  recording?

17       A.   I don't know.  But it wasn't going to be

18  included in that investigation.

19       Q.   The Internal Affairs Division of the

20  department is there to investigate complaints made

21  against officers in the course of their job as

22  officers, correct?

23       A.   Can you restate that?

24       Q.   What's the purpose of IA?  Why do we have an

25  Internal Affairs Division?

1    A.   To ensure that our personnel operate under
2  our operating guidelines and statutes.
3    **Q.   Okay.  And an investigation, an**
4  **administrative investigation, they're all triggered by**
5  **some sort of a complaint that something has occurred,**
6  **right?**
7    A.   Not necessarily a formal complaint.  It could
8  be a procedural issue; it could be an interpretation
9  of a policy.
10   **Q.   Right.  So at the time you directed that tape**
11 **to be retained, what procedural policy, or rule, or**
12 **regulation, or law, or anything was potentially at**
13 **issue that that would have been evidence of for any**
14 **future investigation?**
15   A.   At the moment I didn't know, so that's why we
16 retained it.
17   **Q.   Okay.  Is there -- I apologize.  You answer.**
18 **I didn't mean to cut you off.**
19   A.   Go ahead.
20   **Q.   Is it common for internal affairs to just**
21 **retain evidence that is not tied to any ongoing**
22 **investigation or closed investigation?**
23   A.   They would not retain evidence.  But we
24 have -- sometimes we receive information that's
25 retained, that is just retained as a public record as

1  a matter of just information that comes into -- we're

2  required to retain information that comes into the

3  office whether it's a complaint, whether it's

4  evidence, whether it's a statement.  So it was being

5  retained because something that's brought to internal

6  affairs can't just be sent out the door, so I retained

7  it.

8      Q.   Were you ever made aware of any other audio

9  recordings of Gregory Rideau's phone calls that

10  occurred during this time frame between the start of

11  internal affairs investigation for sexual harassment

12  up through you no longer being the chief?

13     A.   No.

14     Q.   Captain Swiderski discussed the fact that he

15  believed that Agent Steinberg, or perhaps some other

16  agent, was going to present that recording to DEA to

17  see if they needed it for part of some potential

18  investigation that they were instituting.

19          Are you aware of anything like that?

20     A.   Not specifically.

21     Q.   Okay.  So when you said to -- when you had IA

22  retain a copy of the recording, you didn't do that

23  because it was possible that recording was going to be

24  used in a criminal investigation that was ongoing at

25  that time, correct?

```
 1              MR. GOBEO:  Objection.

 2      A.   We didn't have internal investigation ongoing

 3  at the time in IA.

 4  BY MR. NORBRATEN:

 5      Q.   Right.  And you were unaware of any federal

 6  criminal investigation that was ongoing that that

 7  could have been part of, correct?

 8      A.   Correct.

 9              MR. NORBRATEN:  We've been going for about 50

10         minutes.  Why don't we take a ten-minute break and

11         we'll start up again at 2 o'clock, if you don't

12         mind, Chief.  Thank you.

13              (A recess was held at 1:50 p.m. until

14          2:00 p.m.)

15              MR. NORBRATEN:  Back on the record.

16  BY MR. NORBRATEN:

17      Q.   Chief Mooney, I don't believe I asked you

18  this but I want to be clear.  The audio recording of

19  Gregory Rideau and the confidential informant, you did

20  not order anyone to provide that to Gregory Rideau,

21  correct?

22      A.   No.

23      Q.   Okay.  Is there a reason for that?

24      A.   No.

25      Q.   Did anyone in internal affairs ask you if
```

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Sarah Mooney on 11/03/2021                                          Page 36

1  they should provide it to Gregory Rideau?

2      A.   Not that I recall.

3      Q.   Okay.  So did you tell anybody to not give it

4  to him?

5      A.   No.

6      Q.   Were you under the belief that Greg was given

7  a copy of this during the course of IA 18-001?

8      A.   No.

9      Q.   Obviously now you know he wasn't.  But at the

10 time, did you think he was provided a copy?

11     A.   No.  Because it wasn't part of the case.

12     Q.   Okay.  Is Officer Terry Golden a member of

13 the police department?

14     A.   He is.

15     Q.   Were there sexual harassment allegations made

16 against him by two separate individuals within the

17 department?

18     A.   I don't know.  I have to refer to the record

19 on that.  I don't know.

20     Q.   Okay.  You did not assign any sort of an

21 advocate for the complainants in those IA

22 investigations, did you?

23     A.   I don't know which IA investigations you're

24 referring to.

25     Q.   Okay.  Well, it's the sexual harassment

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Sarah Mooney on 11/03/2021

1   allegations against Terry Golden.  I believe

2   Brittany Tatum was one the officers involved.  Do you

3   recall that?

4       A.   I have no independent recollection of that at

5   all.

6       Q.   Okay.  I'll share my screen with you again

7   here.  At the conclusion of the investigation

8   conducted by Sergeant Oswald you received the IA

9   investigation, the allegation of sexual harassment,

10  and you made the determination to discipline

11  Sergeant Rideau with an 80-hour suspension, correct?

12      A.   Yes.

13      Q.   Okay.  You'll see the screen.  Is that your

14  handwriting at the bottom, or is that someone else's

15  handwriting?

16      A.   That's my handwriting.

17      Q.   Okay.  Is that your signature for chief of

18  police?

19      A.   It is.

20      Q.   So on October 16, 2018, you made that

21  determination that the 80-hour suspension was

22  appropriate for the allegations based on the

23  investigation, correct?

24      A.   Yes.

25      Q.   Okay.  Did you consider what you heard in the

 1  audio recording when making that determination?

 2      A.   No.

 3      Q.   You had at that point in time though listened

 4  to the audio recording, correct?

 5      A.   Yes.

 6      Q.   Okay.  And you were aware that Gregory Rideau

 7  did not have knowledge of the existence of that

 8  recording at that time, correct?

 9           MR. GOBEO:  Objection.

10      A.   Say that again.  I'm sorry.  Got distracted.

11  BY MR. NORBRATEN:

12      Q.   Yeah.  You were aware at the time you handed

13  out this discipline that Gregory Rideau did not

14  receive a copy of that audio recording as part of that

15  investigation, correct?

16      A.   I didn't believe he had a copy of it, no.

17      Q.   Okay.  Following your decision to suspend him

18  for 80 hours, he had requested a predisciplinary

19  hearing; do you recall that?

20      A.   Yes.

21      Q.   Okay.  And you selected the officers that

22  would be involved in making the determination whether

23  or not to uphold or amend in any way the discipline

24  that was handed out, correct?

25      A.   They would have been members of the command

1  staff, yes.

2     Q.   Right.  Okay.  And so two members of command

3  staff and yourself, right?

4     A.   Yes.

5     Q.   And following that predisciplinary hearing,

6  this discipline of 80 hours was upheld, correct?

7     A.   Yes.

8     Q.   And thereafter Mr. Rideau through his counsel

9  sought to arbitrate this decision, correct?

10    A.   Yes.

11    Q.   All right.  During this course of time you

12  were aware of the other investigation into

13  Gregory Rideau allegedly double dipping in working

14  overtime at City Place, correct?

15    A.   I was aware of an allegation of double

16  dipping, yes.

17    Q.   Okay.  And at that point in time had you made

18  a decision?  And by that point in time, I mean on

19  October 16th of 2018, when you handed this suspension

20  down, at that point in time had you made a decision

21  referring to that investigation into overtime in any

22  way?  Had you made a decision as to whether or not

23  that was going to be administratively reviewed, or

24  not?

25    A.   No.  That investigation wasn't even an

 1  official investigation.  There were some -- the

 2  allegations came to our attention during the IA

 3  investigation.

 4      **Q.   Right.  Officer Ravelo made those**

 5  **allegations, correct?**

 6      A.   I believe they came from her, yes.

 7      **Q.   Okay.**

 8      A.   Separate and part and parcel to the -- from

 9  the other allegations.  So there were some very

10  specific dates in the allegations in the information

11  that she provided, so I requested that

12  Captain Swiderski try to just cross reference the

13  records on the specific dates and allegations that

14  were included in that to see if, number one, if there

15  was any validity to them or possibility of validity to

16  them, and to see whether or not there were records of

17  the information that we could compare to to say

18  whether or not that was a valid accusation.

19      **Q.   Okay.  And you are aware of that process**

20  **having been in place and was ongoing as of October**

21  **16th of 2018, correct?**

22      A.   We were trying to obtain records.  I think

23  there was eight allegations.  Six of them we were able

24  to just mitigate so that there wasn't anything that

25  needed to be done with them, and I believe there was

1  two that were found to have a potential issue.  I

2  don't remember the specific date that that finding

3  was.  I believe it was in a memo format that

4  Officer McDaniel had presented regarding the

5  allegations.  It was sometime during the end of

6  October.

7      **Q.  Okay.  And during the course of that internal**

8  **review that was being conducted, was Gregory Rideau**

9  **ever made aware of the fact that that was happening?**

10     A.  I don't recall.  It wasn't -- it was a -- it

11 was additional information that was brought to us of

12 something that was related to a completely different

13 potential violation.  However, it was something that

14 we could look at records or should have been able to

15 look at records to look and see whether or not it was

16 something that needed to be investigated.

17         So I asked them to try to obtain the records

18 so that we could see if it was even anything worth

19 looking into or question anybody about.

20     **Q.  Okay.  I'll ask you some more questions**

21 **specifically on that in a minute.  But I guess what**

22 **I'm getting at is, as Sergeant Rideau is being**

23 **punished for 18-001 there's another ongoing review**

24 **into his conduct as a police officer, and he is not**

25 **aware of it at that point in time, correct?**

1    A.   It was an allegation that involved a couple

2  different people ultimately.

3       Q.   Okay.  Including his wife Deanna, correct?

4    A.   Yes.  Unbeknownst to us at the time.

5       Q.   Unbeknownst to you at the time when?

6    A.   That she was going to be involved in that,

7  because the allegation was specific to

8  Sergeant Rideau.  However, it then involved another

9  officer so we were trying to see if there were records

10 that would correlate with what the allegations were.

11      Q.   Okay.  So Officer Ravelo's complaint did not

12 name Deanna Rideau.  But in the course of

13 investigating it she got brought into it because of

14 what internal affairs was looking at in terms of

15 documents.  That's your understanding?

16   A.   I believe so, yes.

17      Q.   Okay.  So during this course of time were you

18 aware of a prior internal affairs investigation that

19 involved an agent or an officer by the name of

20 Zachary Imler?

21   A.   Yes.

22      Q.   Okay.  And Zachary Imler was working under

23 Sergeant Rideau alongside Officer Ravelo in a unit,

24 correct?

25   A.   Yes.

1     Q.   And tell me what you know as of today, what

2 you just generally know about that particular incident

3 that ultimately led to Officer Imler resigning from

4 the department.

5     A.   Officer Imler was on a search warrant, they

6 were doing a search warrant.  There at the search

7 warrant there was an allegation that there was money

8 missing from the residence that they were searching.

9 Ultimately the money was located in Officer Imler's

10 possession, and he had taken it inappropriately, and

11 ultimately got charged with theft, and was put on

12 leave, had been put on leave immediately.

13        I actually was out of the town the day that

14 that was going on.  And the subsequent criminal

15 investigation resulted in his arrest about a month

16 after it, after the incident.  And then ultimately he

17 ended up in a plea agreement, surrendered his license

18 to be a police officer, and tendered his resignation.

19     Q.   Okay.  Zachary Imler's father was or is the

20 chief of police at the Boynton Beach Police

21 Department, correct?

22     A.   He was.

23     Q.   What's his name?

24     A.   Chief Imler.

25     Q.   Did you know Chief Imler on a social basis

1  back in 2017?

2      A.   Not social, only professionally.

3      **Q.   And I would imagine the various chiefs of the**

4  **various cities in the county know each other just from**

5  **working in the same sort of environment.  Yes?**

6      A.   Yes.

7      **Q.   Is it true that Sergeant Rideau is the one**

8  **that initiated the investigation into Officer Imler?**

9      A.   I believe he is the one who received the

10 initial complaint.

11     **Q.   Okay.**

12     A.   And handled it at the operational level at

13 the time the complaint was initiated.  And ultimately

14 it was followed up that day.  Again, I was out of

15 town, so this whole operation occurred, and I got

16 notified after the fact.  So I believe he was the one

17 that was instrumental in initiating it, and the

18 investigation, and subsequent location of the money in

19 Officer Imler's possession.

20     **Q.   Were you ever made aware of the fact that in**

21 **doing this initial investigation, which ultimately led**

22 **to Officer Imler's admission to what he had done,**

23 **Officer Ravelo was initially untruthful to both**

24 **Sergeant Rideau and Captain Kapper when initially**

25 **asked about what occurred during that search**

1  warrant?

2         MR. GOBEO:  Objection.

3     A.   I don't have firsthand information on that.

4  However, in discussions after the initial incident

5  there was some discussion that her story had changed

6  when she was speaking with the sergeant and I think

7  the captain.

8  BY MR. NORBRATEN:

9     Q.   Okay.  Are you aware of the fact that

10  Sergeant Rideau relates these allegations that have

11  been made against him by Officer Ravelo back to that

12  day when he took issue with her being untruthful with

13  him?  Whether or not you agree with them or not, were

14  you aware of the fact that that's what Sergeant Rideau

15  believes is initially the basis for Officer Ravelo's

16  allegations against him?

17     A.   I don't know what he believes.

18     Q.   Were you made aware of that in the course of

19  rendering the disciplines and reviewing the internal

20  affairs investigation from IA 18-001?

