**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
**Theodore Swiderski on 11/03/2021**

1                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
2                      WEST PALM BEACH DIVISION

3
                            CASE NO.:  9:20-CV-82406-AMC
4

5   GREGORY RIDEAU,

6           Plaintiff,

7   vs.

8   CITY OF WEST PALM BEACH,
    a Florida municipal corporation,
9

10          Defendant.

11  _____/

12

13          VIDEO CONFERENCE DEPOSITION OF

14               Theodore Swiderski

15

16          Wednesday, November 3, 2021
               10:00 a.m. - 12:13 p.m.
17

18                     Remote

19

20

21

22          Stenographically Reported By:
                 Karen Allen-Lewin
23

24

25

```
 1   APPEARANCES:

 2   (All parties appeared via video conference.)

 3

 4   On behalf of Plaintiff:

 5        Rubin & Rubin
          2055 South Kanner Highway
 6        Stuart, Florida 34994
          (772)283-2004
 7        BY:  TODD NORBRATEN, ESQUIRE
          tnorbraten@rubinandrubin.com
 8

 9   On behalf of Defendant:

10        Ford & Harrison LLP
          1450 Centrepark Boulevard, Suite 325
11        West Palm Beach, Florida 33401
          (561)345-7512
12        BY:  DAVID M. GOBEO, ESQUIRE
          dgobeo@fordharrison.com
13

14   On behalf of Deponent:

15        Olds & Stephens, P.A.
          312 11th Street
16        West Palm Beach, Florida 33401
          (561)832-6814
17        BY:  DON STEPHENS, ESQUIRE
          dstephens@oslegal.com
18

19

20   ALSO PRESENT:

21        City of West Palm Beach
          City Attorney Office
22        P.O. Box 3366
          West Palm Beach, Florida 33401
23        (561)822-1350
          BY:  ZOE PANARITES, ESQUIRE
24        zpanarites@wbp.org

25
```

```
 1                    I N D E X

 2

 3   Examination                            Page

 4   Direct by Mr. Norbraten                   4

 5   Witness Signature Page                   94

 6   Certificate of Oath                      95

 7   Certificate of Reporter                  96

 8   Errata Sheet                             97

 9

10

11

12                 E X H I B I T S

13             No Exhibits Marked

14

15

16

17

18

19

20

21

22

23

24

25
```

 1  Thereupon,

 2  the following video conference proceedings began at

 3  10:00 a.m.:

 4          THE STENOGRAPHER:  Raise your right hand for

 5      me, please.

 6          Do you swear or affirm the testimony you're

 7      about to give will be the truth, the whole truth,

 8      and nothing but the truth?

 9          THE WITNESS:  I do.

10  Thereupon:

11              Theodore Swiderski,

12  having first been duly sworn, testifies as follows:

13              DIRECT EXAMINATION

14  BY MR. NORBRATEN:

15      **Q.   Good morning.  Captain, correct?**

16      A.   Yes, sir.

17      **Q.   Good morning, Captain Swiderski.  Could you**

18  **please state your name and spell it for the record.**

19      A.   Yes.  It's Theodore Swiderski,

20  T-h-e-o-d-o-r-e, Swiderski, S-w-i-d-e-r-s-k-i.  And I

21  go by Ted sometimes.

22          MR. GOBEO:  Todd, did you want to stipulate

23      we're doing by Zoom like we did in the other

24      depositions?

25          MR. NORBRATEN:  Do you want to have that

1    done, Ms. Lewin?

2         THE STENOGRAPHER:  I handle it like we're in

3    person when we're by Zoom because I'm able to

4    identify the witness.  It is placed on the

5    transcript that it's by video conference.

6         MR. GOBEO:  Sounds good.

7         MR. NORBRATEN:  I think that the primary

8    issue comes into play, David, when they're

9    recording the Zoom depo at the same time.  They

10   have to get everybody's permission to do that.

11        But in any event, for the record, the

12   plaintiff has no issue conducting this deposition

13   via Zoom, because we've done all our depositions

14   that way.

15        And, David, I assume you guys are okay with

16    this as well?

17        MR. GOBEO:  Yes.  We stipulate as well.

18        MR. NORBRATEN:  Okay.  So we cleared that

19   up.

20  BY MR. NORBRATEN:

21    Q.   Captain Swiderski, my name is Todd Norbraten.

22  I'm an attorney with the law firm of Rubin & Rubin in

23  Stuart, Florida.  I represent Lieutenant Gregory

24  Rideau.  I filed a lawsuit against the city.

25  Initially I included claims against yourself and the

1    other witness that's being deposed today, former

2    chief, Sarah Mooney, in an overarching, essentially

3    discrimination case alleged by my client against

4    people of the city.  I have amended my complaint.  You

5    are no longer a named defendant in the case.  But I am

6    here today to take your discovery deposition just to

7    see what, if any, information you may have that

8    relates to the allegations we've made in our complaint

9    and potential defenses raised by the city.

10           Is that your understanding as to why you're

11   here?

12       A.   Yes, sir.

13       Q.   You've given depositions before, I assume?

14       A.   Yes, sir.

15       Q.   Okay.  And you are represented by both

16   personal counsel, counsel for the city.  And also the

17   city attorney's office is present in the room at this

18   time, correct?

19       A.   Yes, sir.

20       Q.   Did you meet with all of them prior to

21   today's deposition?

22       A.   Yes, sir.

23       Q.   Okay.  Was the meeting conducted with all of

24   them in the same room at the time?

25       A.   Yes, sir.

1      Q.   Okay.  When was that meeting?

2      A.   Monday.

3      Q.   Okay.  And at that meeting were you provided

4  any documents to review in preparation for today?

5      A.   I don't believe so.

6      Q.   Okay.  Prior to today's deposition, have you

7  reviewed any documents specifically to refresh your

8  recollection as to anything that you may be asked

9  today?

10     A.   Yes, sir.

11     Q.   What did you review?

12     A.   I was given a copy of the lawsuit.

13     Q.   Okay.  Other than that, anything else?

14     A.   From my attorneys, no.

15     Q.   Well, whether or not it was given to you by

16  your attorneys, or whether it was something you did on

17  your own, was there anything else you reviewed to

18  prepare yourself for today?  You're allowed to look at

19  whatever you want.  I'm just curious as to what it is,

20  that way, you know, I have --

21     A.   The question was:  Was anything provided to

22  me by the attorneys?  The answer was no.  But I have

23  reviewed -- the lawsuit was forwarded to me by

24  Zoe Panarites, and I reviewed some of the reports

25  associated with the lawsuit that were named in the

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021                              Page 8

 1  lawsuit.

 2      Q.   Okay.  You mean reports, you mean the IA

 3  investigations?

 4      A.   Yes, sir.

 5      Q.   Okay.  Anything in addition to that that you

 6  reviewed in preparation for today?

 7      A.   Not that I recall.  Just anything that was

 8  mentioned in the lawsuit that I had access to, I

 9  reviewed at some point during the course of my initial

10  notification of the lawsuit.

11      Q.   Okay.  Have you had any conversations with

12  Sarah Mooney outside of the presence of your personal

13  attorney, Don Stephens, concerning this case?

14      A.   Not about the substance of the case.

15      Q.   Okay.  Obviously I imagine you had

16  conversations with her during the time frame with

17  which the case is encapsulated, because you work in

18  the same agency and were involved in some of the

19  investigations, correct?

20      A.   Correct.

21      Q.   Okay.  And we'll talk about some of those as

22  we get into the deposition.  But you answered my

23  question for what I was concerned with.

24           Particularly in preparation for today's

25  deposition, have you had any communications with

1  Assistant Chief Mooney outside of the presence of your

2  attorney, Don Stephens?  And your answer is no?

3      A.   No, I don't think that's how I answered it.

4      Q.   Okay.  What is your answer today?

5      A.   I said I didn't have any conversations with

6  her about the substance.  We had talked about being

7  noticed of the investigation, we talked about being

8  released from the lawsuit.  So we've had conversations

9  about the lawsuit.  We have not talked substantively

10 about things that occurred during the course of the

11 investigations that were named in the lawsuit.

12     Q.   Okay.  I want to talk with you a little bit

13 about your history with the department.  When did you

14 begin working with the West Palm Beach Police

15 Department?

16     A.   August of 1997.

17     Q.   Okay.  So when you actually came on to the

18 department, at that point in time was Gregory Rideau

19 already an officer here?

20     A.   Yes, he was.

21     Q.   Okay.  And my understanding is you have a

22 history -- you worked with the SWAT team for a period

23 of time?

24     A.   Yes, sir.

25     Q.   What years were that?

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021

1    A.   I don't have a clue.  I can track the dates

2  down if you need me to.  Somewhere probably shortly

3  after 2000 I went on the team, and I was on the team

4  about nine-and-a-half years.

5    **Q.   Okay.  And the primary area in which I'm**

6  **going to be questioning you about today is going to be**

7  **a time in which you were involved in working in**

8  **internal affairs.  Do you understand that?**

9    A.   Yes, sir.

10   **Q.   Okay.  When did you begin working in internal**

11 **affairs with the West Palm Beach Police Department?**

12   A.   My professional history, you don't mind me

13 referring back to that just so I can give you accurate

14 dates.  Those dates derive throughout software system

15 that keeps track of when people transfer, so it's

16 accurate in that software.  Is that okay with you?

17   **Q.   You are allowed to refer to anything you want**

18 **to answer any question I ask of you.**

19   A.   Okay.

20   **Q.   The only caveat to that is if I ask you what**

21 **you're referring to you have to let me know what it**

22 **is.  You have my permission to look at anything you**

23 **want.**

24   A.   Okay.  So my first transfer to internal

25 affairs was as a sergeant, January approximately of

1  2009.

2      Q.   Okay.  And were you in internal affairs for a

3  continuous period of time up through the events, which

4  are the subject of this lawsuit, or were you in and

5  out of internal affairs where you went to other parts

6  of the department and then came back?

7      A.   I was in and out three times at three

8  different tenures of my career as three different

9  ranks.

10      Q.   Okay.  So the primary period of time that I'm

11  going to be interested in for today's deposition is

12  going to be years 2017 through 2019.

13          Tell me what your time frame was in working

14  in IA during those years.

15      A.   In December of approximately 2015 I was

16  transferred to not just internal affairs.  I was

17  placed in charge of the professional standards

18  division, which oversaw internal affairs as well as

19  the training division, accreditation units, the hiring

20  and background unit.

21      Q.   Okay.  And you remained there until when?

22      A.   Until November of 2018.

23      Q.   And when you left in November of 2018, who in

24  the department took over for your position there as

25  head of professional standards?

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021                                    Page 12

1      A.    Captain Joseph Ahern.

2      **Q.    Okay.  Do you recall independently the**

3  **various internal affairs investigations in which**

4  **Gregory Rideau was the subject of those**

5  **investigations?**

6            MR. GOBEO:  Objection.

7  BY MR. NORBRATEN:

8      **Q.    You may answer.  Do you recall independently?**

9      A.    Independently, no.

10     **Q.    Okay.  Well, can you tell me which ones you**

11 **do recall?**

12     A.    After being served with the lawsuit I know I

13 was involved or had knowledge of IA 1801, which was a

14 sexual harassment investigation.  I forget the exact

15 number.  I think it was 18056 maybe was the allegation

16 of double dipping, if you will.  And there was another

17 one that was Joseph Ahern -- I'm sorry -- with

18 Joseph Herb that was a bit prior to that.

19     **Q.    Okay.  So I'd like to start off with the one**

20 **that also involved, I believe at the time, was**

21 **Sergeant Joseph Herb; do you recall that?**

22     A.    Yes, sir.

23     **Q.    So during that time frame were you in your**

24 **position over the head of professional standards?**

25     A.    Could you just give me the date on that?  I

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021                    Page 13

1  apologize, I don't have it in front of me.

2      **Q.   I don't have it in front of me either.  But**
3  **you recalled that incident.  So during that time frame**
4  **do you recall that incident?  Were you over**
5  **professional standards, or were you not involved in IA**
6  **at that point?**

7      A.   Without the date in front of me, I don't know
8  if I was in professional standards.  I was in IA three
9  different times.  I recall the investigation with the
10  two of them.  I know I conducted the investigation.  I
11  don't recall the date, so I don't know if I was
12  captain or lieutenant at the time.

13     **Q.   Well, the date is not that important to me.**
14  **If you recall the investigation, that you conducted**
15  **the investigation.  So tell me what you recall of the**
16  **investigation.  What was the basis of it, and what**
17  **were your investigative findings?**

18     A.   There was a -- well, the findings themselves
19  I would refer to the investigation.  But if you're
20  asking about my recollection, there was a complaint
21  filed by Joseph Herb on professional conduct
22  allegation towards -- I don't know if he was
23  lieutenant, sergeant.  I believe it was sergeant at
24  the time.  I think they were both sergeants of
25  professional conducts from Rideau towards Joseph Herb.

1  And there was also an allegation that there was some
2  sort of racial overtone to it.
3      **Q.   Okay.   Essentially was Gregory Rideau accused**
4  **of calling Joseph Herb a racist?**
5      A.   I don't know if that was the exact word, but
6  there was racial overtone to the complaint.
7      **Q.   Okay.   The subject of the investigation, the**
8  **person accused of doing something wrong, that was**
9  **Gregory Rideau, correct?**
10     A.   Correct.
11     **Q.   Okay.   Did there come a point in the**
12 **investigation when Joseph Herb requested that IA drop**
13 **the investigation?**
14     A.   I don't recall.
15     **Q.   Okay.   And do you recall that following**
16 **Joseph Herb requesting that the investigation be**
17 **dropped the investigation was not dropped, it**
18 **continued forward?**
19          MR. GOBEO:   Objection.
20 BY MR. NORBRATEN:
21     **Q.   You may answer.**
22     A.   I don't recall that request, so I don't know
23 how I could answer the question.
24     **Q.   Okay.   You concluded the investigation**
25 **though, correct?**

```
 1     A.   Yes, sir.
 2     Q.   Okay.  And do you recall meeting with
 3  Gregory Rideau and interviewing him as part of this
 4  investigation?
 5     A.   Yes, at some point.
 6     Q.   Okay.  Do you recall being present with
 7  Gregory Rideau at that time was his attorney from the
 8  PBA, Angela Barbosa?
 9     A.   I would have to refer to the document.  I
10  don't remember who his attorney was for that case.
11     Q.   Okay.  Do you know who Angela Barbosa is from
12  your interactions with the PBA?
13     A.   I do.
14     Q.   Is she an attorney there?
15     A.   She is.
16     Q.   Would you dispute the fact that Gregory
17  Rideau was represented by her during that internal
18  affairs investigation?
19     A.   I would refer back to the investigation for
20  proper documentation.
21     Q.   Okay.  If the investigation reveals that she
22  was his attorney, would you agree with that?
23     A.   If that's what the document says, yes.
24     Q.   Okay.  Do you recall Mack Graham from human
25  resources with the city also being involved in a
```

1   meeting with you, Gregory Rideau, and Angela Barbosa?

2      A.   Independently, no.

3      Q.   Okay.  Do you know who Matthew Graham is?

4      A.   I do.

5      Q.   Okay.  He's no longer with the city,

6   correct?

7      A.   I don't believe so.

8      Q.   Okay.  He was in human resources when he was

9   with the City of West Palm Beach?

10     A.   Yes, sir.

11     Q.   Just generally, how does internal affairs

12  involve human resources with the city when they're

13  conducting an IA investigation, generally?

14     A.   Generally speaking, they don't.  A complaint

15  of that nature, because they have potential for EEOC

16  violation as well, we work in concert with -- I

17  shouldn't say we -- IA will work in concert with HR.

18     Q.   Okay.  And I believe you said you don't

19  recall whether Matthew Graham was involved in a

20  meeting?

21     A.   I don't know.  I'd have to refer back to the

22  document.

23     Q.   Okay.  Do you recall during that

24  investigation and during that meeting Gregory Rideau

25  producing to you screenshots of Joseph Herb's Facebook

1  account that included images depicting allegedly of

2  Joe Herb being racist and making racist comments?

3      A.   I don't recall.

4      Q.   Okay.  Had Gregory Rideau provided those to

5  you during this internal affairs investigation, would

6  they have been made part of the IA report and file?

7           MR. GOBEO:  Objection.  You can answer.

8      A.   If I was provided something by any subject

9  employee that pertains to the investigation, I would

10 include it in the investigation.

11 BY MR. NORBRATEN:

12     Q.   Okay.  Is there some sort of a guide that

13 internal affairs utilizes to determine what evidence

14 to use in an investigation versus what evidence to not

15 use in an investigation, generally?

16     A.   I don't believe we have a policy.  And

17 there's a state statute that governs internal affairs

18 investigations.

19     Q.   Right.  I guess what I'm asking you is, in

20 your answer you said if something pertains to it.  How

21 is it determined whether or not a document pertains to

22 an IA investigation?

23     A.   Generally speaking, if a subject author

24 produces something that they want included in that

25 investigation, I'll put it in the investigation.

1      Q.   Okay.  And is that decision as to whether or

2   not something pertains to the investigation, is that a

3   decision made by the investigating officer, or

4   somewhere else in the chain of command?

5           MR. GOBEO:  Objection.

6      A.   I'm not quite sure how to answer the

7   question, because I would need an example.  I don't

8   have an example.  I can't think of a time that

9   something was provided to an investigator that wasn't

10  included in the investigation.

11  BY MR. NORBRATEN:

12     Q.   Okay.  Well, if you want an example we can

13  use the example we're talking about.  Gregory Rideau

14  provides you with screenshots of a Facebook page of

15  Joseph Herb's personal account.  Gregory Rideau

16  alleges that those are pictures that indicate

17  Joseph Herb is making racial comments.  Okay.

18          The determination of whether or not that

19  pertains to the allegations of Joseph Herb against

20  Gregory Rideau, the investigator makes that decision

21  at that time to determine whether to include them or

22  not, or does the investigator report that to someone

23  else in the chain of command where that decision is

24  made?  That's what I'm trying to get a gauge of.

25     A.   I don't recall Rideau ever providing any of

 1  those text messages that you're referring to.  So I

 2  can't give you an answer.  If Greg Rideau provided me

 3  something, I believe I would have included it in the

 4  investigation.  Again, I'll refer to the documents.

 5  Any interview would have been recorded.  I don't

 6  recall that even being provided to me.

 7      Q.   I understand your answer and I appreciate

 8  that.  You just asked for an example of what my

 9  question was, and that's why I gave you that example.

10  I can give you a different example.

11          If there's an allegation of one officer

12  committing sexual harassment against another officer,

13  and the officer that is accused provides text messages

14  that he would have argued show that he did not

15  sexually harass someone, are those text messages

16  automatically included in the investigation based on

17  the decision of the investigating officer, or does

18  that investigating officer just gather information and

19  feed it up the chain of command where a decision is

20  made what is and is not relevant to that

21  investigation?

22      A.   I'm not aware of any investigator during my

23  tenure at internal affairs being told not to include

24  something in an investigation.  If something was

25  delivered to the investigator that pertain to an

 1  investigation, it should be included in the

 2  investigation.

 3      Q.   Okay.  And, again, you're getting a step

 4  ahead of me.  I think you're trying to answer it, but

 5  I want to make sure.

 6           Is the investigator, the assigned

 7  investigator on that investigation, are they the

 8  gatekeeper for what is and what is not evidence for

 9  that investigation?  That's what I'm getting at.

10      A.   Essentially.

11      Q.   Okay.  And that's all I want to know.  And

12  it's a general question.  Obviously, if there's

13  evidence of something being done not that way, that

14  would be a different answer.

