**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Joseph Ahern on 09/29/2021

```
1                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
2                 WEST PALM BEACH DIVISION

3
                        CASE NO.:  9:20-CV-82406-AMC
4

5  GREGORY RIDEAU,

6           Plaintiff,

7  vs.

8  CITY OF WEST PALM BEACH,
   a Florida municipal corporation,
9

10          Defendant.

11  _____/

12

13            VIDEO CONFERENCE DEPOSITION OF

14                  Joseph Ahern

15

16           Wednesday, September 29, 2021
                1:00 p.m. - 2:52 p.m.
17

18                     Remote

19

20

21

22           Stenographically Reported By:
                Karen Allen-Lewin
23

24

25
```

```
 1   APPEARANCES:

 2   (All parties appeared via video conference.)

 3

 4   On behalf of Plaintiff:

 5        Rubin & Rubin
          2055 South Kanner Highway
 6        Stuart, Florida 34994
          (772)283-2004
 7        BY:  TODD NORBRATEN, ESQUIRE
          tnorbraten@rubinandrubin.com
 8

 9   On behalf of Defendant:

10        Ford & Harrison LLP
          1450 Centrepark Boulevard, Suite 325
11        West Palm Beach, Florida 33401
          (561)345-7512
12        BY:  DAVID M. GOBEO, ESQUIRE
          dgobeo@fordharrison.com
13

14   ALSO PRESENT:

15        City of West Palm Beach
          City Attorney Office
16        P.O. Box 3366
          West Palm Beach, Florida 33401
17        (561)822-1350
          BY:  ZOE PANARITES, ESQUIRE
18        zpanarites@wbp.org

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2

 3   Examination                              Page

 4   Direct by Mr. Norbraten                     4

 5   Cross by Mr. Gobeo                          77

 6   Redirect by Mr. Norbraten                   80

 7   Witness Signature Page                      82

 8   Certificate of Oath                         83

 9   Certificate of Reporter                     84

10   Errata Sheet                               85

11

12

13

14                  E X H I B I T S

15   Plaintiff's Exhibits:

16   1 -  Documents                             38

17   2 -  Audit                                 51

18

19

20

21

22

23

24

25
```

 1  Thereupon,

 2  the following video conference proceedings began at

 3  1:00 p.m.:

 4          THE STENOGRAPHER:  Raise your right hand for

 5      me, please. Mr. Ahern.

 6          Do you swear or affirm the testimony you're

 7      about to give will be the truth, the whole truth,

 8      and nothing but the truth?

 9          THE WITNESS:  I do.

10  Thereupon:

11                      Joseph Ahern,

12  having first been duly sworn, testifies as follows:

13                  DIRECT EXAMINATION

14  BY MR. NORBRATEN:

15      **Q.   Good afternoon, Captain Ahern.**

16      A.   Good afternoon.

17      **Q.   Could you please state your name, and spell**

18  **it for the record.**

19      A.   Joseph Ahern.  A-h-e-r-n, last name; Joseph,

20  J-o-s-e-p-h, first.

21      **Q.   And my understanding is you're still a**

22  **captain with the West Palm Beach Police Department?**

23      A.   Correct.

24      **Q.   How long have you been an employee of the**

25  **West Palm Beach Police Department?**

1    A.   Over 21 years now.  Just over 21 years.

2    **Q.   Prior to that, did you have any other law**

3    **enforcement experience?**

4    A.   I did.  I worked for the City of Lake Worth,

5    to the south of West Palm Beach.  I was there for just

6    under three years.  And then prior to that for several

7    months I was in Parkland Police Department for a

8    couple months before going to Lake Worth.

9    **Q.   Okay.  As you probably know, I represent**

10   **Gregory Rideau who is a lieutenant within the City of**

11   **West Palm Beach Police Department.  Do you know who**

12   **Mr. Rideau is?**

13   A.   I do.

14   **Q.   I assume you know his wife Deanna Rideau?**

15   A.   I do.

16   **Q.   Okay.  Can you describe for me how you first**

17   **met Gregory Rideau?**

18   A.   When I first became a policeman actually in

19   West Palm Beach, he was one of my field training

20   officers for -- I don't know if it was for the entire

21   part of it, but I spent some time as a trainee under

22   Greg Rideau.

23   **Q.   Okay.  And as we sit here today, you**

24   **currently outrank him within the department,**

25   **correct?**

1     A.    I do.

2     **Q.    What about Deanna Rideau, how did you first**

3  **meet her?**

4     A.    We were in patrol together and worked in a

5  quick response team together one time also for several

6  years.

7     **Q.    Okay.  Has there been a point in time where**

8  **you were the direct supervisor of Deanna Rideau?**

9     A.    There was.

10    **Q.    Okay.  When in time frame was that?**

11    A.    When I worked in -- out of the chief's

12 office, she worked in the hiring department and

13 background department.  I was a captain in charge of

14 that at one time.

15    **Q.    And is that current, or that was at some**

16 **other point in time?**

17    A.    That's in the past.  That's a couple years

18 ago now.

19    **Q.    Okay.  Was there ever a point in time where**

20 **you were the direct supervisor of Greg?**

21    A.    I don't believe so.

22    **Q.    Okay.  Was there ever a point in time where**

23 **he was your direct supervisor?**

24    A.    I don't believe so.

25    **Q.    When did you get promoted to captain?**

1     A.   In 2017.

2     Q.   **And my understanding in a lot of questions**

3  **I'm going to have about -- I'm going to have for you**

4  **here today is concerning your time frame working in**

5  **internal affairs.  Understood?**

6     A.   Understood.

7     Q.   **What time frame did you begin working within**

8  **the internal affairs, I guess, department of the**

9  **agency?**

10    A.   I was a captain in internal affairs from late

11 2018, perhaps around November of 2018, for about a

12 year, until about the same time frame of maybe October

13 of 2019.

14    Q.   **Okay.**

15    A.   Within a couple months of each other,

16 somewhere around that time frame.

17    Q.   **Okay.  That's good enough.  And since you**

18 **left there in 2019, what area of the department are**

19 **you working in?**

20    A.   I am now the captain in criminal

21 investigations.  So that time frame until present.

22    Q.   **Okay.  Are you aware generally of what my**

23 **client is accusing the city and the department of in**

24 **his lawsuit?**

25    A.   Generally, yes.

1    Q.   What is your understanding of what he's

2  generally accusing them of?

3    A.   Harassment discrimination.  That's generally

4  what I believe to know.

5    Q.   Okay.  And I'm going to ask you some specific

6  questions as we go along here.  But I want to ask you

7  just on the front end just generally.  Have you

8  observed anything that you would deem to be harassment

9  towards my client Mr. Rideau?

10    A.   No.

11    Q.   Have you observed anything that you would

12  deem to be harassment towards his wife

13  Deanna Rideau?

14    A.   No.

15    Q.   Okay.  Generally working for 21 years with

16  the City of West Palm Beach, have you observed

17  anything during that time frame that you would

18  consider to be discrimination against any employee of

19  the department because of their race?

20    A.   No.

21    Q.   I want to talk about your time frame working

22  in IA, because I think that's what's most critical to

23  the time I have with you here today.  But I want to

24  ask just generally a little bit before that.

25         Did there come a time when you became aware

 1  that Deanna and Gregory Rideau were romantically

 2  involved as a couple?

 3      A.   Yes.

 4      Q.   When approximately was that?

 5      A.   It was probably along that same street teams

 6  I was working with Deanna about.  I don't recall the

 7  exact year, but I remember them dating at the time and

 8  moving forward from there.

 9      Q.   So you became aware that they were

10  romantically involved prior to them becoming

11  married?

12      A.   Yes.

13      Q.   Okay.  During that time frame, did you ever

14  observe any other officers make any comments about the

15  fact that Gregory is a black man and Deanna is a white

16  woman?

17      A.   No.

18      Q.   Did you personally have any concern with the

19  fact that the two of them were a couple, not

20  necessarily because Greg is black and Deanna is white,

21  but because they're both officers working together in

22  this department?  Did you have any concerns about

23  that?

24      A.   No.

25      Q.   Okay.  Is it true that there are other

1  officers and members of management within the police

2  department that date other officers and other

3  management within the police department?

4          MR. GOBEO:  Objection.

5      A.   That's true.

6  BY MR. NORBRATEN:

7      Q.   Okay.  Off the top of your head, how many

8  couples do you think there are within the

9  department?

10     A.   I don't know that answer.  I just know it

11  exists.  I couldn't give you a number.

12     Q.   Okay.  Do you think it's more than five

13  couples?

14     A.   I would say somewhere about there.  My guess

15  just off the top of my head, somewhere around there.

16     Q.   Okay.  Are there other couples that are

17  married within the department?

18     A.   Yes.

19     Q.   Of the other couples that you know that are

20  married, are any of them in a biracial marriage?

21     A.   I don't know.  I don't know.

22     Q.   When you start -- I guess strike that.

23          What was the reasoning -- I don't know if

24  it's something you choose to do, or something you were

25  assigned to do, or whatever the reason is.  So I'm

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Joseph Ahern on 09/29/2021                                    Page 11

1  asking this broadly.  What was the reasoning that you

2  became the captain in internal affairs in 2018?

3      A.   The current chief at the time, Sarah Mooney,

4  had asked me to move to that position.  There were

5  some captains being rotated, which is not abnormal,

6  and asked if I wanted to go in internal affairs.

7      Q.   So you had already been a captain for over a

8  year, correct?

9      A.   Correct.

10     Q.   Okay.  And what department were you in before

11  the move?

12     A.   They call it special services.  That's like

13  traffic, canine, our entertainment district, and

14  community response.

15     Q.   So Chief Mooney approached you and said, I'm

16  going to move you to IA?  Or said, I'd like to move

17  you to IA if that's something you'd like to do?

18     A.   I don't really recall the conversation, but I

19  was asked to do it.  I don't know if I was asked or --

20  I would have been asked to do it.  I don't recall the

21  exact conversation.  I didn't have any issue with

22  it.

23     Q.   Okay.  It was a lateral move, correct?  It

24  wasn't a promotion of any kind?

25     A.   That's correct.

1    Q.   Had you had any experience in working in
2    internal affairs at any point prior in your career
3    with the department?

4    A.   Very small stint.  When I was a lieutenant,
5    they had me go to IA for -- it was probably months
6    until there were some promotions made of people to go
7    in there as lieutenant.  So I filled the gap for a
8    short period of time.

9    Q.   Okay.  You told me before you became a
10   captain in 2017.  When did you become a lieutenant?

11   A.   2014 I believe it was.

12   Q.   And do you know when you became a sergeant?

13   A.   I believe that was 2010.

14   Q.   The few months that you had been in IA
15   previously as a lieutenant, do you recall any sort of
16   training that you received before being placed in that
17   position?

18   A.   It was more on-the-job training, kind of
19   navigate the systems and assist IA.  That's pretty
20   much about it at the time.

21   Q.   Okay.  Were you provided any training on the
22   police officers' bill of rights?

23   A.   Well, I had been to an internal affairs class
24   ran through an agency up in north Florida, and went to
25   a week training class prior to going.  That was a

 1  couple years before that, so they had went over bill

 2  of rights training at that time.

 3       **Q.   Okay.  So you attended a training outside of**

 4  **the agency several years earlier.  And was that**

 5  **training specifically on internal affairs**

 6  **investigation, or was it a broad training and one of**

 7  **the things covered happened to be internal affairs?**

 8       A.   It was specifically on internal affairs.

 9       **Q.   Okay.  So is it because you had attended and**

10  **had that prior training that made you eligible to work**

11  **in internal affairs when you went there as a**

12  **lieutenant?**

13       A.   I don't know what made me -- I think everyone

14  is eligible.

15       **Q.   Okay.  I guess what I'm getting at is, if --**

16  **let me re-ask the question.**

17            **Have you received any training within the**

18  **department regarding internal affairs investigations**

19  **and how to conduct internal affairs investigations**

20  **prior to being assigned a lieutenant in internal**

21  **affairs back whatever year that was?**

22       A.   Within the department it was just a review of

23  their software, and externally through that school I

24  mentioned to you before.

25       **Q.   Okay.  So it was a review of the software**

```
 1  utilized in conducting the investigations?

 2      A.   Correct.  They had some Excel spreadsheets

 3  that they track people's status on there, just to

 4  navigate how they manage.  That's actually conducted

 5  to manage that department.

 6      Q.   Okay.  Have you yourself ever been a subject

 7  of an IA investigation?

 8      A.   I've never been questioned as a subject of an

 9  IA investigation.  It depends.  If we get investigated

10  for a vehicle crash it goes into IA.  It's kind of

11  a -- no, I've never been anything elaborate in IA.

12  No.

13      Q.   Okay.  But you've been investigated for

14  something.  Whether you did it or not, you've been

15  investigated by the agency for actions that you've had

16  as an officer, correct?

17           MR. GOBEO:  Objection.

18      A.   Yes.

19  BY MR. NORBRATEN:

20      Q.   And when that occurred you were made aware of

21  what your rights were as it would relate to those

22  particular investigations, correct?

23      A.   Correct.

24      Q.   Okay.  I mean, that's standard procedure that

25  everyone goes through, right?
```

1    A.   Yes.

2    Q.   Okay.  So I guess what my question is:  When

3  you became the lieutenant in IA, did you receive any

4  training about the proper procedures to go through to

5  conduct an internal affairs investigation?  You talked

6  about the software.  I'm talking about just

7  specifically the training and what needs to occur

8  timeline wise for investigations.

9         MR. GOBEO:  Objection.

10   A.   Yes.  Like I said prior, I've been in other

11  classes outside the agency that gave me the background

12  of that stuff, so...

13  BY MR. NORBRATEN:

14   Q.   Okay.  So now I want to take those same

15  questions to when you became the captain over internal

16  affairs in 2018.

17         Did you receive any specific training from

18  the West Palm Beach Police Department concerning the

19  proper protocols and procedures for conducting

20  internal affairs investigations prior to becoming the

21  captain in IA in 2018?

22   A.   It would have been more along the same lines

23  of introduction from the past person until mine.  So

24  any documented training.  No hands on to, again, go

25  over the information I did as a short-time lieutenant

1   there, because there was a gap between there.  So

2   again, I was introduced to what the procedures were.

3       Q.   Okay.  And would it have been

4   Captain Swiderski that was leaving as you were coming

5   in?

6       A.   That's correct.

7       Q.   Was he the one that provided you whatever

8   training you received prior to taking over as a

9   captain in IA in 2018?

10      A.   Yes.

11      Q.   Did you -- for lack of a better term, did you

12  shadow him for a period of time to kind of see how he

13  was doing things trainingwise?

14      A.   Correct.

15      Q.   Approximately how long was that period of

16  time where you were working or watching him work to

17  train?

18      A.   It would have been days.

19      Q.   Okay.  When you take over as captain in IA in

20  2018, is there a debriefing period where you are

21  updated on the status of pending internal affairs

22  investigations within the department?

23      A.   Well, daily those people working in the same

24  office space -- the investigators work out of the same

25  office space as I would at the time, so there is

 1  constantly a status update of issues.

 2      Q.   Okay.  I guess what I'm getting at is, when

 3  you became captain did you discuss all of the open IA

 4  investigations with the investigators investigating

 5  them so you could get caught up on what was going on,

 6  or did that not happen?

 7      A.   That happened, yes.

 8      Q.   Okay.  All right.  Good.  And did you also

 9  have similar conversations with Captain Swiderski

10  about the open investigations?

11      A.   When he was in internal affairs, or when he

12  was out of internal affairs?  What time point are

13  we --

14      Q.   When he was training you to take over for

15  him.

16      A.   Yes.

17      Q.   When he's in internal affairs and you're

18  about to take over?

19      A.   There was a spreadsheet that had the current

20  cases and what their status was.  And from what I

21  recall, it would be a review of the case, the status

22  updates.

23      Q.   Okay.  Do you have any idea of approximately

24  how many IA investigations were open when you took

25  over as captain?

1      A.    I have no idea.

2      Q.    Okay.  Do you recall that at least one of the

3   cases that was open at that time was investigation

4   into Mr. Rideau?

5            MR. GOBEO:  Objection.

6      A.    I don't recall if it was open before I got

7   there or after I got there.  I don't know the exact

8   time frame that investigation was opened at.

9   BY MR. NORBRATEN:

10     Q.    Okay.  All right.  There were two 2018

11  internal affairs investigations into Gregory Rideau.

12  One of them involved allegations of sexual harassment

13  made by Officer Ravelo, a second involved potential

14  theft due to overbilling for overtime while also being

15  part of a drug task force team.  So those, to my

16  knowledge, are the two 2018 internal affairs

17  investigations.

18            Do you know if when you took over as captain

19  you had any debriefing from Captain Swiderski

20  concerning the sexual harassment internal affairs

21  investigation?