21     A.   I believe that he felt that that played into

22  her filing a complaint.

23     Q.   And you were aware of that at the time you

24  made the decision to suspend him, yes?

25     A.   Yes.

1     Q.   Okay.  Similarly the allegations, the eight
2  dates that she gave that she believed he was double
3  dipping on overtime, he relates that to the same issue
4  that he had with her relating back to this incident
5  involving Zachary Imler.  Were you aware of that?
6     A.   Those specifics, no, not independently.  No.
7     Q.   Okay.  We talked about the 80-hour
8  suspension.  Are you able to tell me what went into
9  your reasoning for determining that being the
10  appropriate discipline for the conclusion of this
11  internal affairs investigation?
12     A.   If you refer to the record, that disciplinary
13  action form that's on the cover sheet of the
14  investigation, it's outlined right there.  It's based
15  on the matrix that we have for meting out discipline.
16  In that final disposition section right there, you see
17  the number one and the number two, the levels that
18  they fell on the matrix, that's what the disciplinary
19  action was based on.
20     Q.   Okay.  And in making these determinations,
21  did you use the interview and statement of
22  Officer Burgoon in which she claimed that
23  Officer Rideau had issues with her in the past as part
24  of the reasoning for making this discipline be an
25  80-hour suspension?

1   A.   I used the findings in the investigation to

2   score out the disciplinary recommendation based on the

3   matrix.

4   Q.   Okay.  And was that related to the fact that

5   there had been a prior issue of sexual harassment?

6   A.   I don't understand your question.

7   Q.   Well, I'm trying to gather whether or not the

8   80-hour suspension was a result of the sexual

9   harassment allegations of Officer Ravelo, or a result

10  of the sexual harassment allegations of Officer Ravelo

11  coupled with the interview that was given by

12  Officer Burgoon where she indicated that she had felt

13  sexually harassed in the past?

14  A.   It was based on the original complaint and

15  the totality of the investigation.  There was only one

16  instance in there that there was corroborating witness

17  statements that was independent of Sergeant Rideau and

18  the accuser, and it was based on that incident.

19  Q.   Okay.  And so you're referring to

20  Officer Senior's corroboration?

21  A.   Yes.

22  Q.   So the 80-hour suspension was based on her

23  corroborating Officer Ravelo's incident at that moment

24  in time, and that's it?

25          MR. GOBEO:  Objection.

1  BY MR. NORBRATEN:

2      Q.   I don't mean to say that's it.  But that was

3  the evidence that got the most attention from you?

4      A.   That was the one incident where we had

5  somebody other than Officer Ravelo witnessing or

6  verifying that her allegations of the incidents that

7  she was alleging occurred had occurred.  So that was

8  the primary incident.

9      Q.   Assistant Chief Tameca West was the

10 supervisor of both Sergeant Rideau and Officer Ravelo

11 at the time of these allegations, correct?

12     A.   Yes.

13     Q.   Is there a reason why she was not included as

14 a witness and given a witness statement, to your

15 knowledge?

16          MR. GOBEO:  Objection.

17     A.   I did not do the investigation.  I don't

18 dictate who gets interviewed or who doesn't, so that

19 would be a question for your investigator on the

20 incident.

21 BY MR. NORBRATEN:

22     Q.   Okay.  We got into a little bit the review of

23 the overtime at City Place.  And I'll pull that up on

24 the screen here for a second so you can see it.

25          But just generally, did you become aware of

 1   those allegations from Officer Ravelo at the same time

 2   that you became aware of the sexual harassment

 3   allegations?

 4           And by asking the question, I mean, it's

 5   clear now that she made them at the same similar time,

 6   but I don't know if you as the chief became aware of

 7   them at the same time.  That's what I'm asking you.

 8       A.   I don't believe I was aware of it until about

 9   a month after the original sexual harassment

10   allegations were made.

11       Q.   Okay.  So that would have been approximately

12   April of 2018?

13       A.   Yes.

14       Q.   Okay.  Did there come a time that you became

15   aware of the fact that the Department of Justice,

16   Organized Crime Drug Enforcement Task Force was going

17   to conduct an audit of the agency?

18       A.   They do them on a regular basis.  So

19   specifically, no.  I know we get audited all the

20   time.

21       Q.   Okay.

22       A.   But a specific audit I'm not aware of.

23       Q.   Okay.  And so I'm going to make some

24   statements; I want you to correct me where I'm wrong.

25           OCDEFT is a federal program that provides

1  grant money to the department to help finance certain

2  operations for the Drug Enforcement Task Force, yes?

3        MR. GOBEO:  That's not a question.

4  Objection.  You can answer if you understand.

5     A.  Can you repeat the question?

6  BY MR. NORBRATEN:

7     Q.  The federal government, the Drug Enforcement

8  Task Force, provides funding to the department to help

9  pay for some of the salaries of officers that are

10 involved on the task force through the department,

11 correct?

12    A.  That's a different statement than you made

13 before.

14    Q.  Well, I'm asking that one now because your

15 counsel objected.  So go ahead.

16    A.  We receive funding from the Department of

17 Justice to work on Drug Enforcement Task Force, yes.

18 They contribute to investigations and hours spent

19 doing narcotics investigations.

20    Q.  Okay.  And so when they come to do an audit,

21 they're auditing where the money that they fund is

22 going, correct?

23    A.  They audit everything.  Our recordkeeping is

24 the primary thing that they're looking at to make sure

25 that the amounts that we're charging and/or they're

1  paying are accurate, that the records match.  There's

2  multiple requirements to be able to receive the grant

3  funding, and documentation that goes with it.  So in

4  doing their due diligence to ensure that the money is

5  being spent and documented appropriately they will

6  come in and do an audit to ensure all those things

7  align.

8      Q.  Okay.  And so when Officer Ravelo makes the

9  complaint that Sergeant Rideau is double dipping, she

10  is alleging that while Sergeant Rideau is working for

11  the task force, and being paid from part of that

12  federal money, he is also working an off-duty detail

13  at City Place making money from them, that's the basis

14  of those allegations, correct?

15      A.  Yes.

16      Q.  Okay.  And so were you aware that the

17  Department of Justice was conducting an audit right

18  around the time that your agency was doing their own

19  review of records concerning Sergeant Rideau's

20  overtime at City Place?

21      A.  I don't know that they -- I don't recall when

22  they came to do the audit, because they typically work

23  with supervision in special investigations.  They

24  don't typically go through the chief's office to do

25  their auditing.  I do know that we had some other

1  other federal grant issues that were audited while I

2  was chief and before I was chief.  So it wasn't

3  unusual.  So I'm not aware specifically of the timing

4  of those audits.  The money comes from different

5  locations and different grants, so at any given time

6  we have people coming in and auditing the records.

7  But I wasn't necessarily aware of it when they would

8  come in.

9      Q.   Okay.  Are you able to see the screen,

10  Chief?

11      A.   Yes.

12      Q.   Okay.  This is a cover page for fiscal year

13  2018, IPAR findings and recommendations that was

14  conducted at West Palm Beach Police Department, it's

15  dated July 19th of 2018.  Okay?

16      A.   Okay.

17      Q.   So were you aware of the fact that this audit

18  was going to take place during the same time frame

19  that Gregory Rideau was being investigated, or there

20  was a review going on of Gregory Rideau's overtime at

21  City Place?

22      A.   I don't recall having knowledge of the OCDEFT

23  audit at the time.  If it was in July 2018, I don't

24  recall it specifically being an audit that was

25  conducted at that time.

1      Q.   Okay.  And I want to be crystal clear on

2  this.  I think I understand your answer, but I want to

3  be clear.  I'm not asking you if you were aware of

4  their findings.  I'm asking you if you were just aware

5  of the fact that they were conducting an audit at that

6  time?

7      A.   I really don't remember.

8      Q.   Okay.  And so did there come a point in time

9  where you were made aware of the findings of this

10 audit conducted by OCDEFT?

11     A.   I was advised of the findings.  I don't

12 recall when that was.

13     Q.   Okay.  Do you recall if you were advised of

14 the findings before or after the conclusion of the

15 review for Gregory Rideau?

16     A.   Again, I don't recall when the findings were

17 presented.

18     Q.   I'm showing you now on the screen AD 18-056,

19 which is the investigation into Gregory Rideau's

20 overtime.  And again, you mentioned that there were

21 other officers that got tied in.  Would that be

22 Sergeant Deanna Rideau and Detective Steven Regis?

23     A.   Yes.

24     Q.   Any other officers?

25     A.   Not in regard to those eight incidents that

 1  we were looking at, no.

 2       Q.    Okay.  And so the preface of this report is

 3  that in April of '18 I received a complaint, the

 4  complaint that you described earlier, from

 5  Officer Ravelo about the overtime at City Place

 6  specific to Gregory Rideau.  That happens in April of

 7  2018.

 8            On October 30th of 2018, Captain Swiderski

 9  and Officer McDaniel met with the Public Corruption

10  Unit at the state attorney's office.  Do you know why

11  they met with the Public Corruption Unit at the state

12  attorney's office on August 30th of 2018?

13       A.    Yes.

14       Q.    Why?

15       A.    Because the findings of what Officer McDaniel

16  had found in reviewing the records and what we could

17  disprove, six out of the eight allegations, there was

18  a minor finding of a potential overlap of hours, which

19  would be a double dipping type situation.  At the time

20  I did not believe that it was a major issue.

21            However, I was aware that the timing of our

22  findings was going to be under scrutiny.  So for me to

23  arbitrarily say that a couple hours of double dipping

24  wasn't a big deal when technically speaking it could

25  be a criminal issue, I felt more comfortable having

1  the state attorney's office review what we had found

2  to verify that it wasn't something that needed to be

3  further investigated criminally in order to resolve

4  it.

5          And as you see, it took about -- I think it

6  took them probably maybe a week, week and a half to

7  come to the same determination that I had.  However,

8  to have the state actually look at it criminally made

9  more sense, so that I'm not independently staying away

10 from criminal investigation into something that

11 personally I probably wouldn't have looked at

12 criminally.

13     **Q.   Okay.  You just said that the timings of the**

14 **findings would be under scrutiny.  What scrutiny?**

15     A.   The scrutiny of the complainant and the

16 sexual harassment allegation.  And had I found

17 something in part of her complaint, i.e., the overtime

18 complaint that was actually true, and I just

19 completely disregarded it, that would have been

20 inappropriate on my part.  And I knew that they would

21 be looking for what did you do with these

22 allegations.

23     **Q.   Okay.  Were you aware that at the time**

24 **you -- strike that.**

25          **Did you direct Captain Swiderski and**

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Sarah Mooney on 11/03/2021

1 Officer McDaniel to meet with the state attorney's

2 office?

3     A.   I asked them to make contact with them, yes.

4     Q.   Okay.  And were you aware at the time that

5 you asked them to make contact with them that OCDEFT

6 was conducting an audit?

7     A.   I don't believe I did know at the time.  I

8 don't remember that.

9     Q.   Okay.  Had you known at the time, would you

10 have said let's wait and see what they find in their

11 audit before we take this to the Public Corruption

12 Unit?

13          MR. GOBEO:  Objection.

14     A.   I would say probably not.  Because the

15 information we had should have been the same records

16 that the OCDEFT auditors would have been looking at.

17 They would not have been privy to the other half of

18 that allegation that he was getting paid by the feds

19 at the same time he's getting paid by City Place.  So

20 they wouldn't have had both pieces.  I didn't believe

21 that he wasn't where he was supposed to be.  And the

22 records show that he had put in a submission for the

23 OCDEFT reimbursement.  So it wasn't -- they would find

24 what they found.  They're looking more for accurate

25 bookkeeping.

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Sarah Mooney on 11/03/2021

1  BY MR. NORBRATEN:

2      **Q.   Okay.  So is it your testimony that the**

3  **records that they reviewed for their audit do not show**

4  **Sergeant Rideau's logging in to work a detail at City**

5  **Place?**

6          MR. GOBEO:  Objection.

7      A.   I don't know what the record review or what

8  they show.

9  BY MR. NORBRATEN:

10     **Q.   Right.  So the records that Officer McDaniel**

11  **was reviewing were internal police department records,**

12  **correct?**

13     A.   From two different locations, yes.

14     **Q.   Right.  And those records would have been**

15  **available to OCDEFT when they conducted their audit,**

16  **correct?**

17     A.   They would have been available.  But short of

18  somebody making the allegation that he was double

19  dipping to them, I don't know that they would ever --

20  that there would not be a reason for them to look at

21  our private vendor paying overtime database.

22     **Q.   Isn't that why they conduct an audit?**

23     A.   No.

24     **Q.   To look at everything to audit it?**

25     A.   No.  It's to audit our bookkeeping of what we

 1  submit in regard to investigations that are being

 2  conducted.  It has nothing to do with vendor paid

 3  overtime outside of the work that they might be doing

 4  on the task force.

 5      **Q.   When you asked Captain Swiderski and**

 6  **Officer McDaniel to meet with the Public Corruption**

 7  **Unit, at that time you were aware of the fact that**

 8  **City Place had refused to provide records of which**

 9  **officers were working which dates that were requested**

10  **by Officer McDaniel?**

11      A.   Yes, I was aware of that in April.

12      **Q.   Okay.  So if you were aware of that in April,**

13  **why did it take until October to order them to meet**

14  **with the state attorney's office?**

15      A.   Because Officer McDaniel had not finished his

16  closeout of his review until October is my

17  understanding, I believe.  I don't think he closed it

18  out until October.