15           But I'm just asking you generally, evidence

16  that's provided to the investigator, the investigator

17  is the one that makes the decision on whether or not

18  that evidence becomes part of the IA investigation,

19  correct?

20      A.   I think it's a matter of fact.  If something

21  is provided it's included.  I don't know any

22  investigator that's ever discarded information that

23  was given to them that pertain to a case.

24      Q.   Okay.  Do you recall, what, if any,

25  discipline Gregory Rideau received following that

1  internal affairs investigation where he was accused of

2  calling Joseph Herb a racist?

3      A.   Again, you're putting words I don't recall in

4  there.  I think I said earlier I don't recall if that

5  word was used.  I said it had a racial overtone to the

6  complaint.  But any discipline or how this case was

7  substantiated, I would refer back to the documents.

8      Q.   Okay.  So you don't remember?

9      A.   Independently, no.

10      Q.   Okay.  When did you first become aware that

11  Gregory Rideau and Deanna Rideau were a couple?

12      A.   I have no idea.

13      Q.   Okay.  Are you aware of that today?

14      A.   I am.

15      Q.   Okay.  Do you know if you became aware that

16  they were dating prior to them becoming husband and

17  wife, or did you only become aware after they became

18  married?

19      A.   I have no idea.

20      Q.   Okay.  Do you know who Deanna Rideau is?

21      A.   I do.

22      Q.   Are you aware of any internal affairs

23  investigations that you can recall independently that

24  you ever made involving Deanna Rideau?

25      A.   No.

1    Q.   In terms of your process when you were in

2  charge of professional standards as it would relate to

3  an individual internal affairs investigation, can you

4  describe for me how, if at all, you were involved when

5  an internal affairs complaint comes in through the

6  course of the investigation all the way through any

7  disciplinary action?  How would you as the head of

8  professional standards be involved, if at all?

9    A.   So I was the captain of that unit, I also

10  conducted some commensurate investigations, so it

11  would depend.  The chief would ultimately make a

12  decision as to who was doing investigations, or

13  sometimes she would -- at that point Chief Mooney --

14  her or she, I worked under several chiefs.  They

15  allowed me some authority to delegate.

16          But typically speaking depending on the

17  nature of the complaint or who was involved, if it

18  involved the rank of lieutenant or above, I typically

19  did those investigations to avoid supervisors having

20  to work with each other again down the road.  But

21  anything below the rank of lieutenant, I would assign

22  the cases based on the workload that the investigators

23  had at the time, or the expertise, and the specific

24  background of the complaint.

25    Q.   Okay.  I'm going to share my screen with you

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021

1  here, so hopefully you can see it.

2          MR. NORBRATEN:  And, Karen, send your e-mail

3      later, and I'll send all the exhibits and I'll

4      copy David on everything as well.

5  BY MR. NORBRATEN:

6      Q.   Captain, are you able to visualize on the

7  screen what I'm attempting to share here via Zoom?

8      A.   I see it, yes, sir.

9      Q.   It's a lot easier in person when I can hand

10 it to you.  This has been working.

11          Are you able to see it?

12     A.   I can see it.

13     Q.   Okay.  Do you recall this as being a

14 coversheet essentially for a closed IA

15 investigation?

16     A.   Yes, sir.

17     Q.   Okay.  And this is the investigation of

18 Officer Zachary Imler.  Do you recall Zachary Imler?

19     A.   Yes, sir.

20     Q.   Okay.  And at the time it appears that you

21 were in charge of, or the captain over internal

22 affairs during this time frame, correct?

23     A.   Yes, sir.

24     Q.   Okay.  So kind of using this as an example,

25 are you able to recall and tell me how it was you were

 1  involved during this IA investigation of

 2  Officer Imler?

 3     A.   I would always again refer back to the

 4  documents for specifics.  I can give you my best

 5  recollection.

 6     **Q.   Yeah, give me your best recollection.  And I**

 7  **have the whole IA here, so we can go through it**

 8  **piecemeal.  I'm just more interested in just generally**

 9  **what your role was during this investigation.**

10     A.   I was a captain of professional standards.

11  Based on the form, it appears Sergeant Mike Oswald

12  conducted the investigation.  I would have reviewed it

13  at some point.  I would have probably been updated

14  during the course of the investigation.

15     **Q.   Okay.**

16     A.   I'm sorry?

17     **Q.   I said okay.  I apologize.**

18     A.   You want more?

19     **Q.   Yeah.  I didn't mean to cut you off.  Please**

20  **answer.**

21     A.   When you said okay I didn't know if you meant

22  that was enough.  So Mike Oswald would have done the

23  investigation.  As I said, it obviously was reviewed

24  by Lieutenant Wiggs, who was a lieutenant over

25  internal affairs at that time, and then I would have

 1  ultimately reviewed it after her.  And then as you can

 2  see, it went through Assistant Chief Kalil and then

 3  ultimately Chief Mooney's signature on that one.

 4      **Q.   Okay.  Do you know who Zachary Imler's father**

 5  **is?**

 6      A.   I know of his father.

 7      **Q.   Who is his father?**

 8      A.   I don't know his name.  At the time I believe

 9  he was a chief in Boynton.

10      **Q.   Okay.  The Chief of Police for the City of**

11  **Boynton Beach?**

12      A.   I believe so.  Again, I don't know him

13  personally.  I know he was a chief of police of

14  something.

15      **Q.   Okay.  And do you know if he was the chief of**

16  **police during the time Zachary Imler was working at**

17  **the West Palm Beach Police Department?**

18      A.   I don't independently recall that.

19      **Q.   Okay.  That's fine.  Do you recall what**

20  **occurred during this investigation in terms of what**

21  **happened to Officer Imler?**

22      A.   To some extent, again, I'll just -- I was

23  referred to a document for full extent of the

24  investigation.  But ultimately Zach Imler was accused

25  of stealing money during the course of a search

1  warrant.  I believe Sergeant Rideau was his supervisor

2  at that time, who brought forward some of the

3  information that was then later turned over to

4  internal affairs after the criminal investigation was

5  completed.

6     Q.   Okay.  And I scrolled down here to page 1 of

7  6 of IA 17-006, which is this investigation to

8  Agent Zachary Imler.  And the preface, you can see

9  that there?

10    A.   Yes, sir.

11    Q.   Okay.  So October 25th of 2017, there was a

12 search warrant executed, and it was in the execution

13 of that search warrant that Agent Imler -- I don't

14 know how to use the word -- stole or embezzled money

15 that was evidence from the scene, correct?

16    A.   Yes, sir.

17    Q.   Okay.  And Sergeant Rideau was the one that

18 initially brought this information to the department

19 that resulted in this investigation, and ultimately

20 Agent Imler's resignation from the department,

21 correct?

22    A.   Yes, sir.

23    Q.   Okay.  He was charged with grand theft,

24 right?

25    A.   I believe so.  I'll refer back to the

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021

1  document itself.

2      **Q.    A criminal investigation commenced for the**
3  **crime of grand theft, right?**

4      A.    Correct.

5      **Q.    Okay.  And during the discovery of this**
6  **information on October 25, 2017, were you aware of how**
7  **Sergeant Rideau at the time became aware of the fact**
8  **that Agent Imler had stolen this money from the scene**
9  **of the search warrant?**

10      A.    I have a recollection.  I don't know if it's
11  very specific.  But, yes, I have a recollection of the
12  incident.

13      **Q.    Okay.  Tell me what you recall, and then**
14  **we'll go through the inquiry.**

15      A.    During the course of the search of a
16  residence after search warrant was served by SWAT, as
17  I recall, the homeowner -- and again, I'll refer back
18  to the document.  But from what I recall, there's
19  mention of cash that wasn't located, that I believe
20  the homeowner relayed to Sergeant Rideau that there
21  was definitely cash in the house.  And they found some
22  dope, but nobody was finding cash.  Sergeant Rideau, I
23  believe, spoke with the homeowner, and she said, no,
24  there was definitely cash in there because I remember
25  counting it the night before.

1          Sergeant Rideau, I believe, told everybody

2   nobody leaves here until we find this cash.

3   Officer Imler -- or Agent Imler at one point -- I

4   believe he went to his car or something to do with him

5   taking his vest off.  And again, I don't know the

6   specific order of it.  Somewhere along the way he

7   apparently went to his car and allegedly stashed the

8   money in his car.

9          When Sergeant Rideau refused to let anybody

10  leave until they found the cash, I believe Imler at

11  some point pulled somebody aside, I don't remember who

12  it was, but he made an initiative of taking the money.

13  Sergeant Rideau then reported that to his chain of

14  command.  I believe Captain Kapper then alerted

15  Chief Mooney.  I got pulled into a meeting at some

16  point.

17       Q.   Okay.  That's a very good memory you have.

18  During the time of the search warrant on this date

19  October 25, 2017, Agent Elainy Ravelo was working with

20  Agent Imler and Sergeant Rideau, executing that search

21  warrant, correct?

22       A.   I believe so.

23       Q.   Okay.  And during the course of discovering

24  that Agent Imler had taken this money, were you aware

25  that Agent Ravelo became aware that Agent Imler had

1   taken the money, and didn't initially share that

2   information with Captain Kapper or Sergeant Rideau?

3            MR. GOBEO:  Objection.

4       A.   I apologize.  That's a very complex question.

5   Could you simplify that, because I'm not quite sure if

6   you're asking the time frame that I knew something.

7   BY MR. NORBRATEN:

8       Q.   Right.  At any point in time did you ever

9   become aware of the fact that Agent Ravelo was accused

10  of being dishonest with Captain Kapper and

11  Sergeant Rideau during the investigation of what

12  Agent Imler did or did not do at that home?

13      A.   At some point I became aware that there was

14  an allegation she was dishonest.

15      Q.   Okay.  Do you have an understanding as to why

16  that allegation never became part of this internal

17  affairs investigation?

18      A.   I don't know if that was known at the time

19  the investigation was completed.

20      Q.   Okay.  Do you have an understanding as to why

21  that allegation never became part of any other

22  internal affairs investigation?

23      A.   I don't recall.

24      Q.   Okay.  Did you become aware of the fact that

25  at that time Sergeant Rideau no longer wanted

1  Agent Ravelo in his unit because he could not trust

2  her?

3          MR. GOBEO:  Objection.

4      A.   I don't think I became aware of that

5  allegation until I saw it in the lawsuit.

6  BY MR. NORBRATEN:

7      Q.   Okay.  Did you ever have any communication

8  with Captain Kapper about his involvement in the

9  investigation of what Agent Imler did or did not do

10  that day?

11     A.   I'm sorry.  Could you repeat the question?

12     Q.   Yeah.  During your work on this internal

13  affairs investigation, did you personally ever have

14  any involvement with Captain Kapper in reviewing him

15  for what may or may not have happened?

16     A.   I don't believe I interviewed Captain Kapper,

17  but I did speak with him at some point or another.  I

18  think I told you I got pulled into a meeting with the

19  chief and Captain Kapper at some point.

20     Q.   Right.  Would you agree that Captain Kapper

21  was a witness to happened?

22     A.   No.  He wasn't at the house the morning of

23  the search warrant.

24     Q.   Okay.  Was he not at the station when it was

25  revealed that Agent Imler had actually done this?

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021

```
 1      A.   I don't recall where he was.
 2      Q.   Okay.  Whatever the case may be,
 3 Captain Kapper was not a named witness in this IA,
 4 correct?
 5      A.   Referring to the document, he's not listed.
 6      Q.   Okay.  Do you have an understanding as to why
 7 Captain Kapper was not listed as a witness?
 8      A.   He was not on scene of the incident.
 9      Q.   Okay.  The investigation, the criminal
10 investigation, references what was done and how
11 Agent Imler initially came clean, and admitted to what
12 had happened.
13           During this, there's no reference in this to
14 whether or not Agent Ravelo was ever dishonest towards
15 Captain Kapper or Sergeant Rideau.  You don't recall
16 ever having any of that information as part of this
17 IA, correct?
18      A.   I wasn't involved.
19      Q.   Okay.  During your time working in IA when
20 Chief Mooney was the chief of the police department,
21 what was her typical role during the course of an IA
22 investigation?
23      A.   Typical role for most cases, she didn't get
24 involved in much.  She was always briefed on it on the
25 front end what the allegations were.  She would assign
```

1  it, or she would have me assign the case, or sometimes

2  she'll be a little bit more involved.  But as far as

3  who gets the case on the front end, we would have

4  weekly meetings, and then we would have separate

5  meetings sometimes just to talk about internal affairs

6  cases to keep the chief briefed on where cases are.

7          But as far as getting involved in the

8  investigation itself, I don't think I can recall her

9  ever getting involved in a case.

10      Q.    Okay.  And is that by design?

11      A.    You'd have to ask her that question.

12      Q.    Well, you worked in IA for a long time for

13  various periods under various chiefs.  Isn't the

14  internal affairs investigation process designed to be

15  as confidential as it can be?

16          MR. GOBEO:  Objection.

17      A.    It should be.  But who designs that?  I mean,

18  every police department may operate a little bit

19  different than other police departments.  I can tell

20  you how each chief is a little bit different.  But I

21  don't know whose design you're referring to.

22  BY MR. NORBRATEN:

23      Q.    I'm talking about just the general design

24  within the agency of how internal affairs is run.

25          There is an internal affairs investigating

1  officer that is in charge of gathering all the

2  information, correct?

3      A.   Yes, sir.

4      Q.   Okay.  And not until that officer has

5  completed their investigation and their report is that

6  information shared up the chain of command, correct?

7          MR. GOBEO:  Objection.

8      A.   Not necessarily.

9  BY MR. NORBRATEN:

10     Q.   Okay.  Give me examples of when that

11  information is shared up the chain of command.

12     A.   I just told you we would have weekly meetings

13  to brief myself, and at the time the chief was briefed

14  on the investigations and where they're going.

15     Q.   Okay.  So there were weekly meetings.  Where

16  were they held?

17     A.   I would have meetings -- as the captain my

18  office was in internal affairs.  I was in the office

19  regularly, sometimes there were impromptu meetings,

20  sometimes there were scheduled meetings on Thursdays

21  or Fridays to get caught up on where we're at in the

22  cases.  There was weekly meetings beginning with

23  command staff, but I wouldn't disclose ongoing

24  investigations and general command staff, but I would

25  update the chief on cases sometimes as they were

 1  going.

 2      Q.   Okay.  And so -- and I want to be, I guess,

 3  as clear as I can on what you're saying.  So there

 4  were weekly meetings; sometimes people that were not

 5  in internal affairs would attend those meetings?

 6      A.   No.  I just said there were meetings in the

 7  police department every day, as far as ongoing

 8  investigations with anybody outside the chain of

 9  command that would sign off on the investigation.

10      Q.   Okay.  So the chief could be disclosed

11  information concerning ongoing investigations, yes?

12      A.   Yes.

13      Q.   Okay.  And describe for me when those

14  disclosures would take place?

15      A.   It would depend on the circumstances.

16  Sometimes -- again, I worked for various chiefs.

17  Sometimes chiefs would come into internal affairs just

18  to have conversations so that there was nobody else

19  around.  There was other times that chief -- I've been

20  in the same building the entire time, so I'll just

21  refer to the chief's conference room, which is

22  adjacent to the chief's offices, there were meetings

23  that were held in there at times.

24      Q.   Do you recall having meetings with

25  Chief Sarah Mooney concerning internal affairs

1  investigations that were ongoing about Greg Rideau?

2      A.   I don't recall independently.

3      Q.   Okay.  You mentioned that there were weekly

4  meetings that occurred within internal affairs,

5  correct?

6      A.   Yes.

7      Q.   Okay.  Where the chain of command at internal

8  affairs would update themselves on what was going on

9  and processing of cases, correct?

10     A.   Yes.

11     Q.   Okay.  So I'm not talking about those

12 meetings.  I'm talking about meetings that would have

13 occurred with Chief Mooney -- and I'm only talking

14 about Chief Mooney, not any other chief -- during the

15 course of an ongoing investigation, you do not recall

16 having any of those meetings with Chief Mooney

17 concerning investigations into Gregory Rideau?

18     A.   I know that at least one or two meetings I

19 had with Chief Mooney about one specific

20 investigation.

21     Q.   Okay.  So can you tell me about those one or

22 two meetings that you recall having?

23     A.   At some point in IA 18-001 an agent brought

24 up a conversation, a phone conversation, that was

25 recorded on a CI's phone that was forwarded to the

1  agent, that CI believed that Sergeant Rideau was

2  interfering with an ongoing criminal drug

3  investigation that was brought up to us.  There was a

4  later subsequent meeting that was going to be held at

5  DEA to discuss that recording.

6          I briefed the chief on the situation of that

7  recording.  I believe Captain Kapper was briefed on

8  that recording as well.  I don't know if he knew

9  before that, because it may be in your complaint that

10  Kapper brought up -- I'm not quite sure when Kapper

11  was brought in.  But there was a meeting discussing

12  the fact that that recording was going to be reviewed

13  with Captain Kapper and the case agent at DEA to see

14  if they wanted to review it any further.

15      **Q.   Okay.  Do you recall when in time that**

16  **meeting took place?**

17      A.   I don't recall a date.

18      **Q.   Okay.  And I believe your testimony was one**

19  **or two meetings.  Were both of those meetings about**

20  **that issue?**

21      A.   There was a separate one with legal counsel

22  involved as well.

23      **Q.   Okay.  The separate one with legal counsel,**

24  **did that occur after the one that you previously**

25  **described?**

1      A.    I don't recall.

2      **Q.    Okay.  Describe for me what you recall**

3  **occurring in the separate meeting with legal counsel.**

4            MR. GOBEO:  Objection to the extent that it's

5        going to ask for attorney-client privilege.

6            MR. NORBRATEN:  There is no such privilege.

7        She represents the city, not any individual

8        officers.  Or I don't even know who else is in

9        this meeting.  But similarly when I asked in the

10       beginning of the case who he met with, if he met

11       with all three of you, that's not an

12       attorney-client privilege meeting either.  So I

13       can ask him about those conversations.  I'm not

14       doing that because I don't think it's pertinent

15       and I don't want to have that fight.  But this is

16       a fight we may need to have.  So let's make it

17       clean on the record that way we can have it.

18  BY MR. NORBRATEN:

19     **Q.    Captain Swiderski, I would like to know what**

20  **happened during the meeting you just described that**

21  **took place, you don't recall when in time, but with**

22  **legal counsel concerning the audio recording**

23  **concerning Greg Rideau's conversations with a CI that**

24  **was recorded without Gregory Rideau's knowledge and**

25  **appeared during the course and scope of this internal**

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021

1  affairs investigation.

2          MR. GOBEO:  I'm objecting.  I'm instructing

3      the witness not to answer the questions that he's

4      asking about your conversations with the city

5      attorney.

6  BY MR. NORBRATEN:

7      Q.   Okay.  Captain Swiderski, who was present in

8  that meeting where legal counsel was there?

9          MR. GOBEO:  You can answer that.

10     A.   I believe it was Chief Mooney and

11  Zoe Panarites.

12  BY MR. NORBRATEN:

13     Q.   And yourself?

14     A.   Yes, sir.

15     Q.   Anyone else?

16     A.   I don't recall.

17     Q.   Okay.  And you believe that meeting took

18  place at some point in the calendar year of 2018, or

19  no?

20     A.   Yes, sir.

21     Q.   And you believe that meeting took place prior

22  to Gregory Rideau's 80-hour suspension handed down by

23  Chief Mooney at the end of 2018?

24     A.   If you're referring to the 80 hours

25  associated with IA 18-001, then yes.