22     A.    I did not have any briefing from

23  Captain Swiderski in reference to that case.

24     Q.    Okay.  Now Lieutenant Oswald, at the time

25  Sergeant Oswald, was the investigating internal

 1  affairs officer for that investigation of sexual

 2  harassment.  Do you recall that?

 3      A.   I recall he was assigned that case, yes.

 4      Q.   And when you became captain within the

 5  department, was Sergeant Oswald still there as an

 6  investigator?

 7      A.   When I became a captain in internal affairs?

 8      Q.   Yes.

 9      A.   I don't recall.  Because it may have been a

10  short period of time he was there.  He got moved,

11  promote, one of the two.  I don't recall the exact

12  time frame.

13      Q.   Okay.  Do you know if you ever had a

14  conversation with Sergeant Oswald, now Lieutenant

15  Oswald, but at the time Sergeant Oswald, concerning

16  his investigation into the sexual harassment

17  allegations against Gregory Rideau?

18      A.   Not that I recall.

19      Q.   Okay.  Do you recall ever having a

20  conversation with Captain Swiderski concerning the

21  sexual harassment allegations, an open internal

22  affairs investigation into Gregory Rideau?

23      A.   An open internal affairs investigation?  I

24  sat on his predisciplinary hearing for that case, so

25  that's when I would have been introduced to that

 1  case.

 2      **Q.   Okay.  So your testimony is that prior to**

 3  **sitting on the predisciplinary board in that case, you**

 4  **had no knowledge of that investigation?  I don't mean**

 5  **to say no knowledge of the investigation taking place,**

 6  **but no knowledge of any of the facts of the**

 7  **investigation.**

 8      A.   That's correct.

 9      **Q.   Okay.  How was it that it was determined that**

10  **you would be a member of the predisciplinary board?**

11      A.   They rotate captains out that are not

12  involved in the case.

13      **Q.   Okay.**

14      A.   I wasn't involved in the case, and my number

15  got picked as a rotational captain.

16      **Q.   Okay.  Do you have an understanding that**

17  **Troy Marcasi (phonetic) was supposed to be on that**

18  **predisciplinary board at some point in time?**

19          MR. GOBEO:  Objection.

20      A.   No, I didn't know who was going to be -- at

21  least I don't recall who was picked to be on that

22  board at that time.

23  BY MR. NORBRATEN:

24      **Q.   Do you know who ended up serving on the**

25  **board?**

1      A.    I believe it was me and Captain Senate at the

2   time.

3      **Q.    Along with Chief Mooney, correct?**

4      A.    Correct.  She serves on every one of them,

5   yes.  I think she serves on every predis board.

6      **Q.    Thank you for clarifying that.**

7           **And what was the outcome of the**

8   **predisciplinary hearing?**

9      A.    I believe his discipline remained the same.

10     **Q.    And that was what, if you recall?**

11     A.    Again, I believe he had 80 hours suspension

12   and 40 hours of remedial training.

13     **Q.    Okay.  Do you have an understanding as to why**

14   **he received an additional 40 hours of remedial**

15   **training?**

16     A.    I believe it was for sexual harassment

17   training, remedial training.

18     **Q.    Okay.  Do you have an understanding as to**

19   **whether or not that remedial was handed down because**

20   **of an alleged history of sexual harassment?**

21     A.    I believed it was directly related to this

22   case.

23     **Q.    Okay.  Meaning directly tied to the**

24   **allegations of Officer Ravelo?**

25     A.    Correct.

1      Q.   Do you recall having conversations with

2   Gregory Rideau following that predisciplinary

3   hearing?

4           MR. GOBEO:  Objection.

5   BY MR. NORBRATEN:

6      Q.   Specifically concerning this investigation

7   and his suspension?

8      A.   I don't recall.

9      Q.   Okay.  Do you recall having a conversation

10  with Gregory Rideau and suggesting to him that if he

11  were to turn over the 80 hours of overtime for

12  vacation time during that calendar year, that then in

13  the following year he may still be eligible for

14  promotion?  Do you recall a conversation to that

15  effect?

16     A.   That conversation may have happened, but I

17  don't recall the time frame of when it was.  But I

18  know that it was discussed, and perhaps I discussed it

19  with Greg Rideau to get it done because I didn't want

20  him to be ineligible for promotion.

21     Q.   Okay.  So you were aware during this whole

22  time frame he was attempting to be promoted to

23  lieutenant, correct?

24          MR. GOBEO:  Objection.

25     A.   I did know that, yes.

1  BY MR. NORBRATEN:

2      Q.   Okay.  And at that time if he had an open

3  internal affairs investigation, that could weigh in on

4  his ability to be promoted to lieutenant, correct?

5      A.   Correct.

6      Q.   Okay.  Are you or were you aware that

7  subsequent to the predisciplinary hearing he filed a

8  grievance and then attempted to have the case

9  arbitrated?

10     A.   Yes.  That's the procedure, yes.

11     Q.   Okay.  Can you tell me if you were aware at

12 the time that you had the conversation with him about

13 forgoing the 80 hours of vacation pay to essentially

14 take the suspension, if you were aware at that time

15 that he was intending on going forward with an

16 arbitration?

17     A.   I was not aware.

18     Q.   Okay.  Would that have changed your advice to

19 him to forgo the 80 hours of vacation time?

20         MR. GOBEO:  Objection.

21     A.   That's saying that I don't really recall

22 having that conversation with him.  And again, I may

23 have.  But it wouldn't have changed my advice to him

24 or conversation with him to educate him that the time

25 spent would have been during that calendar year

1  wouldn't affect the next calendar year for that.  It

2  wouldn't change that.  Educating about the rules so he

3  was aware.

4  BY MR. NORBRATEN:

5      Q.   Okay.  Can you just explain to me on the

6  record, so it's clear, what your understanding of

7  those rules are, and how they would affect the

8  promotional process potentially?

9      A.   At the end of an ongoing investigation or if

10  you have a certain amount of suspension time during a

11  calendar year it will make you not eligible to be

12  promoted.  Promotion tests last for two years.  He was

13  still eligible for the year following, and if he had

14  served that time it wouldn't affect his promotion for

15  the following year.

16      Q.   Okay.  Were you aware of the fact that

17  following the prediscipinary hearing and the

18  suspension and Greg submitting his 40 hours of

19  vacation time, that the department filed notice to the

20  Florida Department of Law Enforcement concerning the

21  allegations, and that they had been sustained at

22  hearing?

23      A.   Am I aware of it?  No.  But would it have

24  been a procedural thing?  Yes.

25      Q.   Okay.  Is it your understanding from working

1  in IA that that would have been a procedural thing?

2  It would have occurred regardless of whether or not

3  Mr. Rideau had scheduled an arbitration prior to

4  that?

5      A.   Yes.

6      Q.   Okay.  What is your understanding of the

7  process for reporting internal affairs investigations

8  to the Florida Department of Law Enforcement?  What

9  are the obligations for that?

10     A.   There's a criteria of obligations, and

11  there's pretty much a -- that if you are found --

12  substantiate a claim, that it goes to the Florida

13  Department, and they do a review, and they have a

14  committee.  That's just because in the police

15  department we find that just a suspension, there's

16  still checks and balances through FDLE and that

17  committee to review those cases.

18     Q.   Okay.  Did there come a point in time where

19  you became aware of the fact that the department had

20  recorded audio telephone conversations between Gregory

21  Rideau and a confidential informant?

22     A.   Yes.

23     Q.   When in time did you become aware of the

24  existence of those recordings?

25     A.   When the new chief and deputy chief came to

1 the department.  I was actually finishing up the FBI

2 National Academy, and within a week or two of them

3 starting at our agency, I came back to work.  I met

4 the two chiefs, the deputy chief.  And the deputy

5 chief asked me to review the Rideau case.

6      **Q.   Okay.**

7      A.   The exact date on that, I don't really recall

8 the exact date, but it was soon after their hire.

9      **Q.   Okay.  And just to be clear for the record,**

10 **the new chief being Chief Adderley?**

11      A.   Correct.

12      **Q.   And the deputy chief being -- is it assistant**

13 **chief or deputy chief?**

14      A.   Deputy Chief Rick Morris.

15      **Q.   Okay.  And Deputy Chief Morris came to you**

16 **and asked you to do what exactly?**

17      A.   They found out there was an upcoming

18 arbitration involving Greg Rideau, and asked me to

19 review it.  I wasn't initially -- like I say, I wasn't

20 involved in that investigation besides the predis

21 board.  And asked me to review it and my opinion if

22 they believe it would be won in arbitration.

23      **Q.   Okay.  And so from their request for you to**

24 **review the file, that's when you became aware of the**

25 **audio recording?**

1    A.   When I was asked to review the file I went to

2  internal affairs I had Lieutenant Wiggs pull the file

3  to give to me -- it's a pretty big binder -- give me

4  that binder.  I went back to my office started reading

5  it, and that same day she walked in with a thumb drive

6  and asked me if I was aware of this thumb drive and

7  the audio on it, which you're referring to.  I wasn't

8  aware.  I listened to it, and then I reported to my

9  supervisor.

10    **Q.   So on the day that she asked you if you were**

11  **aware of it, you had not been made aware of it at that**

12  **point in time?**

13    A.   Or seen it or heard of it.

14    **Q.   And you had previously gone and obtained the**

15  **complete, or what you thought was the complete**

16  **internal affairs file?**

17    A.   Yes.  Whenever you're on the predis board you

18  get the file to review before making an opinion in the

19  matter.

20    **Q.   Okay.  So you already had a copy of the full**

21  **file before Assistant Chief Morris asked you to review**

22  **it?**

23    A.   Not that I kept to review the file.  I didn't

24  still have it in my hands.  I don't keep those.  When

25  you're part of a predis board, I don't keep that file

1  when I'm done, I leave it with internal affairs.  I

2  don't keep those files.

3      **Q.   Okay.  So I guess what I'm -- and this may**

4  **seem silly.  But I'm interested in the actual physical**

5  **process of you going in obtaining the internal affairs**

6  **file that you said was a rather large file, because**

7  **there were a lot of statements taken.  I know you**

8  **don't recall exactly when in time it was, but describe**

9  **for me what you did specifically to go obtain the**

10 **file.  Where did you go?  Who did you get it from?**

11 **Those sorts of details.**

12     A.   I called Lieutenant Wiggs, I said I need that

13 file, have it ready for me.  I went into her office --

14 my office was not in the same work space as hers at

15 the time.  Walked down the hall, she had the file

16 ready for me, she handed me the binder.  I took it

17 back to my area.  We have file cabinets there that

18 they retain all those.  So she had pulled it for me,

19 had it ready.  She gave me the working copy of that,

20 and I took it back to my office and started reading.

21     **Q.   Okay.  At that time was Lieutenant Wiggs in**

22 **internal affairs?**

23     A.   She was a lieutenant in internal affairs,

24 yes.

25     **Q.   That would be why you contacted her to get**

 1  the file?

 2      A.   Correct.

 3      Q.   Now, how long after that interaction where

 4  you physically got the file until Lieutenant Wiggs

 5  then came to provide you with the additional thumb

 6  drive?

 7      A.   Shortly after.  That same day.

 8      Q.   Okay.

 9      A.   Within a very short period of time.  I don't

10  recall what time lapse it was, but I was at my desk

11  starting to review that file, and she walked in, and

12  gave me that thumb drive.

13      Q.   Okay.  You had previously reviewed the file

14  as part of the predisciplinary hearings and your

15  obligations for that, correct?

16      A.   Yes.

17      Q.   When you had previously reviewed the file

18  back in 2018 as part of the predisciplinary hearing,

19  were you then at that time given a copy of the audio

20  recording?

21      A.   No.

22      Q.   Do you have an understanding as to why?

23      A.   It wasn't part of the file.

24      Q.   Okay.  Now after receiving the thumb drive

25  from Lieutenant Wiggs, was there anything else that

 1   she gave you additionally as part of the file that was

 2   also part of the investigation?

 3       A.   No.

 4       Q.   What, if anything, did you do at that

 5   point?

 6       A.   I notified the Assistant Chief Tony Spatara,

 7   and we had Deputy Chief Rick Morris, and we had a

 8   meeting there.  And I believe the chief attended at

 9   some point in time during that same day.

10       Q.   Okay.  Did there come a point where you

11   listened to the audio recording?

12       A.   I did.

13       Q.   Was that done in the presence of those other

14   individuals you just mentioned, or did you do that

15   yourself first?

16       A.   I did it myself first.  I didn't know what

17   was on it, so I listened to it myself first, and then

18   that same day reported it up the chain.

19       Q.   Okay.  After you reported it up the chain

20   that day, did you have any other actions concerning

21   specifically the audio recording?

22       A.   No.

23       Q.   Okay.  Did you continue reviewing the file

24   that you had been assigned to review by Deputy Chief

25   Morris?

1      A.   I did.

2      Q.   Okay.  And when you were done with that, did

3   you create some kind of memo or anything to him, or

4   did you just report to him what you thought?

5      A.   Just verbal conversation of what I thought.

6      Q.   Okay.  Did that conclude your interactions

7   with internal affairs investigation, I believe at

8   18001, concerning Officer Ravelo's sexual harassment

9   allegations against Gregory Rideau?

10     A.   I believe it did.

11     Q.   Prior to today, and outside of any

12  conversations you had with your attorney Mr. Gobeo

13  here, have you had conversations with anyone else

14  about your review of that investigation other than

15  what you've described with the chief and the deputy

16  chief?

17     A.   And the Assistant Chief Spatara.

18     Q.   Yes.  Other than those conversations, have

19  you discussed it with anyone else?

20     A.   Not that I recall.

21     Q.   Okay.  Have you had any communication with

22  Gregory Rideau about the fact that you reviewed his

23  internal affairs investigation?

24     A.   Not --

25     Q.   Obviously he knows you did it during the

1  predisciplinary hearing.  But subject to Deputy Chief

2  Morris' request?

3     A.   Not that I recall.

4          MR. NORBRATEN:  We've been at it for a little

5     bit.  It's probably a good place to take a break.

6     I have 1:36.  Can we take a break until 1:42 or

7     something?

8          MR. GOBEO:  Sounds good.

9          MR. NORBRATEN:  All right.  Thank you.

10         (A recess was held from 1:36 until 1:42 p.m.)

11 BY MR. NORBRATEN:

12    Q.   Captain, I assume you're more familiar with

13 the internal affairs investigation concerning

14 potential abuse of overtime by Greg Rideau, correct?

15    A.   Yes.

16    Q.   Okay.  So we'll talk about that now.  I'm

17 going to share with you my screen.  I hope you're able

18 to see it.  But it's essentially the IA report from

19 that investigation.  So if you have a copy of that

20 available there, you know, feel free to look at it.

21 And if there's something else at any point during the

22 deposition that would help you in answering questions,

23 please let us know and we'll try to get that for you.

24 Okay?

25    A.   Okay.  Thank you.

1      Q.   You're a police officer so I didn't ask you

2   at the beginning if you've given a deposition before,

3   because I vouched you've given many over your career,

4   and so the rules are essentially the same.

5           I assume you've given depositions before,

6   yes?

7      A.   I have.

8      Q.   So when you were working in internal affairs,

9   generally describe for me the process for how an

10   investigation goes from when it is first initiated to

11   when a suspension or discipline is handed down in

12   terms of the number of individuals involved in the

13   investigation?  Can you do that for me just

14   generally?

15      A.   Every investigation is the same.  You receive

16   a complaint, or whatever it may be, or a supervisor

17   sees an issue, they bring it forward.  They document

18   that if it's in-house, if it's outside the agency, you

19   get the complaint to come in.  It gets addressed.  All

20   complaints filter up through internal affairs.  They

21   review the complaints.  The chief of police is the

22   only one who can deem if we're going to do an internal

23   affairs investigation or not.  Then it's also

24   addressed to where that investigation will lie.  It

25   can be done at the patrol level, or the supervision

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Joseph Ahern on 09/29/2021                                    Page 34

 1  within that employees chain of command, or it can be

 2  moved to internal affairs depending on what the chief

 3  of police deems at the time.

 4      **Q.   Okay.  So when you were captain in internal**

 5  **affairs, that chief of police would have been**

 6  **Sarah Mooney, correct?**

 7      A.   Both.  I was there for Chief Sarah Mooney and

 8  I was there for a time under Chief Adderley.

 9      **Q.   Okay.  I apologize.  I thought you had left**

10  **prior to Adderley taking over.**

11      A.   Yes.

12      **Q.   Okay.  So the chief of police essentially**

13  **determines if an IA is going to be conducted, and at**

14  **what level the investigation would take place,**

15  **correct?**

16      A.   Correct.

17      **Q.   And then following an investigation, the**

18  **chief is potentially involved in the predisciplinary**

19  **hearing, correct?**

20      A.   The chief is, correct.

21      **Q.   And then if any discipline is handed out, the**

22  **chief is the person that has to sign off on the**

23  **discipline, correct?**

24      A.   Correct.

25      **Q.   Okay.  Does the chief of police have a role**

 1  during the course of the investigation?