19      **Q.   Okay.  So he was doing the internal review**

20  **with the records from the department itself between**

21  **April and October, and then once he was done in**

22  **October you directed him to the state attorney's**

23  **office?**

24      A.   Yes.  And to share that we were not able to

25  get the records without a subpoena.  But we presented

1  what we had.  And to me the amount of work that would

2  have had to go into proving a four-hour potential

3  clerical error, that was not for me to make the

4  decision that we would or wouldn't go after that

5  criminally.  So we let them review what we had, and

6  they agreed that it should be administratively

7  handled, and that's how we closed it out.

8      **Q.   Okay.  And do you have an understanding as to**

9  **when you became aware of the findings from the OCDEFT**

10 **audit?**

11     A.   I have no idea when I got the findings from

12 the OCDEFT audit.

13     **Q.   Okay.  Did you receive them at some point in**

14 **time while you were the chief of police?**

15     A.   I don't even know if it was when I was still

16 the chief or if I was an assistant chief at that

17 point.  I don't recall when the findings came in.  I

18 have no recollection of that at all.  I wasn't aware

19 of any major issues on the audit.  They typically

20 wouldn't necessarily come to me unless there was a

21 major issue with the audit.

22     **Q.   Okay.  Are you aware of when Gregory Rideau**

23 **received a copy of the OCDEFT findings?**

24     A.   No, I'm not.

25     **Q.   Are you aware of how he received the OCDEFT**

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Sarah Mooney on 11/03/2021

```
 1  findings?

 2      A.   No, I'm not.

 3      Q.   You're not aware that Assistant Chief Tameca

 4  West assisted him to obtain a copy of the findings

 5  directly from the DOJ?

 6      A.   I had heard that, but I don't have firsthand

 7  knowledge of that.

 8      Q.   Where did you hear that?

 9      A.   Somewhere in the department, maybe even

10  through Captain Swiderski.  I don't remember.  I know

11  that there was a copy of it that got requested through

12  the supervisor who I believe knew the auditor or

13  something.  I don't know.  I know that the audit all

14  of a sudden was here, and then it became an issue that

15  we didn't utilize it.  I can't really utilize

16  something that I don't have.  I just know that it's

17  around now.

18      Q.   Captain Wrobbel would be the supervisor that

19  had the connection with the OCDEFT auditor?

20      A.   I believe that's who it was.  But you have to

21  check with Assistant Chief West, because I believe

22  she's the one that obtained the record.

23      Q.   I can check with Captain Wrobbel as well,

24  right?

25      A.   If he's the one that obtained the record.
```

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Sarah Mooney on 11/03/2021                                      Page 61

1      Q.   Did you indicate somewhere in your testimony
2   there that you believed that Gregory Rideau was where
3   he was supposed to be during those overtime
4   allegations, or did I mishear you?
5      A.   I didn't have any firsthand knowledge that he
6   wouldn't have been where he was supposed to be.  My
7   presumption is that the officers are going to be where
8   they're supposed to be when they say that they're
9   there.
10      Q.   Okay.  And when he was working with his team
11   on the task force, he was not required to be where the
12   team was while overseeing the task force, correct?
13         MR. GOBEO:  Objection.
14      A.   You would have to ask his lieutenant.  I'm
15   not sure how they operate those task forces
16   on specific -- depending on what they're doing, I
17   don't know that.  Each operation could be different.
18   BY MR. NORBRATEN:
19      Q.   Did there come a time when Officer Ravelo
20   herself was the subject of internal investigations
21   within the department?
22      A.   I believe so, yes.
23      Q.   When was that approximately?
24      A.   I don't know.  You have to refer to her IA
25   file.

1     Q.    Were you the chief of police at the time that

2  that initiated?

3     A.    I don't recall the specific dates.

4     Q.    Do you recall anything about the issue that

5  led to Officer Ravelo being investigated by IA?

6     A.    There was something involving her city

7  vehicle, but I don't remember the specifics on it.

8     Q.    Okay.  Was it involved in an accident of some

9  kind?

10    A.    Something involving the vehicle.  I believe

11  it was reported stolen, or something, or crashed.

12  There were circumstances around the vehicle that

13  prompted an investigation.  There was a police report

14  done by the sheriff's office.  I don't know that I

15  ever saw the completed report.  I don't recall the

16  specifics on it.  I just know it had to do with her

17  take-home vehicle.

18    Q.    Okay.  Did you ever have a one-on-one

19  conversation with Officer Ravelo about the allegations

20  that she made against Gregory Rideau?

21    A.    I don't believe I ever met with her

22  individually without somebody else there.  So when you

23  say individually, I'll say no.

24    Q.    Did you ever meet with her and

25  Lieutenant Colombino?

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Sarah Mooney on 11/03/2021

1    A.    Yes.  As well as Lieutenant Wiggs.

2    Q.    Okay.  And when in time did that meeting take

3  place?

4    A.    At the conclusion of the -- when the

5  disposition of the report was done or the

6  investigation was going to be finalized.

7    Q.    Okay.  And what was the basis of the

8  meeting?

9    A.    To let her know what the findings were.

10    Q.    Okay.  And as a result of that, did you

11  reassign Gregory Rideau out of the unit that he was

12  in?

13    A.    He was reassigned during the investigation.

14    Q.    Okay.  And was the reason for his

15  reassignment the allegations of Officer Ravelo?

16    A.    The reason for his reassignment was that the

17  two of them during the investigation could not work in

18  the same physical location space without generating

19  more complaints.  So he was transferred.

20    Q.    Because he was the accused?

21    A.    He was the accused.

22    Q.    And that's why he was transferred as opposed

23  to transferring the accuser?

24    A.    He was transferred because additional

25  allegations came about as a result of him having

1 contact with Officer Ravelo in the workplace after the

2 fact, and having an issue with it, and it resulted in

3 another complaint.  So in order to avoid having more

4 complaints made regarding the same situation, he was

5 separated from the unit.

6     **Q.   Okay.  And that's the meeting that**

7 **Officer Ravelo attended at the request of**

8 **Detective Cognetti, correct?**

9     A.   Yes.

10    **Q.   Are you aware of that fact?**

11    A.   Yes.

12    **Q.   Okay.  Just making sure that you had those**

13 **facts.**

14        MR. NORBRATEN:  Let's take a five-minute

15     break, and I'll come back and finish up.  I won't

16     be much longer.  I promise.  Thank you.

17        (A recess was held from 2:43 p.m. until

18      2:50 p.m.)

19        MR. NORBRATEN:  Back on the record.

20 BY MR. NORBRATEN:

21    **Q.   Chief Mooney, do you recall granting**

22 **Officer Ravelo a leave of absence in the middle of the**

23 **IA investigation to her and her work vehicle?**

24    A.   No, I don't recall specifically.  I know she

25 was not at work.  I don't recall the circumstances.  I

 1  don't remember the specifics of how that was

 2  documented or what was granted or not.

 3      Q.   Okay.  If she had a leave of absence that

 4  would toll her IA investigation, correct?

 5      A.   Depending on the nature of the absence or

 6  what type of leave she was taking.

 7      Q.   So if she was granted a leave of absence to

 8  toll her IA, and that IA was pending just as

 9  Sergeant Rideau was preparing to go to arbitration on

10  IA 18-001, you were unaware of fact that she was

11  having a leave of absence which tolled her IA?

12          MR. GOBEO:  Objection.

13      A.   That was really confusing.  Can you rephrase

14  that or repeat that?

15  BY MR. NORBRATEN:

16      Q.   Right.  Officer Ravelo had an IA

17  investigation against her, correct?  We talked about

18  it.  Yes?

19      A.   At some point in time, yes.

20      Q.   Okay.  That was going on prior to the

21  scheduled arbitration that Sergeant Rideau was going

22  to have, correct?

23      A.   The records would have to speak to that.  I

24  don't recall the timing of that.

25      Q.   I don't need you to agree to it or not.  But

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Sarah Mooney on 11/03/2021

1  this is the point I'm making.  I want to get your

2  answers to these questions.

3          So she was granted a leave of absence that

4  tolled the IA and the eventual resolution of the

5  investigation into her, which prevented that IA from

6  concluding perhaps prior to Sergeant Rideau's

7  scheduled arbitration.

8          MR. GOBEO:  Objection.

9          MR. NORBRATEN:  I didn't ask the question

10     yet.

11  BY MR. NORBRATEN:

12     Q.  Were you aware that tolled her -- excuse

13  me -- that you granted her a leave of absence, which

14  tolled her internal affairs investigation?

15          MR. STEPHENS:  Objection to the form of the

16     question.

17  BY MR. NORBRATEN:

18     Q.  Were you aware that you granted her a leave

19  of absence to toll her internal affairs

20  investigation?

21          MR. STEPHENS:  Is that the only question

22     right now?  I agree with that question.  I was

23     concerned about all of the stuff being lumped

24     together.  But that question by itself, yes, you

25     can answer if you remember what he said.

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Sarah Mooney on 11/03/2021

1    A.   I don't independently recall the

2  circumstances of -- nor the timing of when the

3  incident occurred, when her leave was granted, and

4  what type of leave it was.  Nor do I recall when

5  arbitration was scheduled.  Other than I know it was

6  after October 30th.

7  BY MR. NORBRATEN:

8    **Q.   Do you recall the fact that Sergeant Rideau**

9  **was attempting to become a lieutenant within the**

10  **department while you were the chief of police?**

11    A.   He participated in the promotional process,

12  yes.

13    **Q.   Right.  He wanted to become a lieutenant?**

14    A.   Okay.

15    **Q.   Right?**

16    A.   I would assume he wanted to if he took the

17  process, participated in the process.

18    **Q.   And do you recall promoting Mike Oswald -- is**

19  **Mike his first name?  I don't want to butcher his**

20  **name -- Sergeant Oswald ahead of Gregory Rideau to**

21  **become lieutenant?**

22    A.   Yes.

23    **Q.   Okay.  You promoted Sergeant Oswald ahead of**

24  **Gregory Rideau and Kevin Farrell I believe, correct?**

25    A.   Kevin Farrell was not promoted, correct,

1  under me.

2  **Q.   Okay.  And the reason that Kevin Farrell was**

3  **not promoted was he had an internal affairs**

4  **investigation himself during that time frame,**

5  **correct?**

6  A.   An open investigation?  What is your

7  question?

8  **Q.   He had an internal affairs investigation that**

9  **was either open or had recently closed that allowed --**

10  **that you used as a justification to promote**

11  **Sergeant Oswald over him, correct?**

12  A.   I didn't need justification.  I chose Mike

13  out of the five people that were on the list based on

14  their eligibility and the number of positions that we

15  had available that were open.

16  **Q.   Okay.  Did Gregory Rideau score better than**

17  **Mike on the assessment and on the test?**

18  A.   His overall score was better, yes.

19  **Q.   So why was Mike promoted over**

20  **Gregory Rideau?**

21  A.   Because pending the outcome of the

22  arbitration, if the arbitrator had ruled in favor of

23  the city and upheld the disciplinary action, he would

24  not have been eligible to be promoted at that time.

25  When the list became active January 1st of that year,

1  I had two lieutenant vacancies that had been vacant

2  for quite a while.  I needed to get my manpower

3  situated, so Mike, in my opinion, was the best choice

4  to fill at least one of those vacancies.  And at the

5  time I left the second vacancy open pending the

6  arbitration ruling, which we never got to.  So there

7  was a position available waiting for the arbitration

8  to be done.

9           But technically speaking at the time, with an

10  80-hour suspension Sergeant Rideau was not eligible to

11  be promoted.  Had I promoted him at the time before

12  the arbitration was completed, there was a potential I

13  would have had to demote him.

14      Q.   Okay.  So the basis for not promoting him was

15  IA 18-001, correct?

16      A.   The basis for not promoting him was he was

17  issued 80 hours of suspension in the two years prior

18  to the promotion potentially occurring, which would

19  eliminate him from being eligible to be promoted.

20      Q.   Based on the suspension that you handed down

21  following your review of IA 18-001, correct?

22      A.   Yes.

23      Q.   I want to ask you about another potential IA.

24  I don't know if you had any involvement in it at all,

25  or not.  I believe it involves your nephew,

1  Officer Stephen Mooney, involving a police chase that

2  occurred in 2015.  So you were not the chief at the

3  time, but are you aware of this investigation?

4      A.   Not independently, no.

5      Q.   So you're not aware of the fact that the

6  department investigated your nephew and another

7  officer, a Sergeant William Nealy, who I believe has

8  since passed away, involving a chase that they were

9  involved with on Cameron Avenue?

10          MR. GOBEO:  Objection.

11     A.   I don't independently recall that, no.

12  BY MR. NORBRATEN:

13     Q.   You don't recall what happened, or you don't

14  recall that there's been an investigation of any

15  kind?

16     A.   I don't recall which investigation you're

17  speaking of.  I've been involved or notified of

18  multiple investigations, and to try to pull it out of

19  my hat from 2015 I can't do it.  Sorry.

20     Q.   This one involves a family member.

21  Stephen Mooney is your relative, correct?

22     A.   Okay.  Yes, he's my nephew through marriage,

23  yes.

24     Q.   Okay.  So do you recall ever having any

25  involvement in this investigation into the car chase,

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Sarah Mooney on 11/03/2021

1 which ultimately led to the death of an individual?

2   A.   I don't recall what -- now that you're saying

3 which -- I'm sure that he's been investigated more

4 than once regarding proactive policing.  But, yes, I

5 recall him being involved in a chase that someone

6 crashed at the end of it, because I believe there was

7 a lawsuit that came to the city as a result of it.