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021

1    Q.   Okay.  And I didn't ask you this before, but

2  I'm assuming, so correct me if I'm wrong.  The other

3  meeting you talked about where there was consideration

4  about whether or not that recording was going to be

5  discussed with DEA, that also took place prior to

6  Greg Rideau's 80-hour suspension from IA 18-001, yes?

7    A.   Yes.

8    Q.   Okay.  Who was present during that meeting?

9    A.   To the best of my recollection, it would have

10  been myself, Chief Mooney, and Captain Kapper.

11    Q.   Okay.  And do you recall what, if any,

12  decision was made out of that meeting?

13    A.   I don't believe that meeting was intended for

14  a decision.  It was more of a briefing that

15  Captain Kapper was going to be attending a meeting

16  with DEA and the case agent, reference that audio

17  recording.

18    Q.   Okay.  At the time of that meeting, had you

19  listened to the audio recording?

20    A.   Yes, sir.

21    Q.   At the time of that meeting, did you have an

22  understanding as to how that recording was created?

23    A.   Yes, sir.

24    Q.   And how was it created?

25    A.   From my recollection, I believe

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021                              Page 40

1  Sergeant Rideau contacted a confidential informant

2  that he had a prior relationship with, that CI was now

3  working with another case agent, and Sergeant Rideau

4  contacted that agent -- that CI, I'm sorry -- and

5  that's how it was recorded.

6       Q.   Okay.  Were there other recordings of

7  Sergeant Rideau that were floating around the

8  department around this time frame?

9       A.   I have no idea what you're referencing.

10      Q.   Okay.  Are there other audio recordings of

11  Gregory Rideau on a phone call with other individuals

12  that were in possession of the police department

13  during 2018 and 2019 that you at some point became

14  aware of?

15      A.   Not that I'm aware of.

16      Q.   Okay.  When you observed and listened to the

17  audio recording, did you make a determination as to

18  whether or not the contents of that recording

19  pertained to the investigation IA 18-001?

20      A.   Did I make a decision, or did I make an

21  opinion, I'm sorry?

22      Q.   Both.  First, did you have an opinion?

23      A.   Yes, I did.

24      Q.   What is that opinion?

25      A.   That it had nothing to do with 18-001.

1      Q.   Okay.  And then the next question, decision.

2   Did you make a decision based on that?

3      A.   I don't recall if it was my decision or the

4   chief's.  We, again, had a meeting about it with legal

5   counsel.

6      Q.   Okay.  Did you provide legal counsel with the

7   audio recording?

8      A.   I don't recall.

9      Q.   Did you play legal counsel the audio

10   recording?

11      A.   I don't recall.

12      Q.   Did legal counsel instruct you not to turn

13   that recording over to Gregory Rideau?

14           MR. GOBEO:  Objection.  And instructions from

15       legal counsel would be attorney-client privilege.

16       I'm instructing you not to answer that question.

17   BY MR. NORBRATEN:

18      Q.   Did legal counsel have an understanding as to

19   how that recording was made?

20           MR. GOBEO:  Same objection.

21   BY MR. NORBRATEN:

22      Q.   Did you inform legal counsel of how that

23   recording was made?

24           MR. GOBEO:  Objection.  The contents of the

25       conversation with legal counsel are protected by

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021                    Page 42

```
 1      attorney-client privilege.
 2  BY MR. NORBRATEN:
 3      Q.   Did there come a point in time where you
 4  discovered what happened as a result of the meeting
 5  with DEA concerning the audio recording?
 6      A.   I was briefed, yes.
 7      Q.   What happened?
 8      A.   I would refer to Kapper for the specifics.
 9  But I recall that the case was not a federal case as
10  of yet, and that they decided not to adopt the case.
11      Q.   Okay.  And Agent Steinberg was in fact the
12  individual that was now working with the CI,
13  correct?
14      A.   Yes.
15      Q.   Okay.  Was Agent Steinberg present with the
16  meeting with legal counsel?
17      A.   I don't recall.
18      Q.   You mentioned you don't recall whether or not
19  it was your decision or Chief Mooney's decision not to
20  turn over the audio recording to Gregory Rideau as
21  part of 18-001.
22           Do you have an understanding as to why that
23  recording remained in IA after the conclusion of
24  18-001?
25           MR. GOBEO:  Objection.
```

1    A.   Yes.

2   BY MR. NORBRATEN:

3    **Q.   Why was that?**

4    A.   There was some conversation that Greg Rideau

5   had made an allegation to fake an injury and sue the

6   city.

7    **Q.   Okay.  And you were aware of that allegation**

8   **prior to suggesting to Gregory Rideau that he apply**

9   **and go under FMLA to get therapy, correct?**

10        MR. GOBEO:  Objection.

11   A.   Could you repeat the question?  I'm not sure

12   I understand that.

13  BY MR. NORBRATEN:

14   **Q.   There came a point in time when you**

15  **recommended that Gregory Rideau get an EPA?**

16   A.   I don't believe so.

17   **Q.   I apologize.  EAP.  You don't think you ever**

18  **recommended that he go do that?**

19   A.   I don't believe so.

20   **Q.   Okay.  You never had a conversation with him**

21  **where you suggested that he seemed stressed out and**

22  **that he needed to go perhaps get some therapy and take**

23  **some FMLA time?**

24   A.   No.

25   **Q.   When you were aware of the existence of this**

1  audio recording, do you know whether or not the

2  contents of that recording were considered by

3  Chief Mooney when she made her determination in

4  disciplining Gregory Rideau for 18-001?

5     A.   You would have to refer to Chief Mooney on

6  that.

7     Q.   Okay.  And I will.  I just didn't know if she

8  shared with you anything during these meetings you

9  guys had about the case.

10     A.   I don't recall.

11     Q.   Okay.  All right.  Captain, we've been going

12  for about 50 minutes.  Why don't we take a 10-minute

13  break, and we'll start up again 11 a.m. if that's

14  okay.

15     A.   Okay.

16          (A recess was held from 10:50 a.m. until

17      11:05 a.m.)

18          MR. NORBRATEN:  Back on the record.

19  BY MR. NORBRATEN:

20     Q.   Before we get further I want to make sure I

21  got this clear on the record.  I understood your

22  answer -- I think you said you didn't recall.

23          Captain Swiderski, do you recall meeting with

24  Gregory Rideau, with Captain Kapper present, where you

25  recommended to Gregory Rideau that he go to an EAP?

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021

Page 45

1    A.   I don't recall.

2    Q.   Okay.  I'm going to share with you the

3  screen, and this is related to investigation 18-001,

4  which is identified as sexual harassment allegations

5  against Gregory Rideau.

6         During this time frame you were the captain

7  of internal affairs, correct?

8    A.   Yes, sir.

9    Q.   Okay.  And this is the, I guess, kind of like

10  the face sheet for it.  And the eventual punishment

11  that was handed down by Chief Mooney was 80-hour

12  suspension, correct?

13    A.   According to the document, yes.

14    Q.   Okay.  Do you have a recollection as to how

15  Chief Mooney arrived at an 80-hour suspension as

16  opposed to a 40-hour suspension?

17    A.   Would I have a recollection of why

18  Chief Mooney did something?  No.

19    Q.   And, again, I would assume you don't.  I just

20  want to make sure.  I will talk to her later and ask

21  her.  But I didn't know if you and her discussed these

22  things.

23         Did she ever relate to you as to why it was

24  an 80-hour suspension versus any other type of

25  suspension?

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021                                    Page 46

1      A.    Prior to this discipline being served, I
2  don't recall.
3      Q.    Okay.  Do you recall ever learning that part
4  of the consideration for that was the fact that
5  Officer Burgoon had also made some sort of an
6  allegation of sexual harassment against
7  Gregory Rideau?
8          MR. GOBEO:  Objection.
9      A.    Could you repeat.  I'm sorry, the first part
10  of the question I misunderstood.
11  BY MR. NORBRATEN:
12      Q.    Of course.  Please do that.  If I ever ask
13  anything and you're confused, clarify.  That way we're
14  on the same page.
15          Did you ever become aware of whether or not
16  Chief Mooney used the fact that Officer Burgoon had
17  prior allegations of sexual harassment against
18  Gregory Rideau in her disciplining Gregory Rideau for
19  the sexual harassment claims of Officer Ravelo?
20          MR. GOBEO:  Objection.
21      A.    I don't know if Chief Mooney used that or
22  not.
23  BY MR. NORBRATEN:
24      Q.    Okay.  All I want to know.  Do you have an
25  independent recollection of what the allegations were

```
 1  of sexual harassment by Officer Ravelo?

 2      A.   I recall -- I know I read them at some point,

 3  and I was briefed on it.  I have a recollection.  How

 4  specific it is, I don't know.

 5      Q.   Okay.  The alleged incidents occurred over a

 6  year before the allegations were made to the

 7  department, correct?

 8          MR. GOBEO:  Objection.

 9      A.   I would refer to the documents for specific

10  dates.

11  BY MR. NORBRATEN:

12      Q.   Okay.  Do you have an understanding as to why

13  Officer Lori Colombino was involved in this particular

14  IA investigation?

15      A.   I don't recall why specifically.  I know she

16  was involved.

17      Q.   Okay.  It appears from my review of the

18  documents that she was used as somewhat of a victim

19  advocate for Officer Ravelo.  Would you agree with

20  that?

21      A.   I don't know victim advocate.  But she was

22  used as somebody for her to relay information to.

23      Q.   Okay.  And she sat in on Officer Ravelo's

24  interviews, correct?

25      A.   I don't recall.
```

1     Q.   Okay.  Well, if the evidence is in the report

2  that she did sit in on the interviews, would you agree

3  with that?

4     A.   I would.

5     Q.   Okay.  For instance, looking at IA 18-001

6  now, the summary of interview one of Agent Ravelo

7  Marte, Chief Mooney requested Sergeant Lori Colombino

8  be present during the interview due to the allegations

9  of sexual harassment.  You would agree that that

10  happened?

11     A.   If it's in the report, I concur with the

12  report.

13     Q.   Okay.  So do you have an understanding as to

14  why that happened?

15     A.   I don't know.

16     Q.   Was it common for other officers to accompany

17  fellow officers during the interviews they gave when

18  they made IA allegations?

19          MR. GOBEO:  Objection.

20     A.   It's not necessarily common, but it's not

21  unheard of.

22  BY MR. NORBRATEN:

23     Q.   Okay.  Do you have an understanding as to why

24  it was done in this case?

25     A.   I believe the report refers to that.

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021                                    Page 49

1      Q.    Okay.  Because of the allegations of sexual

2   harassment, is that what you mean?

3      A.    That's what the report says.

4      Q.    Okay.  So do you know why Sergeant Colombino

5   herself was interviewed as part of this

6   investigation?

7      A.    I would refer to the document.  I believe she

8   became a witness.

9      Q.    Right.  And she became a witness while

10   serving as a liaison, or a victim advocate, or

11   go-between for Agent Ravelo, correct?

12            MR. GOBEO:  Objection.

13      A.    I don't agree to the way you summarized it.

14   BY MR. NORBRATEN:

15      Q.    Okay.  Well summarize it any way you'd like.

16   How did she become a witness during the actual

17   investigation?

18      A.    Again, I'll refer to the document.  But I

19   believe she was at a meeting where there was another

20   incident that occurred.

21      Q.    Right.  A meeting where Officer Ravelo showed

22   up even though she had no business being at that

23   meeting, correct?

24            MR. GOBEO:  Objection.

25   BY MR. NORBRATEN:

1      Q.    You may answer.

2      A.    I don't know that she had no business.  I

3  think she was invited.

4      Q.    Okay.  Do you know who invited her?

5      A.    I don't recall.

6      Q.    Do you know who Officer Cognetti is?

7      A.    I do.

8      Q.    Okay.  Do you know if she invited her?

9      A.    I don't recall.

10      Q.    Do you recall what type of meeting it was?

11      A.    I believe it was a criminal investigation

12  meeting.

13      Q.    Okay.  Was Agent Ravelo involved in the

14  investigation that the meeting was pertinent to, to

15  your knowledge?

16      A.    I believe she was.

17      Q.    Okay.  What do you base that belief on?

18      A.    It was relayed to me at some point she had

19  some interaction during the investigation.

20      Q.    Okay.  And Sergeant Rideau certainly was

21  involved in that investigation, correct?

22      A.    I don't know.

23      Q.    Okay.  If Sergeant Rideau was involved in

24  that investigation, why does that meeting matter?

25      A.    I'm not quite sure I understand the

1  question.

2      Q.   So you said Officer Colombino, Sergeant

3  Colombino, became a witness because of a meeting, a

4  meeting that involved an investigation that

5  Officer Ravelo attended.

6          How does that involve Gregory Rideau?

7      A.   I would refer to the document.  I believe he

8  was a supervisor or something like that at the time.

9  I don't know if he was involved in the investigation

10  itself.

11     Q.   Okay.  So do you have any independent

12  knowledge as to how Lori Colombino became a witness in

13  this case?

14          MR. GOBEO:  Objection.

15     A.   I would refer to the document.

16  BY MR. NORBRATEN:

17     Q.   Well then you don't have any independent

18  knowledge, right?

19     A.   I have some knowledge.  I don't know

20  specifically.  I said I have some recollection of it.

21  But if you want specific information, I'll refer to

22  the document.

23     Q.   I'm not asking for any specific information.

24  I'm asking you whether or not you have specific

25  information.  So the answer is yes or no.  So I'm

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021

1  taking the I'm referring you to the document as no.

2  Am I correct in doing that?

3          MR. GOBEO:  Objection.

4    A.   No.

5  BY MR. NORBRATEN:

6    Q.   Explain to me how I'm incorrect in doing

7  that?

8    A.   You asked me if I had recollection of this, I

9  said yes.  And I told you what that recollection was.

10 It was a meeting that I believe they were both in

11 attendance of, and there was another incident that

12 occurred that Agent Ravelo later document as a further

13 complaint towards her ongoing investigation.

14   Q.   Okay.  And what I'm asking you is, how does

15 that involve Gregory Rideau?

16   A.   Again, I believe there was another incident

17 that was documented by Elainy Ravelo that she felt

18 uncomfortable that Sergeant Rideau did something or

19 said something at that meeting.  So that's how it

20 involved Sergeant Rideau.

21   Q.   Okay.  And at any point in time was it

22 relayed to you through your position in internal

23 affairs that Sergeant Rideau alleged that that was a

24 setup to bring Officer Ravelo to that meeting when the

25 two of them were not supposed to be in the same place?

1  Was that ever relayed to you?

2      A.   No.

3      Q.   Did that ever become part of the IA

4  investigation or Sergeant Rideau's -- at the time

5  Sergeant Rideau's defenses to the allegations?

6      A.   I never sat in on this interview.  I don't

7  know if he mentioned it during his interview.

8      Q.   Okay.  Well, you saying you don't know would

9  just answer that for me.  So that's all I'm getting

10  at.  You agree you don't know?

11      A.   You asked like six questions and you keep

12  repeating things back to me in a different manner.

13  I'm not sure what the question is at this point.

14      Q.   Okay.  We started down this path by asking

15  what Lori Colombino has to do with this case.  And

16  initially she was someone assisting Officer Ravelo in

17  making the complaint, correct?

18      A.   No.

19      Q.   Okay.  So how was she initially involved in

20  this case?

21      A.   I would think she was initially involved in

22  the case at all.  I'm not quite -- I don't recall a

23  point she was introduced in the case, but she had

24  nothing to do with the initial complaint, I don't

25  believe.

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021                                      Page 54

```
 1     Q.   Okay.  And so at some point during the

 2  investigation she became a witness.  That was your

 3  testimony, correct?

 4     A.   Yes.

 5     Q.   Okay.  How did she become a witness?

 6          MR. GOBEO:  Objection.

 7     A.   Counselor, I'm not trying to be argumentative

 8  with you.  But I answered this several times.  It's

 9  documented in the investigation, and at some point

10  there was a meeting that was held.  I believe there

11  was multiple people at the meeting to include

12  Lori Colombino, Greg Rideau, Agent Ravelo.  There was

13  a subsequent complaint that was filed after that

14  meeting, and that's how she became part of that

15  investigation as a witness.

16  BY MR. NORBRATEN:

17     Q.   Okay.  And you know that information based on

18  what, your review of the file?

19     A.   I have some independent recollection of it.

20  I reviewed the file prior to this deposition, so that

21  refreshed it.  But I don't have the report in front of

22  me to read to you verbatim.  But I'll refer to the

23  document for most of the information.

24     Q.   And then my follow-up to that was, at any

25  point in time did you become aware of the fact that
```

1  Gregory Rideau alleged that that meeting and

2  Officer Ravelo's attendance at that meeting

3  specifically was an effort to set him up to put him in

4  the same place as Officer Ravelo?  Were you ever made

5  aware of that?  That's my simple question.

6      A.   I don't believe so.

7      Q.   Okay.  We can move on.

8           I'm showing what is -- I guess it seems like

9  it's somewhat of a log and a timeline of events that

10  take place during an IA investigation.  Are you

11  familiar with what I've put up on the screen now, just

12  generally what these are?

13      A.   Yes.

14      Q.   What are they?

15      A.   That's an IA probe printout and it summarizes

16  what was entered into it, to be honest with you.  It's

17  not necessarily a log.

18      Q.   Okay.  And this particular IA probe is for IA

19  18-001, the sexual harassment investigation,

20  correct?

21      A.   Yes, sir.

22      Q.   All right.  So again we get the allegations

23  here.  The initial IA was received on March 6th of

24  2018, correct?

25      A.   According to that, yes.

```
 1      Q.   According to this, yes.  And after the IA was
 2  completed, actions taken on October 30, 2018,
 3  Officer Rideau was suspended for 80 hours, correct?
 4      A.   Correct.
 5      Q.   Okay.  Now when you scroll through the events
 6  that occurred, Officer Rideau initially requested a
 7  hearing prior to the discipline being handed out,
 8  correct?
 9      A.   Yes.
10      Q.   Okay.  And if we go down here to the summary,
11  it would appear that that request was made on
12  October 16th of 2018, correct?
13      A.   According to that document, yes.
14      Q.   And then the hearing took place on
15  October 30th of 2018, correct?
16      A.   Yes, sir.
17      Q.   And the hearing was held before
18  Captain Sinnott, Captain Ahern, and Chief Mooney,
19  correct?
20      A.   Accord to the document, yes, sir.
21      Q.   Okay.  And then following the predisciplinary
22  hearing, the board upheld the discipline order by
23  Chief Mooney, and Sergeant Rideau was served with that
24  on November 6th of 2018, correct?
25      A.   Yes, sir.
```

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021                              Page 57

```
 1      Q.   Okay.  And then so on and so forth.  By the
 2  way, Rick King mentioned here on November 6, 2018,
 3  that's a PBA attorney that represented Sergeant Rideau
 4  in appealing -- during this IA process and in
 5  appealing this process, an order asking to go to
 6  arbitration, correct?
 7           MR. GOBEO:  Objection.
 8      A.   That was like six questions.  Is he a PBA
 9  attorney?  Yes, he is.
10  BY MR. NORBRATEN:
11      Q.   Okay.  And he represented Gregory Rideau,
12  correct?
13      A.   Yes, sir.
14      Q.   Okay.  And you filed a grievance against
15  Rick King for his representation of Gregory Rideau and
16  the allegations that were made against you, correct?
17      A.   A grievance?  I'm not sure.
18      Q.   Bar grievance?
19      A.   I'm sorry?
20      Q.   Did you file a grievance with the Florida Bar
21  against Attorney King?
22      A.   Filed a complaint of Mr. King, yes, sir.
23      Q.   Okay.  We call it -- with my union we call it
24  a grievance.
25           Do you recall when you did that?
```

```
 1     A.   I don't recall the date.
 2     Q.   Okay.  But what I want to be focused on here
 3  for the date is this October 30, 2018, hearing for
 4  predisciplinary hearing.
 5          Is that something that you take part of as
 6  the captain of IA, or no?
 7     A.   Other than setting it up, no.
 8     Q.   Okay.  Do you know if you were in attendance
 9  at that hearing?
10     A.   No, I wouldn't have been.
11     Q.   Okay.  Who presents at the hearing on behalf
12  of the department?  Would that have been the
13  investigating officer?
14          MR. GOBEO:  Objection.
15     A.   There is no presentation on behalf of the
16  agency.  A predisciplinary hearing is after the
17  conclusion of the investigation.  The subject officer
18  and/or his attorney would be the one making a
19  presentation or tasked to answer questions.  That
20  isn't necessarily a presentation by the city.
21  BY MR. NORBRATEN:
22     Q.   Okay.  All right.  Well, thank you for
23  clarifying that for me.
24          And during that predisciplinary hearing, you
25  in fact were meeting with the state attorney's office
```

1  in an investigation into what you said before was

2  essentially the double dipping that Gregory Rideau was

3  accused of, correct?