 2      A.   Not specifically, no.

 3      Q.   Okay.  Is it that they don't specifically

 4  have a role, or that they shouldn't have a role?

 5  They're not part of the fact-finding, correct?

 6      A.   They're not part of fact-finding, correct.

 7      Q.   And that's by design, correct?

 8      A.   Yes.

 9      Q.   Who is a part of the fact finding?  Is it

10  just the officers that work within internal affairs?

11      A.   Again, it just depends on who it gets

12  assigned to.  There could be fact finding done at a

13  supervisor level outside internal affairs depending on

14  the gravity of the incident, or it would be

15  investigators inside internal affairs.  Correct.

16      Q.   Okay.  So if the investigation is conducted

17  by international affairs, if the chief makes that

18  decision, then all of the investigation is to be

19  conducted solely by the officers inside of internal

20  affairs, correct?

21      A.   Correct.

22      Q.   And is it that these investigations are

23  supposed to be maintained in confidence during the

24  course of the investigation?

25      A.   Correct.

 1      Q.    And what is your understanding of the
 2   reasoning for that?
 3      A.    You know, pertaining to other people that may
 4   be witnesses or subjects inside that same
 5   investigation.
 6      Q.    And the ultimate goal is to get to the truth,
 7   correct?
 8      A.    That's correct.
 9      Q.    And then once the investigation is completed,
10   the investigating officer generates a report that then
11   goes up the chain of command within internal affairs,
12   correct?
13      A.    Correct.
14      Q.    And then ultimately makes its way to the
15   chief, who decides what, if any, discipline occurs,
16   correct?
17      A.    Correct.
18      Q.    During that process obviously you were not
19   working in internal affairs as an investigator.  What
20   was your role as a captain inside of internal
21   affairs?
22            MR. GOBEO:  Objection.
23      A.    The role of a captain in internal affairs is
24   to review, manage case assignments, and sign off or
25   have corrections made to investigations.  So

```
 1  supervision and management of cases.

 2  BY MR. NORBRATEN:

 3      Q.   Okay.  Are you personally interviewing

 4  witnesses during investigations, or no?

 5      A.   Not normally, no.

 6      Q.   Are you constantly -- constantly is not a

 7  good word.  Strike that.

 8           Are you regularly checking in with your

 9  investigators to get updates on investigations?

10      A.   Correct.  The only time a captain would do an

11  investigation if it raised to a rank that would be

12  appropriate for a captain to actually do it.  But I

13  never did that.  I don't believe I, in internal

14  affairs, I ever was the primary investigator.

15      Q.   Okay.  And so when an investigation is taking

16  place, throughout the course of the investigation are

17  you being updated on the evidence that is being

18  obtained by your investigators, or are you receiving

19  essentially the report of those findings whenever

20  those investigators concluded their investigation?

21      A.   It would depend on the investigation.  But I

22  would get updates on investigations.

23      Q.   Okay.  Part of that is built into the process

24  to just keep you in the loop?

25      A.   Correct.
```

1      Q.   So I'm sharing with you now what we'll mark

2   as Exhibit 1, it is a 78-page exhibit.  Probably

3   doesn't need to be all those pages, but that's what it

4   is.  It is the IA investigation for 18056 against

5   Sergeant Gregory Rideau -- sergeant at the time --

6   concerning violations of compensation and standard

7   operating procedure for special events, extra duty

8   details and outside employment.

9           Is this the IA that I was referencing

10  earlier -- I want to make sure we're talking about the

11  same thing -- concerning potential overtime while

12  working at City Place?

13     A.   Yes.

14          (Exhibit No. 1 was identified and will be

15      marked after deposition is completed and/or

16      received.)

17  BY MR. NORBRATEN:

18     Q.   Okay.  And during this investigation -- I

19  mean, this is your signature here at the conclusion of

20  it in February of 2019, correct, as the captain?

21          MR. GOBEO:  Objection.

22     A.   Yes.

23  BY MR. NORBRATEN:

24     Q.   Okay.  Officer Brian McDaniel was the lead

25  investigator on the case, correct?

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Joseph Ahern on 09/29/2021                                    Page 39

1     A.   He was.

2     Q.   All right.  Did you assign this case to

3  Officer McDaniel, do you know?

4     A.   I don't recall if it was me, or the

5  lieutenant, or sergeant at the time.  I don't recall

6  who assigned it to him.

7     Q.   Okay.  We'll go through the investigation.

8  But I just want to ask you generally, do you have any

9  recollection of any specific conversations you had

10  with Officer McDaniel during the course of his

11  investigation?

12     A.   I don't recall the specific conversations.

13     Q.   Okay.  Do you recall having conversations

14  with anyone else in the West Palm Beach Police

15  Department about this investigation during the course

16  of this investigation?

17     A.   I don't recall.

18     Q.   Explain to me what your role is versus what

19  Lieutenant Wiggs' role is within internal affairs in

20  terms of supervising Officer McDaniel in this

21  investigation.

22     A.   Lieutenant Wiggs is really the day-to-day,

23  moment-to-moment supervisor, and I get the overall

24  from her, or at times specifically from the

25  investigators.

1      Q.   Okay.  And that would make sense, that's how

2   the chain of command went within the department.  I

3   assume Assistant Chief Spatara would get occasionally

4   information from you if he needed it as opposed to

5   going to Officer McDaniel or Lieutenant Wiggs,

6   correct?

7           MR. GOBEO:  Objection.

8      A.   Correct.

9   BY MR. NORBRATEN:

10     Q.   And the findings here on the first page of

11  it, and you know we'll get to them later.  But

12  essentially what was your understanding of this

13  investigation and what the allegations were against

14  Mr. Rideau?

15     A.   We received the complaint from another

16  officer in the agency stating that Sergeant Rideau at

17  the time was working what they call an OCDETF, which

18  is federal overtime -- paid city overtime, and working

19  at City Place, and there were overlapping times that

20  he was getting paid for both.

21     Q.   So the allegations were he was working on a

22  drug enforcement task force that was being funded by

23  the Department of Justice, correct?

24     A.   Correct.

25     Q.   And at the same time he was working a detail

```
 1   doing security work at City Place?

 2       A.   That was the allegation.

 3       Q.   Okay.  You recognized this as the start page

 4   of the investigative report as completed by

 5   Officer McDaniel?

 6       A.   Yes.

 7       Q.   Okay.  And you reviewed his report in detail

 8   prior to signing off on it when you presented it up to

 9   Assistant Chief Spatara, correct?

10       A.   Correct.

11       Q.   This starts out:  "During the month of April

12   2018, internal affairs received a complaint."

13            And then it appears that not until December

14   of 2018 Chief Mooney orders an administrative

15   investigation to commence.

16            Do you have an understanding as to why there

17   was such a delay in the reporting of the complaint and

18   the commencement of the internal affairs

19   investigation?

20            MR. GOBEO:  Objection.

21       A.   They had this case reviewed by the state

22   attorney's office, public corruptions department.

23   BY MR. NORBRATEN:

24       Q.   Okay.  And it appears that that review

25   started on October 30th of 2018, correct?
```

1    A.   According to this document, yes.

2    Q.   **Would you have any reason to disbelieve this**

3  **document?**

4    A.   I have nothing to do with that.  So that was

5  Captain Swiderski that met with them.

6    Q.   **So that's kind of what I wanted to discover.**

7  **What, if anything, you may know about that.  Because**

8  **what I'm trying to understand is a complaint that's**

9  **made in April of 2018, it appears in this IA report**

10  **that there is no action taken until October of 2018.**

11  **And I'm trying to understand what was happening during**

12  **that internal time frame.**

13       **Do you have any knowledge as to what was**

14  **going on with this investigation?**

15    A.   Besides what's written here, no.

16    Q.   **Okay.  Do you have an understanding that at**

17  **any point in time Gregory Rideau was being**

18  **investigated criminally for these allegations?**

19    A.   That's why they would have met with the state

20  attorney public corruption to see if there were

21  criminal charges that they were going to pursue.

22    Q.   **Okay.  But that would have required**

23  **presenting the state attorney with some evidence, or**

24  **lack of evidence, correct?**

25    A.   Yes.

1     Q.   So how did they obtain that evidence that
2  they presented to the assistant state attorney?  It
3  would have been done outside of internal affairs
4  according to this report, correct?
5          MR. GOBEO:  Objection.
6     A.   They obtained the complaint from the
7  Officer Ravelo who had made this complaint at the
8  time.  That's where they got that information.
9  BY MR. NORBRATEN:
10    Q.   Right.  Okay.  So you're getting a little bit
11 ahead of me.  But essentially Officer Ravelo made this
12 complaint at the same time she made her complaint of
13 sexual harassment against Sergeant Rideau, correct?
14         MR. GOBEO:  Objection.
15    A.   Clarify your question, please.
16 BY MR. NORBRATEN:
17    Q.   Do you have an understanding that former
18 Officer Ravelo Markay made this complaint against
19 Sergeant Gregory Rideau concerning this allegation of
20 abusing overtime at the same time she made the
21 allegation of sexual harassment against Sergeant
22 Rideau?
23    A.   I don't recall the date when she made the
24 accusation about sexual harassment.  I don't believe
25 it's the same date as this complaint being done.  But

 1   it's the same time frame that investigation was being

 2   conducted.

 3       Q.   Okay.  So you don't have any understanding as

 4   to what, if anything, occurred in terms of an

 5   investigation into these overtime allegations that

 6   would have been conducted by Captain Swiderski,

 7   correct?

 8       A.   That's correct.  Besides that meeting with

 9   the state attorney and the findings of the state

10   attorney.

11       Q.   Right.

12       A.   Correct.

13       Q.   Do you now have an understanding as to who in

14   the agency ordered Captain Swiderski to make any kind

15   of investigation into Sergeant Rideau?

16       A.   Do I know who did it?  No.  But the only

17   person who could would be the chief of police.

18       Q.   That would have been Sarah Mooney?

19       A.   Correct.

20       Q.   Is it commonplace for a captain within the

21   West Palm Beach Police Department to be conducting

22   investigations on issues like this, public corruption

23   issues, that they personally are conducting these

24   investigations?

25            MR. GOBEO:  Objection.

```
 1      A.   I personally have been to public corruption

 2 as a captain and talked about other issues.  So is it

 3 commonplace?  I don't know if public corruptions have,

 4 but I have before.

 5 BY MR. NORBRATEN:

 6      Q.   Okay.  And when you did that, did you have

 7 other officers that were working under you at those

 8 meetings?

 9      A.   Yes.

10      Q.   Okay.  And Assistant State Attorney Brian

11 Fernandes was an assistant state attorney who worked

12 in the public corruption unit at the state attorney's

13 office, correct?

14      A.   Correct.

15      Q.   Okay.  And did you have an understanding that

16 when this complaint came in in April of 2018, that it

17 was going to be an internal affairs investigation?

18           MR. GOBEO:  Objection.

19      A.   I wasn't aware of his complaint in April

20 2018.

21 BY MR. NORBRATEN:

22      Q.   Okay.  So I guess the better question is:  Do

23 you have an understanding as to when internal affairs

24 became aware of this complaint that was made by

25 Officer Ravelo reportedly in April 2018?
```

1      A.   Say that question one more time.  I
2  apologize.
3      Q.   That's fine.  If you don't understand it,
4  please tell me and I'll do a better job.
5           Do you have an understanding, as the captain
6  in internal affairs during this time frame, of when
7  internal affairs became aware of the allegation made
8  by Officer Ravelo?  Was it in December when
9  Chief Mooney ordered the administrative investigation?
10          MR. GOBEO:  Objection.
11     A.   Well, the answer to the question would be, I
12  wasn't in internal affairs when this complaint
13  initially came in April 2018.  I don't think I went to
14  internal affairs until October, November, maybe
15  November of that same year.  So I didn't know about
16  that.  And soon after is when the administrative
17  investigation began.  As you see, December 3rd it was
18  ordered.
19          When I specifically became aware of it, I
20  don't recall.  But I did know about it beforehand.
21  BY MR. NORBRATEN:
22     Q.   Okay.  And certainly you would agree that
23  Officer McDaniel would know more about his
24  investigation than even you, because he's the one that
25  conducted the investigation, correct?

```
 1      A.   Correct.

 2      Q.   Okay.  Do you have an understanding as to

 3  whether or not Officer McDaniel knew about this

 4  complaint during the year of 2018 prior to

 5  Chief Mooney ordering the investigative -- the

 6  administrative investigation to commence?

 7           MR. GOBEO:  Objection.

 8      A.   That's the only reason I became of aware of

 9  that, because he met with them prior to it becoming an

10  administrative investigation.  He met with the state

11  attorney, him and Captain Swiderski.

12  BY MR. NORBRATEN:

13      Q.   Okay.  So it appears from his report that the

14  investigating officer minimally was aware of it during

15  this October 30, 2018, meeting that's reported here,

16  correct?

17      A.   Yes.  He said he met with the state attorney,

18  correct.

19      Q.   Okay.  And so at that time Captain Swiderski

20  in October of 2018 was still the internal affairs

21  captain, correct?

22      A.   Correct.

23      Q.   You had not yet taken over for him,

24  correct?

25      A.   Correct.
```

1    Q.   Okay.  And so when you took over as captain,

2  I think we said sometime in November of 2018, did

3  Captain Swiderski relate to you any information about

4  this IA investigation?

5    A.   I don't recall.

6    Q.   Did Officer McDaniel relate to you any

7  background information related to this IA

8  investigation into Gregory Rideau?

9    A.   I don't recall.

10    Q.   Okay.  Do you know if you ever had any

11  conversations with Emily Wiggs about this

12  investigation into Gregory Rideau?

13    A.   If I ever had conversations about it?

14    Q.   Well, yeah.  I'm specifically talking about

15  during that time frame when you took over for

16  Swiderski.

17    A.   I don't recall when those conversations would

18  have been had before the investigation began.  So I

19  don't recall being briefed on it or anything before we

20  actually started the investigation in this case.

21    Q.   Okay.  So you don't recall any conversation

22  about it before December 2018?

23    A.   No.

24    Q.   Okay.  Once the investigation began, did you

25  have any communication with Chief Mooney about the

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Joseph Ahern on 09/29/2021                        Page 49

 1  investigation?

 2      A.   I don't recall.

 3      Q.   Okay.  Do you know if Officer McDaniel had

 4  any communication with the chief about it?

 5      A.   I don't know.

 6      Q.   Do you know if Lieutenant Wiggs had any

 7  communication with the chief about it?

 8      A.   I don't know.

 9      Q.   Okay.  Do you have access to this -- are you

10  relying on my screen, or do you have this in front of

11  you?

12      A.   The screen is fine.  I'm relying on the

13  screen.

14      Q.   Okay.  So it talks about the fact that

15  Officer Ravelo makes the complaint against

16  Officer Rideau.  And there's multiple dates here that

17  are alleged, and then it goes through them.

18           And what I'm primarily focused on for you,

19  because you didn't do the complete investigation, you

20  were overseeing someone who was overseeing someone who

21  was doing it, correct?

22      A.   Correct.

23      Q.   Just generally, did you have an understanding

24  as to why Sarah Mooney ordered this investigation to

25  commence following the state attorney's office

1  declining to make any criminal charges against

2  Officer Rideau?

3       MR. GOBEO:  Objection.

4  A.   My understanding about any case that doesn't

5  meet criminals, they're clearly separated.  And it

6  would have been an administrative investigation, not a

7  criminal investigation.

8  BY MR. NORBRATEN:

9  Q.   Okay.  Do you have an understanding as to

10  whether or not Chief Mooney had an understanding of

11  the fact that the state attorney's office declined to

12  press any criminal charges against Sergeant Rideau?

13  A.   I don't know.  Because, again, Captain

14  Swiderski handled that part of this investigation.  I

15  don't know what her understanding was at that time.  I

16  don't know.

17  Q.   Okay.  Are you aware that during the year

18  2018 the Department of Justice conducted their own

19  internal audit of the department, and these OCDETF

20  officers, and what they were being paid?

21  A.   I know there was an investigation about an

22  audit of their OCDETF.

23  Q.   Okay.  And I'm going to show you that audit

24  now, which we'll mark as Exhibit 2.  First I have to

25  open up before I can do that.

1          (Exhibit No. 2 was identified and will be

2      marked after deposition is completed and/or

3      received.)

4  BY MR. NORBRATEN:

5      Q.   Captain, are you able to see the screen?

6      A.   Yes.

7      Q.   Do you know if you ever had an opportunity to

8  see this audit conducted by the Department of

9  Justice?

10     A.   I don't believe I've ever seen it.

11     Q.   Okay.  Knowing that they were auditing

12  essentially the same thing that is being investigated

13  by internal affairs concerning the overtime use and

14  working under this task force by Officer Rideau, would

15  you have expected that this audit would be part of the

16  evidence in the internal affairs investigation into

17  Officer Rideau concerning his overtime while working

18  on the task force?