8   Q.   Okay.  Did you have any role in overseeing or

9 taking part in the investigation that is -- I'm

10 showing on the screen now -- CCIF 15-030?

11   A.   I don't recall specifically being involved in

12 it.  I would have been aware of it, but I don't

13 remember getting involved in it.

14   Q.   At the time were you the assistant chief in

15 charge of professional standards?

16   A.   When was it?

17   Q.   2015.

18   A.   I believe so, yes.

19   Q.   Okay.  So were you involved in determining

20 who would be investigating the matter?  Whether you

21 yourself investigated or not, were you involved in

22 selecting Sergeant Andrew Clark as the investigating

23 officer?

24   A.   Again, through the chain of command in

25 internal affairs, I don't recall who was assigned.  I

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Sarah Mooney on 11/03/2021                                   Page 72

1  couldn't have told you it was Andrew Clark.  And I

2  don't recall if I would have been the one that put him

3  in charge of it or not.

4      Q.   Okay.  Do you recall the findings of the

5  investigation?

6      A.   No.

7      Q.   Chief Mooney, at any point in time in the

8  course of your career with the department, not just

9  when you were chief, but at any point in time, were

10  you made aware of incidents of racism or racist

11  statements that were directed towards

12  Gregory Rideau?

13      A.   I have firsthand knowledge of it.

14      Q.   Okay.  Were you made aware of any racist

15  statements or racist actions against Gregory Rideau?

16      A.   Accusations of such, yes.  Just through

17  investigations that maybe I would have reviewed or

18  been involved in, complaints.

19      Q.   Okay.  When was the earliest of these that

20  you would recall, what year, if you can?

21      A.   I have no independent recollection of what

22  the earliest would be.  It's not something that's a

23  commonplace thing.

24      Q.   Okay.  Well, you said you were aware of some.

25  How many can you recall?

 1      A.   The only one that comes to mind was

 2   allegations regarding a run-in that he had with

 3   Joe Herb.  That's the only one that I have firsthand

 4   knowledge of.

 5      **Q.   Okay.  And that's one where Greg was accused**

 6   **of calling Joe Herb a racist, correct?**

 7      A.   I don't know the particulars of it.  I just

 8   know that there was an incident between the two of

 9   them.

10      **Q.   Okay.  When did you become aware of the fact**

11   **that Gregory Rideau and Deanna Rideau were**

12   **romantically involved?**

13      A.   I have no idea.

14      **Q.   Did you become aware that they were dating**

15   **prior to them being married?**

16      A.   Probably.  But I couldn't tell you when that

17   was.

18      **Q.   Okay.  Did you ever become aware of officers**

19   **in the department take issue with the fact that the**

20   **two of them were dating?**

21           MR. GOBEO:  Objection.

22      A.   I did when I read there complaint that was

23   filed.

24   BY MR. NORBRATEN:

25      **Q.   But prior to that, you never heard anything**

 1  about that within the department?

 2      A.   Not to my knowledge, no.

 3      Q.   Okay.  While working in the department were

 4  you ever in a situation where you were one on one

 5  having conversations with Deanna Rideau?

 6      A.   Probably, yes.  Because she worked with our

 7  recruitment, and at one point I was in charge of

 8  recruitment.

 9      Q.   Did she ever relate to you issues she or Greg

10  were having because of issues taking place within the

11  department?

12           MR. GOBEO:   Objection.

13      A.   Can you ask that again?

14  BY MR. NORBRATEN:

15      Q.   Has Deanna Rideau ever relayed to you any

16  concerns or issues that she and Greg were dealing with

17  from others in the department?

18      A.   Not that I recall.  I had fairly limited

19  conversation with her about anything other than

20  work.

21      Q.   Can you describe for me what your role was

22  in -- if there was any role in it -- Lieutenant

23  Emily Wiggs submitting the findings of IA 18-001 to

24  the Florida Department of Law Enforcement?

25      A.   What role did I have in it?

1    **Q.   If any?**

2    A.   I wasn't involved in that being sent off.

3 Typically the allegation would require it statutorily

4 to send the findings to FDLE based on the allegations

5 and the findings.  So multiple occasions, different

6 cases, we've had to send the findings to FDLE.  This

7 was one of the cases that met the requirements.

8    **Q.   So Lieutenant Wiggs would have done that on**

9 **her own without any input from you?**

10   A.   She would have got a signature on it from me

11 if it was sent while I was still chief.  But other

12 than that, there's not really a discussion about it

13 because it's just part of the process.

14   **Q.   Okay.  And when that was forwarded to FDLE,**

15 **was FDLE notified of the fact that the officer had**

16 **elected to seek arbitration to dispute the findings**

17 **and discipline?**

18   A.   I don't know.  You'd have to look at the form

19 that was submitted and the timing of it.  I'm not

20 sure.

21   **Q.   Okay.  To your knowledge, is that supposed to**

22 **be the case, that FDLE is made aware that the officer**

23 **has elected to go to arbitration?**

24   A.   I don't know that we would typically send the

25 form before the arbitration was completed -- that the

1  investigation was completed.  Sometimes they will

2  reach out because we will sometimes make notification

3  ahead of time if they know that there's an

4  investigation they're waiting for.  But I don't recall

5  specifically.  I don't recall an occasion where we

6  have sent something up, and then gone to arbitration,

7  and then had to resend it.  So I don't know the timing

8  of when that form would have been sent.

9      **Q.   The sexual harassment allegations in the IA**

10 **report indicates that Teresa Gordon from human**

11 **resources was involved in the process and sitting in**

12 **on the investigation and the interviews.**

13          **What is your understanding of human resources**

14 **involvement in allegations of that kind, sexual**

15 **harassment complaints?**

16      A.   They would typically be involved.  We would

17 be conducting the investigation; however, they would

18 be -- they do a parallel investigation regarding

19 allegations that were filed on an EEOC complaint.  So

20 I don't know how they document it.  However, because

21 they're seeking the same information we are, they

22 would typically sit in with our investigators and base

23 their report on the information that they glean from

24 our investigation, and word it in their own

25 closeout.

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Sarah Mooney on 11/03/2021

1    Q.   Does human resources, or the city

2 administrator, or the mayor, do they have any control

3 or input on discipline and suspension from an IA?

4    A.   Ultimately it comes down to the chief's

5 decision.  This particular case -- in this particular

6 case there was discussion amongst the city

7 administrator, human resources, and myself to discuss

8 the findings, and what would be appropriate, and what

9 my thought process was on what I felt was

10 appropriate.

11   Q.   Okay.  And so those discussions took place

12 between yourself, and Ms. Gordon, and Jeff Green who

13 was a city administrator?

14   A.   Actually, I believe it was -- it would have

15 been Jose Louis Rodriguez, not Ms. Gordon.  Her

16 findings, I believe, would have been submitted to the

17 HR director who was Mr. Rodriguez.

18   Q.   Okay.  So is it your testimony that prior to

19 suspending Gregory Rideau for 80 hours on October 16th

20 of 2018, that you had a meeting that involved

21 Jose Rodriguez and Jeff Green in discussing with them

22 your decision?

23   A.   We had discussions leading up to the final

24 disciplinary recommendation, we had discussions.  I

25 don't recall if it was meetings in particular in the

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Sarah Mooney on 11/03/2021

1  same room, but definitely phone calls and -- I can't

2  remember specifically if we were in the same room, but

3  I know that we talked.  I can't tell you where, but I

4  know that we all discussed it on several different

5  occasions, because I believe everybody had a little

6  bit of a different viewpoint on it.

7      **Q.   Okay.  Jeff Green was not in favor of the**

8  **suspension you were recommending?**

9          MR. STEPHENS:  Objection to form.  Doesn't

10      sound like a question to me.

11  BY MR. NORBRATEN:

12      **Q.   You may answer.**

13          MR. STEPHENS:  It's not a question.  It's a

14      statement.

15          MR. NORBRATEN:  It's a leading question.

16  BY MR. NORBRATEN:

17      **Q.   Jeff Green took issue with the suspension you**

18  **were going to give Gregory Rideau, yes?**

19          MR. GOBEO:  Objection.

20      A.   I can tell you that I was actually at a

21  conference when the discipline was meted out.  And the

22  discussion that we had prior is Jeff Green didn't

23  agree.  He initially said he should have been fired.

24  So I took heed for doing 80 hours instead of going the

25  termination route.  And the HR director was on the

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Sarah Mooney on 11/03/2021                                    Page 79

1  same page as Jeff Green.

2  BY MR. NORBRATEN:

3      Q.   So Jose Rodriquez recommended that you fire

4  Gregory Rideau?

5      A.   Initially.  Basically the conversation was

6  more or less that anybody else in the city if they

7  weren't a police officer would have been fired.

8      Q.   Okay.  Did Mayor Muoio have any knowledge of

9  this internal affairs investigation into

10 Gregory Rideau?

11          MR. GOBEO:  Objection.

12     A.   She had knowledge of the investigation, but

13 she did not provide any input regarding it.

14 BY MR. NORBRATEN:

15     Q.   Okay.  How was it that you became aware that

16 she had knowledge of the investigation?

17     A.   She was at the same meeting that we were at

18 when I got a phone call regarding the fact that we had

19 given him 80 hours and questioning it.

20     Q.   Okay.  So after the discipline had been

21 handed out, she became aware of the fact that you had

22 suspended him for 80 hours?

23     A.   Yes.

24     Q.   Okay.  Prior to that date, to your knowledge,

25 was Mayor Muoio knowledgeable of the sexual harassment

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Sarah Mooney on 11/03/2021

Page 80

1  allegations and investigation into Gregory Rideau?

2      A.   I don't believe I spoke to her about it.  But

3  I can't advise you whether or not the city

4  administrator or the HR director had told her, because

5  all of them were in the loop on it.

6      Q.   All I can ask you is what you know

7  personally.

8      A.   I don't recall.  I don't recall having a

9  discussion with her prior.

10      Q.   That's not what I'm asking you.  I'm asking

11  you if you knew if she was aware of it.  Whether you

12  had a discussion with her, or you knew Emily Wiggs had

13  a discussion with her, or you knew Captain Swiderski

14  had a discussion with her?  If you know that someone

15  had a discussion with her and she was aware of it,

16  even if you weren't part of that discussion then

17  you're able to say that you believe she's aware of it.

18          I'm asking you not whether you had a

19  conversation with her about it.  Whether or not you

20  were aware if she knew about this investigation prior

21  to her sitting in the room with you when you got that

22  phone call, as you described, after handing out the

23  discipline?

24          MR. GOBEO:  Objection.

25      A.   I don't know.  I can't answer that.

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Sarah Mooney on 11/03/2021                                    Page 81

1        MR. NORBRATEN:  I think that's all the

2   questions I have for you, Chief Mooney.  I

3   appreciate your time.  Thank you.  Stay safe and

4   good luck.

5        MR. STEPHENS:  Have a good one.

6        MR. GOBEO:  We don't have any questions.

7   She'll read.

8        MR. NORBRATEN:  We'll order a copy,

9   electronic only, please.

10        MR. GOBEO:  And we'll order as well.

11     (Thereupon, the foregoing deposition was

12    concluded at 3:15 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Sarah Mooney on 11/03/2021                                    Page 82

```
 1                WITNESS SIGNATURE PAGE

 2

 3  I hereby certify that I have read my deposition, made

 4  changes and/or corrections as I deem necessary and

 5  approve the same as now written.

 6

 7  Executed this _____ day of _____, 2021.

 8

 9

10                            _____

11                            Sarah Mooney

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    CERTIFICATE OF OATH

2

3   STATE OF FLORIDA
    COUNTY OF ORANGE
4

5           I, the undersigned authority, certify that

6   Sarah Mooney, appeared via video conference and was

7   duly sworn.

8           WITNESS my hand and official seal this 12th

9   day of November, 2021.

10

11

12

13

14

15   _____
     KAREN ALLEN-LEWIN
16   Professional Shorthand Reporter
     Notary Public - State of Florida
17   My Commission No.  GG220933
     Expires:  July 7, 2022
18

19

20

21

22

23

24

25
```

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Sarah Mooney on 11/03/2021                                   Page 84

```
 1            REPORTER'S CERTIFICATE WITH ACKNOWLEDGMENT

 2

 3   STATE OF FLORIDA
     COUNTY OF ORANGE
 4

 5            I, Karen Allen-Lewin, Court Reporter,

 6   certify that I was authorized to and did

 7   stenographically report the foregoing proceedings and

 8   that the transcript is a true record of the

 9   proceedings.

10

11            I Further Certify that I am not a relative,

12   employee, or attorney, or counsel of any of the

13   parties, nor am I a relative or employee of any of the

14   parties' attorney or counsel connected with the

15   action, nor am I financially interested in the action.

16

17            DATED this 12th day of November, 2021.

18

19

20            _____
              KAREN ALLEN-LEWIN,
21            Court Reporter, Notary Public

22

23

24

25
```

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Sarah Mooney on 11/03/2021                                        Page 85

```
 1                    ERRATA SHEET

 2              DO NOT WRITE ON TRANSCRIPT
                ENTER CHANGES ON THIS PAGE
 3
     In Re:  Gregory Rideau -v- City of West Palm Beach
 4
                    November 3, 2021
 5

 6   PAGE  LINE   CHANGE    REASON

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19

20   Under penalties of perjury, I declare that I have read
     the foregoing document and that the facts stated in it
21   are true.

22   _____

23   Date                        Sarah Mooney

24

25
```