4          MR. GOBEO:  Objection.

5      A.   During that meeting, I don't have a clue what

6  time it would have been.

7  BY MR. NORBRATEN:

8      Q.   Okay.  Well, I'm now referring to IA 18-056,

9  and it indicates that on November 8th -- excuse me --

10 on October 30, 2018, Captain Swiderski and I -- and

11 these are the words of Brian McDaniel -- met with

12 State Attorney Brian Fernandes and Sergeant Daniel

13 Boland of the 15th Circuit, State Attorney's Public

14 Corruption Unit.  We presented this investigation to

15 them for further investigation.

16          So would you agree that on the same day

17 Gregory Rideau was presenting his predisciplinary

18 hearing for IA 18-001, yourself and -- I don't know if

19 it was Captain or Lieutenant McDaniel at the time --

20 were meeting with the State Attorney's Office Public

21 Corruption Unit?

22     A.   According to that document, yes.

23     Q.   Okay.  And so do you have an understanding as

24 to when the initial information related to IA 18-056

25 became aware to internal affairs?

```
 1      A.   I think you're actually referring to AD
 2  18-056.  Not to split hairs, but there's different
 3  suffix to --
 4      Q.   You're correct.  You're correct.  So what
 5  does the AD stand for?
 6      A.   Administrative investigation versus -- it's
 7  really just splitting hairs.  I just want to make sure
 8  that you're referring to the right document.
 9      Q.   Yes.  So I'm sharing my screen with you now.
10  Can you see my screen?
11      A.   Yes, sir.
12      Q.   Okay.  And is this the document we're
13  referring to, the investigation into the alleged
14  double dipping of Gregory Rideau?
15      A.   Yes, sir.
16      Q.   So this preface -- I guess let's get up and
17  see what your involvement was in this case.
18           Officer McDaniel was the investigating
19  officer?
20      A.   Yes, sir.
21      Q.   Okay.  And Lieutenant Wiggs is still there as
22  the lieutenant in IA, correct?
23      A.   Yes, sir.
24      Q.   You were the captain of internal affairs over
25  professional standards, correct?
```

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Theodore Swiderski on 11/03/2021                                    Page 61

1      A.    When that document was signed, no.

2      Q.    Okay.  Well, I'm talking about I guess when

3  it came in.  Your name --

4      A.    You scrolled up to this form.  I apologize.

5  I didn't mean to cut you off.  You scrolled up to that

6  form, so I assumed you're talking about that form.

7      Q.    So I guess let's be clear on that.  You left

8  internal affairs I believe you said in November of

9  2019, correct?

10     A.    No.

11     Q.    When did you leave?

12     A.    Let me refer to my timeline.  I left internal

13  affairs November 2018.

14     Q.    I apologize.  I have my years confused there.

15  So November of 2018 you left IA.  And it wasn't just

16  IA, you were no longer over professional standards,

17  correct?

18     A.    Correct.

19     Q.    Where did you go?

20     A.    To special investigations division.

21     Q.    Okay.  And who is -- who took -- I asked you

22  that before.  Who took your place?  That would have

23  been Captain Ahern, correct?

24     A.    Correct.

25     Q.    And that's why his name is here when the

```
 1  investigation was concluded in March of 2019,

 2  correct?

 3      A.   Yes, sir.

 4      Q.   Correct?

 5      A.   Yes, sir.

 6      Q.   I didn't hear you.  I've got the screen share

 7  up so I'm not looking at you, I'm looking at the

 8  document.

 9           Tell me what you recall independently about

10  AD 18-056.

11      A.   That complaint came in again from

12  Agent Ravelo at the same time that she made the sexual

13  harassment complaint based on the initial interview

14  and review of the documents that she provided.  The

15  harassment complaint and the allegation of double

16  dipping had no nexus to each other.  They were treated

17  as two different complaints, although they came in on

18  one document.  One investigation was assigned to

19  Sergeant Oswald and the other investigation was

20  assigned to Agent McDaniel.

21      Q.   And I know you're aware from having read your

22  complaint about Rick King, that part of what was

23  alleged, and part of what we have alleged is that the

24  delay in beginning this investigative process against

25  Gregory Rideau violated his police officers' bill of
```

1   rights.  You're aware of those allegations, correct?

2       A.   Yes.

3       Q.   Okay.  So please explain to me the process

4   that took place between Officer Ravelo making these

5   allegations of Sergeant Rideau's double dipping, and

6   the statement that on December 3, 2018, Chief Mooney

7   ordered an administrative investigation to commence.

8   So between March of '18 and December of '18, what

9   happened during that time frame?

10      A.   Agent McDaniel could speak better to that as

11  he was the investigator.  But Agent McDaniel was

12  conducting an administrative investigation.  That line

13  as it stands I don't believe is an accurate statement

14  that you just read about December 3rd.

15           The investigation commenced when we got the

16  complaint.  At some point it was tolled while there

17  was a potential that it was going to be criminally

18  reviewed.  But I don't know why that statement is in

19  there.  I didn't review this report before I signed

20  off on it.

21      Q.   Okay.  So the proper process is if there is

22  an allegation of something that is criminal, the

23  criminal investigation would take precedent over any

24  internal administrative investigation, correct?

25      A.   Correct.

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021                        Page 64

1      Q.   And when that occurs there can be a tolling
2  process, correct?

3      A.   Yes, sir.

4      Q.   Okay.  So explain to me how this was tolled.

5      A.   I don't recall off the top of my head the
6  exact procedure that was done.  Agent McDaniel
7  conducted the administrative review of the
8  investigation, or conducted the administrative
9  investigation.  I would refer to him specifically.
10 But there was some talk that I recall that he
11 conducted an initial audit to see if the complaint was
12 even valid.  We got to a point where we couldn't
13 confirm a couple dates that were given to us, and then
14 there was a meeting with the state attorney's office
15 at some point that you referred to, and then I was
16 transferred out of the unit.

17     Q.   Okay.  Do you know when Gregory Rideau was
18 notified of the fact that these allegations were made
19 against him?

20     A.   I don't know specifically if he reviewed IA
21 18-001.  He would have reviewed the same memo that was
22 documented on all the incidents.  I don't know when he
23 was served as the subject officer in this case.

24     Q.   Okay.  Your understanding of proper IA
25 procedures, when should he have been served as the

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021                                    Page 65

```
 1  subject officer in AD 18-056?
 2      A.   When it was determined he was the subject
 3  officer.
 4      Q.   Okay.  Would that not have been upon
 5  Agent Ravelo's making the complaint in March of
 6  2018?
 7      A.   Could have been.  I don't recall.
 8      Q.   Okay.  And the allegations that were made
 9  were for incidents that had already occurred,
10  correct?
11      A.   Yes.
12      Q.   So this was not an ongoing alleged criminal
13  act, correct?
14           MR. GOBEO:  Objection.
15      A.   Based on the allegation, I don't believe
16  so.
17  BY MR. NORBRATEN:
18      Q.   Okay.  So it wasn't as though notifying him
19  was going to get him to correct his behavior and
20  prevent you guys from investigating what had been
21  alleged, correct?
22      A.   Correct.
23      Q.   So is it your understanding that between
24  March of '18 and October 30th of 2018, when you met
25  with the state attorney's office, that there was an
```

 1  investigation taking place into Gregory Rideau --

 2          MR. GOBEO:  Objection.

 3      Q.   -- concerning this allegation?

 4      A.   Could you just repeat the question?

 5  BY MR. NORBRATEN:

 6      Q.   Sure.  Was it your understanding prior to

 7  leaving IA in November of '18, that between March of

 8  '18 and this meeting with the state attorney's office

 9  on October 30th of 2018, that there was an ongoing

10  investigation into these allegations against

11  Gregory Rideau?  Did you have that knowledge at the

12  time?

13      A.   That Sergeant McDaniel was conducting an

14  administrative investigation into it, yes.

15      Q.   Okay.  And during that time frame, did you

16  have any communication with Chief Mooney about the

17  fact that this was an ongoing investigation into

18  Gregory Rideau?

19      A.   Specifically I don't recall.  But I would

20  have briefed her on the progress of the case.

21      Q.   Okay.  And was Chief Mooney aware of the fact

22  that yourself and Officer McDaniel were going to meet

23  with the State Attorney's Office Public Corruption

24  Unit about this case?

25      A.   Yes.  It was at her direction.

1      Q.   Okay.  And that meeting being at her

2  direction, did that meeting occur at that time in

3  October of 2018, because of her decision to direct it

4  to the state attorney's office came close in time to

5  October 30th of 2018?

6      A.   I have no idea what that question was.  I

7  apologize.

8      Q.   Sure.  Do you know when she made the decision

9  that you guys should go meet with the Public

10  Corruption Unit to discuss these allegations?

11      A.   When we couldn't get information back from

12  the City Place that we were trying to request, we hit

13  a wall with it, and she wanted to be consistent with

14  how similar investigation was handled that was outside

15  the city, she wanted to follow a state procedure that

16  was done with another investigation.

17      Q.   Okay.  And so I'm scrolling down now to the

18  inquiry.  And the double dipping that was alleged to

19  have taken place, it involved Sergeant Rideau's work

20  in the Organized Crime Drug Enforcement Task Force,

21  correct?

22      A.   It coincided with it.

23      Q.   Right.  So the double dipping was he was

24  being paid for working in that task force while also

25  being compensated by City Place for working off-duty

 1  details there, correct?

 2      A.   Correct.

 3      Q.   Okay.  That's what the double dipping was.

 4  During the same period of time he was alleged to have

 5  been working on the federal government grant for

 6  OCDEFT as well as City Place's dollar to do whatever

 7  it is they needed him to do there, correct?

 8      A.   Correct.

 9      Q.   So you, or IA, ran into an issue when City

10  Place refused to turn over information related to

11  their payroll for the dates which you requested,

12  correct?

13      A.   Yes, sir.

14      Q.   Okay.  And during this time frame were you

15  also aware of the fact that the Organized Crime Drug

16  Enforcement Task Force was conducting their own audit

17  of the entire agency related to issues of finance and

18  overtime?

19           MR. GOBEO:  Objection.

20      A.   No.

21  BY MR. NORBRATEN:

22      Q.   Okay.  When did you become aware of that?

23      A.   I became aware of an audit.  How you

24  described it I don't know that that's an accurate

25  description.

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021

1      Q.    Okay.  So point of clarity, that's fine.

2   OCDEFT was conducting their own audit of the West Palm

3   Beach Police Department during the time frame -- for

4   the time period in which Officer Rideau was alleged to

5   have committed this double dipping, correct?

6           MR. GOBEO:  Objection.

7      A.    For completely different purposes as it was

8   relayed to me.

9   BY MR. NORBRATEN:

10     Q.    Okay.  Well, how was it relayed to you?

11     A.    Captain Kapper at some point notified

12  Chief Mooney during a command staff meeting that -- I

13  don't recall who the agents were, whether DEA -- some

14  federal agency was coming in to conduct an

15  administrative audit of the OCDEFT funds, yes.

16     Q.    Of the OCDEFT funds, correct?

17     A.    Yes, sir.

18     Q.    Okay.  Those funds are what's used to pay

19  officers when they work on OCDEFT cases, correct?

20     A.    Correct.

21     Q.    So during -- strike that.

22           When did you become aware of that audit

23  taking place as you described it?

24     A.    I believe a couple weeks before the audit

25  occurred Captain Kapper informed the chief of it.

1    Q.   Okay.  So the audit took place in July of

2  2018, correct?

3         MR. GOBEO:  Objection.

4    A.   I would refer back to the document.

5  BY MR. NORBRATEN:

6    Q.   Okay.  Have you seen this document before?

7    A.   Yes, sir.

8    Q.   This is the Organized Crime Drug Enforcement

9  Task Force's, or OCDEFT, fiscal year 2018 internal

10  process and assessment review, findings, and

11  recommendations, West Palm Beach Police Department,

12  July 19, 2018, correct?

13   A.   That's what the document states.

14   Q.   Okay.  So you became aware of the fact that

15  this was going to take place, you said a couple of

16  weeks before it took place.  So would you agree it

17  took place on July 19, 2018?

18   A.   I don't know when the audit occurred.  That

19  has a document that says July 19th.  I don't know if

20  that's when the report was completed, or if that's

21  when the audit was conducted.

22   Q.   I'll get to that later.  I don't know when

23  the report was completed either, and I'm not

24  suggesting that you knew what the findings of the

25  report were on July 19, 2018, to be clear.

 1            I'm just asking you if when you became aware

 2    of the fact that the Department of Justice was

 3    conducting an audit on the agency in July of 2018,

 4    when did you become aware of that?  A couple weeks

 5    before July 19, 2018, correct?

 6       A.   I don't know if that was the date they were

 7    physically at the station.  What day they were

 8    physically at the station, I don't know.

 9       Q.   Okay.  If there are documents that suggest

10    when they were at the station, and we can verify that

11    based on people signing in as coming to the station,

12    and meeting with people there to conduct the audit,

13    would you agree with those time stamps if it can be

14    proven?

15       A.   Yes.

16       Q.   Okay.  And is your testimony that whenever

17    they came, you and command staff became aware of it a

18    couple of weeks before then?

19       A.   Yes.

20       Q.   All right.  So getting back to 18-056.

21    Again, the alleged double dipping was that

22    Gregory Rideau was working on the task force and

23    working a detail at the same time, correct?

24       A.   Correct.

25       Q.   Okay.  And there were dates that were

 1   provided specifically by Officer Ravelo that suggested

 2   that on these particular dates she knew Greg was not

 3   there working on the task force or whatever the

 4   complaint was, she gave specific dates, correct?

 5        A.   Yes.

 6        Q.   Okay.  And as it would stand, you were

 7   unable -- or Officer McDaniel was unable to verify

 8   whether or not Gregory Rideau actually worked at City

 9   Place on those dates because of City Place's refusal

10   to provide you with information, correct?

11        A.   Correct.

12        Q.   All right.  And you also were aware that

13   OCDEFT was conducting an audit on their funding with

14   the city, correct?

15        A.   Completely different type of audit.  Yes.

16        Q.   Completely different type of audit based on

17   what you were told by Captain Kapper, correct?

18        A.   Correct.

19        Q.   Were you working with them when they

20   conducted the audit?

21        A.   No.

22        Q.   Okay.  Do you know, as we sit here today, the

23   results of the audit?

24        A.   I reviewed the report.

25        Q.   Okay.  Does the report mention

1  Gregory Rideau's name at all?

2      A.   Not once.

3      Q.   Okay.  Does the report --

4      A.   That I recall.

5      Q.   Does the report mention the names of other

6  officers from the agency?

7      A.   I believe it does.

8      Q.   Okay.  So would you agree that if the two

9  individual organizations that are paying

10 Sergeant Rideau are not providing evidence of him

11 double dipping, that he would not be double dipping,

12 correct?

13          MR. GOBEO:  Objection.

14     A.   I'm not quite sure if that was a question or

15 a statement.

16 BY MR. NORBRATEN:

17     Q.   I prefaced it with would you agree.

18     A.   I don't agree --

19     Q.   Let me do it piecemeal so we have it easy.

20          City Place did not cooperate with your

21 investigation, correct?

22     A.   Correct.

23     Q.   And OCDEFT conducted an audit that did not

24 implicate Gregory Rideau doing anything wrong,

25 correct?

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021                              Page 74

1      A.   I wasn't aware that the audit was going on at

2   that time.

3      **Q.   And I know you were not.  I know you were**

4   **not.  You were aware that an audit was taking place**

5   **though, correct?**

6      A.   I was told specifically that it had nothing

7   to do with Sergeant Rideau.

8      **Q.   Okay.  You were told specifically it had**

9   **nothing to do with Sergeant Rideau.  Who told you**

10  **that?**

11     A.   Captain Kapper.

12     **Q.   Okay.  It became known at some point in time**

13  **that Gregory Rideau was not implicated as a result of**

14  **that audit, correct?**

15     A.   I don't know that anybody specific was

16  implicated in the manner that you're referring to.

17  There was some violations and how I believe some of

18  the reimbursement was done.  But, again, from the very

19  onset, Captain Kapper's notification to the chief, it

20  was explained that there was an administrative audit

21  on how the agency conducts reimbursement paperwork.

22  It had nothing to do with any specific officer.

23     **Q.   Okay.  But you mentioned you reviewed the**

24  **findings of the report, and specific officers were**

25  **named, correct?**

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021

```
 1      A.   A year or so later, yes, I did.
 2      Q.   Okay.  So my question is:  When you went to
 3  meet with the State Attorney's Office Public
 4  Corruption Unit, did you inform them that the
 5  Department of Justice, OCDEFT, was at the police
 6  department conducting an audit?
 7           MR. GOBEO:  Objection.
 8      A.   Again, what was told to us, it had nothing to
 9  do -- it had no overlap or any bearing in the
10  investigation that was conducted by Brian McDaniel.
11  BY MR. NORBRATEN:
12      Q.   Understood.  That's what you were told.
13           My question is:  What did you tell someone
14  else?
15      A.   I don't recall specifically what was said.
16      Q.   Okay.  So you don't recall whether or not you
17  or Officer McDaniel shared with the State Attorney's
18  Office Public Corruption Unit the fact that OCDEFT
19  conducted an audit in July of 2018 at the police
20  department?
21      A.   I don't recall.
22      Q.   Okay.  Do you recall whether or not you
23  shared with them the fact that City Place was not
24  cooperating with subpoenas -- strike that -- City
25  Place refused to provide any documents without a
```

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021                                    Page 76

1    subpoena?

2        A.    Yes.

3        Q.    Okay.  In fact that was the reason

4    Chief Mooney directed you guys to go to the State

5    Attorney's Office, correct?

6        A.    No.

7        Q.    Didn't you need them to get subpoena power?

8        A.    No.

9        Q.    How could you have subpoenaed City Place

10   without their involvement?

11       A.    We couldn't.  It was an administrative

12   investigation.

13       Q.    Correct.  So when you couldn't get the

14   information from City Place voluntarily, the only way

15   to get it is through a subpoena, correct?

16       A.    If a criminal investigation is conducted a

17   subpoena could be issued.

18       Q.    And that's the reason why you and

19   Officer McDaniel were directed by Chief Mooney to meet

20   with the State Attorney's Office so you could get that

21   information, correct?