19          MR. GOBEO:  Objection.

20     A.   I don't know when this audit would have

21  been -- became available to the police department.  It

22  was not, to my knowledge, available while this other

23  investigation was going on.

24  BY MR. NORBRATEN:

25     Q.   Okay.  Were you aware that it was being

 1  conducted while this other investigation was going

 2  on?

 3      A.   No.

 4      Q.   When did you become aware that this audit had

 5  been conducted?

 6      A.   After this investigation was done.  And,

 7  again, that's through rumors or whatever at the

 8  agency.  I've never seen this.  I've heard about there

 9  was an OCDETF warrant, but this is the first I've seen

10  it.  I wasn't aware at that time.

11      Q.   And this is kind of just a general question

12  for you.  But there had been -- strike that.

13           It's a very specific question.  There had

14  been a delay in commencing this administrative action

15  against Gregory Rideau presumably because

16  Captain Swiderski was approaching the state attorney's

17  office to look into criminal charges, correct?

18           MR. GOBEO:  Objection.

19      A.   That's what I assumed about why that was

20  being delayed.  Correct.

21  BY MR. NORBRATEN:

22      Q.   There is no other justifiable reason for the

23  delay, correct?

24      A.   Not that I'm aware.

25      Q.   Is it your understanding that the time frame

1  between a complaint for an internal -- that would

2  require an internal affairs investigation and the

3  commencement of an investigation?  Is there a time

4  frame there that should occur under?

5      A.   My understanding, it depends on the type of

6  investigation.  If it's internal; in other words, an

7  issue that we find ourselves, I don't know the time

8  frame compared to outside complaint coming in to the

9  agency, which was 180 days.

10     Q.   Okay.  But obviously that time frame can be

11  tolled if there is a pending criminal investigation

12  into the actions, correct?

13     A.   Correct.

14     Q.   Okay.  So whether there was an actual

15  criminal investigation or not, there was a tolling

16  between the start or the complaint being made by

17  Officer Ravelo and the commencement of this

18  investigation?

19          MR. GOBEO:  Objection.

20  BY MR. NORBRATEN:

21     Q.   Correct?

22     A.   I don't know if they tolled this

23  investigation or not.

24     Q.   There was a delay in starting it, correct?

25  That's not an opinion question.  The complaint came in

 1  in April according to the report, and the commencement

 2  began in December, correct?

 3      A.   That's correct.

 4      Q.   That's over 180 days, correct?

 5      A.   To me it would be considered an internal

 6  investigation from an in-house complaint, not an

 7  external investigation.  I don't know if that rule

 8  would apply to this investigation.

 9      Q.   Okay.  Fair enough.  But whatever the case

10  may be, there was a delay?

11      A.   Yes.

12      Q.   But then in December it began, correct?

13      A.   Yes.

14      Q.   Had the department known -- by "the

15  department" I mean Chief Mooney and the police

16  department -- had they known that the Department of

17  Justice was undertaking an audit for the allegations

18  in part that they were lodging against

19  Sergeant Rideau, his wife Deanna Rideau, and

20  Officer Regis; wouldn't you have wanted to have the

21  benefit of the Department of Justice's investigation

22  as well before concluding the internal affairs

23  investigation into Sergeant Rideau?

24          MR. GOBEO:  Objection.

25      A.   Yes.  If I would have known there was another

1  investigation that would incorporate this

2  investigation, I would have wanted to know that.

3  BY MR. NORBRATEN:

4       Q.   Okay.  And certainly if the results of this

5  audit did not place Sergeant Rideau or confirm any

6  errors in the hourly wages of Sergeant Rideau, that

7  would be something that would be relevant to his

8  internal affairs investigation, correct?

9       A.   Yes.

10      Q.   And are you aware of who Officer Thomas Walsh

11  is?

12      A.   Yes, I know who he is.

13      Q.   Is he an officer in the West Palm Beach

14  Police Department?

15      A.   Yes.

16      Q.   Are you aware of who Officer Tim Coleman

17  is?

18      A.   I am.

19      Q.   Is he an officer in the police department?

20      A.   He is.

21      Q.   To your knowledge, did Chief Mooney order any

22  internal affairs investigations into Officer Timothy

23  Coleman due to his rate not being supported under this

24  OCDETF defendant audit?

25      A.   Not to my knowledge.  I've never seen this

 1  audit.  Not to my knowledge.

 2      Q.    To your knowledge, did Chief Mooney ever

 3  order an internal affairs investigation into

 4  Officer Matthew Steinberg, and the fact that his

 5  hourly rate was being charged as greater than what it

 6  was supposed to be according to this audit?

 7      A.    Not to my knowledge.

 8      Q.    And the same question for Officer Thomas

 9  Walsh.  Are you aware of whether or not Chief Mooney

10  ever ordered an internal affairs investigation into

11  Officer Thomas Walsh for the fact that this Department

12  of Justice audit came back that his hourly rate being

13  charged was being charged greater than what it should

14  have been?

15      A.    I'm not aware.

16      Q.    Is Officer Thomas Walsh white?

17      A.    He is.

18      Q.    Is Officer Matthew Steinberg white?

19      A.    He is.

20      Q.    Is Officer Timothy Coleman white?

21      A.    He is.

22      Q.    And to be clear, you've never seen that

23  OCDETF audit before today?

24      A.    I've not.

25      Q.    You mentioned that at some point in time you

 1  possibly became aware of its existence, or rumors of

 2  its existence, correct?

 3      A.   Correct.

 4      Q.   I don't want to put words in your mouth.

 5           Were you ever confirmed that existed, or you

 6  just heard about it?

 7      A.   Never confirmed it.  Heard it was

 8  completed.

 9      Q.   Approximately when in time was that that you

10  had heard that it had been completed?

11      A.   I don't recall.

12      Q.   Do you have knowledge of what the end result

13  was of this internal affairs investigation into

14  Gregory Rideau concerning these overtime theft

15  allegations?

16      A.   The overtime theft?

17      Q.   Yes.  What was he accused of doing in this IA

18  18056?

19      A.   It was unfounded that there was any theft,

20  but he got a verbal counseling for failure to properly

21  change jobs on our internal software.

22      Q.   Are you aware of how many days he was accused

23  of having committed theft in the allegation?

24      A.   I don't recall as to how many days the

25  original complaint and if there is a list of them on

1  there.  I don't recall how many.

2    Q.   Go back to Exhibit 1 here.  Are you able to

3  see the screen?

4    A.   Yes.

5    Q.   So this is a letter from state attorney's

6  office, correct?

7    A.   Yes.  Well, the public corruptions, the

8  sergeant in public corruptions Stan Baldwin at the

9  time, yes.

10   Q.   Okay.  And is he kind of like a dual

11  employee, he works for your department as well as the

12  state attorney's office?

13   A.   No.  He actually works for Palm Beach County

14  Sheriff's Office as a sergeant.  We do have someone

15  attached there, but he does not.

16   Q.   Okay.  Did you have an opportunity to review

17  this letter when you reviewed this investigation as

18  it's given to by Officer McDaniel?

19   A.   I would have reviewed it.  It was in the

20  file.  I don't recall it.  I recall the general

21  statements of it.  I don't recall specifics, no.

22   Q.   Okay.  Paragraph 2 it states that

23  Sergeant Rideau has collected overtime detail pay on

24  eight different dates while working his normal duties.

25  These dates were documented by an officer, presumably

1  Officer Ravelo, over an extended period of months.

2  Correct?

3     A.   Correct.

4     Q.   During the investigation, and again at this

5  point in October of 2018 when they met with the state

6  attorney's office, at that time, to your knowledge,

7  you didn't have any knowledge this investigation was

8  ongoing, correct?

9     A.   I don't recall it, no.

10    Q.   I mean, you weren't in IA at that point so

11  you didn't know it was ongoing, did you?

12    A.   No.

13    Q.   Okay.  I would imagine because it was seeking

14  a criminal investigation into Sergeant Rideau, he

15  didn't know it was going on either, correct?

16    A.   I don't know.

17    Q.   Okay.  Well, is it commonplace for you guys

18  to notify suspects of criminal investigations that

19  you're investigating ing them?

20    A.   Circumstances dictate that.

21    Q.   Okay.  All right.  Well, I'm going to go out

22  on a limb and suggest that Sergeant Rideau was not

23  aware that this was going on at the time.

24         But whether it was or it wasn't, the

25  allegation as investigated by, I guess at the time

1  Detective McDaniel in internal affairs, showed that

2  seven of the eight shifts were given away to others,

3  seven of the eight are off the board right away.

4  There is one of the potential alleged dates that can't

5  be confirmed by evidence, correct?

6           MR. GOBEO:  Objection.

7     A.   That was -- weren't there two dates that were

8  in question?  I just don't remember the semantics of

9  how many dates were in question of being -- for some

10 reason I remember two dates.  I don't recall them.  I

11 just remember there two that were in question.

12 BY MR. NORBRATEN:

13    Q.   If that's your memory, then that's your

14 memory.

15          Can we agree that this letter states that

16 during the investigation he was able to show that

17 seven of the eight shifts alleged to be theft of

18 overtime pay were actually given away to other

19 officers.

20          So that would mean seven of those eight

21 shifts that were alleged to be theft were not theft,

22 correct?

23    A.   Yes.

24    Q.   Okay.  And the one other potential date he

25 needed evidence to try and prove that it was theft,

1  and he could not get that evidence from City Place,

2  and therefore couldn't present any evidence of it to

3  the state attorney, correct?

4      A.   That's correct.

5      Q.   And so with that knowledge, Chief Mooney then

6  decides that it should be an internal affairs

7  investigation.  That's your understanding of what

8  happened?

9          MR. GOBEO:  Objection.

10     A.   Yes.

11  BY MR. NORBRATEN:

12     Q.   And we haven't even talked about whether or

13  not Chief Mooney was aware of the Department of

14  Justice audit, correct?  You're unaware of whether or

15  not she knew about it or not at the time, correct?

16     A.   Correct.

17     Q.   During the time frame that you are in

18  internal affairs and since then, can you think of a

19  another officer in the West Palm Beach Police

20  Department that has been investigated to the extent of

21  Gregory Rideau?

22          MR. GOBEO:  Objection.

23     A.   I believe there's other officers that have

24  been investigated more extensively than

25  Gregory Rideau.

 1  BY MR. NORBRATEN:

 2      Q.   Who?  We don't have to get into details of

 3  any investigation, because some of that is

 4  confidential I'm sure.

 5           But which other officers?  Is one of them

 6  Emily Ravelo?

 7      A.   Are you asking me for a list, or are you

 8  asking me about Emily Ravelo?

 9      Q.   You mentioned that you believe there are

10  other officers who have been investigated more

11  significantly than Officer Rideau.  I asked you who.

12  And then I suggested is one of them Officer Ravelo.

13  So I guess I'll break those up.

14           Who within the department has been

15  investigated to the extent of Gregory Rideau, in your

16  opinion?

17      A.   Are you talking about my entire time frame in

18  the police department?

19      Q.   I'm talking about since early 2018 when IA

20  18001, which we talked about earlier, commenced?

21      A.   I'm just going to name officers.  I don't

22  know what years their investigations were done.

23      Q.   Let's limit it to this.

24      A.   If it's before or after.

25      Q.   That's fine.  Let's limit it to under

 1  Chief Sarah Mooney's reign as the chief of police.
 2      A.   Again, you're asking me for a specific time
 3  frame of when she was -- I don't want to say
 4  somebody's name if they weren't under that time
 5  frame.
 6      Q.   Okay.  If you say somebody's name and they
 7  weren't under that time I'm going to document it to
 8  back that up.
 9      A.   Officer Kevin Perrow (phonetic) has been
10  investigated extensively for numerous incidents.
11  Officer Jason Sangara (phonetic) has been investigated
12  for numerous incidents.  We had -- I'm drawing a blank
13  of his name right now.  But some people that were
14  terminated for incidents where they received a lot
15  more than 80 hours suspension over discipline
16  Greg Rideau did.  I consider that to be a more
17  extensive investigation of people who were terminated.
18  And we've had terminations of people who were
19  investigated, I consider that to be more extensive
20  investigation than --
21      Q.   Okay.  Would you agree that the individuals
22  that were terminated or investigated for allegations
23  of more significant actions or criminal activity,
24  correct?
25      A.   No.

```
 1      Q.    No?

 2      A.    No.

 3      Q.    Who was terminated for doing something that

 4 in your opinion was less significant than what

 5 Gregory Rideau has been accused of?

 6      A.    Well, I consider sexual harassment and theft

 7 from the city pretty high accusations and

 8 investigations.  We've had other officers investigated

 9 for theft, whether it's domestics, whatever it may be,

10 but I consider those pretty high accusations.

11      Q.    They are high accusations, and they're

12 significant allegations, and they were pending for a

13 period of time, and the process was extensive.

14            But what I'm asking you is, can you think of

15 any other officer during that time frame that was

16 under investigation for significance, and you've named

17 some of them.  And so we'll talk about those officers,

18 perhaps individually with those officers, because

19 I don't want to put anyone's confidential information

20 out there.

21            But tell me, since you were on the

22 predisciplinary hearing, what evidence was most

23 important to you in upholding the ruling in the

24 internal affairs investigation of the allegations of

25 sexual harassment?
```

```
 1      A.   There was an independent witness that saw
 2 some of the allegations.
 3      Q.   Do you recall the witness?
 4      A.   Russel Senior.
 5      Q.   When you concluded the investigation
 6 or -- strike that.
 7           Following you signing off on this overtime
 8 investigation in February of 2019, did you have any
 9 further action concerning this IA investigation into
10 Gregory Rideau?
11      A.   No.
12      Q.   Do you know a Jennifer Chirpezuk?  I'm
13 butchering her last name, but she works in human
14 resources with the city.
15      A.   I can't say her name either.  But, yes, I
16 know who you're referring to.
17      Q.   Okay.  To your understanding, what is her
18 role within the city?
19      A.   She works in human resources.
20      Q.   And have you ever had any interaction with
21 Jennifer concerning Gregory Rideau?
22      A.   Not that I recall.
23      Q.   Was there ever a time when you were involved
24 with a review of Gregory Rideau's medical records in
25 order to determine whether or not he needed to go for
```

 1  a psychological examination to determine his fitness

 2  for duty as a law enforcement officer?

 3     A.   No.

 4     Q.   And so there was never a time frame when you

 5  and Jennifer were having any conversation about

 6  Gregory Rideau's medical records?

 7     A.   No.

 8     Q.   Okay.  Just want to be clear.

 9          Have you had any conversations with any other

10  officers outside of internal affairs concerning

11  Gregory Rideau's internal affairs investigations?

12          MR. GOBEO:  Objection.

13     A.   Since they've been over?

14  BY MR. NORBRATEN:

15     Q.   At any point in time outside of the presence

16  of counsel?  Obviously if you're meeting with other

17  officers and Mr. Gobeo, that's privileged

18  communication that I'm not allowed to know about.  But

19  any other time --

20     A.   Yes.

21     Q.   Okay.  Who and when?

22     A.   Like I stated prior, when the new chiefs were

23  taken in, Chief Adderley, Deputy Chief Morris, and

24  then Assistant Chief Spatara, we were all reviewing

25  this case to see if they wanted to take arbitration.

1     Q.    Okay.

2     A.    In-depth conversations about this case.

3     Q.    **And about this case specifically being the**

4  **sexual harassment allegations?**

5     A.    Correct.

6     Q.    **Okay.  You never had any conversations with**

7  **them about the overtime City Place investigation,**

8  **correct?**

9     A.    It may have been mentioned, but it wasn't the

10  focus of what the conversations were.

11     Q.    **Okay.  Outside of those conversations with**

12  **Chief Adderley, Deputy Chief Morris, or Assistant**

13  **Chief Spatara, any other officers within the West Palm**

14  **Beach Police Department that you had conversations**

15  **with concerning internal affairs investigations of**

16  **Gregory Rideau?**

17     A.    Nothing specific about it.  But I'm sure I

18  have talked about it, but I wouldn't remember who or

19  was it an in-depth conversation.

20     Q.    **Did you do anything to review any document to**

21  **prepare for today's deposition?**

22     A.    Aside meeting with counsel, and like I saw

23  this document, I read this document that you have on

24  the screen right now, at the time I reviewed that

25  document.

1     Q.   Okay.  Do you recall whether or not -- strike

2  that.

3          Do you recall where Captain Swiderski was

4  shifted to after he left internal affairs and you came

5  into internal affairs?

6     A.   I believe he went to special

7  investigations.