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
**Sarah Mooney on 11/03/2021**                    Index: 13th..advocate

## 1

**13th**  19:23

**15-030**  71:10

**16**  37:20

**16th**  39:19
  40:21
  77:19

**17**  7:3

**18**  54:3

**18-001**  17:8
  36:7 41:23
  45:20
  65:10
  69:15,21
  74:23

**18-056**  53:18

**19**  7:3

**1995**  6:7,8

**19th**  52:15

**1:00**  4:3

**1:50**  35:13

**1st**  68:25

## 2

**2**  35:11

**2015**  70:2,
  19 71:17

**2017**  6:15
  44:1

**2018**  13:2

19:23
37:20
39:19
40:21
49:12
52:13,15,
23 54:7,8,
12 77:20

**2019**  6:25

**2:00**  35:14

**2:43**  64:17

**2:50**  64:18

## 3

**30th**  54:8,
  12 67:6

**3:15**  81:12

## 4

**4**  3:4

## 5

**50**  35:9

## 8

**80**  38:18
  39:6 69:17
  77:19
  78:24
  79:19,22

**80-hour**
  37:11,21

46:7,25
47:8,22
69:10

**82**  3:5

**83**  3:6

**84**  3:7

**85**  3:8

## A

**ability**  7:12
  16:2

**absence**
  10:17 12:8
  64:22
  65:3,5,7,
  11 66:3,
  13,19

**abuse**  15:21

**accident**
  62:8

**accurate**
  18:18 51:1
  56:24

**accusation**
  40:18

**Accusations**
  72:16

**accused**
  63:20,21
  73:5

**accuser**
  47:18
  63:23

**action**  8:1,8
  46:13,19
  68:23

**actions**
  72:15

**active**  68:25

**actively**
  9:16

**actual**  20:10

**AD**  53:18

**additional**
  32:9 41:11
  63:24

**addressed**
  16:4

**administrative**
  7:17 33:4

**administrative
ly**  39:23
  59:6

**administrator**
  77:2,7,13
  80:4

**admission**
  44:22

**advise**  80:3

**advised**  6:23
  12:19
  26:21
  29:13
  53:11,13

**advocate**
  15:10,22,

23 16:2,14
36:21

**advocates**
16:5,16

**affairs**  7:7,
22,24 8:13
9:14,23
10:1,13,
16,21 11:2
14:1,21
15:15
16:10,25
19:1,8,24
21:24 22:6
23:18
24:6,13,22
25:3,4,7,
13 28:3,5,
7 30:13
31:1
32:19,25
33:20
34:6,11
35:25
42:14,18
45:20
46:11
66:14,19
68:3,8
71:25 79:9

**affirm**  4:6

**afternoon**
4:15,16
18:9

**agency**  11:21
49:17

51:18

**agent**  22:16,
23 23:17
24:16,19,
21 25:3
28:10,15,
21 34:15,
16 42:19

**agree**  18:9
45:13
65:25
66:22
78:23

**agreed**  59:6

**agreement**
43:17

**ahead**  33:19
50:15
67:20,23
76:3

**Ahern**  10:16

**align**  51:7

**allegation**
7:21 8:2
16:13 37:9
39:15
42:1,7
43:7 55:16
56:18
57:18 75:3

**allegations**
5:4 9:24
11:12
12:15,17,
23 15:11,

13,21,23
16:8 17:19
30:14,16,
18 31:6,20
36:15
37:1,22
40:2,5,9,
10,13,23
41:5 42:10
45:10,16
46:1 47:9,
10 48:6,11
49:1,3,10
51:14
54:17
55:22 61:4
62:19
63:15,25
73:2 75:4
76:9,14,19
80:1

**allegedly**
39:13

**alleging**
48:7 51:10

**allowed**
26:18 68:9

**alongside**
42:23

**amend**  38:23

**amount**  21:20
59:1

**amounts**
50:25

**and/or**  50:25

**Andrew**  71:22
72:1

**anonymous**
9:12 22:9

**answers**  66:2

**apologize**
24:15
33:17

**apparent**
6:16,20

**appropriately**
51:5

**approval**
12:7

**approximately**
49:11
61:23

**April**  6:25
7:3 19:23
49:12
54:3,6
58:11,12,
21

**arbitrarily**
54:23

**arbitrate**
39:9

**arbitration**
65:9,21
66:7 67:5
68:22
69:6,7,12
75:16,23,
25 76:6

arbitrator
  68:22

arrest    43:15

assessment
  68:17

assign    7:23
  16:14
  36:20

assigned
  16:5  71:25

assigning
  15:18

assist    15:5

assistant
  6:18  12:21
  18:20  48:9
  59:16
  60:3,21
  71:14

assisted
  60:4

assume    5:19
  67:16

assumed    24:3

attached    8:2
  21:11

attempted
  17:6

attempting
  67:9

attended
  64:7

attention
  25:13  40:2
  48:3

attorney
  17:3,7,10,
  15,22
  18:4,14
  19:23
  21:14

attorney's
  54:10,12
  55:1  56:1
  58:14,22

attorneys
  19:8

audio    22:13
  23:2  34:8
  35:18
  38:1,4,14

audit    49:17,
  22  50:20,
  23  51:6,
  17,22
  52:17,23,
  24  53:5,10
  56:6,11
  57:3,15,
  22,24,25
  59:10,12,
  19,21
  60:13

audited
  49:19  52:1

auditing
  50:21

51:25  52:6

auditor
  60:12,19

auditors
  56:16

audits    52:4

August    54:12

Avenue    70:9

avoid    64:3

aware    8:20
  9:1,11
  12:1,14,23
  17:16
  22:4,12
  25:10
  27:13
  34:8,19
  38:6,12
  39:12,15
  40:19
  41:9,25
  42:18
  44:20
  45:9,14,
  18,23  46:5
  48:25
  49:2,6,8,
  15,22
  51:16
  52:3,7,17
  53:3,4,9
  54:21
  55:23  56:4
  58:7,11,12
  59:9,18,

22,25  60:3
  64:10
  66:12,18
  70:3,5
  71:12
  72:10,14,
  24  73:10,
  14,18
  75:22
  79:15,21
  80:11,15,
  17,20

——————————

        B

back    35:15
  44:1  45:11
  46:4
  64:15,19

base    24:10
  76:22

based    15:11
  30:9  37:22
  46:14,19
  47:2,14,
  18,22
  68:13
  69:20  75:4

Basically
  79:5

basis    18:13
  43:25
  45:15
  49:18
  51:13  63:7
  69:14,16

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Sarah Mooney on 11/03/2021                    Index: Beach..cities

Beach  4:24
 6:6,9,14
 7:2 43:20
 52:14

began  4:2

belief  36:6

believed
 34:15 46:2
 61:2

believes
 45:15,17

big  54:24

bit  30:21
 48:22 78:6

blackballed
 16:19

bookkeeping
 56:25
 57:25

bottom  37:14

Boynton
 43:20

break  35:10
 64:15

Brian  24:9,
 22,23 25:1

bring  25:13

bringing
 6:24

Brittany
 37:2

brought

12:20
25:3,7
27:24
28:1,2,3,4
34:5 41:11
42:13

Burgoon
 46:22
 47:12

butcher
 67:19

────────────
          C
────────────

call  23:3,
 8,13 24:4
 27:15,21
 79:18
 80:22

called  20:22

calling  73:6

calls  24:2
 27:17 34:9
 78:1

Cameron  70:9

captain  9:25
 10:2,12,22
 11:1
 29:13,18,
 22 32:14
 34:14
 40:12
 44:24 45:7
 54:8 55:25
 58:5
 60:10,18,

23 80:13

car  70:25

career  72:8

case  4:25
 5:1,2
 10:4,22
 16:3,7,17,
 25 17:11
 22:11
 36:11
 75:22
 77:5,6

caseloads
 10:2

cases  75:6,7

CCIF  71:10

Certificate
 3:6,7

chain  12:20,
 22 71:24

changed  45:5

charge  10:1
 15:19
 71:15 72:3
 74:7

charged
 43:11

charging
 50:25

chase  70:1,
 8,25 71:5

check  60:21,
 23

chief  4:15,
 20 6:13,
 17,18,21,
 24 7:2,16
 8:16 9:7,
 21,22
 10:12,24
 11:15
 12:21 13:5
 16:11
 18:25 22:4
 27:19 29:3
 34:12
 35:12,17
 37:17
 43:20,24,
 25 48:9
 49:6 52:2,
 10 59:14,
 16 60:3,21
 62:1 64:21
 67:10 70:2
 71:14
 72:7,9
 75:11 81:2

chief's
 51:24 77:4

chiefs  44:3

choice  69:3

chose  68:12

CI  25:17,18

circumstances
 62:12
 64:25 67:2

cities  44:4

city  4:23
  6:6 39:14
  48:23
  51:13,20
  52:21 54:5
  56:19 57:4
  58:8 62:6
  68:23 71:7
  77:1,6,13
  79:6 80:3

claimed
  46:22

claims  8:16

Clark  71:22
  72:1

clear  35:18
  49:5 53:1,
  3

clerical
  59:3

client  7:5

close  11:5

closed  33:22
  58:17 59:7
  68:9

closeout
  58:16
  76:25

Cognetti
  21:6 64:8

Colombino
  15:5,9,14
  16:2,22
  17:3

20:14,21
  62:25

comfortable
  54:25

command
  12:20,22
  38:25 39:2
  71:24

committed
  31:12,17

committing
  26:10
  31:20

common  33:20

commonplace
  18:24
  19:6,11,13
  72:23

communicate
  10:22 11:1

communicating
  27:20

communication
  18:14

communications
  12:3,12
  19:15

compare
  40:17

complainant
  55:15

complainants
  36:21

complained
  16:6

complaining
  16:15

complaint
  5:5,17,18
  7:21 12:24
  13:6,16,
  18,21,25
  33:5,7
  34:3 42:11
  44:10,13
  45:22
  47:14 51:9
  54:3,4
  55:17,18
  64:3 73:22
  76:19

complaints
  12:1 32:20
  63:19 64:4
  72:18
  76:15

complete
  7:22

completed
  62:15
  69:12
  75:25 76:1

completely
  41:12
  55:19

completion
  7:24

concern  8:22

27:8 30:3

concerned
  16:18
  29:24
  66:23

concerns
  27:3 74:16

concluded
  8:7 11:3
  81:12

concluding
  66:6

conclusion
  9:8 37:7
  46:10
  53:14 63:4

conduct
  41:24
  49:17
  57:22

conducted
  37:8 41:8
  52:14,25
  53:10
  57:15 58:2

conducting
  26:11
  51:17 53:5
  56:6 76:17

conference
  4:2 78:21

conferred
  23:16,17

confidential

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Sarah Mooney on 11/03/2021                    Index: conflict..deal

22:15
23:3,11,
15,19,25
24:1 35:19

conflict
10:5

confusing
65:13

connection
60:19

considered
27:6

consistent
32:10

contact
14:13
56:3,5
64:1

contained
12:17
22:13

content
21:18 27:7
29:24
30:17
31:14

contents
28:23

contribute
50:18

control
21:16 77:2

conversation
18:21 19:5

22:14
62:19
74:19 79:5
80:19

conversations
74:5

copy  13:14,
17 29:13,
18,23
32:14,15
34:22
36:7,10
38:14,16
59:23
60:4,11
81:8

correct
5:13,20
8:5,13
10:17
11:24 13:2
17:4 23:4
26:3,12,
19,23
27:12,25
28:24 30:9
32:22
34:25
35:7,8,21
37:11,23
38:4,8,15,
24 39:6,9,
14 40:5,21
41:25
42:3,24
43:21
48:11

49:24
50:11,22
51:14
57:12,16
61:12 64:8
65:4,17,22
67:24,25
68:5,11
69:15,21
70:21 73:6

correlate
42:10

corroborating
47:16,23

corroboration
47:20

Corruption
54:9,11
56:11 58:6

counsel  5:9
39:8 50:15

county  44:4

couple  12:24
42:1 54:23

coupled
47:11

cover  46:13
52:12

crashed
62:11 71:6

crime  26:7,
8,10 27:10
49:16

criminal
26:11
34:24 35:6
43:14
54:25
55:10

criminally
55:3,8,12
59:5

cross  40:12

crystal  53:1

cut  33:18

─────────
D

database
57:21

date  22:17
41:2 79:24

dated  52:15

dates  40:10,
13 46:2
58:9 62:3

dating
73:14,20

day  17:25
18:4,8
31:10
43:13
44:14
45:12

days  12:24

DEA  34:16

deal  54:24

dealing
  15:20
  74:16

Deanna   42:3,
  12 53:22
  73:11
  74:5,15

death   71:1

decision
  13:25
  29:2,7
  30:22,25
  38:17
  39:9,18,
  20,22
  45:24 59:4
  77:5,22

decisions
  8:3,11

defendants
  4:25 5:1

demote   69:13

denial   32:10

denying
  31:12,17

department
  6:14,22
  7:2,19
  12:5 20:5,
  9 21:8,11
  22:16
  32:20
  36:13,17
  43:4,21
  49:15