22       A.    No.

23       Q.    No?

24       A.    No.

25       Q.    Then why were you directed to meet there?

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021

1    A.   To file a similar format that was done with

2  another investigation, we allowed the State Attorney's

3  Office to review the information that we had obtained

4  at that point, and we let them know we couldn't go any

5  further with our administrative investigation.

6    **Q.   Okay.  Was there any time table with which**

7  **you had to meet with the State Attorney's Office**

8  **Public Corruption Unit?**

9    A.   I'm not sure I understand the question.

10   **Q.   Sure.  You met with them October 30th of**

11 **2018.  This complaint came in in March of 2018.  Was**

12 **there any reason why you had to meet with them in**

13 **October of 2018?**

14   A.   Not specifically.

15   **Q.   Okay.  Was there any reason why you couldn't**

16 **have waited until the agency became aware of the**

17 **results of the OCDEFT audit?**

18   A.   Again, I'll repeat my answer from before.  It

19 was explained to me the OCDEFT audit had absolutely

20 nothing to do with Sergeant Rideau.

21   **Q.   Again, who gets to decide what the value of**

22 **the OCDEFT audit is?  Is it OCDEFT?**

23         MR. GOBEO:  Objection.

24 BY MR. NORBRATEN:

25   **Q.   It's their audit, right?**

1    A.   Correct.

2    Q.   It's their funding, their auditing,

3  correct?

4    A.   Yes.

5    Q.   It's their fund that Sergeant Rideau is being

6  accused of double dipping with, correct?

7    A.   I don't believe they were aware of that at

8  the time.

9    Q.   Well, do you know they weren't aware of it?

10   A.   I never spoke to them.

11   Q.   Okay.  Well, what I'm asking you is what you

12 know, not what you don't know.  So if you don't know

13 something, you can tell me you don't know it.

14   A.   Can you repeat the question?  Is there a

15 question I'm not answering for you?  I apologize.  I'm

16 not quite sure.

17   Q.   I'm just trying to get an understanding as to

18 why Officer McDaniel and yourself met with the Public

19 Corruption Unit of the State Attorney's Office seeking

20 to get a criminal investigation into Gregory Rideau

21 when you had no evidence of any double dipping of

22 Gregory Rideau aside from the allegations of

23 Officer Ravelo.

24        MR. GOBEO:  Objection.

25                    - - - - - -

1  BY MR. NORBRATEN:

2      **Q.   Why did that happen?**

3      A.   Your question was more of an assertion.  We

4  did not go there to get a criminal investigation

5  conducted into Sergeant Rideau.  We went there to

6  follow the same format that we did with a similar

7  investigation that was reviewed by the Public

8  Corruption Unit.  We simply relayed the information

9  that we had and asked them to give us an opinion as to

10  whether we should go any further.

11      **Q.   Okay.**

12      A.   If you look at the no file notice, you'll

13  actually see where they agreed that it wasn't criminal

14  in nature and should be handled administratively.

15      **Q.   Right.  And when you provided them with**

16  **information, you can't tell me whether or not you**

17  **provided them with the fact that OCDEFT was conducting**

18  **their own audit, correct?**

19          MR. GOBEO:  Objection.

20      A.   I don't recall if that was discussed or

21  not.

22  BY MR. NORBRATEN:

23      **Q.   Okay.  Chief Mooney absolutely knew that**

24  **OCDEFT was conducting an audit when she made the**

25  **decision to have yourself and Officer McDaniel go to**

 1  the State Attorney's Office, correct?

 2          MR. GOBEO:  Objection.

 3      A.   I can't answer on behalf of Chief Mooney.  I

 4  believe there was a briefing at one point that she was

 5  briefed on it.  Whether she'd remember, I couldn't

 6  answer that question.

 7  BY MR. NORBRATEN:

 8      Q.   Okay.  Well, did you share with her when you

 9  guys were going over this investigation prior to her

10  sending you to the State Attorney's Office the fact

11  that there was an OCDEFT audit being conducted?

12          MR. GOBEO:  Objection.

13      A.   That audit wasn't discussed again in

14  conjunction with this investigation.

15  BY MR. NORBRATEN:

16      Q.   Okay.  Because to your mind it wasn't

17  relevant?

18      A.   We were instructed it had nothing to do with

19  Sergeant Rideau and the allegations that were

20  presented.

21      Q.   Who instructed you of that?

22      A.   Captain Kapper.

23      Q.   Okay.  How did Captain Kapper obtain that

24  information, to your knowledge?

25          MR. GOBEO:  Objection.

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021                    Page 81

```
 1      A.   I would refer to Captain Kapper for that

 2   question.

 3   BY MR. NORBRATEN:

 4      Q.   Okay.  Was Captain Kapper a witness in this

 5   AD 18-056?

 6      A.   I don't believe he was ever interviewed.  He

 7   is not listed up there as a witness.

 8           MR. NORBRATEN:  Captain, I want to thank you

 9       for your time.  I will take a five-minute break,

10       and I'll come back and finish up with you.  Okay?

11       It won't be much longer.  I appreciate it.

12           THE WITNESS:  No worries.  Thank you.

13           (A recess was held at 11:48 a.m. until

14        11:59 a.m.)

15           MR. NORBRATEN:  Back on the record.

16   BY MR. NORBRATEN:

17      Q.   Captain, prior to meeting with the State

18   Attorney's Office on October 30th of 2018, to discuss

19   the double dipping allegations, did you and/or

20   Officer McDaniel, to your knowledge, meet with any

21   representatives from human resources with the city

22   about that issue?

23      A.   I don't recall.

24      Q.   Wouldn't that have been something that would

25   have been part of the process normally to meet with
```

1  human resources before going to the State Attorney's

2  Office, or would that not be something that would

3  normally be done?

4          MR. GOBEO:  Objection.

5      A.   I think it would depend on the nature of the

6  allegation.  That type of allegation, no.

7  BY MR. NORBRATEN:

8      Q.   Okay.  To your knowledge, when did the

9  department become aware of the OCDEFT audit

10  findings?

11     A.   There's an e-mail tree that would be

12  specific.  To my knowledge, the e-mails forwarded to

13  me I believe April of 2019, and to my knowledge that

14  would be the first time anybody from the agency

15  reviewed a copy of the report.

16     Q.   Okay.  Do you know how it was Gregory Rideau

17  received a copy of the report?

18     A.   I have no idea.

19     Q.   Okay.  Did you become aware of the fact that

20  Assistant Chief Tameca West assisted Gregory Rideau in

21  obtaining a copy of the OCDEFT report?

22     A.   I was never informed of that specifically.

23  No.

24     Q.   Okay.  Were you informed of that generally in

25  some way?  Had you heard that from someone?

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021

```
 1     A.   I don't recall specifically.
 2     Q.   Okay.  Well, the reason I keep asking is you
 3  say you don't recall specifically.  So do you recall
 4  non specifically if you had heard that information or
 5  rumor from somewhere?
 6     A.   I heard it, but I don't recall specifically
 7  though.
 8     Q.   Okay.  Do you recall when you heard that
 9  Tameca West had assisted Gregory Rideau to obtain a
10  copy of the OCDEFT audit?
11     A.   I don't have a clue on the date.  I know that
12  the e-mail would be the best record as to when it was
13  received.  I don't know Chief West's involvement in
14  the case.
15     Q.   Okay.  When the city became aware of the
16  audit, at any point in time did you have any
17  conversation with Chief Mooney about the fact that the
18  audit existed?
19     A.   Yes.
20     Q.   Okay.  What was the contents of that
21  conversation you had with Chief Mooney?
22     A.   At that time I was the captain of special
23  investigations, I reviewed that audit.  It was
24  forwarded to me by the former lieutenant of the unit.
25  I reviewed the findings to see if there were any
```

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021                    Page 84

1  compliance issues that we needed to change or -- there

2  again, there was an e-mail that went back to the agent

3  who after I reviewed the report detailed that

4  information.  So I briefed the chief on any issues

5  that came up with that audit.

6      **Q.   Okay.  Did you have any conversations with**

7  **Chief Mooney specifically about the fact that**

8  **Gregory Rideau had a copy of the audit and the**

9  **findings?**

10     A.   Not that I can recall.

11     **Q.   Would there have been a reason for you to**

12 **have any conversation with Chief Mooney about that?**

13     A.   No.  I believe the audit is a public

14 record.

15     **Q.   Right.  But my question is:  Would there have**

16 **been any reason for you to have any conversations with**

17 **Chief Mooney about Gregory Rideau possessing a copy of**

18 **this audit after you had left IA?**

19     A.   No.  It's a public record.

20     **Q.   Okay.  If this audit was available to the**

21 **city during AD 18-056, should it have been provided to**

22 **Gregory Rideau during that administrative review?**

23          MR. GOBEO:  Objection.

24     A.   No.

25 BY MR. NORBRATEN:

1      Q.    Why not?

2      A.    It had nothing to do with the administrative

3  investigation conducted by Agent McDaniel.

4      Q.    Should it have been included in the

5  investigation at all?

6      A.    No.

7      Q.    Similar to communications you had with

8  Chief Mooney about IA 18-001, did you have those same

9  sorts of meetings where you would discuss what was

10  occurring in administrative review 18-056?

11      A.    During my tenure assigned to the unit, yes.

12      Q.    Okay.  And, yes, thank you for clarifying

13  that.

14           Obviously once you left internal affairs, you

15  were no longer involved in these investigations,

16  correct?

17      A.    Correct.

18      Q.    All right.  When you left internal affairs,

19  did you brief Captain Ahern on the cases that he was

20  taking over?

21      A.    Yes.

22      Q.    Okay.  And do you recall what you briefed him

23  on concerning these sexual harassment allegations of

24  Officer Ravelo?

25      A.    I believe that case had concluded at that

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021                          Page 86

 1  point.  I don't know that I briefed him on it.

 2      Q.   Okay.  How about the investigation into AD

 3  18-056, the double dipping allegations, do you recall

 4  what you told him?

 5      A.   Specifically, no.

 6      Q.   All right.  Would you have given him a

 7  lengthy brief on what was occurring, or would that

 8  have been something that would have been handled

 9  primarily by Officer McDaniel since he was the person

10  conducting the investigation?

11           MR. GOBEO:  Objection.

12      A.   I would have given him a summary of any open

13  cases.  A lengthy briefing, that's subjective in

14  nature.  I would have given him an overview of the

15  investigations and where the investigations were.

16  BY MR. NORBRATEN:

17      Q.   Okay.  During your time over professional

18  standards and internal affairs, was there ever any

19  sort of an investigation into Gregory Rideau's use of

20  Family Medical Leave Act related to an EAP?

21      A.   During my tenure, no, sir.

22      Q.   Okay.  To your knowledge, has there ever been

23  one?

24      A.   I have no idea.

25      Q.   You mentioned before that because of the

1  contents of the audio recording that was obtained by

2  the CI, and provided through Agent Steinberg, that IA

3  maintained possession of that evidence for what

4  reason?

5          MR. GOBEO:  Objection.

6      A.   I believe it was discussed.  Again, it was

7  discussed with counsel, so I'll refer back to my

8  attorney as to whether or not I should answer that.

9  BY MR. NORBRATEN:

10     Q.   Well, I'm not asking you -- again, I object

11 to that.  I think you should answer that.  But you

12 listen to your attorneys.  I'm not asking what they

13 told you.  I'm asking you what happened afterwards?

14     A.   It was retained by internal affairs.

15     Q.   Okay.  For what purpose?

16     A.   I would refer back to attorney-client

17 privilege.

18     Q.   Well, no, you don't get to do that.  I'm

19 asking you why internal affairs retained it.  You were

20 over internal affairs at that time.  If you're talking

21 about -- I'm not asking you what the city attorneys

22 office told you or what they advised you.  I'm asking

23 you what happened.  Why was it retained by internal

24 affairs?

25         MR. STEPHENS:  He's provided his answer.

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021                    Page 88

 1  BY MR. NORBRATEN:

 2      Q.   And I will take that because you were advised

 3  by the city that internal affairs should maintain

 4  it?

 5           MR. STEPHENS:  That's not what he said.

 6           MR. NORBRATEN:  Well, what did he say then?

 7      A.   You asked what happened to the tape, I said

 8  it was retained by internal affairs.

 9  BY MR. NORBRATEN:

10      Q.   And then I asked you why.

11      A.   And I said I would refer to my counsel on

12  that.

13      Q.   Okay.  Was it -- which counsel, Mr. Stephens

14  now, or --

15           MR. GOBEO:  Objection.  To the extent that

16      you're inquiring --

17           MR. NORBRATEN:  There's three of you there.

18      I'm not trying to be funny.  Who is he --

19  BY MR. NORBRATEN:

20      Q.   Who are you referring to when you say -- is

21  certain counsel there advising you not to answer that

22  question?

23           MR. GOBEO:  I am advising him not to answer

24      the question.

25  BY MR. NORBRATEN:

1      Q.   So are you not answering that question

2  because of David Gobeo's direction to not answer that

3  question?

4      A.   Yes, sir.

5      Q.   Okay.  Now, was there an ongoing

6  investigation that that audio recording pertained

7  to?

8      A.   No.

9      Q.   And IA continued to maintain possession of

10 it, correct?

11     A.   Correct.

12     Q.   And it was in possession of internal affairs

13 when you left the unit, correct?

14     A.   Correct.

15     Q.   Did you brief Captain Ahern on that fact when

16 you left the unit?

17     A.   I believe I did.

18     Q.   Okay.  Is there an area where you guys store

19 evidence that is not related to any particular

20 administrative investigation?

21     A.   Like a locker, no, sir.

22     Q.   If it's electronic are there electronic

23 documents in internal affairs that contain evidence

24 that is not necessarily tied to any open

25 investigation?

 1     A.   No, sir.

 2     Q.   And to clarify.  Or any closed investigation,

 3  evidence is just there?

 4     A.   There is a software, as in computers, where

 5  things are downloaded onto.

 6     Q.   Okay.  Well, this particular audio recording,

 7  was it maintained on some sort of a disc, or a thumb

 8  drive, or was it maintained just on a computer system

 9  hardware somewhere?

10     A.   I don't recall specifically.

11     Q.   Okay.  Physically where would it have been

12  located within the department when you left internal

13  affairs in November of 2018?

14     A.   What I recall, I believe it's one of the

15  agent had possession of it.  One of the investigators

16  that was assigned internal affairs.

17     Q.   Okay.  An IA agent had possession of it?

18     A.   Yes, sir.

19     Q.   Okay.  And Agent Steinberg no longer was in

20  possession of it, correct?

21     A.   I have no idea what he was in possession of.

22  I believe he downloaded a copy of the audio for one of

23  the agents in the office.

24     Q.   Okay.  And at that time the DEA, based on

25  your knowledge, was not going to use it in

 1  investigating any criminal act, correct?

 2          MR. GOBEO:  Objection.

 3      A.  To my knowledge, I wasn't at the meeting.

 4  BY MR. NORBRATEN:

 5      Q.  Okay.  But that's what you understood from

 6  being briefed after the meeting, correct?

 7      A.  That's what was relayed to me.

 8      Q.  And that did not change before you left IA?

 9  When you left IA in November of '18, that was the

10  state of it as far as you knew?

11      A.  I never spoke to anybody from DEA about that.

12  I couldn't answer that question.

13      Q.  Okay.  And I asked you this before, but I

14  just want to be clear.  You never became aware of any

15  other recordings of Gregory Rideau that existed that

16  were within the department, correct?

17      A.  I don't recall.

18      Q.  Okay.  I'm specifically talking about

19  recordings of Gregory Rideau that he was not aware of

20  the existence of, correct?  That's what I'm talking

21  about.  You weren't aware of any others like that,

22  correct?

23      A.  I have no idea what Lieutenant Rideau is

24  aware of or what he's not aware of.  I don't know.

25      Q.  Well, were you aware of any other audio

```
 1  recordings of Gregory Rideau having phone calls with
 2  other individuals that came into possession of the
 3  West Palm Beach Police Department?
 4     A.   I don't recall.
 5     Q.   Okay.  And I'm referring to recordings that
 6  would have been like the recording of Sergeant Rideau
 7  and the CI that was presented by Agent Steinberg,
 8  recordings like that?
 9          MR. GOBEO:  Objection.
10     A.   I don't recall.
11  BY MR. NORBRATEN:
12     Q.   Okay.  At any point in time were you given
13  access to Gregory Rideau's medical records that were
14  maintained by the city health clinic?
15     A.   No.
16     Q.   At any point in time did you review any of
17  Gregory Rideau's therapy records from his own personal
18  therapist?
19     A.   No.
20     Q.   Okay.  At any point in time did you have any
21  association with any of Gregory Rideau's FMLA where he
22  was treating with a therapist?
23     A.   I don't believe so.
24          MR. NORBRATEN:  Okay.  All right.  Captain, I
25     thank you for your time.  Stay safe and good luck.
```

1      MR. GOBEO:  I don't have any questions.

2   We're good.

3      MS. PANARITES:  Read.

4      MR. GOBEO:  And he'll read.

5      MR. NORBRATEN:  We understand, Zoe.  We got

6   you.  I will order, so electronic version, please.

7   And I don't know that I announced any of these as

8   exhibits.  I don't know, David, if you want them

9   to be exhibits.  There's stuff that's in the case.

10   I don't feel a need to make them exhibits just to

11   make the transcript longer.  But if you want me to

12   send any of them off I will.  But I'll leave that

13   up to you.

14      MR. GOBEO:  I don't have a need for you to

15   attach those documents.  That's up to you.

16      MR. NORBRATEN:  I don't think so, sir.  So

17   see in 47 minutes.

18      MR. GOBEO:  And I'll order as well.

19      (Thereupon, the foregoing deposition was

20    concluded at 12:13 p.m.)