8     Q.   And following Chief Adderley coming into the

9  department, Chief Mooney, where is her assignment

10  currently?

11     A.   Right now she works out of the Emergency

12  Operations Center.

13     Q.   Have you had any conversation with

14  Chief Mooney about Gregory Rideau at any point in

15  time?

16     A.   Yes.

17     Q.   When was that?

18     A.   Nothing recent.  It would have been during

19  the time frames when these investigations were going

20  on.  I was on the predis board, nothing recent.  But,

21  yes, I've had conversations as I was in internal

22  affairs for some of these investigations.

23     Q.   Okay.  Did you ever have conversations with

24  Chief Mooney and Emily Wiggs about any internal

25  affairs investigation into Gregory Rideau?

1     A.    Yes, sir.

2     Q.    And when would those have taken place?

3     A.    That same time frame when I was in internal

4  affairs.

5     Q.    During the investigation?

6     A.    This investigation?

7     Q.    Any investigation.  But, yes, let's talk

8  about this investigation first.  I mean, if you were

9  in internal affairs then this would have been the only

10  investigation into Gregory Rideau, correct, to your

11  knowledge?

12     A.    Right.

13     Q.    So did you have conversations with

14  Chief Mooney about this investigation during the

15  course of this investigation?

16     A.    I'm sure I did.  I don't recall the exact

17  specifics of it.

18     Q.    Okay.  Without knowing the specifics, do you

19  have an understanding as to what the reasonings for

20  the conversations was?

21     A.    No, I don't recall.

22     Q.    Were they conversations between yourself, and

23  Lieutenant Wiggs, and Chief Mooney solely about

24  Gregory Rideau's internal affairs investigation, or

25  were they conversations about a variety of subjects?

1    A.   I don't recall specifically.  But it probably

2    would have been more of a variety of subjects.

3    **Q.   Okay.  Do you recall how the subject of**

4    **Gregory Rideau came up during the course of an open IA**

5    **investigation with Chief Mooney?**

6    A.   Rephrase that question.

7    **Q.   Yes.  During the course of this internal**

8    **affairs investigation into Gregory Rideau, you**

9    **mentioned that you had conversations with Chief Mooney**

10   **and Lieutenant Wiggs about the investigation, correct?**

11   **You said that before.  I'm just confirming.  Yes?**

12   A.   I said I believe there were conversations.  I

13   don't recall any specific conversations.

14   **Q.   Okay.  Can you explain to me how those**

15   **conversations came about?**

16   A.   Status update.

17   **Q.   Okay.  Were they scheduled meetings?**

18   A.   No.

19   **Q.   So they were informal in nature?**

20   A.   It's not an -- it's not an informal meeting.

21   It's part of our investigation, so we have to see

22   where the investigation was going.

23   **Q.   Okay.  And were those conversations**

24   **documented in any way?**

25   A.   Again, these are casual conversations not

 1  about specifics, just passing on where this

 2  investigation is going so far and a status update.

 3  So, no, they wouldn't be documented.

 4      **Q.   Okay.  And presumably that's what**

 5  **Chief Mooney's conversing about too, a status on the**

 6  **investigation, correct?**

 7      A.   I don't know if she would have brought it up

 8  or if I would have told her the investigation was

 9  coming closer to be concluded at the time frame.  So I

10  don't recall the specific conversation about this

11  investigation.

12      **Q.   Okay.  Well, I acknowledge that you said you**

13  **don't recall specific conversations.  But you said you**

14  **recall some conversations about it.  So I guess I'm**

15  **trying to gather what would you be talking to her**

16  **about if she's not part of the investigation?**

17          MR. GOBEO:  Objection.

18      A.   The only thing that she would have been

19  briefed on is how far or close the investigation is

20  coming to.  And as I stated before, it wouldn't be

21  specifically to the Gregory Rideau investigation, it

22  will be about any investigations that were going.

23  BY MR. NORBRATEN:

24      **Q.   Okay.  Did Lieutenant Wiggs meet with**

25  **Chief Mooney outside of your presence to discuss**

```
 1  internal affairs investigations?

 2          MR. GOBEO:  Objection.

 3      A.   I don't know.

 4  BY MR. NORBRATEN:

 5      Q.   To your knowledge, did Officer McDaniel ever

 6  meet with Chief Mooney to discuss internal affairs

 7  investigations outside your presence?

 8      A.   I don't know.

 9      Q.   If Sergeant Oswald was still in internal

10  affairs at the time you were there, do you recall if

11  he ever met with Chief Mooney to discuss internal

12  affairs investigations?

13      A.   I don't know.

14      Q.   The prior assistant chief before Spatara was

15  Kahill?

16      A.   Kihei.

17      Q.   Kihei.  I apologize.  To your knowledge, did

18  Emily Wiggs ever meet with Assistant Chief Kihei about

19  internal affairs investigations during the course of

20  those investigations?

21      A.   I don't know.

22      Q.   Did you ever meet with Assistant Chief Kihei

23  about internal affairs investigations?

24      A.   I don't recall.

25          MR. NORBRATEN:  Okay.  Let me take a
```

```
 1      three-minute break here and we'll come back.  I

 2      might be done, but I just want to go over my

 3      notes.  Whatever the case may be, I'll have you

 4      out of here ahead of 3 o'clock, okay.

 5           THE WITNESS:  Thank you.

 6           (A recess was held at 2:37 p.m. until

 7        2:42 p.m.)

 8           MR. NORBRATEN:  Back on the record.

 9  BY MR. NORBRATEN:

10      Q.   Captain, I appreciate your answers before,

11  and I just want to be perfectly clear on these things.

12  I just need to get you on the record for it.

13           At any point in time were you ever in

14  possession of any medical records for Gregory Rideau?

15      A.   No.

16      Q.   Were you ever in possession of any therapist

17  records for Gregory Rideau?

18      A.   No.

19      Q.   Okay.  At any point in time have you ever met

20  with anyone with the city health clinic concerning

21  Gregory Rideau's medical records?

22      A.   Not that I recall.

23      Q.   Okay.  Were you present in Captain

24  Swiderski's office when Gregory Rideau was handed his

25  80-hour suspension following the sexual harassment
```

 1  internal affairs investigation?

 2      A.   No.

 3      Q.   Did you say no?

 4      A.   I said I don't recall.

 5      Q.   Okay.  Do you recall at the time making a

 6  statement to Greg that he shouldn't take it personal,

 7  that it was strictly a business decision?

 8      A.   I don't recall that.

 9      Q.   Okay.  If he recalls that occurring, do you

10  dispute it?

11           MR. GOBEO:  Objection.

12      A.   I don't know how to answer that question.  I

13  don't recall.

14  BY MR. NORBRATEN:

15      Q.   If he recalls that conversation took place,

16  do you dispute that you would have said that?

17      A.   I would dispute things that Greg Rideau says

18  because he's made false claims against me in his

19  complaint, so I would, yes.

20      Q.   Also in the room with you there is senior

21  assistant city attorney Ms. Panarites.  Have you at

22  any point in time been part of a meeting with her

23  concerning any investigation into Gregory Rideau?

24           MR. GOBEO:  Objection.

25      A.   Yes.  I had to come to -- I had met with her

1  in reference to this case, yes.

2  BY MR. NORBRATEN:

3      Q.    Okay.  And by reference to this case, I don't

4  mean reference to the civil lawsuit.  I mean,

5  reference to any of the internal affairs

6  investigations with Gregory Rideau?

7      A.    Yes.

8      Q.    Okay.  When was that?

9      A.    I don't remember the date.  I do recall

10  meeting with the city counsel, and the city manager

11  was also present.

12      Q.    Okay.  Was that before or after Chief

13  Adderley had requested you do an independent

14  investigation into the IA?

15          MR. GOBEO:  Objection.

16  BY MR. NORBRATEN:

17      Q.    Or review of the IA?

18      A.    After.

19      Q.    Okay.  Was Chief Adderley part of that

20  meeting as well?

21      A.    I don't recall him being there, no.

22      Q.    Was Deputy Chief Morris part of that

23  meeting?

24      A.    I don't recall him being there, no.

25      Q.    Was Lieutenant Wiggs part of that meeting?

 1    A.   I don't recall her being there either.

 2    **Q.   Chief Mooney, was she a part of that**

 3 **meeting?**

 4    A.   No.

 5    **Q.   Who do you recall being part of that**

 6 **meeting?**

 7    A.   Me, counsel, and the city manager at the

 8 time.

 9    **Q.   And the subject of the meeting was primarily**

10 **which internal affairs investigation?**

11         MR. GOBEO:  Todd, this is where I'm going to

12      interject and advise the witness not to answer.

13      Because the discussions that were had with counsel

14      are attorney-client privilege.

15         MR. NORBRATEN:  No, they're not.  She

16      represents the city, not this witness.

17         MR. GOBEO:  And he is a management level

18      employee with the city.  And discussions that were

19      had regarding legal issues are privileged.

20         MS. PANARITES:  And the city manager was

21       there.

22         MR. GOBEO:  And the city manager was there,

23      another high level employee.

24         MR. NORBRATEN:  But him being there with the

25      city manager makes it not privilege because he's

1    not management level, he's not the chief of

2    police, he's not the assistant chief of police.

3         MR. GOBEO:  I disagree.  And the witness --

4    I'm instructing the witness not to answer the

5    question on the grounds of attorney-client

6    privilege.

7         MR. NORBRATEN:  Okay.  We'll take it up with

8    the judge.  Thank you for your time, Captain

9    Ahern.  Please stay safe out there.

10        THE WITNESS:  Thank you.

11        MR. GOBEO:  I just have a few follow-up

12   questions.

13                  CROSS EXAMINATION

14   BY MR. GOBEO:

15   Q.   So there were -- you asked him questions

16   early on about the procedures relating to promotions

17   to lieutenant in particular with Gregory Rideau being

18   eligible for promotion.  Were you a decision-maker

19   with respect to Greg Rideau getting promoted to

20   lieutenant at any point?

21   A.   No.

22   Q.   Are those procedures contained within the

23   collective bargaining agreement?

24   A.   Yes.

25   Q.   Does the collective bargaining agreement also

1  cover the bill of rights that applies to police?

2      A.   It does.

3      Q.   Outside training that you referenced relating

4  to internal affairs, was that paid for by the police

5  department?

6      A.   It was.

7      Q.   You had also mentioned that you completed

8  your review of the internal affairs investigation at

9  the request of Chief Adderley, and that you verbally

10  gave him your conclusions.

11          What were your conclusions?

12      A.   Just to clarify.  Deputy Chief Morris asked

13  me to complete that review.  I let that case go to

14  arbitration.

15      Q.   Because you believe the city would win the

16  arbitration?

17      A.   Yes.

18      Q.   Are you aware of an internal investigation

19  into Officer Babcock regarding a Manatee Grant?

20      A.   In the past there was an investigation, and

21  that grant, yes.

22      Q.   Do you know what race Babcock is?

23      A.   White.

24      Q.   Are you aware of an investigation into

25  Frank Alonzo, internal affairs investigation?

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Joseph Ahern on 09/29/2021                                    Page 79

```
 1     A.    A past investigation, yes.

 2     Q.    And what race is Mr. Alonzo?

 3     A.    White or Hispanic.

 4     Q.    Are you aware of an internal affairs

 5  investigation into Frank Nelly?

 6     A.    I do.

 7     Q.    What race is Mr. Nelly?

 8     A.    White.

 9     Q.    Are you aware of an internal affairs

10  investigation in Ryan Brust?

11     A.    I am.

12     Q.    And what race is he?

13     A.    White.

14     Q.    And then you were asked about do you remember

15  having possession of any medical or therapist records;

16  I believe you said no.

17           Did you ever instruct anyone at the clinic to

18  alter the plaintiff's medical records?

19     A.    No.

20     Q.    Did you ever instruct anyone at the clinic to

21  order a fitness for duty exam of the plaintiff?

22     A.    Not that I recall.

23     Q.    You were -- do you recall the subject of the

24  investigation into Nelly, Officer Nelly?

25     A.    Excessive overtime.
```

1    Q.   Was that the same subject into the

2  investigation for Mr. Brust?

3    A.   It was.

4    Q.   And you were asked a few questions about the

5  recording of Gregory Rideau, and I believe -- correct

6  me if I'm wrong -- I believe you testified that that

7  was not a part of the internal affairs investigation

8  into sexual harassment; is that correct?

9    A.   Correct.

10   Q.   Do you know why it wasn't a part of that

11 investigation?

12   A.   I don't know.

13   Q.   If the recording is not a part of the

14 investigation, then not providing the recording to

15 Mr. Rideau wouldn't be a violation of his bill of

16 rights, correct?

17   A.   It's not a bill of rights violation, no.

18        MR. GOBEO:  I don't have any further

19   questions.

20                    REDIRECT EXAMINATION

21 BY MR. NORBRATEN:

22   Q.   Captain, do you have an understanding as to

23 who determines what evidence becomes part of an

24 internal affairs investigation?

25   A.   The investigator doing the investigation.

1    Q.   Okay.  Does the chief of police play any role

2  in that decision-making?

3    A.   Not that I'm aware, no.

4       MR. NORBRATEN:  No further questions.  We'll

5    order the deposition.  I assume you're going to

6    read it.

7       MR. GOBEO:  We will read.  And we'll order as

8    well.

9         (Thereupon, the foregoing deposition was

10     concluded at 2:52 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  WITNESS SIGNATURE PAGE

 2   I hereby certify that I have read my deposition, made

 3   changes and/or corrections as I deem necessary and

 4   approve the same as now written.

 5

 6   Executed this _____ day of _____, 2021.

 7

 8

 9                              _____

10                              Joseph Ahern

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    CERTIFICATE OF OATH

 2

 3   STATE OF FLORIDA
     COUNTY OF ORANGE
 4

 5           I, the undersigned authority, certify that

 6   Joseph Ahern, appeared via video conference and was

 7   duly sworn.

 8           WITNESS my hand and official seal this 29th

 9   day of September, 2021.

10

11

12

13

14

15   _____
     KAREN ALLEN-LEWIN
16   Professional Shorthand Reporter
     Notary Public - State of Florida
17   My Commission No.  GG220933
     Expires:  July 7, 2022
18

19

20

21

22

23

24

25
```

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Joseph Ahern on 09/29/2021                                    Page 84

```
1              REPORTER'S CERTIFICATE WITH ACKNOWLEDGMENT

2

3    STATE OF FLORIDA
     COUNTY OF ORANGE
4

5              I, Karen Allen-Lewin, Court Reporter,

6    certify that I was authorized to and did

7    stenographically report the foregoing proceedings and

8    that the transcript is a true record of the

9    proceedings.

10

11             I Further Certify that I am not a relative,

12   employee, or attorney, or counsel of any of the

13   parties, nor am I a relative or employee of any of the

14   parties' attorney or counsel connected with the

15   action, nor am I financially interested in the action.

16

17             DATED this 7th day of October, 2021.

18

19

20             _____
               KAREN ALLEN-LEWIN,
21             Court Reporter, Notary Public

22

23

24

25
```

```
 1                      ERRATA SHEET

 2                DO NOT WRITE ON TRANSCRIPT
                  ENTER CHANGES ON THIS PAGE
 3
        In Re:  Gregory Rideau -v- City of West Palm
 4                Beach

 5                   September 29, 2021

 6   PAGE  LINE   CHANGE    REASON

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19

20   Under penalties of perjury, I declare that I have read
     the foregoing document and that the facts stated in it
21   are true.