50:1,8,10,
16 51:17
52:14
57:11
58:20 60:9
61:21
67:10 70:6
72:8 73:19
74:1,3,11,
17,24

depending
  10:1 61:16
  65:5

deposition
  5:2,14,15
  81:11

depositions
  5:19

describe
  12:16
  74:21

describing
  20:9,10

desk   9:13

detail   51:12
  57:4

Detective
  21:6 53:22
  64:8

determination
  14:14
  30:11
  37:10,21
  38:1,22
  55:7

determinations
  9:22 46:20

determine
  7:21 14:5
  19:21

determined
  30:15

determining
  46:9 71:19

dictate
  48:18

diligence
  51:4

dipping
  39:13,16
  46:3 51:9
  54:19,23
  57:19

direct   3:4
  4:13
  12:11,19
  14:13
  55:25

directed
  32:13
  33:10
  58:22
  72:11

directly
  19:3 22:9
  32:3 60:5

director
  77:17
  78:25 80:4

disciplinary
  8:1 46:12,
  18 47:2
  68:23
  77:24

discipline
  8:8 37:10
  38:13,23
  39:6
  46:10,15,
  24 75:17
  77:3 78:21
  79:20
  80:23

disciplines
  45:19

discovery
  5:2

discretion
  8:4

discuss
  17:19 77:7

discussed
  34:14 78:4

discussing
  77:21

discussion
  12:21 25:2
  45:5 75:12
  77:6 78:22
  80:9,12,
  13,14,15,
  16

discussions
  11:9 45:4

77:11,23,
24

**disposition**
8:1  46:16
63:5

**disprove**
54:17

**dispute**
31:11
75:16

**disputing**
18:19,22

**disregarded**
55:19

**distracted**
38:10

**division**
14:12
15:15
32:19,25

**document**
6:1,3
76:20

**documentation**
51:3

**documented**
51:5  65:2

**documents**
42:15

**DOJ**  60:5

**door**  34:6

**double**
39:13,15

46:2  51:9
54:19,23
57:18

**drops**  9:12

**Drug**  49:16
50:2,7,17

**due**  51:4

**duly**  4:12

---

**E**

---

**earlier**
30:17  54:4

**earliest**
72:19,22

**EEOC**  76:19

**effort**  18:20

**elected**
75:16,23

**electronic**
81:9

**eligibility**
68:14

**eligible**
68:24
69:10,19

**eliminate**
69:19

**else's**  37:14

**Emily**  74:23
80:12

**end**  22:19
41:5  71:6

**ended**  43:17

**enforcement**
26:9  49:16
50:2,7,17
74:24

**ensure**  33:1
51:4,6

**ensuring**
8:22

**entitled**
26:17

**environment**
44:5

**equate**  19:14

**Errata**  3:8

**error**  59:3

**essentially**
8:3  11:13

**eventual**
66:4

**evidence**  5:3
11:8  26:17
27:5,6,10,
11  29:19
31:24
33:13,21,
23  34:4
48:3

**exact**  22:17

**Examination**
3:3  4:13

**excessive**
21:20

**excuse**  66:12

**Exhibits**
3:13

**existed**  27:4

**existence**
22:13,22
38:7

**experience**
15:20
23:15

---

**F**

---

**fact**  19:20
22:5  27:4
32:9  34:14
41:9
44:16,20
45:9,14
47:4  49:15
52:17  53:5
58:7  64:2,
10  65:10
67:8  70:5
73:10,19
75:15
79:18,21

**facts**  64:13

**fairly**  74:18

**familiar**
20:4

**family**  70:20

**Farrell**
67:24,25
68:2

father   43:19

favor   68:22
  78:7

FDLE   75:4,
  6,14,15,22

February
  6:15  7:3

federal   35:5
  49:25  50:7
  51:12  52:1

feds   56:18

feelings
  16:1

fell   46:18

felony   26:1

felt   14:11
  25:12
  26:22
  45:21
  47:12
  54:25  77:9

female   31:13

file   61:25

filed   73:23
  76:19

filing   45:22

fill   69:4

final   7:25
  46:16
  77:23

finalized
  63:6

finance   50:1

find   56:10,
  23

finding   41:2
  54:18

findings
  47:1  52:13
  53:4,9,11,
  14,16
  54:15,22
  55:14
  59:9,11,
  17,23
  60:1,4
  63:9  72:4
  74:23
  75:4,5,6,
  16  77:8,16

fine   5:23

finish   64:15

finished
  58:15

fire   79:3

fired   78:23
  79:7

firm   4:21

firsthand
  45:3  60:6
  61:5  72:13
  73:3

fiscal   52:12

five-minute
  64:14

Florida   4:22
  26:2  74:24

force   49:16
  50:2,8,10,
  17  51:11
  58:4
  61:11,12

forces   61:15

foregoing
  81:11

form   46:13
  66:15
  75:18,25
  76:8  78:9

formal   33:7

format   41:3

forward
  9:14,18

forwarded
  22:11
  75:14

found   41:1
  54:16
  55:1,16
  56:24

four-hour
  59:2

frame   34:10
  52:18  68:4

fund   50:21

funding
  50:8,16
  51:3

future   29:20
  33:14

———————

G

gather   47:7

gathering
  26:23

gave   18:1,8
  24:13
  25:17  46:2

generally
  7:6,10,16,
  20  43:2
  48:25

generating
  63:18

give   4:7
  9:5  22:8
  36:3  78:18

glean   76:23

GOBEO   8:18
  14:17,23
  17:9  20:1,
  16,24
  21:3,9
  24:8,12
  25:22
  26:4,13,24
  31:22  35:1
  38:9  45:2
  47:25
  48:16  50:3
  56:13  57:6
  61:13
  65:12  66:8

GREGORY RIDEAU vs CITY OF WEST PALM BEACH

70:10
73:21
74:12
78:19
79:11
80:24
81:6,10

**Golden**   36:12
37:1

**good**   4:15,
16  15:23
81:4,5

**Gordon**   76:10
77:12,15

**government**
50:7

**grant**   50:1
51:2  52:1

**granted**
65:2,7
66:3,13,18
67:3

**granting**
64:21

**grants**   52:5

**Green**   77:12,
21  78:7,
17,22  79:1

**Greg**   36:6
73:5  74:9,
16

**Gregory**   4:22
6:8  11:23
12:15

14:16
17:19,25
18:14,20
19:23
21:14,15
22:14
23:3,7
24:3  29:19
31:12,17
34:9
35:19,20
36:1  38:6,
13  39:13
41:8
52:19,20
53:15,19
54:6  59:22
61:2  62:20
63:11
67:20,24
68:16,20
72:12,15
73:11
77:19
78:18
79:4,10
80:1

**group**   20:4,
10,21

**guess**   41:21

**guidelines**
33:2

---

**H**

---

**half**   55:6
56:17

**hallway**
12:10

**hand**   4:4
21:16

**handed**
38:12,24
39:19
69:20
79:21

**handing**
80:22

**handle**   10:4

**handled**
44:12  59:7

**handler**
23:21

**handwriting**
37:14,15,
16

**happened**
7:11  19:21
70:13

**happening**
41:9

**harassed**
47:13

**harassment**
15:22
16:6,12
30:14
31:13,18,
20  34:11
36:15,25
37:9  47:5,

9,10  49:2,
9  55:16
76:9,15
79:25

**hat**   70:19

**hear**   60:8

**heard**   20:8
21:10
28:23
37:25  60:6
73:25

**hearing**
23:16  31:1
38:19  39:5

**heed**   78:24

**held**   35:13
64:17

**Herb**   73:3,6

**hey**   10:3

**hired**   11:19

**hours**   38:18
39:6  50:18
54:18,23
69:17
77:19
78:24
79:19,22

**HR**   77:17
78:25  80:4

**human**   13:14
76:10,13
77:1,7

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Sarah Mooney on 11/03/2021                    Index: i.e...interested

**I**

i.e.   55:17

IA   5:17
  9:2,19
  14:16 15:4
  17:8 18:2
  21:15
  22:10,11
  30:22
  32:24
  34:21 35:3
  36:7,21,23
  37:8 40:2
  45:20
  61:24 62:5
  64:23
  65:4,8,10,
  11,16
  66:4,5
  69:15,21,
  23 74:23
  76:9 77:3

idea   59:11
  73:13

identify
  24:17

illegally
  27:9,10

imagine   44:3

Imler   42:20,
  22 43:3,5,
  24,25 44:8
  46:5

Imler's

43:9,19
44:19,22

immediately
  43:12

impact   8:21
  16:1

inappropriate
  55:20

inappropriatel
y   43:10

incident
  7:10 43:2,
  16 45:4
  46:4
  47:18,23
  48:4,8,20
  67:3 73:8

incidents
  48:6 53:25
  72:10

include
  30:22

included
  30:19
  31:25
  32:18
  40:14
  48:13

includes
  31:16

including
  25:11 42:3

Incorrect
  28:1

independent
  25:23 37:4
  47:17
  72:21

independently
  18:12 46:6
  55:9 67:1
  70:4,11

individual
  12:3 71:1

individually
  62:22,23

individuals
  27:20
  28:14
  36:16

informant
  22:15
  23:4,11,25
  24:1 35:19

informants
  23:15,19

information
  9:1,11,17
  12:17
  21:20,23,
  25 22:3,5,
  10 24:5,7,
  16,20 25:6
  31:23
  33:24
  34:1,2
  40:10,17
  41:11 45:3
  56:15

76:21,23

initial
  44:10,21
  45:4

initially
  44:23,24
  45:15
  78:23 79:5

initiate   8:4

initiated
  44:8,13
  62:2

initiating
  44:17

input   75:9
  77:3 79:13

inquire   15:8
  23:18

inquired
  15:8

instance
  47:16

instituting
  34:18

instrumental
  44:17

interact
  15:12

interaction
  14:15,18

interested
  7:5

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Sarah Mooney on 11/03/2021          Index: internal..involves

internal
  7:7,22,23
  8:12 9:14,
  23 10:1,
  13,15,20
  11:2 14:1,
  21 15:15
  16:10,25
  19:1,8,24
  21:24 22:6
  23:17
  24:6,13,21
  25:3,4,7,
  13 28:3,4,
  7 30:13
  31:1
  32:19,25
  33:20
  34:5,11
  35:2,25
  41:7
  42:14,18
  45:19
  46:11
  57:11
  58:19
  61:20
  66:14,19
  68:3,8
  71:25 79:9

interpretation
  33:8

interview
  18:1,9
  32:2 46:21
  47:11

interviewed

48:18

interviews
  76:12

intimate
  15:11

investigate
  9:23 32:20

investigated
  30:19
  41:16
  52:19 55:3
  62:5 70:6
  71:3,21

investigating
  9:9 10:6,
  9,10 42:13
  71:20,22

investigation
  7:23,25
  8:2,5,7,
  12,15,17,
  19,21,23
  9:6,8,9,
  12,13,15,
  18 10:21
  14:2,6,16,
  22,24
  15:2,6
  16:11
  17:11,18
  19:9,17,25
  21:24
  22:1,2,18,
  19 25:10
  27:12
  29:15

30:9,13,
  20,23
  31:3,5,25
  32:11,18
  33:3,4,14,
  22 34:11,
  18,24
  35:2,6
  37:7,9,23
  38:15
  39:12,21,
  25 40:1,3
  42:18
  43:15
  44:8,18,21
  45:20
  46:11,14
  47:1,15
  48:17
  53:19
  55:10
  62:13
  63:6,13,17
  64:23
  65:4,17
  66:5,14,20
  68:4,6,8
  70:3,14,
  16,25 71:9
  72:5 76:1,
  4,12,17,
  18,24
  79:9,12,16
  80:1,20

investigations
  5:18 7:4,
  18 11:2,7
  19:2,15

26:11
  36:22,23
  50:18,19
  51:23 58:1
  61:20
  70:18
  72:17

investigative
  10:7

investigator
  10:2 48:19

investigators
  9:14 14:25
  28:13
  76:22

involved
  5:18 16:25
  19:4,17
  27:19 31:5
  37:2 38:22
  42:1,6,8,
  19 50:10
  62:8 70:9,
  17 71:5,
  11,13,19,
  21 72:18
  73:12 75:2
  76:11,16
  77:20

involvement
  7:6,17 9:7
  69:24
  70:25
  76:14

involves
  69:25

70:20

**involving**
25:10 46:5
62:6,10
70:1,8

**IPAR** 52:13

**issue** 12:23
14:6
19:19,20
33:8,13
41:1 45:12
46:3 47:5
54:20,25
59:21
60:14 62:4
64:2 73:19
78:17

**issued** 23:20
69:17

**issues** 16:1,
3 46:23
52:1 59:19
74:9,10,16

---

**J**

---

**January**
68:25

**Jeff** 77:12,
21 78:7,
17,22 79:1

**job** 32:21

**Joe** 73:3,6

**Jose** 77:15,
21 79:3

**Joseph** 10:16

**judge** 26:18

**July** 52:15,
23

**Justice**
49:15
50:17
51:17

**justification**
68:10,12

---

**K**

---

**Kapper** 44:24

**Kevin** 67:24,
25 68:2

**kind** 7:6,13
14:18
15:9,25
16:13
31:24 62:9
70:15
76:14

**knew** 23:7
55:20
60:12
80:11,12,
13,20

**knowledge**
15:12
20:20,23
21:7 23:11
25:23 26:3
38:7 48:15
52:22 60:7

61:5 72:13
73:4 74:2
75:21
79:8,12,
16,24

**knowledgeable**
79:25

---

**L**

---

**law** 4:21
26:9 33:12
74:24

**lawsuit** 4:23
71:7

**leading**
77:23
78:15

**learned**
23:19

**leave** 12:8
15:24
43:12
64:22
65:3,6,7,
11 66:3,
13,18
67:3,4

**led** 43:3
44:21 62:5
71:1

**left** 11:5
69:5

**legal** 26:23

**legality**

27:3

**legally** 27:5

**letter** 9:12

**letters** 22:9

**letting** 7:12

**level** 10:6
44:12

**levels** 10:7
46:17

**license**
43:17

**lieutenant**
4:22 10:9,
10 11:13
61:14
62:25 63:1
67:9,13,21
69:1 74:22
75:8

**light** 8:20

**limited**
74:18

**list** 68:13,
25

**listen** 22:25

**listened**
31:8 38:3

**located** 4:21
43:9

**location**
44:18
63:18

**locations**
  52:5 57:13

**logging**   57:4

**longer**  5:1
  6:21 34:12
  64:16

**looked**  55:11

**loop**  80:5

**Lori**  15:5,9
  20:14,21

**lot**  10:19
  21:25
  23:15

**Louis**  77:15

**luck**  81:4

**lumped**  66:23

———————————
            **M**
———————————

**M-O-O-N-E-Y**
  4:19

**made**  5:4
  12:2,15,
  18,22
  15:21,23
  17:20
  23:8,13
  30:22
  32:20 34:8
  36:15
  37:10,20
  39:17,20,
  22 40:4
  41:9 44:20
  45:11,18,