21

22

23

24

25

```
 1                WITNESS SIGNATURE PAGE

 2

 3  I hereby certify that I have read my deposition, made

 4  changes and/or corrections as I deem necessary and

 5  approve the same as now written.

 6

 7  Executed this _____ day of _____, 2021.

 8

 9

10                         _____

11                         Theodore Swiderski

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    CERTIFICATE OF OATH

 2

 3    STATE OF FLORIDA
      COUNTY OF ORANGE
 4

 5            I, the undersigned authority, certify that

 6    Theodore Swiderski, appeared via video conference and

 7    was duly sworn.

 8            WITNESS my hand and official seal this 10th

 9    day of November, 2021.

10

11

12

13

14

15          _____

16          KAREN ALLEN-LEWIN
            Professional Shorthand Reporter
            Notary Public - State of Florida
17          My Commission No.  GG220933
            Expires:  July 7, 2022
18

19

20

21

22

23

24

25
```

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Theodore Swiderski on 11/03/2021                                    Page 96

```
1              REPORTER'S CERTIFICATE WITH ACKNOWLEDGMENT

2

3  STATE OF FLORIDA
   COUNTY OF ORANGE
4

5              I, Karen Allen-Lewin, Court Reporter,

6  certify that I was authorized to and did

7  stenographically report the foregoing proceedings and

8  that the transcript is a true record of the

9  proceedings.

10

11             I Further Certify that I am not a relative,

12  employee, or attorney, or counsel of any of the

13  parties, nor am I a relative or employee of any of the

14  parties' attorney or counsel connected with the

15  action, nor am I financially interested in the action.

16

17             DATED this 10th day of November, 2021.

18

19

20             _____
               KAREN ALLEN-LEWIN,
21             Court Reporter, Notary Public

22

23

24

25
```

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Theodore Swiderski on 11/03/2021                                    Page 97

```
 1                    ERRATA SHEET

 2              DO NOT WRITE ON TRANSCRIPT
                ENTER CHANGES ON THIS PAGE
 3
        In Re:  Gregory Rideau -v- City of West Palm
 4              Beach

 5                    November 3, 2021

 6  PAGE  LINE   CHANGE    REASON

 7  _____

 8  _____

 9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19

20  Under penalties of perjury, I declare that I have read
    the foregoing document and that the facts stated in it
21  are true.

22
    _____              _____
23  Date                          Theodore Swiderski

24

25
```

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Theodore Swiderski on 11/03/2021                              Index: 1..account

---

**1**

1   26:6

10-minute
   44:12

10:00   4:3

10:50   44:16

11   44:13

11:05   44:17

11:48   81:13

11:59   81:14

12:13   93:20

15th   59:13

16th   56:12

17-006   26:7

18   63:8
   65:24
   66:7,8
   91:9

18-001   35:23
   38:25 39:6
   40:19,25
   42:21,24
   44:4 45:3
   48:5 55:19
   59:18
   64:21 85:8

18-056   59:8,
   24 60:2
   62:10 65:1
   71:20 81:5
   84:21

85:10 86:3

1801   12:13

18056   12:15

19   70:12,
   17,25 71:5

1997   9:16

19th   70:19

---

**2**

2000   10:3

2009   11:1

2015   11:15

2017   11:12
   26:11 27:6
   28:19

2018   11:22,
   23 38:18,
   23 40:13
   55:24
   56:2,12,
   15,24 57:2
   58:3 59:10
   61:13,15
   63:6 65:6,
   24 66:9
   67:3,5
   70:2,9,12,
   17,25
   71:3,5
   75:19
   77:11,13
   81:18
   90:13

2019   11:12
   40:13 61:9
   62:1 82:13

25   27:6
   28:19

25th   26:11

---

**3**

3   63:6

30   56:2
   58:3 59:10

30th   56:15
   65:24 66:9
   67:5 77:10
   81:18

3rd   63:14

---

**4**

4   3:4

40-hour
   45:16

47   93:17

---

**5**

50   44:12

---

**6**

6   26:7 57:2

6th   55:23
   56:24

---

**8**

80   38:24
   56:3

80-hour
   38:22 39:6
   45:11,15,
   24

8th   59:9

---

**9**

94   3:5

95   3:6

96   3:7

97   3:8

---

**A**

a.m.   4:3
   44:13,16,
   17 81:13,
   14

absolutely
   77:19
   79:23

access   8:8
   92:13

accompany
   48:16

Accord   56:20

account   17:1
   18:15

---

accreditation
  11:19

accurate
  10:13,16
  63:13
  68:24

accused
  14:3,8
  19:13 21:1
  25:24 29:9
  59:3 78:6

act  65:13
  86:20 91:1

action  22:7

actions  56:2

actual  49:16

AD  60:1,5
  62:10 65:1
  81:5 84:21
  86:2

addition  8:5

adjacent
  34:22

administrative
  60:6 63:7,
  12,24
  64:7,8
  66:14
  69:15
  74:20
  76:11 77:5
  84:22
  85:2,10
  89:20

administrative
ly  79:14

admitted
  31:11

adopt  42:10

advised
  87:22 88:2

advising
  88:21,23

advocate
  47:19,21
  49:10

affairs
  10:8,11,25
  11:2,5,16,
  18 12:3
  15:18
  16:11
  17:5,13,17
  19:23
  21:1,22
  22:3,5
  23:22
  24:25 26:4
  29:17,22
  30:13
  32:5,14,
  24,25
  33:18
  34:5,17,25
  35:4,8
  38:1 45:7
  52:23
  59:25
  60:24
  61:8,13

85:14,18
86:18
87:14,19,
20,24
88:3,8
89:12,23
90:13,16

affirm  4:6

agency  8:18
  32:24
  58:16
  68:17
  69:14 71:3
  73:6 74:21
  77:16
  82:14

agent  26:8,
  13,20 27:8
  28:3,19,
  20,24,25
  29:9,12
  30:1,9,25
  31:11,14
  35:23
  36:1,13
  39:16
  40:3,4
  42:11,15
  48:6 49:11
  50:13
  52:12
  54:12
  62:12,20
  63:10,11
  64:6 65:5
  84:2 85:3
  87:2

90:15,17,
19 92:7

agents  69:13
  90:23

agree  15:22
  30:20
  47:19
  48:2,9
  49:13
  53:10
  59:16
  70:16
  71:13
  73:8,17,18

agreed  79:13

ahead  20:4

Ahern  12:1,
  17 56:18
  61:23
  85:19
  89:15

alerted
  28:14

allegation
  12:15
  13:22 14:1
  19:11
  29:14,16,
  21 30:5
  43:5,7
  46:6 62:15
  63:22
  65:15 66:3
  82:6

allegations

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021

6:8 18:19
31:25 45:4
46:17,25
47:6 48:8,
18 49:1
53:5 55:22
57:16
63:1,5
64:18 65:8
66:10
67:10
78:22
80:19
81:19
85:23 86:3

alleged   6:3
47:5 52:23
55:1 60:13
62:23
65:12,21
67:18 68:4
69:4 71:21

allegedly
17:1 28:7

alleges
18:16

allowed   7:18
10:17
22:15 77:2

amended   6:4

and/or   58:18
81:19

Angela   15:8,
11 16:1

announced

93:7

answering
78:15 89:1

apologize
13:1 24:17
29:4 43:17
61:4,14
67:7 78:15

apparently
28:7

appealing
57:4,5

appeared
37:25

appears
23:20
24:11
47:17

apply   43:8

approximately
10:25
11:15

April   82:13

arbitration
57:6

area   10:5
89:18

argued   19:14

argumentative
54:7

arrived
45:15

assertion
79:3

assessment
70:10

assign   22:21
31:25 32:1

assigned
20:6
62:18,20
85:11
90:16

Assistant
9:1 25:2
82:20

assisted
82:20 83:9

assisting
53:16

association
92:21

assume   5:15
6:13 45:19

assumed   61:6

assuming
39:2

attach   93:15

attempting
23:7

attend   34:5

attendance
52:11 55:2
58:8

attended
51:5

attending
39:15

attorney
5:22 8:13
9:2 15:7,
10,14,22
38:5 57:3,
9,21 58:18
59:12 87:8

attorney's
6:17 58:25
59:13,20
64:14
65:25
66:8,23
67:4 75:3,
17 76:5,20
77:2,7
78:19
80:1,10
81:18 82:1

attorney-
client   37:5,
12 41:15
42:1 87:16

attorneys
7:14,16,22
87:12,21

audio   37:22
39:16,19
40:10,17
41:7,9
42:5,20
44:1 87:1

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Theodore Swiderski on 11/03/2021          Index: audit..brought

89:6 90:6,
22 91:25

audit  64:11
68:16,23
69:2,15,
22,24
70:1,18,21
71:3,12
72:13,15,
16,20,23
73:23
74:1,4,14,
20 75:6,19
77:17,19,
22,25
79:18,24
80:11,13
82:9
83:10,16,
18,23
84:5,8,13,
18,20

auditing
78:2

August  9:16

author  17:23

authority
22:15

automatically
19:16

avoid  22:19

aware  19:22
21:10,13,
15,17,22
27:6,7

28:24,25
29:9,13,24
30:4
40:14,15
43:7,25
46:15
54:25 55:5
59:25
62:21 63:1
66:21
68:15,22,
23 69:22
70:14
71:1,4,17
72:12
74:1,4
77:16
78:7,9
82:9,19
83:15
91:14,19,
21,24,25

─────────
**B**
─────────

back  10:13
11:6 15:19
16:21 21:7
24:3 26:25
27:17
44:18
53:12
67:11 70:4
71:20
81:10,15
84:2 87:7,
16

background
11:20
22:24

Bar  57:18,
20

Barbosa
15:8,11
16:1

base  50:17

based  19:16
22:22
24:11 41:2
54:17
62:13
65:15
71:11
72:16
90:24

basis  13:16

Beach  9:14
10:11 16:9
25:11,17
69:3 70:11
92:3

bearing  75:9

began  4:2

begin  9:14
10:10

beginning
33:22
37:10
62:24

behalf
58:11,15

80:3

behavior
65:19

belief  50:17

believed
36:1

bill  62:25

bit  9:12
12:18
32:2,18,20

board  56:22

Boland  59:13

Boynton
25:9,11

break  44:13
81:9

Brian  59:11,
12 75:10

briefed
31:24 32:6
33:13
36:6,7
42:6 47:3
66:20 80:5
84:4 85:22
86:1 91:6

briefing
39:14 80:4
86:13

bring  52:24

brought
26:2,18
35:23

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021

36:3,10,11

**building**
  34:20

**Burgoon**
  46:5,16

**business**
  49:22 50:2

———————————

            **C**
———————————

**calendar**
  38:18

**call**  40:11
  57:23

**calling**  14:4
  21:2

**calls**  92:1

**captain**
  4:15,17
  5:21 12:1
  13:12 22:9
  23:6,21
  24:10
  28:14
  29:2,10
  30:8,14,
  16,19,20
  31:3,7,15
  33:17
  36:7,13
  37:19 38:7
  39:10,15
  44:11,23,
  24 45:6
  56:18 58:6
  59:10,19

60:24
61:23
69:11,25
72:17
74:11,19
80:22,23
81:1,4,8,
17 83:22
85:19
89:15
92:24

**car**  28:4,7,
  8

**career**  11:8

**case**  6:3,5
  8:13,14,17
  15:10
  20:23 21:6
  31:2 32:1,
  3,9 36:13
  37:10
  39:16 40:3
  42:9,10
  44:9 48:24
  51:13
  53:15,20,
  22,23
  60:17
  64:23
  66:20,24
  83:14
  85:25 93:9

**cases**  22:22
  31:23 32:6
  33:22,25
  35:9 69:19
  85:19

86:13

**cash**  27:19,
  21,22,24
  28:2,10

**caught**  33:21

**caveat**  10:20

**Certificate**
  3:6,7

**chain**  18:4,
  23 19:19
  28:13
  33:6,11
  34:8 35:7

**change**  84:1
  91:8

**charge**  11:17
  22:2 23:21
  33:1

**charged**
  26:23

**chief**  6:2
  9:1 22:11,
  13 25:2,3,
  9,10,13,15
  28:15
  30:19
  31:20
  32:6,20
  33:13,25
  34:10,19,
  25 35:13,
  14,16,19
  36:6
  38:10,23
  39:10

42:19
44:3,5
45:11,15,
18 46:16,
21 48:7
56:18,23
63:6
66:16,21
69:12,25
74:19
76:4,19
79:23 80:3
82:20
83:13,17,
21 84:4,7,
12,17 85:8

**chief's**
  34:21,22
  41:4

**chiefs**  22:14
  32:13
  34:16,17

**CI**  36:1
  37:23
  40:2,4
  42:12 87:2
  92:7

**CI's**  35:25

**Circuit**
  59:13

**circumstances**
  34:15

**city**  5:24
  6:4,9,16,
  17 15:25
  16:5,9,12

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021          Index: claims..conducting

25:10 37:7
38:4 43:6
58:20
67:12,15,
25 68:6,9
72:8,9,14
73:20
75:23,24
76:9,14
81:21
83:15
84:21
87:21 88:3
92:14

claims  5:25
46:19

clarify
46:13 90:2

clarifying
58:23
85:12

clarity  69:1

clean  31:11
37:17

clear  34:3
44:21 61:7
70:25
91:14

cleared  5:18

client  6:3

clinic  92:14

close  67:4

closed  23:14
90:2

clue  10:1
59:5 83:11

Cognetti
50:6

coincided
67:22

Colombino
47:13 48:7
49:4 51:2,
3,12 53:15
54:12

command
18:4,23
19:19
28:14
33:6,11,
23,24 34:9
35:7 69:12
71:17

commence
63:7

commenced
27:2 63:15

commensurate
22:10

comments
17:2 18:17

committed
69:5

committing
19:12

common
48:16,20

communication
30:7 66:16

communications
8:25 85:7

compensated
67:25

complaint
6:4,8
13:20 14:6
16:14 21:6
22:5,17,24
36:9 52:13
53:17,24
54:13
57:22
62:11,13,
15,22
63:16
64:11 65:5
72:4 77:11

complaints
62:17

completed
26:5 29:19
33:5 56:2
70:20,23

completely
69:7
72:15,16

complex  29:4

compliance
84:1

computer
90:8

computers
90:4

concerned
8:23

concert
16:16,17

concluded
14:24 62:1
85:25
93:20

conclusion
42:23
58:17

concur  48:11

conduct
13:21
69:14
71:12

conducted
6:23
13:10,14
22:10
24:12
64:7,8,11
70:21
72:20
73:23
75:10,19
76:16 79:5
80:11 85:3

conducting
5:12 16:13
63:12
66:13
68:16 69:2

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021        Index: conducts..criminal

71:3 72:13
75:6
79:17,24
86:10

conducts
13:25
74:21

conference
4:2 5:5
34:21

confidential
32:15 40:1

confirm
64:13

confused
46:13
61:14

conjunction
80:14

consideration
39:3 46:4

considered
44:2

consistent
67:13

contacted
40:1,4

contents
40:18
41:24 44:2
83:20 87:1

continued
14:18 89:9

continuous
11:3

conversation
35:24
41:25
43:4,20
83:17,21
84:12

conversations
8:11,16
9:5,8
34:18
37:13,23
38:4 84:6,
16

cooperate
73:20

cooperating
75:24

copy   7:12
23:4
82:15,17,
21 83:10
84:8,17
90:22

correct   4:15
6:18 8:19,
20 14:9,
10,25 16:6
20:19
23:22
26:15,21
27:4 28:21
31:4,17
33:2,6
35:5,9

39:2 42:13
43:9 45:7,
12 47:7,24
49:11,23
50:21 52:2
53:17 54:3
55:20,24
56:3,4,8,
12,15,19,
24 57:6,
12,16 59:3
60:4,22,25
61:9,17,
18,23,24
62:2,4
63:1,24,25
64:2
65:10,13,
19,21,22
67:21
68:1,2,7,
8,12 69:5,
16,19,20
70:2,12
71:5,23,24
72:4,10,
11,14,17,
18 73:12,
21,22,25
74:5,14,25
76:5,13,
15,21
78:1,3,6
79:18 80:1
85:16,17
89:10,11,
13,14
90:20

91:1,6,16,
20,22

Corruption
59:14,21
66:23
67:10
75:4,18
77:8 78:19
79:8

counsel   6:16
36:21,23
37:3,22
38:8 41:5,
6,9,12,15,
18,22,25
42:16 87:7
88:11,13,
21

Counselor
54:7

counting
27:25

couple   21:11
64:13
69:24
70:15
71:4,18

coversheet
23:14

created
39:22,24

crime   27:3
67:20
68:15 70:8

criminal

Case 9:20-cv-82406-AMC   Document 30-3   Entered on FLSD Docket 03/02/2022   Page 105 of 125
GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021       Index: criminally..dipping

26:4 27:2
31:9 36:2
50:11
63:22,23
65:12
76:16
78:20
79:4,13
91:1

**criminally**
63:17

**curious**   7:19

**cut**   24:19
61:5

---
**D**
---

**Daniel**   59:12

**date**   12:25
13:7,11,13
28:18
36:17
58:1,3
71:6 83:11

**dates**   10:1,
14 47:10
64:13
68:11
71:25
72:2,4,9

**dating**   21:16

**David**   5:8,15
23:4 89:2
93:8

**day**   30:10

34:7 59:16
71:7

**DEA**   36:5,13
39:5,16
42:5 69:13
90:24
91:11

**Deanna**
21:11,20,
24

**December**
11:15
63:6,8,14

**decide**   77:21

**decided**
42:10

**decision**
18:1,3,20,
23 19:17,
19 20:17
22:12
39:12,14
40:20
41:1,2,3
42:19
67:3,8
79:25

**defendant**
6:5

**defenses**   6:9
53:5

**delay**   62:24

**delegate**
22:15

**delivered**
19:25

**department**
9:13,15,18
10:11
11:6,24
25:17
26:18,20
31:20
32:18 34:7
40:8,12
47:7 58:12
69:3 70:11
71:2 75:5,
6,20 82:9
90:12
91:16 92:3

**departments**
32:19

**depend**   22:11
34:15 82:5

**depending**
22:16

**depicting**
17:1

**depo**   5:9

**deposed**   6:1

**deposition**
5:12 6:6,
21 7:6
8:22,25
11:11
54:20
93:19

**depositions**

4:24 5:13
6:13

**derive**   10:14

**describe**
22:4 34:13
37:2

**description**
68:25

**design**
32:10,21,
23

**designed**
32:14

**designs**
32:17

**detail**   71:23

**detailed**
84:3

**details**   68:1

**determination**
18:18
40:17 44:3

**determine**
17:13
18:21

**determined**
17:21 65:2

**dipping**
12:16 59:2
60:14
62:16 63:5
67:18,23
68:3 69:5

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021      Index: direct..encapsulated

71:21
73:11
78:6,21
81:19 86:3

**direct**  3:4
4:13 67:3

**directed**
76:4,19,25

**direction**
66:25 67:2
89:2

**disc**  90:7

**discarded**
20:22

**disciplinary**
22:7

**discipline**
20:25 21:6
46:1 56:7,
22

**disciplining**
44:4 46:18

**disclose**
33:23

**disclosed**
34:10

**disclosures**
34:14

**discovered**
42:4

**discovering**
28:23

**discovery**

6:6 27:5

**discrimination**
6:3

**discuss**  36:5
67:10
81:18 85:9

**discussed**
39:5 45:21
79:20
80:13
87:6,7

**discussing**
36:11

**dishonest**
29:10,14
31:14

**dispute**
15:16

**division**
11:18,19
61:20

**document**
15:9,23
16:22
17:21
25:23
27:1,18
31:5 45:13
49:7,18
51:7,15,22
52:1,12
54:23
56:13,20
59:22
60:8,12

61:1 62:8,
18 70:4,6,
13,19

**documentation**
15:20

**documented**
52:17 54:9
64:22

**documents**
7:4,7 19:4
21:7 24:4
47:9,18
62:14 71:9
75:25
89:23
93:15

**dollar**  68:6

**Don**  8:13
9:2

**dope**  27:22

**double**  12:16
59:2 60:14
62:15 63:5
67:18,23
68:3 69:5
71:21
73:11
78:6,21
81:19 86:3

**downloaded**
90:5,22

**drive**  90:8

**drop**  14:12

**dropped**

14:17

**drug**  36:2
67:20
68:15 70:8

**due**  48:8

**duly**  4:12

---

**E**

**e-mail**  23:2
82:11
83:12 84:2

**e-mails**
82:12

**EAP**  43:17
44:25
86:20

**earlier**  21:4

**easier**  23:9

**easy**  73:19

**EEOC**  16:15

**effort**  55:3

**Elainy**  28:19
52:17

**electronic**
89:22 93:6

**embezzled**
26:14

**employee**
17:9

**encapsulated**
8:17

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021          Index: end..Florida

end   31:25
  32:3 38:23

Enforcement
  67:20
  68:16 70:8

entered
  55:16

entire   34:20
  68:17

EPA   43:15

Errata   3:8

essentially
  6:2 14:3
  20:10
  23:14 59:2

event   5:11

events   11:3
  55:9 56:5

eventual
  45:10

everybody's
  5:10

evidence
  17:13,14
  20:8,13,
  15,18
  26:15 48:1
  73:10
  78:21 87:3
  89:19,23
  90:3

exact   12:14
  14:5 64:6

Examination
  3:3 4:13

examples
  33:10

excuse   59:9

executed
  26:12

executing
  28:20

execution
  26:12

exhibits
  3:13 23:3
  93:8,9,10

existed
  83:18
  91:15

existence
  43:25
  91:20

expertise
  22:23

explain   52:6
  63:3 64:4

explained
  74:20
  77:19

extent
  25:22,23
  37:4 88:15

_____

F

_____

face   45:10

Facebook
  16:25
  18:14

fact   15:16
  20:20 27:7
  29:9,24
  36:12
  42:11
  46:4,16
  54:25
  58:25
  64:18
  66:17,21
  68:15
  70:14 71:2
  75:18,23
  76:3 79:17
  80:10
  82:19
  83:17 84:7
  89:15

fake   43:5

familiar
  55:11

Family   86:20

father   25:4,
  6,7

federal   42:9
  68:5 69:14

feed   19:19

feel   93:10

fellow   48:17

felt   52:17

Fernandes

59:12

fight   37:15,
  16

file   17:6
  54:18,20
  57:20 77:1
  79:12

filed   5:24
  13:21
  54:13
  57:14,22

finance
  68:17

find   28:2

finding
  27:22

findings
  13:17,18
  70:10,24
  74:24
  82:10
  83:25 84:9

fine   25:19
  69:1

finish   81:10

firm   5:22

fiscal   70:9

five-minute
  81:9

floating
  40:7

Florida   5:23
  57:20

FMLA  43:9,
  23 92:21

focused  58:2

follow  67:15
  79:6

follow-up
  54:24

force  67:20,
  24 68:16
  71:22 72:3

Force's  70:9

foregoing
  93:19

forget  12:14

form  24:11
  61:4,6

format  77:1
  79:6

forward
  14:18 26:2

forwarded
  7:23 35:25
  82:12
  83:24

found  27:21
  28:10

frame  8:16
  11:13
  12:23 13:3
  23:22 29:6
  40:8 45:6
  63:9 66:15
  68:14 69:3