22
     _____                    _____
23   Date                            Joseph Ahern

24

25
```

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Joseph Ahern on 09/29/2021                    Index: 1..advise

**Exhibits**

**AhernJ 1**
  3:16 38:2,
  14 58:2

**AhernJ 2**
  3:17 50:24
  51:1

---

**1**

**1**  38:2,14
  58:2

**180**  53:9
  54:4

**18001**  31:8
  62:20

**18056**  38:4
  57:18

**1:00**  4:3

**1:36**  32:6,
  10

**1:42**  32:6,
  10

---

**2**

**2**  50:24
  51:1 58:22

**2010**  12:13

**2014**  12:11

**2017**  7:1
  12:10

**2018**  7:11
  11:2
  15:16,21
  16:9,20
  18:10,16
  29:18
  41:12,14,
  25 42:9,10
  45:16,20,
  25 46:13
  47:4,15,20
  48:2,22
  50:18 59:5
  62:19

**2019**  7:13,
  18 38:20
  65:8

**21**  5:1 8:15

**2:37**  73:6

**2:42**  73:7

**2:52**  81:10

---

**3**

**3**  73:4

**30**  47:15

**30th**  41:25

**3rd**  46:17

---

**4**

**40**  21:12,14
  24:18

---

**7**

**78-page**  38:2

---

**8**

**80**  21:11
  22:11
  23:13,19
  63:15

**80-hour**
  73:25

---

**A**

**A-H-E-R-N**
  4:19

**ability**  23:4

**abnormal**
  11:5

**abuse**  32:14

**abusing**
  43:20

**Academy**  26:2

**access**  49:9

**accusation**
  43:24

**accusations**
  64:7,10,11

**accused**
  57:17,22
  64:5

**accusing**
  7:23 8:2

**acknowledge**
  71:12

**action**  42:10
  52:14 65:9

**actions**
  14:15
  30:20
  53:12
  63:23

**activity**
  63:23

**actual**  28:4
  53:14

**Adderley**
  26:10
  34:8,10
  66:23
  67:12 68:8
  75:13,19
  78:9

**additional**
  21:14 29:5

**additionally**
  30:1

**addressed**
  33:19,24

**administrative**
  41:14
  46:9,16
  47:6,10
  50:6 52:14

**advice**
  23:18,23

**advise**  76:12

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Joseph Ahern on 09/29/2021                    Index: affairs..assigned

**affairs** 7:5, 8,10 11:2, 6 12:2,23 13:5,7,8, 11,18,19, 21 15:5, 16,20 16:21 17:11,12, 17 18:11, 16,20 19:1,7,22, 23 23:3 25:7 27:2, 16 28:1,5, 22,23 31:7,23 32:13 33:8,20,23 34:2,5 35:10,13, 15,17,20 36:11,19, 21,23 37:14 39:19 41:12,18 43:3 45:17,23 46:6,7,12, 14 47:20 51:13,16 53:2 54:22 55:8,22 56:3,10 57:13 60:1 61:6,18 64:24

66:10,11 67:15 68:4,5,22, 25 69:4,9, 24 70:8 72:1,6,10, 12,19,23 74:1 75:5 76:10 78:4,8,25 79:4,9 80:7,24

**affect** 24:1, 7,14

**affirm** 4:6

**afternoon** 4:15,16

**agency** 7:9 12:24 13:4 14:15 15:11 26:3 33:18 40:16 44:14 52:8 53:9

**agree** 46:22 60:15 63:21

**agreement** 77:23,25

**ahead** 43:11 73:4

**Ahern** 4:5, 11,15,19 77:9

**allegation** 41:2 43:19,21 46:7 57:23 59:25

**allegations** 18:12 19:17,21 21:24 24:21 31:9 40:13,21 42:18 44:5 54:17 57:15 63:22 64:12,24 65:2 67:4

**alleged** 21:20 49:17 60:4,17,21

**allowed** 66:18

**Alonzo** 78:25 79:2

**alter** 79:18

**amount** 24:10

**and/or** 38:15 51:2

**answering** 32:22

**answers** 73:10

**anyone's**

64:19

**apologize** 34:9 46:2 72:17

**appears** 41:13,24 42:9 47:13

**applies** 78:1

**apply** 54:8

**approached** 11:15

**approaching** 52:16

**approximately** 9:4 16:15 17:23 57:9

**April** 41:11 42:9 45:16,19, 25 46:13 54:1

**arbitrated** 23:9

**arbitration** 23:16 25:3 26:18,22 66:25 78:14,16

**area** 7:18 28:17

**assign** 39:2

**assigned** 10:25

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Joseph Ahern on 09/29/2021      Index: assignment..bit

13:20 19:3
30:24
35:12 39:6

assignment
68:9

assignments
36:24

assist 12:19

assistant
26:12
27:21 30:6
31:17 40:3
41:9 43:2
45:10,11
66:24
67:12
72:14,18,
22 74:21
77:2

assume 5:14
32:12 33:5
40:3 81:5

assumed
52:19

attached
58:15

attempted
23:8

attempting
22:22

attended
13:3,9
30:8

attorney

31:12
42:20,23
43:2 44:9,
10 45:10,
11 47:11,
17 61:3
74:21

attorney's
41:22
45:12
49:25
50:11
52:16
58:5,12
59:6

attorney-
client 76:14
77:5

audio 25:20
26:25 27:7
29:19
30:11,21

audit 50:19,
22,23
51:8,15,20
52:4 54:17
55:5,24
56:1,6,12,
23 61:14

auditing
51:11

aware 7:22
8:25 9:9
14:20
22:21
23:6,11,

14,17
24:3,16,23
25:19,23
26:24
27:6,8,11
45:19,24
46:7,19
47:8,14
50:17
51:25
52:4,10,24
55:10,16
56:9,15
57:1,22
59:23
61:13
78:18,24
79:4,9
81:3

---
**B**
---

Babcock
78:19,22

back 13:21
26:3 27:4
28:17,20
29:18
56:12 58:2
63:8 73:1,
8

background
6:13 15:11
48:7

balances
25:16

Baldwin 58:8

bargaining
77:23,25

Beach 4:22,
25 5:5,11,
19 8:16
15:18
39:14
44:21
55:13
58:13
61:19
67:14

began 4:2
46:17
48:18,24
54:2,12

begin 7:7

beginning
33:2

believed
21:21

benefit
54:21

big 27:3

bill 12:22
13:1 78:1
80:15,17

binder 27:3,
4 28:16

biracial
10:20

bit 8:24
32:5 43:10

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Joseph Ahern on 09/29/2021                    Index: black..chief

black   9:15,
  20

blank   63:12

board   20:3,
  10,18,22,
  25  21:5
  26:21
  27:17,25
  60:3 68:20

break   32:5,6
  62:13 73:1

Brian   38:24
  45:10

briefed
  48:19
  71:19

briefing
  18:22

bring   33:17

broad   13:6

broadly   11:1

brought   71:7

Brust   79:10
  80:2

built   37:23

business
  74:7

butchering
  65:13

_____

C

cabinets

28:17

calendar
  22:12
  23:25
  24:1,11

call   11:12
  40:17

called   28:12

canine   11:13

captain
  4:15,22
  6:13,25
  7:10,20
  11:2,7
  12:10
  15:15,21
  16:4,9,19
  17:3,9,25
  18:18,19,
  23 19:4,7,
  20 20:15
  21:1 32:12
  34:4
  36:20,23
  37:10,12
  38:20 42:5
  44:6,14,20
  45:2 46:5
  47:11,19,
  21 48:1,3
  50:13 51:5
  52:16 68:3
  73:10,23
  77:8 80:22

captains
  11:5 20:11

career   12:2
  33:3

case   17:21
  18:23
  19:3,24
  20:1,3,12,
  14 21:22
  23:8 26:5
  36:24
  38:25 39:2
  41:21
  48:20 50:4
  54:9 66:25
  67:2,3
  73:3 75:1,
  3 78:13

cases   17:20
  18:3 25:17
  37:1

casual   70:25

caught   17:5

Center   68:12

chain   30:18,
  19 34:1
  36:11 40:2

change   24:2
  57:21

changed
  23:18,23

charge   6:13

charged
  56:5,13

charges
  42:21

50:1,12
  52:17

checking
  37:8

checks   25:16

chief   11:3,
  15 21:3
  25:25
  26:4,5,10,
  12,13,14,
  15 27:21
  30:6,7,8,
  24 31:15,
  16,17 32:1
  33:21
  34:2,5,7,
  8,12,18,
  20,22,25
  35:17
  36:15 40:3
  41:9,14
  44:17 46:9
  47:5 48:25
  49:4,7
  50:10
  54:15
  55:21
  56:2,9
  61:5,13
  63:1
  66:23,24
  67:12,13
  68:8,9,14,
  24 69:14,
  23 70:5,9
  71:5,25
  72:6,11,

14,18,22
75:12,19,
22 76:2
77:1,2
78:9,12
81:1

**chief's** 6:11

**chiefs** 26:4
66:22

**Chirpezuk**
65:12

**choose** 10:24

**Circumstances**
59:20

**city** 5:4,10
7:23 8:16
38:12
40:18,19
41:1 61:1
64:7
65:14,18
67:7 73:20
74:21
75:10
76:7,16,
18,20,22,
25 78:15

**civil** 75:4

**claim** 25:12

**claims** 74:18

**clarify**
43:15
78:12

**clarifying**

21:6

**class** 12:23,
25

**classes**
15:11

**clear** 24:6
26:9 56:22
66:8 73:11

**client** 7:23
8:9

**clinic** 73:20
79:17,20

**close** 71:19

**closer** 71:9

**Coleman**
55:16,23
56:20

**collected**
58:23

**collective**
77:23,25

**command** 34:1
36:11 40:2

**commence**
41:15 47:6
49:25

**commenced**
62:20

**commencement**
41:18
53:3,17
54:1

**commencing**
52:14

**comments**
9:14

**committed**
57:23

**committee**
25:14,17

**commonplace**
44:20 45:3
59:17

**communication**
31:21
48:25
49:4,7
66:18

**community**
11:14

**compared**
53:8

**compensation**
38:6

**complaint**
33:16,19
40:15
41:12,17
42:8 43:6,
7,12,18,25
45:16,19,
24 46:12
47:4 49:15
53:1,8,16,
25 54:6
57:25
74:19

**complaints**
33:20,21

**complete**
27:15
49:19
78:13

**completed**
36:9 38:15
41:4 51:2
57:8,10
78:7

**concern** 9:18

**concerns**
9:22

**conclude**
31:6

**concluded**
37:20 65:5
71:9 81:10

**concluding**
54:22

**conclusion**
38:19

**conclusions**
78:10,11

**conduct**
13:19 15:5

**conducted**
14:4 34:13
35:16,19
44:2,6
46:25
50:18 51:8
52:1,5

conducting
  14:1 15:19
  44:21,23

conference
  4:2

confidence
  35:23

confidential
  25:21 62:4
  64:19

confirm   55:5

confirmed
  57:5,7
  60:5

confirming
  70:11

considered
  54:5

constantly
  17:1 37:6

contacted
  28:25

contained
  77:22

continue
  30:23

conversation
  11:18,21
  19:14,20
  22:9,14,16
  23:12,22,
  24 31:5
  48:21 66:5
  67:19

68:13
  71:10
  74:15

conversations
  17:9 22:1
  25:20
  31:12,13,
  18 39:9,
  12,13
  48:11,13,
  17 66:9
  67:2,6,10,
  11,14
  68:21,23
  69:13,20,
  22,25
  70:9,12,
  13,15,23,
  25 71:13,
  14

conversing
  71:5

copy   27:20
  28:19
  29:19
  32:19

correct   4:23
  5:25 11:8,
  9,23,25
  14:2,16,
  22,23
  16:6,14
  20:8 21:3,
  4,25 22:23
  23:4,5
  26:11
  29:2,15

32:14
  34:6,15,
  16,19,20,
  23,24
  35:5,6,7,
  15,20,21,
  25 36:7,8,
  12,13,16,
  17 37:10,
  25 38:20,
  25 40:6,8,
  23,24
  41:9,10,25
  42:24
  43:4,13
  44:7,8,12,
  19 45:13,
  14 46:25
  47:1,16,
  18,21,22,
  24,25
  49:21,22
  52:17,20,
  23 53:12,
  13,21,24
  54:2,3,4,
  12 55:8
  57:2,3
  58:6 59:2,
  3,8,15
  60:5,22
  61:3,4,14,
  15,16
  63:24
  67:5,8
  69:10
  70:10 71:6
  80:5,8,9,

16

corrections
  36:25

corruption
  42:20
  44:22
  45:1,12

corruptions
  41:22 45:3
  58:7,8

counsel
  66:16
  67:22
  75:10
  76:7,13

counseling
  57:20

County   58:13

couple   5:8
  6:17 7:15
  9:2,19
  13:1

couples
  10:8,13,
  16,19

cover   78:1

covered   13:7

crash   14:10

create   31:3

criminal
  7:20 42:21
  50:1,7,12
  52:17

53:11,15
59:14,18
63:23

**criminally**
42:18

**criminals**
50:5

**criteria**
25:10

**critical**
8:22

**CROSS**  77:13

**current**  6:15
11:3 17:19

———————
**D**
———————

**daily**  16:23

**date**  10:2
26:7,8
43:23,25
60:24 75:9

**dates**  49:16
58:24,25
60:4,7,9,
10

**dating**  9:7

**day**  27:5,10
29:7 30:9,
18,20

**day-to-day**
39:22

**days**  16:18
53:9 54:4

57:22,24

**Deanna**  5:14
6:2,8 8:13
9:1,6,15,
20 54:19

**debriefing**
16:20
18:19

**December**
41:13
46:8,17
48:22
54:2,12

**decides**
36:15 61:6

**decision**
35:18 74:7

**decision-maker**
77:18

**decision-making**  81:2

**declined**
50:11

**declining**
50:1

**deem**  8:8,12
33:22

**deems**  34:3

**defendant**
55:24

**delay**  41:17
52:14,23
53:24

54:10

**delayed**
52:20

**department**
4:22,25
5:7,11,24
6:12,13
7:8,18,23
8:19 9:22
10:2,3,9,
17 11:10
12:3
13:18,22
14:5 15:18
16:22 19:5
24:19,20
25:8,13,
15,19 26:1
39:15
40:2,23
41:22
44:21
50:18,19
51:8,21
54:14,15,
16,21
55:14,19
56:11
58:11
61:13,20
62:14,18
67:14 68:9
78:5

**depend**  37:21

**depending**
34:2 35:13

**depends**  14:9
35:11 53:5

**deposition**
32:22 33:2
38:15 51:2
67:21
81:5,9

**depositions**
33:5

**deputy**  25:25
26:4,12,
13,14,15
30:7,24
31:15 32:1
66:23
67:12
75:22
78:12

**describe**
5:16 28:8
33:9

**design**  35:7

**desk**  29:10

**detail**  40:25
41:7 58:23

**details**
28:11 38:8
62:2

**Detective**
60:1

**determine**
65:25 66:1

**determined**
20:9

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Joseph Ahern on 09/29/2021                    Index: determines..Excel

determines
 34:13
 80:23

dictate
 59:20

direct   4:13
 6:8,20,23

directly
 21:21,23

disagree
 77:3

disbelieve
 42:2

discipline
 21:9 33:11
 34:21,23
 36:15
 63:15

discover
 42:6

discrimination
 8:3,18

discuss   17:3
 71:25
 72:6,11

discussed
 22:18
 31:19

discussions
 76:13,18

dispute
 74:10,16,
 17

district
 11:13

document
 33:17
 42:1,3
 63:7
 67:20,23,
 25

documented
 15:24
 58:25
 70:24 71:3

domestics
 64:9

drawing
 63:12

drive   27:5,6
 29:6,12,24

drug   18:15
 40:22

dual   58:10

due   18:14
 55:23

duly   4:12

duties   58:24

duty   38:7
 66:2 79:21

─────────

E

─────────

earlier   13:4
 38:10
 62:20

early   62:19

77:16

educate
 23:24

Educating
 24:2

effect   22:15

elaborate
 14:11

eligible
 13:10,14
 22:13
 24:11,13
 77:18

Emergency
 68:11

Emily   48:11
 62:6,8
 68:24
 72:18

employee
 4:24 8:18
 58:11
 76:18,23

employees
 34:1

employment
 38:8

end   8:7
 24:9 57:12

ended   20:24

enforcement
 5:3 24:20
 25:8 40:22

66:2

entertainment
 11:13

entire   5:20
 62:17

errors   55:6

essentially
 23:13
 32:18 33:4
 34:12
 37:19
 40:12
 43:11
 51:12

events   38:7

evidence
 37:17
 42:23,24
 43:1 51:16
 60:5,25
 61:1,2
 64:22
 80:23

exact   9:7
 11:21 18:7
 19:11
 26:7,8
 69:16

exam   79:21

examination
 4:13 66:1
 77:13
 80:20

Excel   14:2

**Excessive**
79:25

**exhibit**
38:2,14
50:24 51:1
58:2

**existed** 57:5

**existence**
25:24