24 49:5,10
50:12 53:9
55:8 62:20
64:4
72:10,14
75:22

**major**  54:20
  59:19,21

**majority**
  10:11
  11:14

**make**  8:21
  9:22 13:25
  25:21
  30:11,25
  49:23
  50:24
  56:3,5
  59:3 76:2

**makes**  51:8

**making**  15:13
  21:4 22:5
  32:6 38:1,
  22 46:20,
  24 51:13
  57:18
  64:12 66:1

**manner**  26:22
  27:7

**manpower**
  69:2

**March**  13:2

**Marked**  3:13

**marriage**

70:22

**married**
  73:15

**Marte**  11:16,
  18 12:4
  18:1

**match**  51:1

**matrix**
  46:15,18
  47:3

**matter**  34:1
  71:20

**mayor**  6:23
  77:2 79:8,
  25

**Mcdaniel**
  24:9,22,23
  25:1 27:23
  41:4 54:9,
  15 56:1
  57:10
  58:6,10,15

**meet**  56:1
  58:6,13
  62:24

**meeting**
  17:18,24
  18:23 19:7
  21:13,17,
  18 63:2,8
  64:6 77:20
  79:17

**meetings**
  18:25

77:25

**member**   16:22
  36:12
  70:20

**members**
  19:17
  25:11
  38:25 39:2

**memo**   41:3

**mentioned**
  27:23 30:8
  32:13
  53:20

**met**  5:16
  11:17
  21:18,19
  54:9,11
  62:21 75:7

**meted**  78:21

**meting**  46:15

**middle**  64:22

**Mike**  67:18,
  19 68:12,
  17,19 69:3

**mind**  35:12
  73:1

**minor**  54:18

**minute**  41:21

**minutes**
  35:10

**mishear**  61:4

**missing**  43:8

mitigate
  40:24

moment   29:15
  33:15
  47:23

money   43:7,9
  44:18
  50:1,21
  51:4,12,13
  52:4

monitored
  14:24

month   43:15
  49:9

months   30:17

Mooney   4:11,
  19,20 13:5
  35:17
  64:21
  70:1,21
  72:7 81:2

morning   18:8

multiple
  51:2 70:18
  75:5

Muoio   79:8,
  25

———————————
             N
———————————

named   4:24
  11:15

narcotics
  50:19

nature   65:5

Navy   20:10,
  18

Nealy   70:7

necessarily
  16:20,23
  33:7 52:7
  59:20

needed   25:12
  34:17
  40:25
  41:16 55:2
  69:2

nephew   69:25
  70:6,22

Norbraten
  3:4 4:14,
  20 14:19
  15:3 17:13
  20:3,19
  21:1,4,5,
  12 24:10,
  15,18
  25:25
  26:6,15
  27:2 32:5
  35:4,9,15,
  16 38:11
  45:8 48:1,
  21 50:6
  57:1,9
  61:18
  64:14,19,
  20 65:15
  66:9,11,17
  67:7 70:12

73:24
74:14
78:11,15,
16 79:2,14
81:1,8

normal   12:13

notification
  76:2

notified
  44:16
  70:17
  75:15

number   40:14
  46:17
  68:14

———————————
             O
———————————

Oath   3:6

objected
  50:15

objection
  8:18
  14:17,23
  17:9 20:1,
  16,24
  21:1,9
  24:8,11
  25:22
  26:4,13,24
  31:22 35:1
  38:9 45:2
  47:25
  48:16 50:4
  56:13 57:6
  61:13

65:12
66:8,15
70:10
73:21
74:12
78:9,19
79:11
80:24

obligated
  25:12

obtain   26:10
  40:22
  41:17 60:4

obtained
  25:15
  26:22 27:5
  60:22,25

occasion
  76:5

occasions
  75:5 78:5

occur   8:12
  9:5 19:11

occurred
  13:2 16:11
  17:25 33:5
  34:10
  44:15,25
  48:7 67:3
  70:2

occurring
  7:18 8:23
  69:18

OCDEFT   49:25
  52:22

53:10
56:5,16,23
57:15
59:9,12,
23,25
60:19

October
37:20
39:19
40:20 41:6
54:8
58:13,16,
18,21,22
67:6 77:19

off-duty
51:12

office  18:19
23:18
28:8,12,13
34:3 51:24
54:10,12
55:1 56:2
58:14,23
62:14

officer  6:5,
9 9:9
10:6,8
11:9,15,
17,21
12:4,9
14:7 15:5,
24 16:18,
24 17:1,6,
20 18:1,8
19:4 23:21
30:14
31:13,18,

21 36:12
40:4 41:4,
24 42:9,
11,19,23
43:3,5,9,
18 44:8,
19,22,23
45:11,15
46:22,23
47:9,10,
12,20,23
48:5,10
49:1 51:8
54:5,9,15
56:1 57:10
58:6,10,15
61:19
62:5,19
63:15
64:1,7,22
65:16
70:1,7
71:23
75:15,22
79:7

officers
16:5,15
18:25 19:7
20:5,11,14
27:20
28:22
32:21,22
37:2 38:21
50:9
53:21,24
58:9 61:7
73:18

official
40:1

one-on-one
17:18,21
62:18

ongoing
19:1,8
33:21
34:24
35:2,6
40:20
41:23

open  14:6
19:24
25:10
29:14
30:13
68:6,9,15
69:5

opened  14:2

operate  33:1
61:15

operating
33:2

operation
44:15
61:17

operational
44:12

operations
50:2

opinion  69:3

opposed
63:22

order  25:21
30:8 31:2,
4 35:20
55:3 58:13
64:3 81:8,
10

Organized
49:16

original
47:14 49:9

originated
11:15 32:4

Oswald  37:8
67:18,20,
23 68:11

outcome
68:21

outlined
46:14

overlap
54:18

overseeing
61:12 71:8

overtime
39:14,21
46:3 48:23
51:20
52:20
53:20 54:5
55:17
57:21 58:3
61:3

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Sarah Mooney on 11/03/2021                    Index: p.m...potential

---
**P**
---

**p.m.**  4:3
  35:13,14
  64:17,18
  81:12

**paid**  51:11
  56:18,19
  58:2

**Palm**  4:23
  6:6,9,14
  7:2 52:14

**parallel**
  76:18

**parcel**  40:8

**part**  9:15,
  18 14:15
  15:14 31:2
  34:17 35:7
  36:11
  38:14 40:8
  46:23
  51:11
  55:17,20
  71:9 75:13
  80:16

**participated**
  67:11,17

**particulars**
  73:7

**parties**
  14:11

**pass**  12:10

**passed**  70:8

**passing**
  12:13

**past**  16:6
  46:23
  47:13

**pay**  50:9

**paying**  51:1
  57:21

**pending**  65:8
  68:21 69:5

**people**
  15:21,23
  22:8 42:2
  52:6 68:13

**perfectly**
  5:23

**period**  7:8
  10:14,23

**periods**
  10:21,25

**person**  12:6
  20:21
  23:22
  24:12 32:2

**personally**
  22:4 28:6
  55:11 80:7

**personnel**
  33:1

**pertaining**
  7:4

**phone**  23:3,
  12 24:2,4

**27:15,17,**
  21 34:9
  78:1 79:18
  80:22

**phones**  23:20

**physical**
  63:18

**pieces**  56:20

**place**  8:9
  39:14
  40:20
  48:23
  51:13,20
  52:18,21
  54:5 56:19
  57:5 58:8
  63:3 74:10
  77:11

**plan**  32:15

**played**  28:19
  29:11
  45:21

**plea**  43:17

**point**  4:24
  12:7,8
  22:18,24
  29:14 38:3
  39:17,18,
  20 41:25
  53:8
  59:13,17
  65:19 66:1
  72:7,9
  74:7

**police**  6:14,

**21** 7:2,16
  8:16 9:21,
  22 10:8,12
  11:15,21
  16:12
  18:25
  21:11
  27:19 29:3
  36:13
  37:18
  41:24
  43:18,20
  52:14
  57:11
  59:14
  62:1,13
  67:10 70:1
  79:7

**policing**
  71:4

**policy**  33:9,
  11

**position**
  69:7

**positions**
  68:14

**possession**
  43:10
  44:19

**possibility**
  40:15

**potential**
  34:17
  41:1,13
  54:18 59:2
  69:12,23

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Sarah Mooney on 11/03/2021          Index: potentially..raised

potentially
  33:12
  69:18

predisciplinar
y  38:18
  39:5

preface  7:9
  54:2

preparation
  5:15

preparing
  65:9

present  28:9
  34:16

presented
  23:5 24:25
  25:4,17
  27:8,18
  28:5,10,
  15,18
  29:1,8
  41:4 53:17
  58:25

presenting
  29:9

presumption
  61:7

prevented
  66:5

primary  48:8
  50:24

prior  5:14
  9:8 12:1
  24:19

42:18 47:5
65:20 66:6
69:17
73:15,25
77:18
78:22
79:24
80:9,20

private
  57:21

privy  56:17

proactive
  71:4

probability
  18:11

procedural
  33:8,11

proceedings
  4:2

process  8:17
  11:6 12:7
  26:11
  40:19
  67:11,17
  75:13
  76:11 77:9

professional
  71:15

professionally
  44:2

program
  49:25

progress
  11:6

promise
  64:16

promote
  68:10

promoted
  67:23,25
  68:3,19,24
  69:11,19

promoting
  67:18
  69:14,16

promotion
  69:18

promotional
  67:11

prompted
  62:13

provide
  35:20 36:1
  58:8 79:13

provided  6:1
  24:6,16,20
  36:10
  40:11

proving  59:2

public  33:25
  54:9,11
  56:11 58:6

pull  48:23
  70:18

punished
  41:23

purpose

32:24

put  43:11,
  12 56:22
  72:2

_____

**Q**

question
  5:22,25
  9:4 14:10
  25:14,16
  26:16 27:1
  41:19 47:6
  48:19 49:4
  50:3,5
  66:9,16,
  21,22,24
  68:7
  78:10,13,
  15

questioning
  79:19

questions
  7:4,9
  41:20 66:2
  81:2,6

_____

**R**

racism  72:10

racist
  72:10,14,
  15 73:6

Raise  4:4

raised  11:12

Ravelo
  11:16,18
  12:4 14:7
  15:5,24
  16:18
  17:1,6,20
  18:1,8
  30:14
  31:13,18,
  21 40:4
  42:23
  44:23
  45:11
  47:9,10
  48:5,10
  49:1 51:8
  54:5 61:19
  62:5,19
  63:15
  64:1,7,22
  65:16

Ravelo's
  42:11
  45:15
  47:23

reach  76:2

reached
  18:20

read  13:18
  73:22 81:7

reading
  13:21

reason  12:4
  29:17
  35:23
  48:13

57:20
63:14,16
68:2

reasoning
  15:17
  46:9,24

reassign
  63:11

reassigned
  63:13

reassignment
  63:15,16

recall  11:11
  12:10 15:7
  17:24
  18:12,16,
  23 19:22
  20:2
  21:13,21
  22:7 27:22
  28:11,12
  31:14 36:2
  37:3 38:19
  41:10
  51:21
  52:22,24
  53:12,13,
  16 59:17
  62:3,4,15
  64:21,24,
  25 65:24
  67:1,4,8,
  18 70:11,
  13,14,16,
  24 71:2,5,
  11,25