Fridays
  33:21

front  13:1,
  2,7 31:25
  32:3 54:21

full  25:23

fund  78:5

funding
  72:13 78:2

funds  69:15,
  16,18

funny  88:18

———————

G

gatekeeper
  20:8

gather  19:18

gathering
  33:1

gauge  18:24

gave  19:9
  48:17 72:4

general
  20:12
  32:23
  33:24

generally
  16:11,13,
  14 17:15,
  23 20:15
  24:8 55:12
  82:24

give  4:7
  10:13
  12:25
  19:2,10
  24:4,6
  33:10 79:9

go-between
  49:11

GOBEO  4:22
  5:6,17
  12:6 14:19
  17:7 18:5
  29:3 30:3
  32:16 33:7
  37:4 38:2,
  9 41:14,
  20,24
  42:25
  43:10
  46:8,20
  47:8 48:19
  49:12,24
  51:14 52:3
  54:6 57:7
  58:14 59:4
  65:14 66:2
  68:19 69:6
  70:3 73:13
  75:7 77:23
  78:24
  79:19
  80:2,12,25
  82:4 84:23
  86:11 87:5
  88:15,23
  91:2 92:9
  93:1,4,14,

18

Gobeo's  89:2

good  4:15,
  17 5:6
  28:17
  92:25 93:2

government
  68:5

governs
  17:17

Graham  15:24
  16:3,19

grand  26:23
  27:3

grant  68:5

Greg  19:2
  35:1 37:23
  39:6 43:4
  54:12 72:2

Gregory  5:23
  9:18 12:4
  14:3,9
  15:3,7,16
  16:1,24
  17:4
  18:13,15,
  20 20:25
  21:11
  35:17
  37:24
  38:22
  40:11
  41:13
  42:20
  43:8,15

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Theodore Swiderski on 11/03/2021              Index: grievance..IA

44:4,24,25
45:5 46:7,
18 51:6
52:15 55:1
57:11,15
59:2,17
60:14
62:25
64:17
66:1,11,18
71:22 72:8
73:1,24
74:13
78:20,22
82:16,20
83:9 84:8,
17,22
86:19
91:15,19
92:1,13,
17,21

**grievance**
57:14,17,
18,20,24

**guess**  17:19
34:2 45:9
55:8 60:16
61:2,7

**guide**  17:12

**guys**  5:15
44:9 65:20
67:9 76:4
80:9 89:18

─────────────
**H**
─────────────

**hairs**  60:2,7

**hand**  4:4
23:9

**handed**  38:22
45:11 56:7

**handle**  5:2

**handled**
67:14
79:14 86:8

**happen**  79:2

**happened**
25:21
30:15,21
31:12
37:20
42:4,7
48:10,14
63:9
87:13,23
88:7

**harass**  19:15

**harassment**
12:14
19:12 45:4
46:6,17,19
47:1 48:9
49:2 55:19
62:13,15
85:23

**hardware**
90:9

**he'll**  93:4

**head**  11:25
12:24 22:7
64:5

**health**  92:14

**hear**  62:6

**heard**  82:25
83:4,6,8

**hearing**
56:7,14,
17,22
58:3,4,9,
11,16,24
59:18

**held**  33:16
34:23 36:4
44:16
54:10
56:17
81:13

**Herb**  12:18,
21 13:21,
25 14:4,
12,16 17:2
18:17,19
21:2

**Herb's**  16:25
18:15

**hiring**  11:19

**history**
9:13,22
10:12

**hit**  67:12

**home**  29:12

**homeowner**
27:17,20,
23

**honest**  55:16

**hours**  38:24
56:3

**house**  27:21
30:22

**HR**  16:17

**human**  15:24
16:8,12
81:21 82:1

**husband**
21:16

─────────────
**I**
─────────────

**IA**  8:2
11:14
12:13
13:5,8
14:12
16:13,17
17:6,22
20:18
23:14
24:1,7
26:7 31:3,
17,19,21
32:12
35:23
38:25 39:6
40:19
42:23
47:14
48:5,18
53:3
55:10,15,
18,23 56:1

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021          Index: idea..interested

57:4 58:6
59:8,18,24
60:22
61:15,16
64:20,24
66:7 68:9
84:18 85:8
87:2 89:9
90:17
91:8,9

idea  21:12,
19 40:9
67:6 82:18
86:24
90:21
91:23

identified
45:4

identify  5:4

images  17:1

imagine  8:15

Imler  23:18
24:2
25:16,21,
24 26:8,13
27:8 28:3,
10,20,24,
25 29:12
30:9,25
31:11

Imler's  25:4
26:20

implicate
73:24

implicated

74:13,16

important
13:13

impromptu
33:19

incident
13:3,4
27:12 31:8
49:20
52:11,16

incidents
47:5 64:22
65:9

include
17:10
18:21
19:23
54:11

included
5:25 17:1,
24 18:10
19:3,16
20:1,21
85:4

incorrect
52:6

independent
46:25
51:11,17
54:19

independently
12:2,8,9
16:2 21:9,
23 25:18
35:2 62:9

individual
22:3 37:7
42:12 73:9

individuals
40:11 92:2

inform  41:22
75:4

informant
40:1

information
6:7 19:18
20:22
26:3,18
27:6 29:2
31:16
33:2,6,11
34:11
47:22
51:21,23,
25 54:17,
23 59:24
67:11
68:10
72:10
76:14,21
77:3 79:8,
16 80:24
83:4 84:4

informed
69:25
82:22,24

initial  8:9
53:24
55:23
59:24
62:13

64:11

initially
5:25 26:18
29:1 31:11
53:16,19,
21 56:6

initiative
28:12

injury  43:5

inquiring
88:16

inquiry
27:14
67:18

instance
48:5

instruct
41:12

instructed
80:18,21

instructing
38:2 41:16

instructions
41:14

intended
39:13

interaction
50:19

interactions
15:12

interested
11:11 24:8

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021      Index: interfering..involve

interfering
  36:2

internal
  10:8,10,24
  11:2,5,16,
  18  12:3
  15:17
  16:11
  17:5,13,17
  19:23
  21:1,22
  22:3,5
  23:21
  24:25  26:4
  29:16,22
  30:12
  32:5,14,
  24,25
  33:18
  34:5,17,25
  35:4,7
  37:25  45:7
  52:22
  59:25
  60:24
  61:8,12
  63:24  70:9
  85:14,18
  86:18
  87:14,19,
  20,23
  88:3,8
  89:12,23
  90:12,16

interview
  19:5  48:6,
  8  53:6,7

62:13

interviewed
  30:16  49:5
  81:6

interviewing
  15:3

interviews
  47:24
  48:2,17

introduced
  53:23

investigating
  18:3
  19:17,18
  32:25
  58:13
  60:18
  65:20  91:1

investigation
  9:7  12:14
  13:9,10,
  14,15,16,
  19  14:7,
  12,13,16,
  17,24
  15:4,18,
  19,21
  16:13,24
  17:5,9,10,
  14,15,22,
  25  18:2,10
  19:4,16,
  21,24
  20:1,2,7,
  9,18  21:1
  22:3,6

23:15,17
  24:1,9,12,
  14,23
  25:20,24
  26:4,7,19
  27:2
  29:11,17,
  19,22
  30:9,13
  31:9,10,22
  32:8,14
  33:5  34:9
  35:15,20
  36:3  38:1
  40:19  45:3
  47:14
  49:6,17
  50:11,14,
  19,21,24
  51:4,9
  52:13  53:4
  54:2,9,15
  55:10,19
  58:17
  59:1,14,15
  60:6,13
  62:1,18,19
  63:7,12,
  15,23,24
  64:8,9
  66:1,10,
  14,17
  67:14,16
  73:21
  75:10
  76:12,16
  77:2,5
  78:20

79:4,7
  80:9,14
  85:3,5
  86:2,10,19
  89:6,20,25
  90:2

investigations
  8:3,19
  9:11  12:3,
  5  17:18
  21:23
  22:10,12,
  19  33:14,
  24  34:8,11
  35:1,17
  61:20
  83:23
  85:15
  86:15

investigative
  13:17
  62:24

investigator
  18:9,20,22
  19:22,25
  20:6,7,16,
  22  63:11

investigators
  22:22
  90:15

invited
  50:3,4,8

involve
  16:12  51:6
  52:15

**involved**
8:18 10:7
12:13,20
13:5 15:25
16:19
22:4,8,17,
18 24:1
31:18,24
32:2,7,9
36:22
47:13,16
50:13,21,
23 51:4,9
52:20
53:19,21
67:19
85:15

**involvement**
30:8,14
60:17
76:10
83:13

**involving**
21:24

**issue** 5:8,12
36:20 68:9
81:22

**issued** 76:17

**issues** 68:17
84:1,4

**J**

**January**
10:25

**Joe** 17:2

**Joseph** 12:1,
17,18,21
13:21,25
14:4,12,16
16:25
18:15,17,
19 21:2

**July** 70:1,
12,17,19,
25 71:3,5
75:19

**Justice** 71:2
75:5

**K**

**Kalil** 25:2

**Kapper** 28:14
29:2,10
30:8,14,
16,19,20
31:3,7,15
36:7,10,13
39:10,15
42:8 44:24
69:11,25
72:17
74:11
80:22,23
81:1,4

**Kapper's**
74:19

**Karen** 23:2

**kind** 23:24
45:9

**King** 57:2,
15,21,22
62:22

**knew** 29:6
36:8 70:24
72:2 79:23
91:10

**knowledge**
12:13
37:24
50:15
51:12,18,
19 66:11
80:24
81:20
82:8,12,13
86:22
90:25 91:3

**L**

**law** 5:22

**lawsuit** 5:24
7:12,23,25
8:1,8,10
9:8,9,11
11:4 12:12
30:5

**learning**
46:3

**leave** 28:10
61:11
86:20
93:12

**leaves** 28:2

**leaving** 66:7

**left** 11:23
61:7,12,15
84:18
85:14,18
89:13,16
90:12
91:8,9

**legal** 36:21,
23 37:3,22
38:8 41:4,
6,9,12,15,
18,22,25
42:16

**lengthy**
86:7,13

**Lewin** 5:1

**liaison**
49:10

**lieutenant**
5:23
13:12,23
22:18,21
24:24
59:19
60:21,22
83:24
91:23

**listed** 31:5,
7 81:7

**listen** 87:12

**listened**
39:19
40:16

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021     Index: located..mentioned

located
  27:19
  90:12

locker   89:21

log   55:9,17

long   32:12

longer   6:5
  16:5 29:25
  61:16
  81:11
  85:15
  90:19
  93:11

Lori   47:13
  48:7 51:12
  53:15
  54:12

lot   23:9

luck   92:25

———————————
        M
———————————

Mack   15:24

made   6:8
  17:6 18:3,
  24 19:20
  21:24
  28:12
  39:12
  41:19,23
  43:5 44:3
  46:5 47:6
  48:18 55:4
  56:11
  57:16

62:12
64:18 65:8
67:8 79:24

maintain
  88:3 89:9

maintained
  87:3 90:7,
  8 92:14

make   20:5
  22:11
  37:16
  40:17,20
  41:2 44:20
  45:20 60:7
  93:10,11

makes   18:20
  20:17

making   17:2
  18:17
  53:17
  58:18 63:4
  65:5

manner   53:12
  74:16

March   55:23
  62:1 63:8
  65:5,24
  66:7 77:11

Marked   3:13

married
  21:18

Marte   48:7

matter   20:20
  50:24

Matthew
  16:3,19

Mcdaniel
  59:11,19
  60:18
  62:20
  63:10,11
  64:6
  66:13,22
  72:7
  75:10,17
  76:19
  78:18
  79:25
  81:20 85:3
  86:9

meant   24:21

medical
  86:20
  92:13

meet   6:20
  66:22 67:9
  75:3
  76:19,25
  77:7,12
  81:20,25

meeting   6:23
  7:1,3 15:2
  16:1,20,24
  28:15
  30:18
  36:4,11,16
  37:3,9,12,
  20 38:8,
  17,21
  39:3,8,12,

13,15,18,
21 41:4
42:4,16
44:23
49:19,21,
23 50:10,
12,14,24
51:3,4
52:10,19,
24 54:10,
11,14
55:1,2
58:25
59:5,20
64:14 66:8
67:1,2
69:12
71:12
81:17
91:3,6

meetings
  32:4,5
  33:12,15,
  17,19,20,
  22 34:4,5,
  6,22,24
  35:4,12,
  16,18,22
  36:19 44:8
  85:9

memo   64:21

memory   28:17

mention
  27:19
  72:25 73:5

mentioned

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021       Index: messages..objection

8:8 35:3
42:18 53:7
57:2 74:23
86:25

messages
19:1,13,15

met  37:10
59:11
65:24
77:10
78:18

Mike  24:11,
22

mind  10:12
80:16

minutes
44:12
93:17

misunderstood
46:10

Monday  7:2

money  25:25
26:14 27:8
28:8,12,24
29:1

Mooney  6:2
8:12 9:1
22:13
28:15
31:20
34:25
35:13,14,
16,19
38:10,23
39:10

44:3,5
45:11,15,
18 46:16,
21 48:7
56:18,23
63:6
66:16,21
69:12
76:4,19
79:23 80:3
83:17,21
84:7,12,17
85:8

Mooney's
25:3 42:19

morning
4:15,17
30:22

move  55:7

multiple
54:11

———————————

N

named  6:5
7:25 9:11
31:3 74:25

names  73:5

nature  16:15
22:17
79:14 82:5
86:14

necessarily
33:8 48:20
55:17
58:20

89:24

needed  43:22
68:7 84:1

nexus  62:16

night  27:25

nine-and-a-
half  10:4

Norbraten
3:4 4:14,
25 5:7,18,
20,21 12:7
14:20
17:11
18:11
23:2,5
29:7 30:6
32:22 33:9
37:6,18
38:6,12
41:17,21
42:2 43:2,
13 44:18,
19 46:11,
23 47:11
48:22
49:14,25
51:16 52:5
54:16
57:10
58:21 59:7
65:17 66:5
68:21 69:9
70:5 73:16
75:11
77:24
79:1,22

80:7,15
81:3,8,15,
16 82:7
84:25
86:16 87:9
88:1,6,9,
17,19,25
91:4
92:11,24
93:5,16

notice  79:12

noticed  9:7

notification
8:10 74:19

notified
64:18
69:11

notifying
65:18

November
11:22,23
56:24 57:2
59:9 61:8,
13,15 66:7
90:13 91:9

number  12:15

———————————

O

Oath  3:6

object  87:10

objecting
38:2

objection
12:6 14:19

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Theodore Swiderski on 11/03/2021   Index: observed..organizations

17:7 18:5
29:3 30:3
32:16 33:7
37:4
41:14,20,
24 42:25
43:10
46:8,20
47:8 48:19
49:12,24
51:14 52:3
54:6 57:7
58:14 59:4
65:14 66:2
68:19 69:6
70:3 73:13
75:7 77:23
78:24
79:19
80:2,12,25
82:4 84:23
86:11 87:5
88:15 91:2
92:9

**observed**
40:16

**obtain**   80:23
83:9

**obtained**
77:3 87:1

**obtaining**
82:21

**occur**   36:24
67:2

**occurred**
9:10 25:20

35:4,13
47:5 49:20
52:12 56:6
65:9 69:25
70:18

**occurring**
37:3 85:10
86:7

**occurs**   64:1

**OCDEFT**   68:6
69:2,15,
16,19 70:9
72:13
73:23
75:5,18
77:17,19,
22 79:17,
24 80:11
82:9,21
83:10

**October**
26:11 27:6
28:19
56:2,12,15
58:3 59:10
65:24 66:9
67:3,5
77:10,13
81:18

**off-duty**
67:25

**office**   6:17
33:18
58:25
59:20
64:14

65:25
66:8,23
67:4 75:3,
18 76:5,20
77:3,7
78:19
80:1,10
81:18 82:2
87:22
90:23

**officer**   9:19
18:3
19:11,12,
13,17,18
23:18 24:2
25:21 28:3
33:1,4
46:5,16,19
47:1,13,
19,23
49:21 50:6
51:2,5
52:24
53:16
55:2,4
56:3,6
58:13,17
60:18,19
63:4 64:23
65:1,3
66:22 69:4
72:1,7
74:22
75:17
76:19
78:18,23
79:25
81:20

85:24 86:9

**officers**
37:8
48:16,17
69:19 73:6
74:24

**officers'**
62:25

**offices**
34:22

**ongoing**
33:23
34:7,11
35:1,15
36:2 52:13
65:12
66:9,17
89:5

**onset**   74:19

**open**   86:12
89:24

**operate**
32:18

**opinion**
40:21,22,
24 79:9

**opposed**
45:16

**order**   28:6
56:22 57:5
93:6,18

**ordered**   63:7

**organizations**
73:9

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021     Index: Organized..point

Organized
  67:20
  68:15 70:8

Oswald
  24:11,22
  62:19

overarching
  6:2

overlap   75:9

oversaw
  11:18

overtime
  68:18

overtone
  14:2,6
  21:5

overview
  86:14

—————————
          P
—————————

p.m.   93:20

paid   67:24

Palm   9:14
  10:11 16:9
  25:17 69:2
  70:11 92:3

Panarites
  7:24 38:11
  93:3

paperwork
  74:21

part   15:3
  17:6 20:18

29:16,21
31:16
42:21
46:3,9
49:5 53:3
54:14 58:5
62:22,23
81:25

parts   11:5

path   53:14

pay   69:18

paying   73:9

payroll
  68:11

PBA   15:8,12
  57:3,8

people   6:4
  10:15 34:4
  54:11
  71:11,12

period   9:22
  11:3,10
  68:4 69:4

periods
  32:13

permission
  5:10 10:22

person   5:3
  14:8 23:9
  86:9

personal
  6:16 8:12
  18:15
  92:17

personally
  25:13
  30:13

pertain
  19:25
  20:23

pertained
  40:19 89:6

pertains
  17:9,20,21
  18:2,19

pertinent
  37:14
  50:14

phone   35:24,
  25 40:11
  92:1

physically
  71:7,8
  90:11

pictures
  18:16

piecemeal
  24:8 73:19

place   34:14
  36:16
  37:21
  38:18,21
  39:5 52:25
  55:4,10
  56:14
  61:22 63:4
  66:1
  67:12,19,
  25 68:10