57:1,2

**exists** 10:11

**expected**
51:15

**experience**
5:3 12:1

**explain** 24:5
39:18
70:14

**extended**
59:1

**extensive**
63:17,19
64:13

**extensively**
61:24
63:10

**extent** 61:20
62:15

**external**
54:7

**externally**
13:23

**extra** 38:7

**F**

**fact** 9:15,
19 24:16
25:19
31:22
35:9,12
49:14
50:11
56:4,11

**fact-finding**
35:5,6

**facts** 20:6

**failure**
57:20

**Fair** 54:9

**false** 74:18

**familiar**
32:12

**FBI** 26:1

**FDLE** 25:16

**February**
38:20 65:8

**federal**
40:18

**feel** 32:20

**Fernandes**
45:11

**field** 5:19

**file** 26:24
27:1,2,16,
18,21,23,

25 28:6,
10,13,15,
17 29:1,4,
11,13,17,
23 30:1,23
58:20

**filed** 23:7
24:19

**files** 28:2

**filled** 12:7

**filter** 33:20

**find** 25:15
53:7

**finding**
35:9,12

**findings**
37:19
40:10 44:9

**fine** 46:3
49:12
62:25

**finishing**
26:1

**fitness** 66:1
79:21

**Florida**
12:24
24:20
25:8,12

**focus** 67:10

**focused**
49:18

**follow-up**

77:11

**force** 18:15
40:22
51:14,18

**foregoing**
81:9

**forgo** 23:19

**forgoing**
23:13

**forward** 9:8
23:15
33:17

**found** 25:11
26:17

**frame** 6:10
7:4,7,12,
16,21
8:17,21
9:13 18:8
19:12
22:17,22
42:12 44:1
46:6 48:15
52:25
53:4,8,10
61:17
62:17
63:3,5
64:15 66:4
69:3 71:9

**frames** 68:19

**Frank** 78:25
79:5

**free** 32:20

**front** 8:7
  49:10

**full** 27:20

**funded** 40:22

――――――――――

                **G**

――――――――――

**gap** 12:7
  16:1

**gather** 71:15

**gave** 15:11
  28:19
  29:12 30:1
  78:10

**general**
  52:11
  58:20

**generally**
  7:22,25
  8:2,3,7,
  15,24
  33:9,14
  39:8 49:23

**generates**
  36:10

**give** 4:7
  10:11 27:3

**goal** 36:6

**Gobeo** 10:4
  14:17 15:9
  18:5 20:19
  22:4,24
  23:20
  31:12 32:8
  36:22

38:21 40:7
41:20
43:5,14
44:25
45:18
46:10 47:7
50:3 51:19
52:18
53:19
54:24 60:6
61:9,22
66:12,17
71:17 72:2
74:11,24
75:15
76:11,17,
22 77:3,
11,14
80:18 81:7

**good** 4:15,
  16 7:17
  17:8 32:5,
  8 37:7

**grant** 78:19,
  21

**gravity**
  35:14

**greater**
  56:5,13

**Greg** 5:22
  6:20 9:20
  22:19
  24:18
  26:18
  32:14
  63:16

74:6,17
77:19

**Gregory**
  5:10,17
  9:1,15
  18:11
  19:17,22
  22:2,10
  25:20
  31:9,22
  38:5 42:17
  43:19
  48:8,12
  52:15
  57:14
  61:21,25
  62:15 64:5
  65:10,21,
  24 66:6,11
  67:16
  68:14,25
  69:10,24
  70:4,8
  71:21
  73:14,17,
  21,24
  74:23 75:6
  77:17 80:5

**grievance**
  23:8

**grounds** 77:5

**guess** 7:8
  10:14,22
  13:15 15:2
  17:2 28:3
  45:22
  59:25

62:13
71:14

**guys** 59:17

――――――――――

                **H**

――――――――――

**hall** 28:15

**hand** 4:4

**handed** 21:19
  28:16
  33:11
  34:21
  73:24

**handled**
  50:14

**hands** 15:24
  27:24

**happen** 17:6

**happened**
  13:7 17:7
  22:16 61:8

**happening**
  42:11

**harassment**
  8:3,8,12
  18:12,20
  19:2,16,21
  21:16,20
  31:8
  43:13,21,
  24 64:6,25
  67:4 73:25
  80:8

**head** 10:7,
  15

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Joseph Ahern on 09/29/2021          Index: health..internal

health  73:20

heard  27:13
  52:8 57:6,
  7,10

hearing
  19:24 21:8
  22:3 23:7
  24:17,22
  29:18 32:1
  34:19
  64:22

hearings
  29:14

held  32:10
  73:6

high  64:7,
  10,11
  76:23

hire  26:8

hiring  6:12

Hispanic
  79:3

history
  21:20

hope  32:17

hourly  55:6
  56:5,12

hours  21:11,
  12,14
  22:11
  23:13,19
  24:18
  63:15

human  65:13,
  19

———————

I

IA  8:22
  11:16,17
  12:5,14,19
  14:7,9,10,
  11 15:3,21
  16:9,19
  17:3,24
  25:1 32:18
  34:13
  38:4,9
  42:9 48:4,
  7 57:17
  59:10
  62:19 65:9
  70:4
  75:14,17

idea  17:23
  18:1

identified
  38:14 51:1

imagine
  59:13

important
  64:23

in-depth
  67:2,19

in-house
  33:18 54:6

incident
  35:14

incidents
  63:10,12,
  14

incorporate
  55:1

independent
  65:1 75:13

individually
  64:18

individuals
  30:14
  33:12
  63:21

ineligible
  22:20

informal
  70:19,20

informant
  25:21

information
  15:25 40:4
  43:8 48:3,
  7 64:19

ing  59:19

initially
  26:19
  46:13

initiated
  33:10

inside
  35:15,19
  36:4,20

instruct

79:17,20

instructing
  77:4

intending
  23:15

interaction
  29:3 65:20

interactions
  31:6

interested
  28:4

interject
  76:12

internal
  7:5,8,10
  11:2,6
  12:2,23
  13:5,7,8,
  11,18,19,
  20 15:5,
  15,20
  16:21
  17:11,12,
  17 18:11,
  16,20,25
  19:7,21,23
  23:3 25:7
  27:2,16
  28:1,5,22,
  23 31:7,23
  32:13
  33:8,20,22
  34:2,4
  35:10,13,
  15,19

36:11,19,
20,23
37:13
39:19
41:12,18
42:12 43:3
45:17,23
46:6,7,12,
14 47:20
50:19
51:13,16
53:1,2,6
54:5,22
55:8,22
56:3,10
57:13,21
60:1 61:6,
18 64:24
66:10,11
67:15
68:4,5,21,
24 69:3,9,
24 70:7
72:1,6,9,
11,19,23
74:1 75:5
76:10
78:4,8,18,
25 79:4,9
80:7,24

**international**
35:17

**interviewing**
37:3

**introduced**
16:2 19:25

**introduction**
15:23

**investigated**
14:9,13,15
42:18
51:12
59:25
61:20,24
62:10,15
63:10,11,
19,22 64:8

**investigating**
17:4 18:25
36:10
47:14
59:19

**investigation**
13:6 14:7,
9 15:5
18:3,8,21
19:1,16,
22,23
20:4,5,7
22:6 23:3
24:9 26:20
30:2 31:7,
14,23
32:13,19
33:10,13,
15,23,24
34:14,17
35:1,16,
18,24
36:5,9
37:11,15,
16,20,21
38:4,18

39:7,11,
15,16,21
40:13
41:15,19
42:14
44:1,5,15
45:17
46:9,17,
24,25
47:6,10
48:4,8,12,
18,20,24
49:1,19,24
50:6,7,14,
21 51:16,
23 52:1,6
53:2,3,6,
11,15,18,
23 54:6,7,
8,21,23
55:1,2,8
56:3,10
57:13
58:17
59:4,7,14
60:16 61:7
62:3
63:17,20
64:16,24
65:5,8,9
67:7 68:25
69:5,6,7,
8,10,14,
15,24
70:5,8,10,
21,22
71:2,6,8,
11,16,19,

21 74:1,23
75:14
76:10
78:8,18,
20,24,25
79:1,5,10,
24 80:2,7,
11,14,24,
25

**investigations**
7:21
13:18,19
14:1,22
15:8,20
16:22
17:4,10,24
18:11,17
25:7 35:22
36:25
37:4,9,22
44:22,24
55:22
59:18
62:22 64:8
66:11
67:15
68:7,19,22
71:22
72:1,7,12,
19,20,23
75:6

**investigative**
41:4 47:5

**investigator**
19:6 36:19
37:14
38:25

80:25

**investigators**
16:24 17:4
35:15
37:9,18,20
39:25

**involved**
9:2,10
18:12,13
20:12,14
26:20
33:12
34:18
65:23

**involving**
26:18

**issue** 11:21
33:17 53:7

**issues** 17:1
44:22,23
45:2 76:19

─────────────

            **J**

─────────────

**J-O-S-E-P-H**
4:20

**Jason** 63:11

**Jennifer**
65:12,21
66:5

**job** 46:4

**jobs** 57:21

**Joseph** 4:11,
19

**judge** 77:8

**Justice**
40:23
50:18 51:9
54:17
56:12
61:14

**Justice's**
54:21

**justifiable**
52:22

─────────────

            **K**

─────────────

**Kahill** 72:15

**Kevin** 63:9

**Kihei** 72:16,
17,18,22

**kind** 11:24
12:18
14:10
16:12 31:3
42:6 44:14
52:11
58:10

**knew** 47:3
61:15

**knowing**
51:11
69:18

**knowledge**
18:16
20:4,5,6
42:13
51:22

55:21,25
56:1,2,7
57:12
59:6,7
61:5 69:11
72:5,17

─────────────

            **L**

─────────────

**lack** 16:11
42:24

**Lake** 5:4,8

**lapse** 29:10

**large** 28:6

**late** 7:10

**lateral**
11:23

**law** 5:2
24:20 25:8
66:2

**lawsuit** 7:24
75:4

**lead** 38:24

**leave** 28:1

**leaving** 16:4

**left** 7:18
34:9 68:4

**legal** 76:19

**letter** 58:5,
17 60:15

**level** 33:25
34:14
35:13

76:17,23
77:1

**lie** 33:24

**lieutenant**
5:10 12:4,
7,10,15
13:12,20
15:3,25
18:24
19:14
22:23 23:4
27:2
28:12,21,
23 29:4,25
39:5,19,22
40:5 49:6
69:23
70:10
71:24
75:25
77:17,20

**limb** 59:22

**limit** 62:23,
25

**lines** 15:22

**list** 57:25
62:7

**listened**
27:8
30:11,17

**lodging**
54:18

**long** 4:24
16:15 29:3

loop  37:24

lot  7:2
  28:7 63:14

_____

M

_____

made  12:6
  13:10,13
  14:20
  18:13
  27:11
  36:25 42:9
  43:7,11,
  12,18,20,
  23 45:24
  46:7 53:16
  74:18

maintained
  35:23

make  9:14
  24:11
  38:10 40:1
  44:14 50:1

makes  35:17
  36:14
  49:15
  76:25

making  27:18
  74:5

man  9:15

manage  14:4,
  5 36:24

management
  10:1,3
  37:1 76:17

77:1

manager
  75:10
  76:7,20,
  22,25

Manatee
  78:19

Marcasi
  20:17

mark  38:1
  50:24

Markay  43:18

marked  38:15
  51:2

marriage
  10:20

married  9:11
  10:17,20

matter  27:19

Matthew
  56:4,18

Mcdaniel
  38:24
  39:3,10,20
  40:5 41:5
  46:23 47:3
  48:6 49:3
  58:18 60:1
  72:5

Meaning
  21:23

medical
  65:24 66:6

73:14,21
  79:15,18

meet  6:3
  50:5 71:24
  72:6,18,22

meeting  30:8
  44:8 47:15
  66:16
  67:22
  70:20
  74:22
  75:10,20,
  23,25
  76:3,6,9

meetings
  45:8 70:17

member  20:10

members  10:1

memo  31:3

memory
  60:13,14

mentioned
  13:24
  30:14
  56:25 62:9
  67:9 70:9
  78:7

met  5:17
  26:3 42:5,
  19 47:9,
  10,17 59:5
  72:11
  73:19
  74:25

mine  15:23

minimally
  47:14

moment-to-
moment  39:23

month  41:11

months  5:7,8
  7:15 12:5,
  14 59:1

Mooney  11:3,
  15 21:3
  34:6,7
  41:14
  44:18 46:9
  47:5 48:25
  49:24
  50:10
  54:15
  55:21
  56:2,9
  61:5,13
  68:9,14,24
  69:14,23
  70:5,9
  71:25
  72:6,11
  76:2

Mooney's
  63:1 71:5

Morris
  26:14,15
  27:21
  30:7,25
  66:23
  67:12
  75:22

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Joseph Ahern on 09/29/2021                    Index: Morris'..office

78:12

**Morris'** 32:2

**mouth** 57:4

**move** 11:4, 11,16,23

**moved** 19:10 34:2

**moving** 9:8

**multiple** 49:16

___

**N**

___

**named** 64:16

**National** 26:2

**nature** 70:19

**navigate** 12:19 14:4

**necessarily** 9:20

**needed** 40:4 60:25 65:25

**Nelly** 79:5, 7,24

**NORBRATEN** 4:14 10:6 14:19 15:13 18:9 20:23 22:5 23:1 24:4 32:4,9,11

37:2
38:17,23
40:9 41:23
43:9,16
45:5,21
46:21
47:12 50:8
51:4,24
52:21
53:20 55:3
60:12
61:11 62:1
66:14
71:23
72:4,25
73:8,9
74:14
75:2,16
76:15,24
77:7 80:21
81:4

**normal** 58:24

**north** 12:24

**notes** 73:3

**notice** 24:19

**notified** 30:6

**notify** 59:18

**November** 7:11 46:14,15 48:2

**number** 10:11 20:14 33:12

**numerous** 63:10,12

___

**O**

___

**Objection** 10:4 14:17 15:9 18:5 20:19 22:4,24 23:20 36:22 38:21 40:7 41:20 43:5,14 44:25 45:18 46:10 47:7 50:3 51:19 52:18 53:19 54:24 60:6 61:9,22 66:12 71:17 72:2 74:11,24 75:15

**obligations** 25:9,10 29:15

**observe** 9:14

**observed** 8:8,11,16

**obtain** 28:9 43:1

**obtained**

27:14
37:18 43:6

**obtaining** 28:5

**occasionally** 40:3

**occur** 15:7 53:4

**occurred** 14:20 25:2 44:4

**occurring** 74:9

**occurs** 36:15

**OCDETF** 40:17 50:19,22 52:9 55:24 56:23

**October** 7:12 41:25 42:10 46:14 47:15,20 59:5

**office** 6:12 16:24,25 27:4 28:13,14, 20 41:22 45:13 49:25 50:11 52:17 58:6,12,14 59:6 73:24

**officer**
14:16
18:13 19:1
21:24 31:8
33:1 36:10
38:24
39:3,10,20
40:5,16
41:5 43:7,
11,18
45:25
46:8,23
47:3,14
48:6 49:3,
15,16 50:2
51:14,17
53:17
54:20
55:10,13,
16,19,22
56:4,8,11,
16,18,20
58:18,25
59:1 61:19
62:11,12
63:9,11
64:15 66:2
72:5 78:19
79:24

**officers**
5:20 9:14,
21 10:1,2
35:10,19
45:7 50:20
60:19
61:23
62:5,10,21
64:8,17,18

66:10,17
67:13

**officers'**
12:22

**on-the-job**
12:18

**ongoing** 24:9
59:8,11

**open** 17:3,
10,24
18:3,6
19:21,23
23:2 50:25
70:4

**opened** 18:8

**operating**
38:7

**Operations**
68:12

**opinion**
26:21
27:18
53:25
62:16 64:4

**opportunity**
51:7 58:16

**opposed** 40:4

**order** 55:21
56:3 65:25
79:21
81:5,7

**ordered**
44:14
46:9,18

49:24
56:10

**ordering**
47:5

**orders** 41:14

**original**
57:25

**Oswald**
18:24,25
19:5,14,15
72:9

**outcome** 21:7

**outrank** 5:24

**overbilling**
18:14

**overlapping**
40:19

**overseeing**
49:20

**overtime**
18:14
22:11
32:14
38:11
40:18
43:20 44:5
51:13,17
57:14,16
58:23
60:18 65:7
67:7 79:25

---
**P**
---

**p.m.** 4:3

32:10
73:6,7
81:10

**pages** 38:3

**paid** 40:18,
20 50:20
78:4

**Palm** 4:22,
25 5:5,11,
19 8:16
15:18
39:14
44:21
55:13
58:13
61:19
67:13

**Panarites**
74:21
76:20

**Paragraph**
58:22

**Parkland** 5:7

**part** 5:21
18:15
27:25
29:14,18,
23 30:1,2
35:5,6,9
37:23
50:14
51:15
54:18
70:21
71:16
74:22

75:19,22,
25 76:2,5
80:7,10,
13,23

passing  71:1

past  6:17
15:23
78:20 79:1

patrol  6:4
33:25

pay  23:13
58:23
60:18

pending
16:21
53:11
64:12

people  12:6
16:23 36:3
63:13,17,
18

people's
14:3

perfectly
73:11

period  12:8
16:12,15,
20 19:10
29:9 59:1
64:13

Perrow  63:9

person  15:23
34:22
44:17

personal
74:6

personally
9:18 37:3
44:23 45:1

pertaining
36:3

phonetic
20:17
63:9,11

physical
28:4

physically
29:4

picked
20:15,21

place  20:5
32:5 34:14
37:16
38:12
40:19 41:1
55:5 61:1
67:7 69:2
74:15

plaintiff