72:2,4,20,
25 74:18
76:4,5
77:25 80:8

receipt  7:20

receive
  33:24
  38:14
  50:16 51:2
  59:13

received
  12:16
  13:7,17,24
  37:8 44:9
  54:3
  59:23,25

recently
  68:9

receptive
  17:1

recess  35:13
  64:17

recognize
  13:5

recollection
  13:3 37:4
  59:18
  72:21

recommendation
  47:2 77:24

recommendation
s  52:13

recommended
  79:3

recommending
  78:8

record  4:18
  10:18
  11:22 13:1
  18:7,11
  26:2 32:1
  33:25
  35:15
  36:18
  46:12 57:7
  60:22,25
  64:19

recorded
  23:8,12,
  20,21,22
  24:2,4
  25:20
  27:9,10,
  11,15,21
  32:7

recording
  22:13,21,
  25 23:2,12
  24:24
  25:7,13,
  15,21
  26:22 27:4
  28:23
  29:11
  30:4,5,12
  31:9,11,16
  32:3,14,16
  34:16,22,
  23 35:18
  38:1,4,8,
  14

recordings
  26:12 34:9

recordkeeping
  50:23

records   5:17
  18:10
  40:13,16,
  22 41:14,
  15,17 42:9
  51:1,19
  52:6 54:16
  56:15,22
  57:3,10,
  11,14
  58:8,20,25
  65:23

recruitment
  74:7,8

refer   10:18
  20:5 36:18
  46:12
  61:24

reference
  40:12

referencing
  9:13

referring
  13:8 21:7
  36:24
  39:21
  47:19

refresh   5:17

refused   58:8

refutes   5:4

regard   13:22
  15:1 17:11
  22:2 53:25
  58:1

Regis   53:22

regular
  49:18

regulation
  33:12

reimbursement
  56:23

relate   11:8
  74:9

related
  21:21,23
  22:11
  30:15
  31:19,24
  32:10
  41:12 47:4

relates
  45:10 46:3

relating
  46:4

relative
  70:21

relayed
  74:15

relevant
  9:11 31:6,
  19

remedial   8:8

remember

12:12 18:6
  21:17,18
  22:17 41:2
  53:7 56:8
  60:10 62:7
  65:1 66:25
  71:13 78:2

rendering
  45:19

repeat   27:1
  50:5 65:14

rephrase
  65:13

report   15:4
  54:2
  62:13,15
  63:5
  76:10,23

reported
  30:16
  62:11

Reporter   3:7

represent
  4:22 16:24

representation
  16:21
  19:18

representative
  19:4

representative
s   16:17

represented
  5:9 19:7

request

18:25
  19:3,6
  64:7

requested
  15:8 38:18
  40:11 58:9
  60:11

require   75:3

required
  34:2 61:11

requirements
  51:2 75:7

resend   76:7

residence
  43:8

resignation
  43:18

resigning
  43:3

resolution
  8:24 14:9
  66:4

resolve   55:3

resource
  15:25

resources
  13:14
  76:11,13
  77:1,7

responsible
  7:25

responsive
  17:1

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Sarah Mooney on 11/03/2021                              Index: restate..section

restate
  32:23

result   47:8,
  9 63:10,25
  71:7

resulted
  43:15 64:2

retain
  29:13,23
  32:14
  33:21,23
  34:2,22

retained
  32:13
  33:11,16,
  25 34:5,6

review   41:8,
  23 48:22
  51:19
  52:20
  53:15 55:1
  57:7
  58:16,19
  59:5 69:21

reviewed
  5:16 39:23
  57:3 72:17

reviewing
  45:19
  54:16
  57:11

Rideau   4:23
  6:8 7:5
  11:13,23
  12:2,15

14:7,16
17:19,25
18:3,14,20
19:23
21:14,15
22:14
23:3,7
24:3 25:9,
11 29:20
31:12,17
35:19,20
36:1 37:11
38:6,13
39:8,13
41:8,22
42:8,12,23
44:7,24
45:10,14
46:23
47:17
48:10
51:9,10
52:19
53:15,22
54:6 59:22
61:2 62:20
63:11
65:9,21
67:8,20,24
68:16,20
69:10
72:12,15
73:11
74:5,15
77:19
78:18
79:4,10
80:1

Rideau's
  34:9 51:19
  52:20
  53:19 57:4
  66:6

road   12:9
  16:4

Rodriguez
  77:15,17,
  21

Rodriquez
  79:3

role   7:6
  8:16 15:18
  71:8
  74:21,22,
  25

romantically
  73:12

room   28:22
  78:1,2
  80:21

rotating
  10:15

rotation
  10:19

route   16:20
  78:25

Rubin   4:21

rule   33:11

ruled   68:22

ruling   69:6

run   10:3

run-in   73:2

─────────────

        S

S-A-R-A-H
  4:19

safe   81:3

salaries
  50:9

Sarah   4:11,
  19

scheduled
  65:21 66:7
  67:5

score   47:2
  68:16,18

screen   13:6
  37:6,13
  48:24 52:9
  53:18
  71:10

scrutiny
  54:22
  55:14,15

SEAL   20:6,
  8,10,15,17
  21:8,10

SEALS   20:18

search   43:5,
  6 44:25

searching
  43:8

section
  46:16

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Sarah Mooney on 11/03/2021      Index: seek..staff

seek  75:16

seeking  9:16
  76:21

selected
  38:21

selecting
  71:22

send  75:4,
  6,24

Senior's
  47:20

sense  55:9

separate
  36:16 40:8

separated
  64:5

sergeant
  12:2 14:7
  15:5 17:3
  18:3 25:9,
  11 37:8,11
  41:22
  42:8,23
  44:7,24
  45:6,10,14
  47:17
  48:10
  51:9,10,19
  53:22 57:4
  65:9,21
  66:6 67:8,
  20,23
  68:11
  69:10 70:7
  71:22

sexual  15:21
  16:6,12
  30:13
  31:12,17,
  20 34:11
  36:15,25
  37:9 47:5,
  8,10 49:2,
  9 55:16
  76:9,14
  79:25

sexually
  47:13

share  37:6
  58:24

She'll  81:7

sheet  3:8
  46:13

sheriff's
  62:14

short  10:4
  57:17

show  56:22
  57:3,8

showing
  53:18
  71:10

signature
  3:5 37:17
  75:10

similar
  16:7,8
  49:5

Similarly

46:1

singled
  16:19

sit  76:22

sitting
  76:11
  80:21

situated
  69:3

situation
  54:19 64:4
  74:4

social  43:25
  44:2

sort  6:1
  16:14 33:5
  36:20 44:5

sought  39:9

sound  78:10

space  63:18

speak  19:22
  65:23

speaking
  14:11 45:6
  54:24 69:9
  70:17

special
  15:10,19
  51:23

specialized
  11:24

specific
  7:10 9:24

11:1 13:22
  15:20
  21:22
  40:10,13
  41:2 42:7
  49:22 54:6
  61:16 62:3

specifically
  11:11,20
  15:1
  17:11,12
  28:11,12
  31:14
  34:20
  41:21
  49:19
  52:3,24
  64:24
  71:11 76:5
  78:2

specifics
  46:6 62:7,
  16 65:1

speculation
  24:14

spell  4:17

spent  50:18
  51:5

spoke  14:4
  17:22 18:3
  19:16
  24:23 25:1
  80:2

spoken  30:5

staff  10:8

23:18
39:1,3

**standards**
71:15

**start**  34:10
35:11

**started**  6:11
18:21

**state**  4:17
26:2
54:10,11
55:1,8
56:1
58:14,22

**statement**
32:6,10
34:4  46:21
48:14
50:12
78:14

**statements**
47:17
49:24
72:11,15

**status**  11:4

**statute**
26:14

**statutes**
33:2

**statutorily**
75:3

**Stay**  81:3

**staying**  55:9

**Steinberg**
22:16,23
25:3  28:1,
2,3,4,7,
10,15,21
34:15

**STENOGRAPHER**
4:4

**Stephen**
70:1,21

**Stephens**
5:12,16
66:15,21
78:9,13
81:5

**stepping**
6:17,19

**Steven**  53:22

**stolen**  62:11

**story**  45:5

**strike**  55:24

**Stuart**  4:22

**stuff**  66:23

**subject**  11:9
61:20

**subjects**
19:1

**submission**
56:22

**submit**  58:1

**submitted**
22:2,15
75:19

77:16

**submitting**
74:23

**subordinate**
10:5

**subpoena**
58:25

**subsequent**
43:14
44:18

**sudden**  60:14

**suggest**
18:10

**suggests**
11:23  13:1
18:7

**supervision**
51:23

**supervisor**
10:6  11:24
48:10
60:12,18

**supervisors**
12:19  14:4

**supports**  5:3

**supposed**
25:6  56:21
61:3,6,8
75:21

**surrendered**
43:17

**suspend**
38:17

45:24

**suspended**
79:22

**suspending**
77:19

**suspension**
37:11,21
39:19
46:8,25
47:8,22
69:10,17,
20  77:3
78:8,17

**swear**  4:6

**Swiderski**
4:25
10:13,24
11:1
29:13,18,
22  32:14
34:14
40:12  54:8
55:25  58:5
60:10
80:13

**sworn**  4:12

---

**T**

**take-home**
62:17

**taking**
19:19,20
65:6  71:9
74:10

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Sarah Mooney on 11/03/2021                Index: talk..true

talk  11:4
  15:25

talked  46:7
  65:17 78:3

Tameca  48:9
  60:3

tape  31:15,
  23 32:2
  33:10

task  49:16
  50:2,8,10,
  17 51:11
  58:4
  61:11,12,
  15

Tatum  37:2

team  20:6,
  8,10,15,17
  21:8,10
  61:10,12

technically
  54:24 69:9

Ted  10:13,
  24

telling  29:5

ten-minute
  35:10

tendered
  43:18

Teresa  76:10

term  19:10
  20:8 21:10

termination

78:25

terms  42:14

Terry  36:12
  37:1

test  68:17

testifies
  4:12

testimony
  4:6 20:13
  57:2 61:1
  77:18

theft  43:11

Theodore
  4:25

thing  14:20
  50:24
  72:23

things  51:6

third-degree
  26:1

thought
  24:15
  29:19 77:9

thrown  20:9

tied  30:12
  33:21
  53:21

time  7:1,8
  9:25
  10:12,14,
  21,23,25
  11:14
  12:2,22

13:15
15:14
18:15
22:21,24
23:18
26:18
28:22 30:9
31:8 33:10
34:10,25
35:3 36:10
38:3,8,12
39:11,17,
18,20
41:25
42:4,5,17
44:13
45:23
47:24
48:11
49:1,5,7,
14,20
51:18
52:5,18,
23,25
53:6,8
54:19
55:23
56:4,7,9,
19 58:7
59:14
61:19 62:1
63:2 65:19
68:4,24
69:5,9,11
70:3 71:14
72:7,9
76:3 81:3

timing  52:3
  54:21
  65:24 67:2
  75:19 76:7

timings
  55:13

today  5:7,10
  6:18 43:1

today's  5:14

Todd  4:20

told  29:17
  31:4 32:1
  72:1 80:4

toll  65:4,8
  66:19

tolled  65:11
  66:4,12,14

totality
  47:15

town  43:13
  44:15

transferred
  63:19,22,
  24

transferring
  63:23

transpired
  25:18

trick  26:16

triggered
  33:4

true  18:19
  44:7 55:18

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Sarah Mooney on 11/03/2021                    Index: truth..word

| | | | |
|---|---|---|---|
| truth  4:7,8 | 58:17 59:8 | 69:1,4 | **W** |
| turn  13:25 | 76:13 | vacancy  69:5 | |
| type  54:19 | Understood | vacant  69:1 | wait  56:10 |
| 65:6 67:4 | 10:11 | vague  14:18 | waiting  69:7 |
| typed  13:9, | union  16:17, | valid  40:18 | 76:4 |
| 10 | 20,23,24 | validity | wanted  16:20 |
| typically | 17:22 | 40:15 | 19:22 |
| 10:3 16:16 | unit  7:24 | vehicle | 67:13,16 |
| 51:22,24 | 11:24 14:5 | 62:7,10, | warrant |
| 59:19 | 15:10,20 | 12,17 | 25:20 |
| 75:3,24 | 24:22 | 64:23 | 26:19 |
| 76:16,22 | 25:9,11 | vendor  57:21 | 43:5,6,7 |
| | 42:23 | 58:2 | 45:1 |
| **U** | 54:10,11 | verbalizing | warrants |
| | 56:12 58:7 | 21:14 | 26:10 |
| ultimately | 63:11 64:5 | verbally | week  55:6 |
| 42:2 43:3, | unpack  30:21 | 12:19,20 | West  4:23 |
| 9,11,16 | untruthful | verify  55:2 | 6:6,9,14 |
| 44:13,21 | 44:23 | verifying | 7:2 12:21 |
| 71:1 77:4 | 45:12 | 48:6 | 48:9 52:14 |
| unaware  35:5 | unusual  52:3 | victim  15:22 | 60:4,21 |
| 65:10 | updates | Victims | whatsoever |
| Unbeknownst | 14:25 | 15:10,19 | 12:4 |
| 42:4,5 | upheld  39:6 | video  4:2 | wife  42:3 |
| understand | 68:23 | viewpoint | Wiggs  63:1 |
| 9:4 47:6 | uphold  38:23 | 78:6 | 74:23 75:8 |
| 50:4 53:2 | utilize | violation | 80:12 |
| understanding | 60:15 | 41:13 | William  70:7 |
| 5:6 11:22 | utilized | voiced  16:18 | witnesses |
| 22:20 | 16:22 | | 11:5 |
| 23:6,10,24 | | **V** | witnessing |
| 24:24 | | | 48:5 |
| 25:19 | | vacancies | word  76:24 |
| 27:14 | | | |
| 42:15 | | | |

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Sarah Mooney on 11/03/2021                    Index: words..Zachary

**words**  21:22

**work**  14:12
  16:2 17:7
  50:17
  51:22 57:4
  58:3 59:1
  63:17
  64:23,25
  74:20

**worked**  25:8
  74:6

**working**  6:9
  11:23 14:7
  39:13
  42:22 44:5
  51:10,12
  58:9 61:10
  74:3

**workplace**
  64:1

**works**  23:22

**worth**  41:18

**written**
  12:24
  13:6,16,18

**Wrobbel**
  60:18,23

**wrong**  49:24

———————
        **Y**
———————

**year**  52:12
  68:25
  72:20

**years**  69:17

———————
        **Z**
———————

**Zachary**
  42:20,22
  43:19 46:5