69:23
70:1,15,
16,17 72:9
73:20 74:4
75:23,25
76:9,14

Place's   68:6
  72:9

plaintiff
  5:12

play   5:8
  41:9

point   8:9
  9:18 13:6
  14:11 15:5
  22:13
  24:13
  28:3,11,16
  29:8,13
  30:17,19
  35:23
  38:18
  40:13 42:3
  43:14 47:2
  50:18
  52:21
  53:13,23
  54:1,9,25
  63:16
  64:12,15
  69:1,11
  74:12 77:4
  80:4 83:16
  86:1
  92:12,16,
  20

GREGORY RIDEAU vs CITY OF WEST PALM BEACH

police   9:14
  10:11
  25:10,13,
  16,17
  31:20
  32:18,19
  34:7 40:12
  62:25 69:3
  70:11
  75:5,19
  92:3

policy   17:16

position
  11:24
  12:24
  52:22

possessing
  84:17

possession
  40:12 87:3
  89:9,12
  90:15,17,
  20,21 92:2

potential
  6:9 16:15
  63:17

power   76:7

precedent
  63:23

predisciplinar
y   56:21
  58:4,16,24
  59:17

preface   26:8
  60:16

prefaced
  73:17

preparation
  7:4 8:6,24

prepare   7:18

presence
  8:12 9:1

present   6:17
  15:6 38:7
  39:8 42:15
  44:24 48:8

presentation
  58:15,19,
  20

presented
  59:14
  80:20 92:7

presenting
  59:17

presents
  58:11

prevent
  65:20

previously
  36:24

primarily
  86:9

primary   5:7
  10:5 11:10

printout
  55:15

prior   6:20
  7:6 12:18

21:16
  38:21 39:5
  40:2 43:8
  46:1,17
  54:20 56:7
  66:6 80:9
  81:17

privilege
  37:5,6,12
  41:15 42:1
  87:17

probe   55:15,
  18

procedure
  64:6 67:15

procedures
  64:25

proceedings
  4:2

process   22:1
  32:14
  57:4,5
  62:24
  63:3,21
  64:2 70:10
  81:25

processing
  35:9

produces
  17:24

producing
  16:25

professional
  10:12

11:17,25
  12:24
  13:5,8,21,
  25 22:2,8
  24:10
  60:25
  61:16
  86:17

progress
  66:20

proper   15:20
  63:21
  64:24

protected
  41:25

proven   71:14

provide   41:6
  72:10
  75:25

provided
  7:3,21
  17:4,8
  18:9 19:2,
  6 20:16,21
  62:14 72:1
  79:15,17
  84:21
  87:2,25

providing
  18:25
  73:10

public
  59:13,20
  66:23 67:9
  75:3,18

77:8 78:18
79:7
84:13,19

**pulled**
28:11,15
30:18

**punishment**
45:10

**purpose**
87:15

**purposes**
69:7

**put**   17:25
55:3,11

**putting**   21:3

---

**Q**

**question**
7:21 8:23
10:18
14:23 18:7
19:9 20:12
29:4 30:11
32:11
41:1,16
43:11
46:10 51:1
53:13 55:5
66:4 67:6
73:14
75:2,13
77:9
78:14,15
79:3 80:6
81:2 84:15

88:22,24
89:1,3
91:12

**questioning**
10:6

**questions**
38:3 53:11
57:8 58:19
93:1

---

**R**

**racial**   14:2,
6 18:17
21:5

**racist**   14:4
17:2 21:2

**Raise**   4:4

**raised**   6:9

**ran**   68:9

**rank**   22:18,
21

**ranks**   11:9

**Ravelo**
28:19,25
29:9 30:1
31:14
46:19
47:1,19
48:6
49:11,21
50:13 51:5
52:12,17,
24 53:16
54:12 55:4

62:12 63:4
72:1 78:23
85:24

**Ravelo's**
47:23 55:2
65:5

**read**   47:2
54:22
62:21
63:14
93:3,4

**reason**   76:3,
18 77:12,
15 83:2
84:11,16
87:4

**recall**   8:7
12:2,8,11,
21 13:4,9,
11,14,15
14:14,15,
22 15:2,6,
24 16:19,
23 17:3
18:25 19:6
20:24
21:3,4,23
23:13,18,
25 25:18,
19 27:13,
17,18
29:23
31:1,15
32:8 34:24
35:2,15,22
36:15,17
37:1,2,21

38:16
39:11
41:3,8,11
42:9,17,18
44:10,22,
23 45:1
46:2,3
47:2,15,25
50:5,9,10
53:22
57:25 58:1
62:9 64:5,
10 65:7
66:19
69:13 73:4
75:15,16,
21,22
79:20
81:23
83:1,3,6,8
84:10
85:22 86:3
90:10,14
91:17
92:4,10

**recalled**
13:3

**received**
20:25
55:23
82:17
83:13

**recess**   44:16
81:13

**recollection**
7:8 13:20
24:5,6

Index: recommendations..represent

27:10,11
39:9,25
45:14,17
46:25 47:3
51:20
52:8,9
54:19

**recommendation
s** 70:11

**recommended**
43:15,18
44:25

**record** 4:18
5:11 37:17
44:18,21
81:15
83:12
84:14,19

**recorded**
19:5 35:25
37:24 40:5

**recording**
5:9 36:5,
7,8,12
37:22
39:4,17,
19,22
40:17,18
41:7,10,
13,19,23
42:5,20,23
44:1,2
87:1 89:6
90:6 92:6

**recordings**
40:6,10

91:15,19
92:1,5,8

**records**
92:13,17

**refer** 10:17
13:19
15:9,19
16:21 19:4
21:7 24:3
26:25
27:17
34:21 42:8
44:5 47:9
49:7,18
51:7,15,21
54:22
61:12 64:9
70:4 81:1
87:7,16
88:11

**reference**
31:13
39:16

**references**
31:10

**referencing**
40:9

**referred**
25:23
64:15

**referring**
10:13,21
19:1 31:5
32:21
38:24 52:1
59:8 60:1,

8,13 74:16
88:20 92:5

**refers** 48:25

**refresh** 7:7

**refreshed**
54:21

**refusal** 72:9

**refused** 28:9
68:10
75:25

**regularly**
33:19

**reimbursement**
74:18,21

**relate** 22:2
45:23

**related** 45:3
59:24
68:10,17
86:20
89:19

**relates** 6:8

**relationship**
40:2

**relay** 47:22

**relayed**
27:20
50:18
52:22 53:1
69:8,10
79:8 91:7

**released** 9:8

**relevant**
19:20
80:17

**remained**
11:21
42:23

**remember**
15:10 21:8
27:24
28:11 80:5

**repeat** 30:11
43:11 46:9
66:4 77:18
78:14

**repeating**
53:12

**report** 17:6
18:22 33:5
48:1,11,
12,25 49:3
54:21
63:19
70:20,23,
25 72:24,
25 73:3,5
74:24
82:15,17,
21 84:3

**reported**
28:13

**Reporter** 3:7

**reports** 7:24
8:2

**represent**
5:23

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021   Index: representation..Sarah

representation
  57:15

representatives  81:21

represented
  6:15 15:17
  57:3,11

represents
  37:7

request
  14:22
  56:11
  67:12

requested
  14:12 48:7
  56:6 68:11

requesting
  14:16

residence
  27:16

resignation
  26:20

resources
  15:25
  16:8,12
  81:21 82:1

result  42:4
  74:13

resulted
  26:19

results
  72:23
  77:17

retained
  87:14,19,
  23 88:8

revealed
  30:25

reveals
  15:21

review  7:4,
  11 36:14
  47:17
  54:18
  62:14
  63:19 64:7
  70:10 77:3
  84:22
  85:10
  92:16

reviewed
  7:7,17,23,
  24 8:6,9
  24:12,23
  25:1 36:12
  54:20
  63:18
  64:20,21
  72:24
  74:23 79:7
  82:15
  83:23,25
  84:3

reviewing
  30:14

Rick  57:2,
  15 62:22

Rideau  5:24
  9:18 12:4

13:25
14:3,9
15:3,7,17
16:1,24
17:4
18:13,15,
20,25 19:2
20:25
21:11,20,
24 26:1,17
27:7,20,22
28:1,9,13,
20 29:2,
11,25
31:15
35:1,17
36:1 40:1,
3,7,11
41:13
42:20
43:4,8,15
44:4,24,25
45:5 46:7,
18 50:20,
23 51:6
52:15,18,
20,23
54:12 55:1
56:3,6,23
57:3,11,15
59:2,17
60:14
62:25
64:17
66:1,11,18
69:4 71:22
72:8
73:10,24

74:7,9,13
77:20
78:5,20,22
79:5 80:19
82:16,20
83:9 84:8,
17,22
91:15,19,
23 92:1,6

Rideau's
  37:23,24
  38:22 39:6
  53:4,5
  63:5 67:19
  73:1 86:19
  92:13,17,
  21

rights  63:1

road  22:20

role  24:9
  31:21,23

room  6:17,
  24 34:21

Rubin  5:22

rumor  83:5

run  32:24

_____

S

_____

S-W-I-D-E-R-S-
K-I  4:20

safe  92:25

Sarah  6:2
  8:12 34:25

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021                Index: sat..sir

sat   47:23
  53:6

scene   26:15
  27:8 31:8

scheduled
  33:20

scope   37:25

screen   22:25
  23:7 45:3
  55:11
  60:9,10
  62:6

screenshots
  16:25
  18:14

scroll   56:5

scrolled
  26:6 61:4,
  5

scrolling
  67:17

search   25:25
  26:12,13
  27:9,15,16
  28:18,20
  30:23

seeking
  78:19

send   23:2,3
  93:12

sending
  80:10

separate

32:4
36:21,23
37:3

sergeant
  10:25
  12:21
  13:23
  24:11
  26:1,17
  27:7,20,22
  28:1,9,13,
  20 29:2,
  11,25
  31:15 36:1
  40:1,3,7
  48:7 49:4
  50:20,23
  51:2
  52:18,20,
  23 53:4,5
  56:23 57:3
  59:12
  62:19 63:5
  66:13
  67:19
  73:10
  74:7,9
  77:20 78:5
  79:5 80:19
  92:6

sergeants
  13:24

served   12:12
  27:16 46:1
  56:23
  64:23,25

serving
  49:10

set   55:3

setting   58:7

setup   52:24

sexual   12:14
  19:12 45:4
  46:6,17,19
  47:1 48:9
  49:1 55:19
  62:12
  85:23

sexually
  19:15

share   22:25
  23:7 29:1
  45:2 62:6
  80:8

shared   33:6,
  11 44:8
  75:17,23

sharing   60:9

she'd   80:5

she'll   32:2

sheet   3:8
  45:10

shortly   10:2

show   19:14

showed   49:21

showing   55:8

sign   34:9

signature

3:5 25:3

signed   61:1
  63:19

signing
  71:11

similar
  67:14 77:1
  79:6 85:7

similarly
  37:9

simple   55:5

simplify
  29:5

simply   79:8

Sinnott
  56:18

sir   4:16
  6:12,14,
  19,22,25
  7:10 8:4
  9:24 10:9
  12:22 15:1
  16:10
  23:8,16,
  19,23
  26:10,16,
  22 33:3
  38:14,20
  39:20,23
  45:8 55:21
  56:16,20,
  25 57:13,
  22 60:11,
  15,20,23
  62:3,5

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021                    Index: sit..subject

64:3 68:13
69:17 70:7
86:21
89:4,21
90:1,18
93:16

sit  48:2
72:22

situation
36:6

software
10:14,16
90:4

sort  14:2
17:12 46:5
86:19 90:7

sorts  85:9

Sounds  5:6

speak  30:17
63:10

speaking
16:14
17:23
22:16

special
61:20
83:22

specific
22:23
27:11 28:6
35:19
47:4,9
51:21,23,
24 72:4

74:15,22,
24 82:12

specifically
7:7 47:15
51:20 55:3
64:9,20
66:19 72:1
74:6,8
75:15
77:14
82:22
83:1,3,4,6
84:7 86:5
90:10
91:18

specifics
24:4 42:8

spell  4:18

split  60:2

splitting
60:7

spoke  27:23
78:10
91:11

staff  33:23,
24 69:12
71:17

stamps  71:13

stand  60:5
72:6

standards
11:17,25
12:24
13:5,8

22:2,8
24:10
60:25
61:16
86:18

stands  63:13

start  12:19
44:13

started
53:14

stashed  28:7

state  4:18
17:17
58:25
59:12,13,
20 64:14
65:25
66:8,23
67:4,15
75:3,17
76:4,20
77:2,7
78:19
80:1,10
81:17 82:1
91:10

statement
63:6,13,18
73:15

states  70:13

station
30:24
71:7,8,10,
11

statute

17:17

Stay  92:25

stealing
25:25

Steinberg
42:11,15
87:2 90:19
92:7

STENOGRAPHER
4:4 5:2

step  20:3

Stephens
8:13 9:2
87:25
88:5,13

stipulate
4:22 5:17

stole  26:14

stolen  27:8

store  89:18

stressed
43:21

strike  69:21
75:24

Stuart  5:23

stuff  93:9

subject  11:4
12:4 14:7
17:8,23
58:17
64:23
65:1,2

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021          Index: subjective..time

subjective
  86:13

subpoena
  76:1,7,15,
  17

subpoenaed
  76:9

subpoenas
  75:24

subsequent
  36:4 54:13

substance
  8:14 9:6

substantiated
  21:7

substantively
  9:9

sue   43:5

suffix   60:3

suggest   71:9

suggested
  43:21 72:1

suggesting
  43:8 70:24

summarize
  49:15

summarized
  49:13

summarizes
  55:15

summary   48:6
  56:10

86:12

supervisor
  26:1 51:8

supervisors
  22:19

supposed
  52:25

suspended
  56:3

suspension
  38:22 39:6
  45:12,15,
  16,24,25

SWAT   9:22
  27:16

swear   4:6

Swiderski
  4:11,17,
  19,20 5:21
  37:19 38:7
  44:23
  59:10

sworn   4:12

system   10:14
  90:8

————————————
           T
————————————

T-H-E-O-D-O-R-
E   4:20

table   77:6

taking   28:5,
  12 52:1
  66:1 69:23

74:4 85:20

talk   8:21
  9:12 32:5
  45:20
  64:10

talked   9:6,
  7,9 39:3

talking
  18:13
  32:23
  35:11,12,
  13 61:2,6
  87:20
  91:18,20

Tameca   82:20
  83:9

tape   88:7

task   67:20,
  24 68:16
  70:9 71:22
  72:3

tasked   58:19

team   9:22
  10:3

Ted   4:21

tenure   19:23
  85:11
  86:21

tenures   11:8

terms   22:1
  25:20

testifies
  4:12

testimony
  4:6 36:18
  54:3 71:16

text   19:1,
  13,15

theft   26:23
  27:3

Theodore
  4:11,19

therapist
  92:18,22

therapy
  43:9,22
  92:17

things   9:10
  45:22
  53:12 90:5

thumb   90:7

Thursdays
  33:20

tied   89:24

time   5:9
  6:18,24
  8:16 9:18,
  23 10:7
  11:3,10,13
  12:20,23
  13:3,12,24
  15:7 18:8,
  21 22:23
  23:20,22
  24:25
  25:8,16
  26:2 27:7

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Theodore Swiderski on 11/03/2021      Index: timeline..utilizes

28:18
29:6,8,18,
25 31:19
32:12
33:13
34:20
36:15
37:21
39:18,21
40:8 42:3
43:14,23
45:6 51:8
52:21 53:4
54:25
59:6,19
62:12 63:9
66:12,15
67:2,4
68:4,14
69:3,4
71:13,23
74:2,12
77:6 78:8
81:9 82:14
83:16,22
86:17
87:20
90:24
92:12,16,
20,25

**timeline**
55:9 61:12

**times**  11:7
13:9
34:19,23
54:8

**today**  6:1,6

7:4,9,18
8:6 9:4
10:6 21:13
72:22

**today's**  6:21
7:6 8:24
11:11

**Todd**  4:22
5:21

**told**  19:23
28:1 30:18
33:12 52:9
72:17
74:6,8,9
75:8,12
86:4
87:13,22

**tolled**  63:16
64:4

**tolling**  64:1

**top**  64:5

**track**  10:1,
15

**training**
11:19

**transcript**
5:5 93:11

**transfer**
10:15,24

**transferred**
11:16
64:16

**treated**
62:16

**treating**
92:22

**tree**  82:11

**trust**  30:1

**truth**  4:7,8

**turn**  41:12
42:20
68:10

**turned**  26:3

**type**  45:24
50:10
72:15,16
82:6

**typical**
31:21,23

**typically**
22:16,18

———————————

**U**

———————————

**ultimately**
22:11
25:1,3,24
26:19

**unable**  72:7

**uncomfortable**
52:18

**understand**
10:8 19:7
43:12
50:25 77:9
93:5

**understanding**
6:10 9:21

29:15,20
31:6 39:22
41:18
42:22
47:12
48:13,23
59:23
64:24
65:23 66:6
78:17

**understood**
44:21
75:12 91:5

**unheard**
48:21

**union**  57:23

**unit**  11:20
22:9 30:1
59:14,21
64:16
66:24
67:10
75:4,18
77:8 78:19
79:8 83:24
85:11
89:13,16

**units**  11:19

**update**  33:25
35:8

**updated**
24:13

**upheld**  56:22

**utilizes**
17:13

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Theodore Swiderski on 11/03/2021                      Index: valid..Zoom

**V**

valid   64:12

verbatim
  54:22

verify   71:10
  72:7

version   93:6

versus   17:14
  45:24 60:6

vest   28:5

victim
  47:18,21
  49:10

video   4:2
  5:5

violated
  62:25

violation
  16:16

violations
  74:17

visualize
  23:6

voluntarily
  76:14

**W**

waited   77:16

wall   67:13

wanted   29:25
  36:14

67:13,15

warrant
  26:1,12,13
  27:9,16
  28:18,21
  30:23

weekly   32:4
  33:12,15,
  22 34:4
  35:3

weeks   69:24
  70:16
  71:4,18

West   9:14
  10:11 16:9
  25:17 69:2
  70:11
  82:20 83:9
  92:3

West's   83:13

wife   21:17

Wiggs   24:24
  60:21

word   14:5
  21:5 26:14

words   21:3
  59:11

work   8:17
  16:16,17
  22:20
  30:12
  67:19
  69:19

worked   9:22

22:14
32:12
34:16 72:8

working   9:14
  10:7,10
  11:13
  23:10
  25:16
  28:19
  31:19 40:3
  42:12
  67:24,25
  68:5
  71:22,23
  72:3,19

workload
  22:22

worries
  81:12

wrong   14:8
  39:2 73:24

**Y**

year   38:18
  47:6 70:9
  75:1

years   9:25
  10:4
  11:12,14
  61:14

**Z**

Zach   25:24

Zachary

23:18
25:4,16
26:8

Zoe   7:24
  38:11 93:5

Zoom   4:23
  5:3,9,13
  23:7