79:21

plaintiff's
79:18

play  81:1

point  6:7,
16,19,22
12:2 17:12
20:18
25:18

27:12
30:5,9,10
32:21
42:17
56:25
59:5,10
66:15
68:14
73:13,19
74:22
77:20

police  4:22,
25 5:7,11
10:1,3
12:22
15:18
25:14
33:1,21
34:3,5,12,
25 39:14
44:17,21
51:21
54:15
55:14,19
61:19
62:18 63:1
67:14 77:2
78:1,4
81:1

policeman
5:18

position
11:4 12:17

possession
73:14,16
79:15

possibly
57:1

potential
18:13
32:14
38:11
60:4,24

potentially
24:8 34:18

predis  21:5
26:20
27:17,25
68:20

predisciplinar
y  19:24
20:3,10,18
21:8 22:2
23:7 24:17
29:14,18
32:1 34:18
64:22

prepare
67:21

presence
30:13
66:15
71:25 72:7

present  7:21
61:2 73:23
75:11

presented
41:8 43:2

presenting
42:23

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Joseph Ahern on 09/29/2021                    Index: press..ready

| | | | |
|---|---|---|---|
| press 50:12 | procedures | provide 29:5 | 32:22 |
| pretty 12:19 | 15:4,19 | provided | 77:12,15 |
| 25:11 27:3 | 16:2 | 12:21 16:7 | 80:4,19 |
| 64:7,10 | 77:16,22 | providing | 81:4 |
| previously | proceedings | 80:14 | quick 6:5 |
| 12:15 | 4:2 | psychological | |
| 27:14 | process 24:8 | 66:1 | R |
| 29:13,17 | 25:7 28:5 | public 41:22 | |
| primarily | 33:9 36:18 | 42:20 | race 8:19 |
| 49:18 76:9 | 37:23 | 44:22 | 78:22 |
| primary | 64:13 | 45:1,3,12 | 79:2,7,12 |
| 37:14 | promote | 58:7,8 | Raise 4:4 |
| prior 5:2,6 | 19:11 | pull 27:2 | raised 37:11 |
| 9:10 12:2, | promoted | pulled 28:18 | ran 12:24 |
| 25 13:10, | 6:25 22:22 | pursue 42:21 | rank 37:11 |
| 20 15:10, | 23:4 24:12 | put 57:4 | rate 55:23 |
| 20 16:8 | 77:19 | 64:19 | 56:5,12 |
| 20:2 25:3 | promotion | | Ravelo 18:13 |
| 31:11 | 11:24 | | 21:24 |
| 34:10 41:8 | 22:14,20 | Q | 43:7,11,18 |
| 47:4,9 | 24:12,14 | | 45:25 46:8 |
| 66:22 | 77:18 | question | 49:15 |
| 72:14 | promotional | 13:16 15:2 | 53:17 59:1 |
| privilege | 24:8 | 43:15 | 62:6,8,12 |
| 76:14,25 | promotions | 45:22 | Ravelo's |
| 77:6 | 12:6 77:16 | 46:1,11 | 31:8 |
| privileged | proper 15:4, | 52:11,13 | re-ask 13:16 |
| 66:17 | 19 | 53:25 56:8 | read 67:23 |
| 76:19 | properly | 60:8,9,11 | 81:6,7 |
| procedural | 57:20 | 70:6 74:12 | reading 27:4 |
| 24:24 25:1 | protocols | 77:5 | 28:20 |
| procedure | 15:19 | questioned | ready 28:13, |
| 14:24 | prove 60:25 | 14:8 | 16,19 |
| 23:10 38:7 | | questions | |
| | | 7:2 8:6 | |
| | | 15:15 | |

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Joseph Ahern on 09/29/2021          Index: reason..represent

**reason**   10:25
42:2 47:8
52:22
60:10

**reasoning**
10:23 11:1
36:2

**reasonings**
69:19

**recall**   9:6
11:18,20
12:15
17:21
18:2,6
19:2,3,9,
11,18,19
20:21
21:10
22:1,8,9,
14,17
23:21 26:7
28:8 29:10
31:20 32:3
39:4,5,12,
13,17
43:23
46:20
48:5,9,17,
19,21 49:2
57:11,24
58:1,20,21
59:9 60:10
65:3,22
68:1,3
69:16,21
70:1,3,13
71:10,13,

14 72:10,
24 73:22
74:4,5,8,
13 75:9,
21,24
76:1,5
79:22,23

**recalls**
74:9,15

**receive**
15:3,17
33:15

**received**
12:16
13:17 16:8
21:14
38:16
40:15
41:12 51:3
63:14

**receiving**
29:24
37:18

**recent**
68:18,20

**recess**   32:10
73:6

**recognized**
41:3

**recollection**
39:9

**record**   4:18
24:6 26:9
73:8,12

**recorded**
25:20

**recording**
26:25
29:20
30:11,21
80:5,13,14

**recordings**
25:24

**records**
65:24 66:6
73:14,17,
21 79:15,
18

**REDIRECT**
80:20

**reference**
18:23
75:1,3,4,5

**referenced**
78:3

**referencing**
38:9

**referring**
27:7 65:16

**Regis**   54:20

**regularly**
37:8

**reign**   63:1

**relate**   14:21
48:3,6

**related**
21:21  48:7

**relating**
77:16 78:3

**relevant**
55:7

**relying**
49:10,12

**remained**
21:9

**remedial**
21:12,14,
17,19

**remember**   9:7
60:8,10,11
67:18 75:9
79:14

**Rephrase**
70:6

**report**   31:4
32:18
36:10
37:19
41:4,7
42:9 43:4
47:13 54:1

**reported**
27:8
30:18,19
47:15

**reportedly**
45:25

**reporting**
25:7 41:17

**represent**
5:9

**represents**
  76:16

**request**
  26:23 32:2
  78:9

**requested**
  75:13

**require**  53:2

**required**
  42:22

**resources**
  65:14,19

**respect**
  77:19

**response**  6:5
  11:14

**result**  57:12

**results**  55:4

**retain**  28:18

**review**
  13:22,25
  17:21
  25:13,17
  26:5,19,
  21,24
  27:1,18,
  21,23
  29:11
  30:24
  31:14
  33:21
  36:24
  41:24
  58:16

65:24
67:20
75:17
78:8,13

**reviewed**
  29:13,17
  31:22
  41:7,21
  58:17,19
  67:24

**reviewing**
  30:23
  66:24

**Rick**  26:14
  30:7

**Rideau**  5:10,
  12,14,17,
  22 6:2,8
  8:9,13 9:1
  18:4,11
  19:17,22
  22:2,10,19
  25:3,21
  26:5,18
  31:9,22
  32:14 38:5
  40:14,16
  42:17
  43:13,19,
  22 44:15
  48:8,12
  49:16
  50:2,12
  51:14,17
  52:15
  54:19,23
  55:5,6

57:14
58:23
59:14,22
61:21,25
62:11,15
63:16 64:5
65:10,21
67:16
68:14,25
69:10
70:4,8
71:21
73:14,17,
24 74:17,
23 75:6
77:17,19
80:5,15

**Rideau's**
  65:24
  66:6,11
  69:24
  73:21

**rights**  12:22
  13:2 14:21
  78:1
  80:16,17

**role**  34:25
  35:4
  36:20,23
  39:18,19
  65:18 81:1

**romantically**
  9:1,10

**room**  74:20

**rotate**  20:11

**rotated**  11:5

**rotational**
  20:15

**rule**  54:7

**rules**  24:2,7
  33:4

**ruling**  64:23

**rumors**  52:7
  57:1

**Russel**  65:4

**Ryan**  79:10

———————

**S**

**safe**  77:9

**Sangara**
  63:11

**Sarah**  11:3
  34:6,7
  44:18
  49:24 63:1

**sat**  19:24

**scheduled**
  25:3 70:17

**school**  13:23

**screen**  32:17
  49:10,12,
  13 51:5
  58:3 67:24

**security**
  41:1

**seeking**
  59:13

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Joseph Ahern on 09/29/2021                    Index: sees..starting

sees  33:17

semantics
  60:8

Senate  21:1

senior  65:4
  74:20

sense  40:1

separated
  50:5

sergeant
  12:12
  18:25
  19:5,14,15
  38:5 39:5
  40:16
  43:13,19,
  21 44:15
  50:12
  54:19,23
  55:5,6
  58:8,14,23
  59:14,22
  72:9

served  24:14

serves  21:4,
  5

services
  11:12

serving
  20:24

sexual
  18:12,20
  19:1,16,21
  21:16,20

31:8
43:13,21,
24 64:6,25
67:4 73:25
80:8

shadow  16:12

share  32:17

sharing  38:1

Sheriff's
  58:14

shifted  68:4

shifts  60:2,
  17,21

short  12:8
  19:10 29:9

short-time
  15:25

Shortly  29:7

show  50:23
  60:16

showed  60:1

sign  34:22
  36:24

signature
  38:19

significance
  64:16

significant
  63:23
  64:4,12

significantly
  62:11

signing  41:8
  65:7

silly  28:4

similar  17:9

sir  69:1

sit  5:23

sitting  20:3

small  12:4

software
  13:23,25
  15:6 57:21

solely  35:19
  69:23

somebody's
  63:4,6

sort  12:15

sorts  28:11

Sounds  32:8

south  5:5

space  16:24,
  25 28:14

Spatara  30:6
  31:17 40:3
  41:9 66:24
  67:13
  72:14

special
  11:12 38:7
  68:6

specific  8:5
  15:17
  39:9,12

52:13 63:2
67:17
70:13
71:10,13

specifically
  13:5,8
  15:7 22:6
  28:9 30:21
  35:2,3
  39:24
  46:19
  48:14 67:3
  70:1 71:21

specifics
  58:21
  69:17,18
  71:1

spell  4:17

spent  5:21
  23:25

spreadsheet
  17:19

spreadsheets
  14:2

Stan  58:8

standard
  14:24 38:6

start  10:22
  41:3 53:16

started  27:4
  28:20
  41:25
  48:20

starting

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Joseph Ahern on 09/29/2021          Index: starts..terminations

26:3 29:11
53:24

**starts** 41:11

**state** 4:17
41:21
42:19,23
43:2 44:9
45:10,11,
12 47:10,
17 49:25
50:11
52:16
58:5,12
59:5 61:3

**stated** 66:22
71:20

**statement**
74:6

**statements**
28:7 58:21

**states** 58:22
60:15

**stating**
40:16

**status** 14:3
16:21
17:1,20,21
70:16
71:2,5

**stay** 77:9

**Steinberg**
56:4,18

**STENOGRAPHER**
4:4

**stint** 12:4

**street** 9:5

**strictly**
74:7

**strike** 10:22
37:7 52:12
65:6 68:1

**stuff** 15:12

**subject**
14:6,8
32:1 70:3
76:9 79:23
80:1

**subjects**
36:4 69:25
70:2

**submitting**
24:18

**subsequent**
23:7

**substantiate**
25:12

**suggest**
59:22

**suggested**
62:12

**suggesting**
22:10

**supervising**
39:20

**supervision**
33:25 37:1

**supervisor**
6:8,20,23
27:9 33:16
35:13
39:23

**supported**
55:23

**supposed**
20:17
35:23 56:6

**suspects**
59:18

**suspension**
21:11 22:7
23:14
24:10,18
25:15
33:11
63:15
73:25

**sustained**
24:21

**swear** 4:6

**Swiderski**
16:4 17:9
18:19,23
19:20 42:5
44:6,14
47:11,19
48:3,16
50:14
52:16 68:3

**Swiderski's**
73:24

**sworn** 4:12

**systems**
12:19

―――――――――

**T**

**taking** 16:8
20:5 34:10
37:15

**talk** 8:21
32:16
64:17 69:7

**talked** 15:5
45:2 61:12
62:20
67:18

**talking** 15:6
38:10
48:14
62:17,19
71:15

**talks** 49:14

**task** 18:15
40:22
51:14,18

**team** 6:5
18:15

**teams** 9:5

**telephone**
25:20

**term** 16:11

**terminated**
63:14,17,
22 64:3

**terminations**

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Joseph Ahern on 09/29/2021                    Index: terms..type

63:18

terms  33:12
  39:20  44:4

testified
  80:6

testifies
  4:12

testimony
  4:6  20:2

tests  24:12

theft  18:14
  57:14,16,
  19,23
  60:17,21,
  25  64:6,9

therapist
  73:16
  79:15

thing  24:24
  25:1  38:11
  51:12
  71:18

things  13:7
  16:13
  73:11
  74:17

Thomas  55:10
  56:8,11,16

thought
  27:15
  31:4,5
  34:9

three-minute
  73:1

thumb  27:5,6
  29:5,12,24

tied  21:23

Tim  55:16

time  5:21
  6:5,7,10,
  14,16,19,
  22  7:4,7,
  12,16,21
  8:17,21,
  23,25  9:7,
  13  11:3
  12:8,20
  13:2
  16:12,16,
  25  17:12
  18:3,8,24
  19:10,12,
  15  20:18,
  22  21:2
  22:12,17,
  22  23:2,
  12,14,19,
  24  24:10,
  14,19
  25:18,23
  27:12
  28:8,15,21
  29:9,10,19
  30:9  34:3,
  8  37:10
  38:5  39:5
  40:17,25
  42:12,17
  43:8,12,20
  44:1  46:1,
  6  47:19

48:15
  50:15
  52:10,25
  53:3,7,10
  56:25  57:9
  58:9  59:6,
  23,25
  61:15,17
  62:17
  63:2,4,7
  64:13,15
  65:23
  66:4,15,19
  67:24
  68:15,19
  69:3  71:9
  72:10
  73:13,19
  74:5,22
  76:8  77:8

timeline
  15:8

times  39:24
  40:19

Timothy
  55:22
  56:20

today  5:23
  7:4  8:23
  31:11
  56:23

today's
  67:21

Todd  76:11

told  12:9
  71:8

tolled
  53:11,22

tolling
  53:15

Tony  30:6

top  10:7,15

track  14:3

traffic
  11:13

train  16:17

trainee  5:21

training
  5:19
  12:16,18,
  21,25
  13:2,3,5,
  6,10,17
  15:4,7,17,
  24  16:8
  17:14
  21:12,15,
  17  78:3

trainingwise
  16:13

Troy  20:17

true  9:25
  10:5

truth  4:7,8
  36:6

turn  22:11

type  53:5

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Joseph Ahern on 09/29/2021          Index: ultimate..worked

---

**U**

---

ultimate
  36:6

ultimately
  36:14

unaware
  61:14

understand
  42:8,11
  46:3

understanding
  4:21 7:2
  8:1 20:16
  21:13,18
  24:6,25
  25:6 29:22
  36:1 40:12
  41:16
  42:16
  43:17
  44:3,13
  45:15,23
  46:5 47:2
  49:23
  50:4,9,10,
  15 52:25
  53:5 61:7
  65:17
  69:19
  80:22

Understood
  7:5,6

undertaking
  54:17

unfounded
  57:19

unit   45:12

upcoming
  26:17

update   17:1
  70:16 71:2

updated
  16:21
  37:17

updates
  17:22
  37:9,22

upholding
  64:23

utilized
  14:1

---

**V**

---

vacation
  22:12
  23:13,19
  24:19

variety
  69:25 70:2

vehicle
  14:10

verbal   31:5
  57:20

verbally
  78:9

versus   39:18

video   4:2

violation
  80:15,17

violations
  38:6

vouched   33:3

---

**W**

---

wages   55:6

walked   27:5
  28:15
  29:11

Walsh   55:10
  56:9,11,16

wanted   11:6
  42:6 54:20
  55:2 66:25

warrant   52:9

watching
  16:16

week   12:25
  26:2

weigh   23:3

West   4:22,
  25 5:5,11,
  19 8:16
  15:18
  39:14
  44:21
  55:13
  61:19
  67:13

white   9:15,

20 56:16,
  18,20
  78:23
  79:3,8,13

wife   5:14
  8:12 54:19

Wiggs   27:2
  28:12,21
  29:4,25
  39:22 40:5
  48:11 49:6
  68:24
  69:23
  70:10
  71:24
  72:18
  75:25

Wiggs'   39:19

win   78:15

wise   15:8

witnesses
  36:4 37:4

woman   9:16

won   26:22

word   37:7

words   53:6
  57:4

work   13:10
  16:16,24
  26:3 28:14
  35:10 41:1

worked   5:4
  6:4,11,12
  45:11

**working** 7:4,     62:22
  7,19 8:15,
  21 9:6,21
  12:1
  16:16,23
  24:25
  28:19 33:8
  36:19
  38:12
  40:17,18,
  21,25 45:7
  51:14,17
  58:24

**works** 58:11,
  13 65:13,
  19 68:11

**Worth** 5:4,8

**written**
  42:15

**wrong** 80:6

_____
        **Y**
_____

**year** 7:12
  9:7 11:8
  13:21
  22:12,13
  23:25
  24:1,11,
  13,15
  46:15 47:4
  50:17

**years** 5:1,6
  6:6,17
  8:15 13:1,
  4 24:12