**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
**Captain Dennis Wrobbel on 01/05/2022**

1                   UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
2                    WEST PALM BEACH DIVISION
                   CASE NO:   9:20-CV-82406-AMC
3

4
     GREGORY RIDEAU,
5
         Plaintiff,
6
     vs.
7
     CITY OF WEST PALM BEACH, a
8    Florida municipal
     corporation,
9
         Defendant.
10

11

12
         ZOOM DEPOSITION OF:   CAPTAIN DENNIS WROBBEL
13
              Taken on Behalf of the Plaintiff
14

15

16       DATE TAKEN:   Wednesday, January 5th, 2022

17       TIME:         9:07 a.m. – 10:28 a.m.

18       PLACE:        West Palm Beach, Florida

19       REPORTER:     Lisa Adkins
                       Notary Public
20                     State of Florida

21

22

23

24

25

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Captain Dennis Wrobbel on 01/05/2022                        Page 2

```
 1   APPEARANCES:

 2   Counsel for Plaintiff:

 3        TODD S. NORBRATEN, ESQUIRE
          Rubin & Rubin
 4        2055 South Kanner Highway
          Stuart, Florida 34994
 5        772.283.2004
          tnorbraten@rubinandrubin.com
 6
             Appeared via Zoom video conference
 7

 8
     Counsel for Defendant:
 9
          DAVID M. GOBEO, ESQUIRE
10        Ford & Harrison, LLP
          1450 Centrepark Boulevard
11        Suite 325
          West Palm Beach, Florida 33401
12        561.345.7500
          dgobeo@fordharrison.com
13
             Appeared via Zoom video conference
14

15
     ALSO PRESENT:
16
          Gregory Rideau
17
          Zoë Panarites
18

19

20

21

22

23

24

25
```

```
 1                     I N D E X

 2   WITNESS                                        PAGE

 3   Called by the Plaintiff:

 4   CAPTAIN DENNIS WROBBEL

 5   Direct Examination By Mr. Norbraten              5

 6   Cross-Examination By Mr. Gobeo                  51

 7   Stipulations                                    54

 8   Signature Instructions                          55

 9   Errata Sheet                                    56

10   Certificate of Reporter Oath                    57

11   Reporter's Deposition Certificate               58

12

13

14                 E X H I B I T S
                                                  PAGE:
15   Plaintiff's Exhibit No. 1                       22
          Visitor log
16
     Plaintiff's Exhibit No. 2                       24
17        OCDETF report

18

19

20

21

22

23

24

25
```

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Captain Dennis Wrobbel on 01/05/2022                    Page 4

```
 1                P R O C E E D I N G S
 2        THE REPORTER:  Good morning, everyone.  My
 3   name is Lisa Adkins, and I'm your court reporter
 4   today.  I am just going to read into the record
 5   the following:
 6        The attorneys participating in this
 7   proceeding acknowledge that I am not physically
 8   present with the witness and that I will be
 9   reporting and administering the oath remotely.
10        The parties and their counsel consent to
11   this arrangement and waive any objections to this
12   manner of reporting.
13        Will counsel please state their name and
14   confirm this agreement on the record starting
15   with counsel for the Plaintiff.
16        MR. NORBRATEN:  This is Todd Norbraten, we
17   have no objections.
18        MR. GOBEO:  David Gobeo, on behalf of the
19   Defendant, we agree as well.
20        THE REPORTER:  Thank you.
21        Sir, please raise your right hand.
22        (Witness sworn.)
23        THE WITNESS:  I do.
24        THE REPORTER:  Thank you.
25                          * * * * *
```

 1                    CAPTAIN DENNIS WROBBEL,

 2  called as a witness by the Plaintiff, having been first

 3  duly sworn, testified as follows:

 4                    DIRECT EXAMINATION

 5  BY MR. NORBRATEN:

 6      Q.   Good morning, sir.  Thank you for being with us

 7  today.

 8      A.   Thank you.

 9      Q.   Before we begin, can you please state your name

10  and spell it for the record.

11      A.   Captain Dennis Wrobbel -- W-r-o-b-b-e-l.

12      Q.   And my understanding is you're a captain with

13  the West Palm Beach Police Department?

14      A.   Yes, sir.

15      Q.   How long have you been employed by the West

16  Palm Beach Police Department?

17      A.   Almost -- in April it will be 24 years.

18      Q.   As you may or may not know, my name is Todd

19  Norbraten, and I represent Lieutenant Rideau.

20           I assume you know who Lieutenant Rideau is?

21      A.   Yes.

22      Q.   And I have asked to take your deposition.  I

23  appreciate you being here today to provide information.

24           This is a discovery deposition in a lawsuit

25  that's been brought against the City of West Palm Beach

```
 1  alleging discrimination in Mr. Rideau's employment,

 2  okay?

 3      A.   Yes.

 4      Q.   Is that your understanding as to why you're

 5  here?

 6      A.   Yes, sir.

 7      Q.   Okay.  I imagine in 24 years in law enforcement

 8  you've given depositions before?

 9      A.   Yes, I have.

10      Q.   So the rules are the same as you've always had.

11  I'm going to ask questions.  You have to give verbal

12  answers.  If for some reason I ask a question that maybe

13  you can't hear because of the connection we have, or if

14  I just ask a question that doesn't make sense to you,

15  please let me know and I'll ask the question again and

16  do a better job in trying to ask a clearer question,

17  okay?

18      A.   Yes, sir.

19      Q.   From time to time I may ask a question that may

20  cause Mr. Gobeo, who is the attorney representing the

21  city, to make an objection.  If he does that, most of

22  the time you're going to be answering the question, but

23  let him finish with whatever he's saying with his

24  objection, okay?

25      A.   Yes.
```

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
**Captain Dennis Wrobbel on 01/05/2022**                    Page 7

```
 1      Q.   And if you need to take a break for any reason,
 2  just simply state that you'd like to take a break, and
 3  if you're done answering the question, we'll let you
 4  take whatever break you need.
 5           I don't anticipate this being longer than an
 6  hour and a half or so, okay?
 7      A.   Yes, sir.
 8      Q.   All right.  My understanding is you've known
 9  Gregory Rideau for a long time, yes?
10      A.   Yes.
11      Q.   In the time that you've known him while working
12  with the City of West Palm Beach, have you been made
13  aware of the fact that he's been accused of sexual
14  harassment?
15      A.   Through the investigation, yes.
16      Q.   Okay.  Particularly, sexual harassment alleged
17  by Officer Elainy Ravelo.
18           Do you know who she is?
19      A.   Yes.
20      Q.   There has also been some evidence in this case
21  asserted by Officer Sarah Burgoon; that she at some
22  point or another also, in someway, was spoken to
23  inappropriately by Lieutenant Rideau.
24           Are you aware of that?
25      A.   I don't have all of the details of the
```

1  investigation.  I only know, kind of, you know, what's

2  been going on within the year.  But I don't -- you know,

3  I don't know who made what allegations or who said what

4  because I never read the actual file from IA.

5      Q.   And that's understandable.  I wouldn't expect

6  you to be interested in it, necessarily.  I just pose

7  those questions to you to see what your general

8  understanding is of this lawsuit.

9           And so what I want to ask you is:  In the time

10 that you have known Gregory Rideau, have you known him

11 to be someone who sexually harasses female employees?

12     A.   No, never.

13     Q.   Have you heard any allegations against him --

14 other than what you've learned from the allegations that

15 have been made in the IAs of the city.

16          Have you heard any other officers in the

17 department allege that he has done anything that is

18 inappropriately sexually to any of them?

19     A.   No.

20     Q.   I wanted to ask you about, specifically,

21 Officer Elainy Ravelo.

22          My understanding is that there was a point in

23 time in which you were the supervisor of the unit she

24 was working in; is that true?

25     A.   Yes, I was a lieutenant in special

1  investigations division.  I believe she -- two females

2  that came up; it was Senior, and then I think Ravelo.

3  But at the time I think when she got there, I was

4  actually going back to patrol.  So my interaction was,

5  you know, not long at all.

6       Q.   Okay.  And that's because you were leaving the

7  division to go somewhere else?

8       A.   Yeah, I went back to the patrol division.

9       Q.   Okay, okay.

10           To your knowledge, did there come a point in

11  time in which Officer Ravelo left the city and was no

12  longer working with the police department?

13      A.   Yes.

14      Q.   Are you aware of the circumstances that led to

15  her departure?

16      A.   Generally, yeah.  Yeah, from what I've heard

17  and, you know --

18      Q.   Okay.

19      A.   -- talked about.

20      Q.   What is your understanding as to what led to

21  her departure from the city?

22      A.   I know there was some issue with a rental car.

23  Her being involved in some sort of crash, and I think

24  just not providing the whole truth, or stuff to that

25  sort.  But, I guess, maybe lying.  I'm not sure.  I

```
 1  didn't read that one either, but I know she got in

 2  trouble with a vehicle and an accident and stuff like

 3  that.

 4      Q.   Is it your understanding that something

 5  happened and she was investigated by the police

 6  department through an IA?

 7      A.   Yes, sir.

 8      Q.   And then following that IA investigation, she

 9  resigned from her post from the city?

10          MR. GOBEO:  Objection.  You can answer.

11      A.   Yes.

12  BY MR. NORBRATEN:

13      Q.   Okay.  Following her resignation, did there

14  come a point in time where you received all of her

15  property that was assigned to her by the city police

16  department?

17      A.   Yes.

18          So when I went back up as a captain, I replaced

19  Captain Swiderski.  At that time we had -- all of our

20  organized crime used to work out of the police

21  department.  So at a point before I got up there, they

22  had rented an offsite out in the -- in an area where

23  they rent a space for all the undercover officers to go.

24  So they had transitioned out there and we had, kind of,

25  restructured.  The street teams coming in -- and since
```

1  they were moving out, we were moving desks and that, and

2  I located a box and it was just kind of all thrown -- a

3  bunch of stuff was thrown in there, so I'm trying to

4  figure out whose it is to come get it.  As I'm going

5  through it, it ends up being Ravelo's -- all of her

6  stuff in there.

7       Q.   Okay.  And was this before or after she had

8  left the police department?

9       A.   This was after.

10      Q.   Okay.  Do you have any idea how long after?

11      A.   I went up there in October of 2019.  October --

12  yeah, so it was within that month, October, November.

13  I'm not sure exactly the date she left.  I think it was

14  within that, you know, year -- within a few months.

15      Q.   Okay.  And when you came across her belongings,

16  was there anything that you did with them?

17      A.   Yeah, I found a phone.  And then the one thing

18  that stood out was I saw a key faub for a car.  And

19  there was this whole thing about the car being stolen

20  and this and that, and a key was left in it with the

21  rentals and -- you know, usually when we would rent,

22  they'd give us one key, but I guess this one key, two

23  key.

24           When I saw that stuff, I stopped right there

25  and I called internal affairs and asked them to come

1  down and, you know, take it because I didn't want to

2  deal with any belongings.  So I didn't know if it had

3  anything to do with the investigation that they either

4  did or were doing.

5      Q.   Okay.  To your knowledge, was their

6  investigation concluded at that time?

7      A.   I'm not sure because the investigation went on,

8  and then I know she was on administrative leave for a

9  while.  So I really don't know at what point what

10 happened first.

11     Q.   Okay.  Is it possible that she was on

12 administrative leave when you located her belongings at

13 this offsite?

14     A.   Yes, it's possible.

15     Q.   Okay.  And you mentioned the belongings that

16 you found.

17          You turned them over to internal affairs?

18     A.   Yeah, I just called internal affairs and they

19 came down and I just said, Hey, here's a box with a

20 bunch of her stuff.  And they took care of it at that

21 point.

22     Q.   Was it -- was it within your job description to

23 identify that stuff and provide it to internal affairs?

24          Is that something that, like, you were charged

25 with going through that offsite and making sure items

1  were there, or was that something that just came about?

2      A.   No, like I said, it just came about because

3  when the group of them -- you know, 10 or 12 of them

4  left our department, in the office that we're currently

5  in, they went out there.  Obviously not everybody takes

6  things and cleans them up too well.

7           So when I was going through and making room for

8  these other guys and girls that were coming up, that's

9  when I located the box.  So I just figured, Okay, it's

10  probably somebody who moved out to the offsite.  It's

11  their belongings, so I could call them and tell them,

12  Hey, come get your stuff.  You forgot a box.  And when I

13  went through it, that's when I realized it was Ravelo's.

14  And obviously she was not working or, you know,

15  obviously not around.

16           I know internal affairs usually, when you get

17  put on administrative leave or something to that sort,

18  they usually take all of your gear and everything.  So I

19  knew that's the process with them, so I figured they

20  could put that with the rest of whatever gear they had.

21      Q.   Okay.  You mentioned you found a phone as well?

22      A.   Yes.

23      Q.   Did you attempt to turn on the phone and look

24  at anything inside the phone, or did you not do that?

25      A.   No, I didn't want to do anything like that

1  because at the time I knew it was an IA investigation,

2  and I was unsure of the status of it.

3      Q.   Okay.  And you mentioned there was a key FOB

4  that you found?

5      A.   Yes.

6      Q.   Anything else of note that you recall finding

7  in those items?

8      A.   No, not offhand.

9      Q.   Okay.  So when you turned that stuff in to

10 internal affairs, do you recall who you presented it to

11 or turned it over to?

12     A.   I can't remember.  I know it was internal

13 affairs, but I just don't remember who came down at that

14 time.  Because there's been some turnover up there and

15 stuff, so I can't right now remember who was up there at

16 the time.

17     Q.   Okay.

18          All right.  I think I asked, generally, any

19 questions about any allegations of sexual harassment

20 but -- against Officer Rideau.

21          But, generally, did Officer Elainy Ravelo ever

22 make any complaints to you about any other officers and

23 their interactions with her?

24     A.   No.

25     Q.   Did you have much interaction with her at all?

1      A.   No, I did not.

2      Q.   Okay.  I want to shift gears now and get to

3  another aspect of an area that I want to talk to you

4  about, and it's a different time, different reference,

5  but it still involves my client Lieutenant Rideau.

6           Did there come a point where you became aware

7  that Lieutenant Rideau was under investigation for

8  potentially double-dipping in overtime with OCDETF work

9  and working details at City Place?

10     A.   That was mentioned.  I don't really remember if

11 it was from word of mouth or -- they had mentioned it

12 was an OCDETF audit, which I've done before when I was a

13 lieutenant up there, so I was aware of it.

14          There's two styles that they do.  There's one

15 we did when I first got up there where they'll request a

16 bunch of files or paperwork.  We'd scan it, and we'd

17 send it up to do them.

18          And then they also have the one where they'll

19 actually send people down to do, like, an audit or, you

20 know, whatever they're doing.  So there's two styles of

21 them.  So I did know there was an audit going on with

22 OCDEFT.

23     Q.   Okay.  Before we get into specifically about

24 this case, you mentioned that you had done them before.

25          Describe for me -- or, I guess, were involved

1  with them before.

2         What involvement does the city police

3  department have when the federal agency wants to audit

4  the city police department's records?

5      A.   What OCDEFT is is basically a federal agency

6  like the DEA.  Our guys will go up on to OCDEFT, which

7  means it's going to be funded through the Feds.

8      Q.   Okay.

9      A.   So with that -- basically, there will be an

10  agreement that comes with signatures, and then there

11  will be an amount of money that they're going to put

12  towards that operation, which they give it a name.

13         So with all that information -- you know, the

14  packet, all the signatures.  And then there's usually a

15  sheet that explains who is going to be working at

16  OCDEFT.  And you can always add and delete, so there's

17  another form for that.

18         So the main thing is every month at the end of

19  the month, the guys have to turn in, and girls, have to

20  turn it in; it's kind of like a time sheet but it's a

21  federal time sheet.  It basically has 1 through 31.

22  You've got to put your normal work hours, and then

23  you've got to put your overtime hours in and, then, you

24  know, it totals out at the bottom.  They all turn those

25  sheets in to me.  I then do, kind of, a main sheet that

1  lists their names, their wages, and stuff of that sort.

2  And at the end of every month, you know, I'd send a

3  copy -- the originals go back to the federal -- you

4  know, the Fed's, the DEA in this case, and then I send a

5  copy to our finance people so when that money gets

6  refunded, they know exactly what it's for and what case

7  and stuff like that.  So it's tracking on both ends.

8  But it's mainly dealing with payments, money and --

9  that's our main part for our department.  Just having

10  the correct paperwork and all the monthlies, you know,

11  in order.

12      **Q.   And I would imagine it's very important to do a**

13  **good job that way the funding continues for programs in**

14  **the future?**

15      A.   Yes.

16      **Q.   When an audit is conducted, is that something**

17  **that command staff at the police department is aware of?**

18      A.   Yes.

19      **Q.   How do they became aware of if?**

20      A.   We just -- I mean, we recently had a city audit

21  for special investigations division.  I just finished.

22           So everything comes to the chief's office.  You

23  know, I know internal affairs had an audit at the same

24  time so, you know, I think internal affairs is involved

25  in someway but -- you know, they have to get permission

1  to come in and obviously discuss what they can see, what

2  they can't.  Depending on who the auditor is, just based

3  on all the confidential information that we have -- you

4  know, obviously in this one division where paperwork

5  can't really leave or make copies of so -- you know, but

6  everything obviously reported back to the chain, Hey,

7  how did it go?  Hey, what are we looking at?  What are

8  we doing?

9          So I know throughout -- the city audit lasts a

10  long time.  You know, it was just -- obviously, you

11  know, I had to tell my assistant chief, who brought it

12  up, on where the audit was going, how it was looking,

13  and at the end, obviously, we had the big, kind of,

14  closeout with the chief and the head city auditor and we

15  kind of -- she did -- went over what was done with the

16  audits.  So everybody is involved in the chain.

17      Q.   Okay.  The recent audit that you're

18  referencing, was that something that took place under

19  Chief Adderley?

20      A.   Yes.

21      Q.   Okay.  Had you been involved in audits --

22  OCDEFT audits while Chief Mooney was the chief of

23  police?

24      A.   Yeah, I believe so.  I don't -- I don't know --

25  I can't remember -- we had a Chief Cumberland and Chief

1  Mooney kind of coincide.  I believe it was -- at the

2  time I did the first original audit -- I can't remember

3  who the chief was, but I know -- I think the one I

4  did -- the second one I did was when Chief Mooney was

5  there.

6      Q.   Okay.  And you mentioned some documents that

7  aren't allowed to be released to whoever is conducting

8  the audit because of confidentiality and trying to

9  protect information, correct?

10     A.   Yes, sir.

11     Q.   So when OCDEFT sends somebody to the police

12 department to conduct an audit, does that person have

13 free-range to go in and look at all of the time sheets

14 from all of the officers and the ability to look at, you

15 know, when they were working and what hours they've put

16 in for particular months?

17     A.   Yeah.  I mean, when anybody from the outside

18 comes in they, you know, obviously have to go through,

19 like, internal affairs and get an ID badge to be able to

20 go to what areas they're going to work.

21          There was a guy from Phoenix that did part of

22 the audit that the city did with him, so obviously when

23 he came in, you know, I kind of had to house him in our

24 office, you know -- you know, almost as, you know,

25 staying with somebody from, you know, the outside or

1  whatever.

2          But, you know, the auditors, I guess, you know,

3  can look at almost everything.  It's just a lot of stuff

4  can't be copied and brought out.  The auditor that was

5  brought in from Phoenix, you know, he was very

6  knowledgeable so -- yeah, I wasn't put in any situation

7  where I had to keep -- you know, it was very, you know,

8  easygoing.  But now -- I mean, it's kind of the scope

9  of, I guess, the audit and what the chief and them

10  decide and say.

11     Q.   Okay.  And so the gentleman that was brought in

12  from Phoenix, is that on the recent audit that you're

13  discussing?

14     A.   Yeah, he started the audit.  He was brought in,

15  and we did that for about a week and a half, and then

16  the head city auditor continued to do an audit for a

17  little bit longer.

18     Q.   Okay.  What I gather from your testimony is

19  when anyone from the outside comes in to the inside

20  workings of the police department, they're kind of

21  assigned somebody to kind of be with them to both, I

22  guess, look over them but also kind of identify where

23  things are for them; is that true?

24     A.   Yes.

25     Q.   Okay.  In terms of the access to the documents,

1  though, is there anything that is restricted from the

2  auditors when they're auditing, let's say, a time period

3  of a fiscal year?

4         Are they able to access, to your knowledge, all

5  of the time sheets from the officers for that fiscal

6  year?

7     A.   Yes.

8     Q.   Can you think of a time, in any of the audits

9  that you've been apart of, that any of the individuals

10  conducting the audit have been prevented from getting

11  access to anyone's time sheets?

12     A.   Not when I've done any, no.

13     Q.   Okay.  To your knowledge, did Chief Mooney

14  appreciate that the auditors, who are there conducting

15  audits of time sheets, had the ability to audit all of

16  the time sheets?

17         MR. GOBEO:  Objection to form.

18  BY MR. NORBRATEN:

19     Q.   You can answer, if you know.  You may not know.

20     A.   Yeah, I'm not sure.

21     Q.   Okay.  But is it your testimony that if an

22  audit is being deducted by OCDEFT that the chief of

23  police is aware that such an audit is occurring?

24     A.   Based on my experience, I would believe so.

25     Q.   Okay.  I'm going to share a couple of

1  documents, if I can get them to load.

2           Captain, are you able to see the document I'm

3  sharing?

4     A.   Yes.

5     Q.   Okay.  And this is something we have in

6  discovery in our case.

7           Do you recognize this as a visitor log that is

8  used by the police department?

9     A.   Yes.

10          MR. NORBRATEN:  Okay.  I'm going to mark this

11     as Exhibit 1 to your deposition.

12          (Plaintiff's Exhibit No. 1 is marked for

13                    identification.)

14  BY MR. NORBRATEN:

15     Q.   And you can see there's a name highlighted in

16  yellow in the middle there with a date of what appears

17  to be 4/16/18 next to it.  And it's Deanna Cockerill

18  from -- and the company or representative is OCDEF -- or

19  OCD -- it looks like it's OCDETF; do you see that?

20     A.   Yeah, that would be OCDETF; that's kind of

21  their -- it's an acronym.

22     Q.   Okay.

23     A.   OCDEFT.

24     Q.   Okay.  To your knowledge, does anyone from

25  OCDEFT come to the police department other than when

1  they're there to conduct an audit?

2      A.   I haven't seen that, no.

3      Q.   Okay.  So based on the fact that -- I should

4  say, do you know who Deanna Cockrill is?

5      A.   No, I do not.

6      Q.   Okay.  But you believe she's from OCDEFT?

7           MR. GOBEO:  Objection.

8      A.   Yes, I believe.

9  BY MR. NORBRATEN:

10     Q.   Okay.  And why do you believe that?

11     A.   I guess I believe it because, one, she signed

12  in as in Captain Kapper as the log -- you know, I guess,

13  as the person that got her in.  And just knowing that

14  there was an audit -- you know, their auditors can come

15  from anywhere.

16     Q.   Okay.

17     A.   They're not from, like, local offices.  That's

18  why I don't recognize her name.  But, I mean, I would

19  just -- my assumption would be yes that she's from

20  there.

21     Q.   Okay.  And so based on this visitor log, she

22  was at the police department visiting Captain Kapper on

23  April 16th of 2018, correct?

24          MR. GOBEO:  Objection.

25     A.   Yes.  Based on that visitor log, yes.

1  BY MR. NORBRATEN:

2      Q.   Okay.  Would that lead you to believe that she

3  conducted an audit at some point in April of 2018?

4           MR. GOBEO:  Objection.

5      A.   Well, at that time Captain Kapper was the

6  special investigations division commander so I -- you

7  know, knowing that an audit was done, I would either say

8  it had something to do with the audit that was going on

9  or being done.

10 BY MR. NORBRATEN:

11     Q.   Okay.  I'll share it with you now and mark as

12 Exhibit 2.

13          (Plaintiff's Exhibit No. 2 is marked for

14                   identification.)

15 BY MR. NORBRATEN:

16     Q.   Are you able to see the screen?

17     A.   Yes.

18     Q.   And OCDEFT stands for Organized Crime Drug

19 Enforcement Traffic Forces?

20     A.   Yes, sir.

21     Q.   Okay.  And this particular cover page here --

22 have you seen a cover page like this before in your

23 assisting with audits?

24     A.   Yes, sir.

25     Q.   Okay.  And what does this cover page identify

1   for you?

2       A.   It identifies basically what the audit is.  If

3   there was -- you know, it could be administrative errors

4   or -- you know, like any other audit telling you what

5   was good; what was not good.  You know, to give you some

6   sort of feedback from the audit.

7       Q.   Okay.  And it appears to be for FY 2018.

8            Do you understand that to be fiscal year 2018?

9       A.   Yes.

10      Q.   And it is dated July 19th, 2018?

11      A.   Yes.

12      Q.   Do you -- in your experience in working with

13  OCDEFT auditors that date there, would that signify to

14  you the date that the audit was completed?

15           MR. GOBEO:  Objection.

16      A.   Yes.

17  BY MR. NORBRATEN:

18      Q.   Okay.  And based on your experience, would that

19  be consistent if the auditor came to the police

20  department in April of 2018 to have an audit completed

21  by July of 2018?

22      A.   Yes.

23      Q.   Okay.  That's a typical timeline in your

24  experience?

25      A.   Yes.

1      Q.   Okay.  You know, this is an 11-page document.

2           Have you gone through these before in your time

3    at the police department?

4           MR. GOBEO:  Objection.

5      A.   Yes.

6    BY MR. NORBRATEN:

7      Q.   Okay.  And are they typically 11 pages, or

8    sometimes are they much longer, are they much shorter?

9      A.   It could be either.  You might have multiple

10   OCDEFT cases going.  So I guess it would depend on how

11   many OCDEFT cases you had for, you know, that fiscal

12   year.

13     Q.   Okay.  So in your experience when this audit --

14   or this 11-page document -- I guess it's an IPAR,

15   internal processing assessment review.

16          When this is completed, is this provided back

17   to the police department?

18          MR. GOBEO:  Objection.

19     A.   Yeah, I mean, it would come back in through --

20   you know, obviously through the chain above.  I mean,

21   we'd go to the chief and the internal affairs, you know,

22   for the findings.  You know, that way if any -- you

23   know, someone would be, like myself, a captain that

24   would have to explain some of the findings -- you know,

25   negative findings that need correction and have some

1  sort of a plan or action to correct them or, you know,

2  obviously prevent stuff from happening again.

3  BY MR. NORBRATEN:

4      **Q.   Okay.  And when it gets sent back, it can be**

5  **good news, or bad news, or just information that is**

6  **shared with the police department through the federal**

7  **agency because that's how the -- you know, they keep the**

8  **relationship together -- the working relationship,**

9  **correct?**

10     A.   Yeah.  I mean, the recommendations would also

11  state -- you know, that you can see them in an area or

12  stuff of that sort.

13     **Q.   Okay.  And so I believe you testified, but I**

14  **want to be clear.  When this is completed, it's provided**

15  **to the police department command staff, correct?**

16         MR. GOBEO:  Objection.

17     A.   Definitely it's provided through the chain of

18  command what that division would be and -- I mean, it

19  goes as high as the chief's office.

20     **Q.   Okay.**

21     A.   Just based on my experience, every chief has

22  always known when, you know, I was involved in an audit

23  because they want to obviously have the results.

24     **Q.   Okay.  Do you know whether or not you have ever**

25  **seen this particular audit that was conducted by**

 1  Ms. Cockerill from OCDEFT?

 2       A.   Yes.

 3       Q.   **Can you explain how and when you have seen this**

 4  **audit before?**

 5       A.   I don't know the exact date, but Assistant

 6  Chief West, who was my patrol chief, had come to me.

 7  And she knew -- I worked the special investigations

 8  division prior, and she had asked if there was an audit

 9  and if it took place, would there been an audit report.

10            And I said, of course.

11            And she asked, Well, I need to get the OCDEFT

12  audit for -- that if it existed in that year 2018.  If I

13  knew someone that could -- you know, if I could locate

14  it.

15            I said, Well, Sure, I'll call the OCDEFT

16  coordinator because I've done some OCDEFT stuff before.

17  And her name is usually on the bottom of all the OCDEFT

18  paperwork; it's Mary -- I think Mary King.  So I called

19  her and she answered and I said, Hey, you know, it's

20  Dennis.

21            She's like, Oh, hey, how are you doing?

22            I said, Hey, was there an OCDEFT audit that

23  just took place, you know, with our department?

24            And she was like, Yes.

25            And I said, Is there anyway I can get a copy of

1  the audit?

2         And she's like -- she sounded like -- Yeah,

3  well, I sent it back a while but, yeah, I can get it.

4  So she said no problem.

5         An email came to me, but it wasn't from Mary.

6  It was like from one of her -- because she oversees it.

7  It was from one of her people email.

8         So once I got it, you know, I printed it, and I

9  forwarded it to Chief West, but I took a copy, kind of,

10 in to her to explain -- you know, I didn't know what she

11 needed with it, so I wanted to explain the findings and

12 what some of the stuff meant on the findings.

13    Q.   Okay.  I think you answered this, but did Chief

14 West tell you who or why she wanted the audit?

15    A.   Yeah, she said at the time it was for Rideau.

16 I guess based on he -- I guess, he couldn't get a copy,

17 or they didn't have one, or whatever.  So he was -- she

18 said, Someone in my chain of command needs it.  And, you

19 know, I later found out it was for Greg.

20    Q.   Okay.  So you mentioned that you reached out to

21 this Mary king in order to obtain a copy of it, yes?

22    A.   Yes, sir.

23    Q.   And she relayed to you that she had already

24 provided it to the city?

25    A.   Yeah, I'm not sure if she did or whatever.  She

1  said -- she made a comment that it was sent over

2  previously.

3      Q.   Okay.  So when you were sent -- I assume you

4  were emailed a copy of it?

5      A.   Yes, so she emailed it directly to me, and then

6  I kind of forwarded that email to Chief West.

7      Q.   Okay.  And so when -- before you received that

8  email, is it your understanding that that was the second

9  time that Mary's office had sent a copy of this report

10 to the police department?

11         MR. GOBEO:  Objection.

12     A.   That was my understanding.

13 BY MR. NORBRATEN:

14     Q.   Okay.  Do you have any idea who she sent it to

15 previously?

16     A.   No, I don't.

17     Q.   She would not have sent it to you previously,

18 though, correct?

19     A.   No.

20     Q.   Because at that point in time, you were not

21 working in that chain of command that was working with

22 her department, correct?

23     A.   Yes.

24     Q.   So upon your receipt of it, you reviewed it in

25 order to be able to explain it to Chief West?

1      A.   Yes.  And, then, like I said, you know,

2  depending on the fiscal calendar year, '17, '18, or

3  whatever, to see the time frame it went through just to

4  see, you know, if there's any errors when I was up there

5  on my part.  But from what I read, it was just

6  administrative stuff.  It was nothing major.

7           You know, like I explained before, it's -- you

8  know, it's -- a guy might make -- you know, just say $50

9  an hour for his overtime, and then every year he gets

10  his step and he makes 5 percent more.  You know, it's

11  kind of a -- it's not in his favor, but he makes 50 on

12  the next one when he was supposed to be making, say, 53,

13  55 an hour?  So they'll ding like -- you know, on

14  something like that.  Like wrong pay amount or -- like I

15  told you before, with people that are allowed on the

16  OCDEFT -- as the OCDEFT goes on -- it can go on for

17  years.  New people may come to the unit, so they get

18  minimized onto the OCDEFT, so you've got to do the add

19  form.  And just the same when people leave, you've got

20  to do the delete form.  So there was a couple, I

21  believe, like, one or two things where someone wasn't

22  added and someone wasn't deleted which, once again, is

23  not a huge issue because the paperwork and the pay and

24  all those records would match up.  It's just making, you

25  know, note of -- some of the administrative stuff so you

1  keep up with.

2      Q.    Okay.  To your knowledge, was Gregory Rideau

3  part of the OCDEFT during this fiscal calendar year that

4  this report was created?

5      A.    I believe so.  I mean, the OCDEFT report didn't

6  have any names it, I don't believe.  I didn't see any

7  names it, but he was up there during that time.  So

8  pretty much everybody is part of OCDEFT once you're up

9  in the unit.

10     Q.    Okay.  And is it your understanding that the

11 auditors that complete these reports are reviewing the

12 time sheets that the officers are working for the task

13 force in conjunction with the time sheets that the

14 officers are working in their regular capacity and their

15 overtime?

16     A.    Yes, because there's certain hour of

17 requirements that you have to do with your regular --

18 with a regular case to be able to continue -- like to do

19 an OCDEFT.  So it's just you can't work all OCDEFT

20 hours.  You've got to have -- work regular hours so you

21 have to check both sheets.

22     Q.    Okay.  So, presumably, if that OCDEFT auditor

23 catches something that is irregular with a particular

24 officer's time sheets, versus their OCDEFT time sheets,

25 that's something that that auditor could have access to

1  and could include in their audit?

2           MR. GOBEO:  Objection.

3       A.   Yes.

4  BY MR. NORBRATEN:

5       Q.   And by that I mean the auditor has access to

6  all of that information so if they find something

7  there's nothing that is preventing them from including

8  that in this audit, correct?

9       A.   Yes.  I mean -- because -- I mean, it's got to

10  show -- like, obviously, you can't be getting paid city

11  overtime while you're getting OCDEFT overtime while

12  you're getting paid, you know, regular work hours.  So

13  that's one of the things.  And obviously if they

14  discover something like that, I mean, it would be -- you

15  know, if it's a pattern, it would be escalated at some

16  point, I would assume.  I've never had to come across

17  something like that but -- you know, that is

18  something -- I know the city audit that we just did was

19  a big thing with checking times and making sure people

20  were here and there and under the right thing that

21  they're supposed to be doing.

22      Q.   Right.

23           Is it your understanding that that's not the

24  sole purpose they conduct this audit but that's one of

25  the things that they are looking for when they conduct

 1  an audit?

 2          MR. GOBEO:  Objection.

 3      A.   Yes, because pretty much everything you're

 4  dealing with is what they're getting paid and, you know,

 5  the amounts; that you're not going over what the OCDEFT

 6  amount is set at.

 7  BY MR. NORBRATEN:

 8      Q.   Okay.  And so based on your review of the

 9  audit, there's nothing in there that indicates the

10  auditor that conducted this OCDEFT for fiscal year 2018

11  finding any errors on the part of Gregory Rideau,

12  correct?

13      A.   No, it did not.

14      Q.   Did you relay that information to assistant

15  Chief West?

16          MR. GOBEO:  Objection.

17      A.   I told her that -- basically what was

18  identified there.  Kind of what I told you.  Just minor

19  administrative errors, which, you know, is not a huge

20  deal.  It's just one of those things.  Hey, you know, be

21  better at the paperwork, or something like that.

22  BY MR. NORBRATEN:

23      Q.   Okay.  And then I believe you mentioned you

24  sent her a copy, and then you brought her a hard copy as

25  well, or no?

1      A.   I think I did.  When I was going over before --

2  because I remember sending her an email, but I also

3  printed it to look at it.  And, you know, when I sent it

4  to her I kind of -- obviously, like you said, it was

5  several pages.  You know, I just pulled out the key

6  stuff and kind of showed her.  So it was just easier to

7  kind of -- you know, instead of looking off the computer

8  when she was looking at it.

9      **Q.   Did you present the audit to anyone else in the**

10  **department?**

11      A.   No, I did not.

12      **Q.   Did you have any communications with anyone**

13  **else in the police department about this particular**

14  **audit that Chief West ordered you to get?**

15      A.   Yes.

16      **Q.   Who did you have conversations with?**

17      A.   Well, Chief Kalil, who is currently retired,

18  and Captain Swiderski kind of got with me.  Well, not

19  really got with me.  But made a comment like holding up

20  a, you know, piece of paper, like, What's this?  What's

21  this?

22           And I'm kind of like -- I didn't know what they

23  were talking about at the time.  I said, Well, what's

24  what?

25           They're like, This here.

1          And I said, Well -- and it was the OCDEFT

2   report.

3          And I said, Oh, that's the OCDEFT report.  I

4   said, It looks good, you know, or whatever.

5          And they're like, No, no, no.  Kind of like,

6   what's this about?  You know, who told you to get this

7   or whatever.

8          And I'm like -- I said, Chief West told me to

9   get it.  Why?  What's the problem?

10          And they're like, Oh, no, no, no, don't worry

11   about it.  Stuff like that.

12          Which, you know, at that point, I was like, All

13   right, what's going on?  You know, what did I do, you

14   know kind of thing.  So I kind of let it go.

15          It was a couple of hours later in the day -- we

16   were cooking for dispatch for command every year and up

17   in the dispatch area it was grilling up, like, on the

18   rooftop and you had to walk through a door and they

19   have, like, a lounge area, and then you walk through and

20   there's a kitchen area.  So I was coming through and

21   Captain Swiderski was talking to Chief Mooney at the

22   time, who was the chief.  And I said, Hey, I think we

23   have something to be proud of.  Like, you know, that

24   deal stuff -- because West told her and I'm like -- they

25   cut us off and -- so I called Chief West right away and

1  I said, Hey, you know, I don't know what's going on but,

2  you know, they said this thing earlier and now they're

3  talking about -- you know, did I do something wrong?

4        She's like, No, not at all.  And she goes, I'm

5  on my way up.

6        Then she comes up and gets with Chief Mooney

7  asking if there's a problem with whatever; that she

8  instructed me to get something because someone in her

9  chain of command needed that and he couldn't get it from

10 somebody else.

11       And she was like, No, no, you know.

12       So that's -- I just walked away from that.

13 But, you know, I was trying to show her, you know, what

14 the big deal was.

15    **Q.   Okay.  Do you know when in time that date was?**

16    A.   I'd have to research it, but I know it was --

17 it'd be about the time that we did kind of the -- we

18 cook for the dispatchers.  You know, it was -- whatever

19 that email I sent to Chief West, that was kind of

20 emailed in, it was following that day, you know.  Like,

21 the next day of -- because I guess Chief West must have

22 emailed it to other people for other people to get it

23 and it was that next day, you know, obviously when I ran

24 into them.

25    **Q.   Okay.  So within a day of you obtaining a copy**

1  of the audit from Mary King's office?

2      A.   Yes.

3      Q.   Okay.  And at any point in time during those

4  communications -- I mean, do you remember any specific

5  comments that were made, or do you only remember

6  generally what you overheard from Swiderski and Kalil?

7      A.   No, I mean, what they -- I mean, obviously they

8  were -- they weren't like, Hey, great, you know, I got

9  this.  It was kind of, like, very -- you know, asking me

10  like who, what, why, you know.  And that's really the

11  interaction I had.

12         The only other interaction that, you know, I

13  heard was what, you know, Captain Swiderski had said to

14  Chief Mooney.  And then, you know, like I said, I called

15  Chief West.  But that was pretty much -- that was the

16  end of it at that point.

17      Q.   So you thought you were in trouble for having

18  done something wrong?

19      A.   Yes.

20      Q.   And you got that from the way in which

21  Swiderski and Kalil approached you?

22      A.   That, and I really didn't think much of it at

23  that point.  It was a couple hours later when the second

24  incident happened.

25      Q.   Okay.  So the second incident occurs up in --

 1  at, like, a cooking area or an area --

 2      A.   Yes --

 3      Q.   -- where you guys --

 4      A.   -- our dispatch area, yeah.

 5      Q.   Okay.  So I guess annually you guys do

 6  something for the dispatchers where you cook for them

 7  and give them meals as like a thank you for their work

 8  or something?

 9      A.   Yeah, kind of like a holiday thing we do.

10      Q.   Okay.

11      A.   Or dispatcher appreciation week.  One of those

12  because we do it a couple of times.

13      Q.   Okay.  And so you were in that area just to

14  assist with that process, to help cook and feed the

15  dispatchers?

16      A.   Yes.

17      Q.   And describe for me again what specifically, if

18  you remember, who said what to whom.

19           And if you don't remember specifically -- you

20  know, let us know if you don't remember specifically.

21  But generally, this is what was said.

22           MR. GOBEO:  Objection.

23      A.   What I remember was Captain Swiderski saying

24  something to the fact of, Hey, we might have a problem.

25  You know, Dennis -- or Dennis got the OCDEFT report.

1  Chief West had Dennis get the OCDEFT report.  It kind of

2  stopped right there.  So it was brought up, Hey, we have

3  an issue and then this is why, because the OCDEFT

4  report.  And at that point, you know, I guess they kind

5  of saw me and stopped talking.  That's when I called

6  Chief West.  I went to the other room to call her

7  because at that point that's when I thought, you know,

8  there was something I'd done wrong.

9  BY MR. NORBRATEN:

10      Q.   Okay.  And, again, your review of the report

11  was -- it was a good report.  There wasn't a lot that

12  was wrong, correct?

13      A.   Correct.

14      Q.   And so who did Swiderski verbalize -- I believe

15  your words were "we might have a problem."

16           Who was he speaking to?

17      A.   Chief Mooney.

18      Q.   Was there anyone else there?

19      A.   No.

20      Q.   And did Chief Mooney respond in any way?

21      A.   No, she didn't respond because that's kind of

22  when they saw me.

23      Q.   Okay.  Do you have any idea what the problem

24  would have been?

25           MR. GOBEO:  Objection.

```
 1     A.   No.
 2  BY MR. NORBRATEN:
 3     Q.   And so you then go to -- you leave that area
 4  and then you call your chief -- your commander, Chief
 5  West?
 6     A.   Yes.  I called Chief West, yes.
 7     Q.   Okay.  And then what happened at that point?
 8     A.   She asked where I was.
 9          I said, I'm upstairs on the third floor in
10  dispatch.
11          She said, I'll be right up.
12          And she kind of comes up and confronts Chief
13  Mooney, Hey, is there an issue that I had Captain
14  Wrobbel get this report for someone in my chain of
15  command; that he couldn't provide it?
16          Chief Mooney said, No.
17          And at that point, I just kind of walked myself
18  away from it and just kind of left it at that.
19  Obviously Chief West later told me, Don't worry.  You
20  didn't do anything wrong.
21     Q.   Okay.  And was that the end of your involvement
22  with this OCDEFT report?
23     A.   Yes, sir.
24     Q.   Or until day?
25     A.   Until day.
```

1    Q.    At any point in time was Lieutenant Rideau's
2  name mentioned by Swiderski?
3    A.    No.
4    Q.    At any point in time was it mentioned by Chief
5  Mooney?
6    A.    No.
7    Q.    At any point in time was it mentioned by
8  Mr. Kalil?
9    A.    No.
10   Q.    Or by Assistant Chief West?
11         And I just mean during that interaction
12 between --
13   A.    Oh, no.
14   Q.    -- Swiderski and West.
15   A.    No.
16   Q.    Okay.  At the time that these interactions
17 occurred -- at that point were you aware that you had
18 requested this audit for Chief West to provide to, at
19 the time, of Rideau?
20   A.    Yes.
21   Q.    Did you say anything about Sergeant Rideau to
22 Captain Swiderski?
23   A.    No, I didn't say anything to him.
24   Q.    Okay.
25         MR. GOBEO:  Is it okay if we take a break?

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
**Captain Dennis Wrobbel on 01/05/2022**                    Page 43

```
 1          MR. NORBRATEN:  Yeah, let's come back at 10:05;
 2     does that sound good?
 3          MR. GOBEO:  Yeah.
 4               (A short recess is taken.)
 5  BY MR. NORBRATEN:
 6     Q.   Captain Wrobbel, you mentioned that there was
 7  recently an audit conducted of the city for the IA unit?
 8     A.   There was -- yeah, there was an audit with
 9  internal affairs and special investigations.  They're
10  two separate, but I know they coincide because the city
11  auditor who was over had explained that she was in and
12  out because she had two going.
13     Q.   Okay.  And were you involved in assisting in
14  either of those audits in any way?
15     A.   Just in the special investigations division.
16     Q.   Okay.  And who was the city auditor, if you
17  know?
18     A.   Beverly.
19     Q.   And to your understanding, has Beverly
20  completed her audits or at least -- either of the
21  audits?
22     A.   She -- I know we completed the special
23  investigations division one because we sat with the
24  chief and kind of went over the findings and everything.
25     Q.   Okay.  Are you able to share any of the those
```

1  findings with us today?

2     A.   Yeah.  I mean, it's public record.  I mean, I

3  know the commission sat through it.  You know, gosh --

4  like, last year at the end when he wrapped it up.  But

5  pretty much everything was stated that we were doing

6  good.  A lot of the errors were prior to my arrival.

7          She said that we had a good -- you know, good

8  things in place and procedures on how to do things.

9  There was a couple of suggestions on -- you know, Hey,

10  would it be easier to do it this way?  And then we kind

11  of added some stuff to, like, the informant funds.  They

12  call IFEs.  So we kind of added a new column to kind of

13  capture different numbers and stuff.  But overall it

14  was, you know, very successful and she gave compliments

15  on it.

16     Q.   Okay.  Do you know whether or not Beverly, the

17  city auditor, completed the audit on internal affairs?

18     A.   That, I do not know, no.

19     Q.   Okay.  You're currently the captain over

20  special investigations?

21     A.   Yes, sir.

22     Q.   And that would include the narcotics unit?

23     A.   Yes.

24     Q.   I took the deposition yesterday of Agent

25  Steinberg; do you know who he is?

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
**Captain Dennis Wrobbel on 01/05/2022**                    Page 45

```
 1      A.    Yes.

 2      Q.    Okay.  To your knowledge, is it proper

 3  procedure for any officer in the police department to

 4  provide a confidential informant with a cellar telephone

 5  that would record all incoming and outgoing calls to

 6  that cellphone?

 7      A.    No, sir.

 8      Q.    And to be clear.  This would be without

 9  obtaining a warrant from a judge.  This would just be an

10  officer working a confidential informant and giving them

11  a phone that intercepts all incoming and outgoing calls.

12           Is that something that would be policy of the

13  city?

14      A.    We provide phones.  We pay bill for informants.

15  There's a CI packet where there's an interception form.

16  The interception form basically states that if they're

17  going to do a narcotics transaction that, you know,

18  they'll be, you know, obviously wired up, audio/video.

19  We have to keep eyes on them.  Watch them go to the

20  door, and do what they do.

21           You know, a controlled called -- if you do a

22  controlled call, it would be recorded.  But just to

23  randomly -- I mean, you would have to have a T2 to

24  basically be able to capture all audio calls.

25           You know, it has to be case specific and, you
```

1  know, usually it's when you have to do a controlled call

2  or something of that sort.  You know, that's kind of

3  what the interception form is for.  You know, you're

4  kind of doing an investigation.  They're going to make a

5  call to the bad guy.  You want to record IT.  If you do

6  a three-way, you know, to get the guy with the meet or

7  whatever they're going to do.  So all that's captured,

8  you know, but it's not like a -- it's like a T2, which

9  would give you full audio.

10        You know, even when we go up on wires, you

11 know, we -- there's certain calls you have to basically

12 void out.  Like, once you identify, like, a wife, a

13 husband and it's normal chatter.  You know, you don't

14 pick those calls up anymore unless something takes you

15 back to it.

16        So, I mean, that's all -- that's even on a wire

17 by a judge.  You just can't 24/7, you know, monitor it.

18    Q.   Okay.  You mentioned a T2.  What's a T2?

19    A.   Like, a T3 is, like, a wire where you're going

20 to go up on someone's phone.

21        A T2 is more actual video versus -- T3 is like

22 a wire or listening devices.  They kind of coincide

23 so -- you know, if you're going to want to investigate

24 somebody and, you know, you want to hear and see

25 everything, you've got to get those signed by a judge.

1      Q.   Okay.  And so I'm gathering from your testimony

2   that there's a confidential informant packet that is

3   utilized by the department, yes?

4      A.   Yes, there's several forms in there.

5      Q.   Okay.  And included in those forms is a waiver

6   of consent that a CI can provide when making specific

7   phone calls for working as a CI with a target of a

8   criminal investigation?

9           MR. GOBEO:  Objection.  Leading.

10     A.   Yes.

11  BY MR. NORBRATEN:

12     Q.   Okay.  And is it -- it's your understanding

13  that that consent does not provide -- is it your

14  understanding that that consent contained in that packet

15  does not provide the authority for the department to

16  record all incoming and outgoing phone calls?

17     A.   No.

18     Q.   And I believe you also said, even in the

19  circumstances where you have a warrant, there are steps

20  that need to be taken to minimize the intrusion on phone

21  calls that are not associated with obtaining evidence of

22  a crime, correct?

23     A.   Yes, sir.

24     Q.   Okay.  And that's something that you've learned

25  throughout the course of your 24 years with the police

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Captain Dennis Wrobbel on 01/05/2022                                    Page 48

 1  department, yes?

 2      A.   Yes, sir.

 3      Q.   **To your knowledge, is it department procedure**

 4  **for the cellphones that are provided to confidential**

 5  **informants to contain apps on them that are capable of**

 6  **recording all incoming and outgoing calls?**

 7      A.   Yes, there's several different types of apps

 8  that we use.  Some are just like -- you know, it could

 9  be an app that you put on a -- where the phone looks

10  it's off but it's recording so when they're with a

11  target and stuff, we can hear it and they're not, like,

12  seeing that their phone is lighting up and stuff like

13  that.

14           So, you know, we -- there's also new apps

15  coming out so, you know, we tend to -- we have a tech

16  guy that kind of goes through the recent and the most

17  up-to-date ones.  There are several apps that we use and

18  continue.

19      Q.   **Okay.  But can you explain to me, generally,**

20  **how -- how the process goes for intercepting a cellphone**

21  **call and using a confidential informant to intercept**

22  **this cellphone call and what an agent in special**

23  **investigations would typically to do accomplish that?**

24      A.   I mean, there are several ways.  You can be

25  there with the informant.  I mean, anytime you meet with

1  an informant there has to be two people.  They can get

2  with the informant in an undisclosed location.  Do a,

3  you know, speaker call, come up with whatever the plan

4  is going to be.  They could be a way where they can do

5  three-way in.  They're probably doing an app that

6  allows -- where you don't have to pause the call to get

7  another guy in.  But, you know, they would get together

8  to obviously make a plan of this.  You don't want the

9  informant just calling and deciding what they're going

10 to do, and you as the officer have no clue what they're

11 agreeing, too.  And obviously the officer needs to hear

12 what the bad guy is saying so -- like in an controlled

13 environment is where you want to do something like that.

14    **Q.   Okay.  And is that where the term "controlled**

15 **call" comes from; it's an organized planned out phone**

16 **call that law enforcement is involved in organizing and**

17 **setting up?**

18    A.   Yes, sir.

19    **Q.   And in those situations, typically, the**

20 **confidential informant is placing a phone call to a**

21 **suspect of a crime, correct?**

22    A.   Yes.

23    **Q.   Can you describe any example where the suspect**

24 **of a crime originates the phone call where it's an**

25 **incoming call to a confidential informant's phone that**

1  you are able to record?

2      A.   I mean, if your informant has, maybe, left a

3  message that he wants to playback for the agent -- I

4  mean, the only other way is, like, if the guy calls

5  the -- you know, the informant at that point would want

6  to notify, whoever his handler is, and say, Hey, I just

7  got a phone call from so-and-so.  He stated this and

8  that.  I mean, at that point, you know -- at some point

9  I would assume the agents would get together to make

10 that call again to see if that suspect is going to talk

11 about whatever they said.

12     **Q.   Okay.  But is there a scenario where that phone**

13 **call that originates from the suspect --**

14     A.   Uh-huh.

15     **Q.   -- that is not planned and it's not prepared**

16 **for, is intercepted and recorded and legally obtained to**

17 **be used in your investigation?**

18     A.   Not to my understanding, no.

19     **Q.   Okay, okay.**

20          MR. NORBRATEN:  Well, I want to thank you for

21     that time there.  I had not anticipated asking about

22     that but based on information that I had, I wanted

23     to get your opinion on it, so thank you.

24          I have no further questions.  I appreciate your

25     time, and I'll turn it over to Mr. Gobeo.

 1          THE WITNESS:  Thanks.

 2          MR. GOBEO:  I'm just going to look at my notes

 3     real quick, and I'll be back in two minutes.

 4          MR. NORBRATEN:  Okay.  You know, I have 10:22.

 5     Do you want to say 10:25?

 6          MR. GOBEO:  10:25 is fine, yeah.

 7              (A brief recess is taken.)

 8          MR. GOBEO:  I only have a couple of questions.

 9                  CROSS-EXAMINATION

10     BY MR. GOBEO:

11     **Q.   Captain, how long have you held your current**

12     **role over at SID?**

13     A.   I went back to SID October of 2019.

14     **Q.   And what role did you have before October of**

15     **2019?**

16     A.   I was a captain in the patrol section.

17     **Q.   How long were you a captain in patrol?**

18     A.   I believe I was down there for about a year and

19     a half.  It's when Chief Adderley and them came in.  A

20     couple of months after that, I was assigned up there.

21     So, yeah, I know my records will reflect the dates and

22     this and that, but it was about a year and a half as a

23     captain in patrol, or maybe two.

24     **Q.   And where were you -- what role did you have**

25     **before you were a captain in patrol?**

1    A.   I was -- I came out of special investigations

2 division around 20, I believe, 17, 2017.  And then I

3 went down back to patrol as a lieutenant, being that I

4 was going to get promoted.  So I went back down, got

5 familiar with it, then I was promoted as a lieutenant to

6 a captain in patrol.  I stayed down there in the patrol

7 area on the first floor until October of '19, and then

8 went upstairs to the captain.

9    Q.   Okay.  So you were not SID in the year 2018?

10    A.   No, I was not.

11    Q.   And who was the captain that you replaced in

12 October of 2019?

13    A.   It was Captain Swiderski.  He was there from

14 January of '19 to October of '19.  And then in '18 would

15 have been -- or 17, '18 maybe it was Captain Kapper.

16    Q.   And do you know what Captain Kapper's

17 instructions were to his agents on how to have

18 confidential informants record their calls?

19    A.   No, I do not.

20    Q.   What about Captain Swiderski's instructions?

21    A.   No.

22    MR. GOBEO:  All right, I don't have any further

23    questions.

24    MR. NORBRATEN:  We're going to order just an

25    electronic copy.

1              I don't have any further questions.  I assume

2       you're going to read?

3              MR. GOBEO:  We will read, and we will also

4       order an electronic copy.

5       (Thereupon, the deposition concluded at 10:28 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        STIPULATIONS

2

3          IT WAS STIPULATED BETWEEN counsel for the

4   respective parties, with the consent of the witness,

5   that reading and signing of the foregoing deposition by

6   the witness be reserved.

7

8          THEREUPON, the deposition of CAPTAIN DENNIS

9   WROBBEL, taken at the instance of the Plaintiff, was

10  concluded at 10:28 a.m.

11

12         NOTE:  The original and one copy of the

13  foregoing deposition will be held by Todd Norbraten,

14  Counsel for the Plaintiff.

15                A copy of the foregoing deposition will

16  be held by David Gobeo, Counsel for the Defendant.

17

18

19

20

21

22

23

24

25

 1    DEPONENT'S ERRATA SHEET AND SIGNATURE INSTRUCTIONS

 2

 3        The original of the Errata Sheet has been

 4   delivered to David Gobeo, Counsel for Defendant.

 5

 6        When the Errata Sheet has been completed by the

 7   deponent and signed, a copy thereof should be delivered

 8   to each party of record and the ORIGINAL delivered to

 9   Todd Norbraten, Counsel for Plaintiff, to whom the

10   original deposition transcript was delivered.

11

12                    INSTRUCTIONS TO DEPONENT

13

14        After reading this volume of your deposition,

15   indicate any corrections or changes to your testimony

16   and the reasons therefor on the Errata Sheet supplied to

17   you and sign it.  DO NOT make marks or notations on the

18   transcript volume itself.

19

20   *** REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE

21   COMPLETED AND SIGNED ERRATA SHEET WHEN RECEIVED.***

22

23

24

25

```
 1   ATTACH TO THE DEPOSITION OF CAPTAIN DENNIS WROBBEL

 2       CASE:  Rideau vs. City of West Palm Beach, Florida
     CASE NO.:  9:20-CV-82406-AMC
 3

 4                         ERRATA SHEET

 5       I, CAPTAIN DENNIS WROBBEL, have read the

 6   foregoing deposition given by me on January 5th, 2022,

 7   in West Palm Beach, Florida, and the following

 8   corrections, if any, should be made in the transcript:

 9   PAGE    LINE            CORRECTION AND REASON THEREFOR

10

11

12

13

14

15

16

17

18       Subject to the above corrections, if any, my

19   testimony reads as given by me in the foregoing

20   deposition.

21       SIGNED at _____ Florida, this

22   _____ day of _____, 2022.

23

24              _____

25                    CAPTAIN DENNIS WROBBEL
```

```
 1                 CERTIFICATE OF REPORTER OATH

 2

 3   STATE OF FLORIDA

 4   COUNTY OF HILLSBOROUGH

 5

 6          I, the undersigned authority, hereby certify

 7   that the witness named herein personally appeared before

 8   me via Zoom video conference and was duly sworn on

 9   January 5th, 2022.

10

11          WITNESS my hand and official seal this 13th day

12   of January, 2022.

13

14

15

16

17          _____

18          LISA T. ADKINS

19          NOTARY PUBLIC - STATE OF FLORIDA

20          MY COMMISSION NO.:  HH 047535

21          EXPIRES:  November 8th, 2024

22

23

24

25
```

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Captain Dennis Wrobbel on 01/05/2022                                   Page 58

1                 REPORTER'S DEPOSITION CERTIFICATE

2

3    STATE OF FLORIDA

4    COUNTY OF HILLSBOROUGH

5

6         I, Lisa T. Adkins Notary Public in and for the

7    State of Florida at large, hereby certify that the

8    witness appeared before me via Zoom video conference for

9    the taking of the foregoing deposition, and that I was

10   authorized to and did stenographically and

11   electronically report the deposition, and that the

12   transcript is a true and complete record of my

13   stenographic notes and recordings thereof.

14        I FURTHER CERTIFY that I am neither an attorney,

15   nor counsel for the parties to this cause, nor a

16   relative or employee of any attorney or party connected

17   with this litigation, nor am I financially interested in

18   the outcome of this action.

19        DATED THIS 13th day of January, 2022. At Tampa,

20   Hillsborough County, Florida.

21

22                          _Lisa J. Adkins_

23                          _____
                            LISA T. ADKINS

24

25

**Exhibits**

WrobbelC 1
 3:15
 22:11,12

WrobbelC 2
 3:16
 24:12,13

**$**

$50   31:8

**1**

1   3:15
 16:21
 22:11,12

10   13:3

10:05   43:1

10:22   51:4

10:25   51:5,6

10:28   53:5

11   26:7

11-page
 26:1,14

12   13:3

16th   23:23

17   31:2
 52:2,15

18   31:2
 52:14,15

19   52:7,14

**19th**   25:10

**2**

2   3:16
 24:12,13

20   52:2

2017   52:2

2018   23:23
 24:3 25:7,
 8,10,20,21
 28:12
 34:10 52:9

2019   11:11
 51:13,15
 52:12

22   3:15

24   3:16
 5:17 6:7
 47:25

24/7   46:17

**3**

31   16:21

**4**

4/16/18
 22:17

**5**

5   3:5 31:10

50   31:11

51   3:6

53   31:12

54   3:7

55   3:8
 31:13

56   3:9

57   3:10

58   3:11

**A**

a.m.   53:5

ability
 19:14
 21:15

access   20:25
 21:4,11
 32:25 33:5

accident
 10:2

accomplish
 48:23

accused   7:13

acknowledge
 4:7

acronym
 22:21

action   27:1

actual   8:4
 46:21

add   16:16
 31:18

added   31:22
 44:11,12

Adderley
 18:19
 51:19

Adkins   4:3

administering
 4:9

administrative
 12:8,12
 13:17 25:3
 31:6,25
 34:19

affairs
 11:25
 12:17,18,
 23 13:16
 14:10,13
 17:23,24
 19:19
 26:21 43:9
 44:17

agency   16:3,
 5 27:7

agent   44:24
 48:22 50:3

agents   50:9
 52:17

agree   4:19

agreeing
 49:11

agreement
 4:14 16:10

allegations
 8:3,13,14
 14:19

allege  8:17

alleged  7:16

alleging  6:1

allowed  19:7
 31:15

amount  16:11
 31:14 34:6

amounts  34:5

annually
 39:5

answering
 6:22 7:3

answers  6:12

anticipate
 7:5

anticipated
 50:21

anymore
 46:14

anyone's
 21:11

anytime
 48:25

app  48:9
 49:5

appears
 22:16 25:7

appreciation
 39:11

approached
 38:21

apps  48:5,
 7,14,17

April  5:17
 23:23 24:3
 25:20

area  10:22
 15:3 27:11
 36:17,19,
 20 39:1,4,
 13 41:3
 52:7

areas  19:20

arrangement
 4:11

arrival  44:6

aspect  15:3

asserted
 7:21

assessment
 26:15

assigned
 10:15
 20:21
 51:20

assist  39:14

assistant
 18:11 28:5
 34:14
 42:10

assisting
 24:23

43:13

assume  5:20
 30:3 33:16
 50:9 53:1

assumption
 23:19

attempt
 13:23

attorney
 6:20

attorneys
 4:6

audio  45:24
 46:9

audio/video
 45:18

audit  15:12,
 19,21 16:3
 17:16,20,
 23 18:9,
 12,17
 19:2,8,12,
 22 20:9,
 12,14,16
 21:10,15,
 22,23
 23:1,14
 24:3,7,8
 25:2,4,6,
 14,20
 26:13
 27:22,25
 28:4,8,9,
 12,22
 29:1,14

33:1,8,18,
 24 34:1,9
 35:9,14
 38:1 42:18
 43:7,8
 44:17

auditing
 21:2

auditor
 18:2,14
 20:4,16
 25:19
 32:22,25
 33:5 34:10
 43:11,16
 44:17

auditors
 20:2 21:2,
 14 23:14
 25:13
 32:11

audits
 18:16,21,
 22 21:8,15
 24:23
 43:14,20,
 21

authority
 47:15

aware  7:13,
 24 9:14
 15:6,13
 17:17,19
 21:23
 42:17

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Captain Dennis Wrobbel on 01/05/2022          Index: back..chain

**B**

back  9:4,8
 10:18 17:3
 18:6
 26:16,19
 27:4 29:3
 43:1 46:15
 51:3,13
 52:3,4

bad  27:5
 46:5 49:12

badge  19:19

based  18:2
 21:24
 23:3,21,25
 25:18
 27:21
 29:16 34:8
 50:22

basically
 16:5,9,21
 25:2 34:17
 45:16,24
 46:11

Beach  5:13,
 16,25 7:12

begin  5:9

behalf  4:18

belongings
 11:15
 12:2,12,15
 13:11

Beverly

43:18,19
44:16

big  18:13
 33:19
 37:14

bill  45:14

bit  20:17

bottom  16:24
 28:17

box  11:2
 12:19
 13:9,12

break  7:1,2,
 4 42:25

brought  5:25
 18:11
 20:4,5,11,
 14 34:24
 40:2

bunch  11:3
 12:20
 15:16

Burgoon  7:21

**C**

calendar
 31:2 32:3

call  13:11
 28:15 40:6
 41:4 44:12
 45:22
 46:1,5
 48:21,22
 49:3,6,15,

16,20,24,
 25 50:7,
 10,13

called  3:3
 5:2 11:25
 12:18
 28:18
 36:25
 38:14 40:5
 41:6 45:21

calling  49:9

calls  45:5,
 11,24
 46:11,14
 47:7,16,21
 48:6 50:4
 52:18

capable  48:5

capacity
 32:14

captain  3:4
 5:1,11,12
 10:18,19
 22:2
 23:12,22
 24:5 26:23
 35:18
 36:21
 38:13
 39:23
 41:13
 42:22 43:6
 44:19
 51:11,16,
 17,23,25
 52:6,8,11,

13,15,16,
 20

capture
 44:13
 45:24

captured
 46:7

car  9:22
 11:18,19

care  12:20

case  7:20
 15:24
 17:4,6
 22:6 32:18
 45:25

cases  26:10,
 11

catches
 32:23

cellar  45:4

cellphone
 45:6
 48:20,22

cellphones
 48:4

Certificate
 3:10,11

chain  18:6,
 16 26:20
 27:17
 29:18
 30:21 37:9
 41:14

charged
  12:24

chatter
  46:13

check  32:21

checking
  33:19

chief  18:11,
  14,19,22,
  25 19:3,4
  20:9
  21:13,22
  26:21
  27:21 28:6
  29:9,13
  30:6,25
  34:15
  35:14,17
  36:8,21,
  22,25
  37:6,19,21
  38:14,15
  40:1,6,17,
  20 41:4,6,
  12,16,19
  42:4,10,18
  43:24
  51:19

chief's
  17:22
  27:19

CI  45:15
  47:6,7

circumstances
  9:14 47:19

city  5:25
  6:21 7:12
  8:15 9:11,
  21 10:9,15
  15:9 16:2,
  4 17:20
  18:9,14
  19:22
  20:16
  29:24
  33:10,18
  43:7,10,16
  44:17
  45:13

cleans  13:6

clear  27:14
  45:8

clearer  6:16

client  15:5

closeout
  18:14

clue  49:10

Cockerill
  22:17 28:1

Cockrill
  23:4

coincide
  19:1 43:10
  46:22

column  44:12

command
  17:17
  27:15,18
  29:18

30:21
  36:16 37:9
  41:15

commander
  24:6 41:4

comment  30:1
  35:19

comments
  38:5

commission
  44:3

communications
  35:12 38:4

company
  22:18

complaints
  14:22

complete
  32:11

completed
  25:14,20
  26:16
  27:14
  43:20,22
  44:17

compliments
  44:14

computer
  35:7

concluded
  12:6 53:5

conduct
  19:12 23:1

33:24,25

conducted
  17:16 24:3
  27:25
  34:10 43:7

conducting
  19:7
  21:10,14

confidential
  18:3 45:4,
  10 47:2
  48:4,21
  49:20,25
  52:18

confidentialit
y  19:8

confirm  4:14

confronts
  41:12

conjunction
  32:13

connection
  6:13

consent  4:10
  47:6,13,14

consistent
  25:19

contained
  47:14

continue
  32:18
  48:18

continued

20:16

continues
 17:13

controlled
 45:21,22
 46:1
 49:12,14

conversations
 35:16

cook  37:18
 39:6,14

cooking
 36:16 39:1

coordinator
 28:16

copied  20:4

copies  18:5

copy  17:3,5
 28:25
 29:9,16,21
 30:4,9
 34:24
 37:25
 52:25 53:4

correct
 17:10 19:9
 23:23
 27:1,9,15
 30:18,22
 33:8 34:12
 40:12,13
 47:22
 49:21

correction

26:25

counsel
 4:10,13,15

couple  21:25
 31:20
 36:15
 38:23
 39:12 44:9
 51:8,20

court  4:3

cover  24:21,
 22,25

crash  9:23

created  32:4

crime  10:20
 24:18
 47:22
 49:21,24

criminal
 47:8

Cross-
examination
 3:6 51:9

Cumberland
 18:25

current
 51:11

cut  36:25

― ― ― ― ― ―
        D
― ― ― ― ― ―

date  11:13
 22:16
 25:13,14

28:5 37:15

dated  25:10

dates  51:21

David  4:18

day  36:15
 37:20,21,
 23,25
 41:24,25

DEA  16:6
 17:4

deal  12:2
 34:20
 36:24
 37:14

dealing  17:8
 34:4

Deanna  22:17
 23:4

decide  20:10

deciding
 49:9

deducted
 21:22

Defendant
 4:19

delete  16:16
 31:20

deleted
 31:22

Dennis  3:4
 5:1,11
 28:20
 39:25 40:1

department
 5:13,16
 8:17 9:12
 10:6,16,21
 11:8 13:4
 16:3 17:9,
 17 19:12
 20:20
 22:8,25
 23:22
 25:20
 26:3,17
 27:6,15
 28:23
 30:10,22
 35:10,13
 45:3 47:3,
 15 48:1,3

department's
 16:4

departure
 9:15,21

depend  26:10

depending
 18:2 31:2

deposition
 3:11 5:22,
 24 22:11
 44:24 53:5

depositions
 6:8

describe
 15:25
 39:17
 49:23

description
  12:22

desks   11:1

details   7:25
  15:9

devices
  46:22

ding   31:13

Direct   3:5
  5:4

directly
  30:5

discover
  33:14

discovery
  5:24 22:6

discrimination
  6:1

discuss   18:1

discussing
  20:13

dispatch
  36:16,17
  39:4 41:10

dispatcher
  39:11

dispatchers
  37:18
  39:6,15

division
  9:1,7,8
  17:21 18:4
  24:6 27:18

  28:8
  43:15,23
  52:2

document
  22:2 26:1,
  14

documents
  19:6 20:25
  22:1

door   36:18
  45:20

double-dipping
  15:8

Drug   24:18

duly   5:3

### E

earlier   37:2

easier   35:6
  44:10

easygoing
  20:8

Elainy   7:17
  8:21 14:21

electronic
  52:25 53:4

email   29:5,7
  30:6,8
  35:2 37:19

emailed
  30:4,5
  37:20,22

employed
  5:15

employees
  8:11

employment
  6:1

end   16:18
  17:2 18:13
  38:16
  41:21 44:4

ends   11:5
  17:7

enforcement
  6:7 24:19
  49:16

environment
  49:13

Errata   3:9

errors   25:3
  31:4
  34:11,19
  44:6

escalated
  33:15

evidence
  7:20 47:21

exact   28:5

Examination
  3:5 5:4

Exhibit
  3:15,16
  22:11,12
  24:12,13

existed
  28:12

expect   8:5

experience
  21:24
  25:12,18,
  24 26:13
  27:21

explain
  26:24 28:3
  29:10,11
  30:25
  48:19

explained
  31:7 43:11

explains
  16:15

eyes   45:19

### F

fact   7:13
  23:3 39:24

familiar
  52:5

faub   11:18

favor   31:11

Fed's   17:4

federal
  16:3,5,21
  17:3 27:6

Feds   16:7

feed   39:14

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Captain Dennis Wrobbel on 01/05/2022          Index: feedback..half

feedback
 25:6

female  8:11

females  9:1

figure  11:4

figured
 13:9,19

file  8:4

files  15:16

finance  17:5

find  33:6

finding  14:6
 34:11

findings
 26:22,24,
 25 29:11,
 12 43:24
 44:1

fine  51:6

finish  6:23

finished
 17:21

fiscal  21:3,
 5 25:8
 26:11 31:2
 32:3 34:10

floor  41:9
 52:7

FOB  14:3

force  32:13

Forces  24:19

forgot  13:12

form  16:17
 21:17
 31:19,20
 45:15,16
 46:3

forms  47:4,5

forwarded
 29:9 30:6

found  11:17
 12:16
 13:21 14:4
 29:19

frame  31:3

free-range
 19:13

full  46:9

funded  16:7

funding
 17:13

funds  44:11

future  17:14

FY  25:7

———————
———————
      G
———————

gather  20:18

gathering
 47:1

gave  44:14

gear  13:18,
 20

gears  15:2

general  8:7

generally
 9:16
 14:18,21
 38:6 39:21
 48:19

gentleman
 20:11

girls  13:8
 16:19

give  6:11
 11:22
 16:12 25:5
 39:7 46:9

giving  45:10

Gobeo  3:6
 4:18 6:20
 10:10
 21:17
 23:7,24
 24:4 25:15
 26:4,18
 27:16
 30:11 33:2
 34:2,16
 39:22
 40:25
 42:25 43:3
 47:9 50:25
 51:2,6,8,
 10 52:22
 53:3

good  4:2
 5:6 17:13

25:5 27:5
 36:4 40:11
 43:2 44:6,
 7

gosh  44:3

great  38:8

Greg  29:19

Gregory  7:9
 8:10 32:2
 34:11

grilling
 36:17

group  13:3

guess  9:25
 11:22
 15:25
 20:2,9,22
 23:11,12
 26:10,14
 29:16
 37:21 39:5
 40:4

guy  19:21
 31:8 46:5,
 6 48:16
 49:7,12
 50:4

guys  13:8
 16:6,19
 39:3,5

———————
———————
      H
———————

half  7:6
 20:15

51:19,22

hand   4:21

handler   50:6

happened
  10:5 12:10
  38:24 41:7

happening
  27:2

harasses
  8:11

harassment
  7:14,16
  14:19

hard   34:24

head   18:14
  20:16

hear   6:13
  46:24
  48:11
  49:11

heard   8:13,
  16 9:16
  38:13

held   51:11

hey   12:19
  13:12
  18:6,7
  28:19,21,
  22 34:20
  36:22 37:1
  38:8 39:24
  40:2 41:13
  44:9 50:6

high   27:19

highlighted
  22:15

holding
  35:19

holiday   39:9

hour   7:6
  31:9,13
  32:16

hours   16:22,
  23 19:15
  32:20
  33:12
  36:15
  38:23

house   19:23

huge   31:23
  34:19

husband
  46:13

———————
          I
———————

IA   8:4
  10:6,8
  14:1 43:7

IAS   8:15

ID   19:19

idea   11:10
  30:14
  40:23

identification
  22:13
  24:14

identified
  34:18

identifies
  25:2

identify
  12:23
  20:22
  24:25
  46:12

IFES   44:12

imagine   6:7
  17:12

important
  17:12

inappropriatel
  y   7:23 8:18

incident
  38:24,25

include   33:1
  44:22

included
  47:5

including
  33:7

incoming
  45:5,11
  47:16 48:6
  49:25

individuals
  21:9

informant
  44:11
  45:4,10

47:2
48:21,25
49:1,2,9,
20 50:2,5

informant's
  49:25

informants
  45:14 48:5
  52:18

information
  5:23 16:13
  18:3 19:9
  27:5 33:6
  34:14
  50:22

inside   13:24
  20:19

instructed
  37:8

instructions
  3:8 52:17,
  20

interaction
  9:4 14:25
  38:11,12
  42:11

interactions
  14:23
  42:16

intercept
  48:21

intercepted
  50:16

intercepting

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Captain Dennis Wrobbel on 01/05/2022          Index: interception..left

48:20

**interception**
45:15,16
46:3

**intercepts**
45:11

**interested**
8:6

**internal**
11:25
12:17,18,
23 13:16
14:10,12
17:23,24
19:19
26:15,21
43:9 44:17

**intrusion**
47:20

**investigate**
46:23

**investigated**
10:5

**investigation**
7:15 8:1
10:8 12:3,
6,7 14:1
15:7 46:4
47:8 50:17

**investigations**
9:1 17:21
24:6 28:7
43:9,15,23
44:20
48:23 52:1

**involved**
9:23 15:25
17:24
18:16,21
27:22
43:13
49:16

**involvement**
16:2 41:21

**involves**
15:5

**IPAR** 26:14

**irregular**
32:23

**issue** 9:22
31:23 40:3
41:13

**items** 12:25
14:7

_____

**J**

_____

**January**
52:14

**job** 6:16
12:22
17:13

**judge** 45:9
46:17,25

**July** 25:10,
21

_____

**K**

_____

**Kalil** 35:17

38:6,21
42:8

**Kapper**
23:12,22
24:5 52:15

**Kapper's**
52:16

**key** 11:18,
20,22,23
14:3 35:5

**kind** 8:1
10:24 11:2
16:20,25
18:13,15
19:1,23
20:8,20,
21,22
22:20 29:9
30:6 31:11
34:18
35:4,6,7,
18,22
36:5,14
37:17,19
38:9 39:9
40:1,4,21
41:12,17,
18 43:24
44:10,12
46:2,4,22
48:16

**king** 28:18
29:21

**King's** 38:1

**kitchen**
36:20

**knew** 13:19
14:1 28:7,
13

**knowing**
23:13 24:7

**knowledge**
9:10 12:5
21:4,13
22:24 32:2
45:2 48:3

**knowledgeable**
20:6

_____

**L**

_____

**lasts** 18:9

**law** 6:7
49:16

**lawsuit** 5:24
8:8

**lead** 24:2

**Leading** 47:9

**learned** 8:14
47:24

**leave** 12:8,
12 13:17
18:5 31:19
41:3

**leaving** 9:6

**led** 9:14,20

**left** 9:11
11:8,13,20
13:4 41:18
50:2

legally
  50:16

lieutenant
  5:19,20
  7:23 8:25
  15:5,7,13
  42:1 52:3,
  5

lighting
  48:12

Lisa   4:3

listening
  46:22

lists   17:1

load   22:1

local   23:17

locate   28:13

located   11:2
  12:12 13:9

location
  49:2

log   3:15
  22:7
  23:12,21,
  25

long   5:15
  7:9 9:5
  11:10
  18:10
  51:11,17

longer   7:5
  9:12 20:17
  26:8

lot   20:3
  40:11 44:6

lounge   36:19

lying   9:25

————————

M

made   7:12
  8:3,15
  30:1 35:19
  38:5

main   16:18,
  25 17:9

major   31:6

make   6:14,
  21 14:22
  18:5 31:8
  46:4 49:8
  50:9

makes   31:10,
  11

making   12:25
  13:7
  31:12,24
  33:19 47:6

manner   4:12

mark   22:10
  24:11

marked   22:12
  24:13

Mary   28:18
  29:5,21
  38:1

Mary's   30:9

match   31:24

meals   39:7

means   16:7

meant   29:12

meet   46:6
  48:25

mentioned
  12:15
  13:21 14:3
  15:10,11,
  24 19:6
  29:20
  34:23
  42:2,4,7
  43:6 46:18

message   50:3

middle   22:16

minimize
  47:20

minimized
  31:18

minor   34:18

minutes   51:3

money   16:11
  17:5,8

monitor
  46:17

month   11:12
  16:18,19
  17:2

monthlies
  17:10

months   11:14
  19:16
  51:20

Mooney   18:22
  19:1,4
  21:13
  36:21 37:6
  38:14
  40:17,20
  41:13,16
  42:5

morning   4:2
  5:6

mouth   15:11

moved   13:10

moving   11:1

multiple
  26:9

————————

N

names   17:1
  32:6,7

narcotics
  44:22
  45:17

necessarily
  8:6

needed   29:11
  37:9

negative
  26:25

news   27:5

Norbraten

```
3:5 4:16            26:4,18           8,19,22,24        offsite
5:5,19              27:16             33:11               10:22
10:12               30:11 33:2        34:5,10             12:13,25
21:18               34:2,16           36:1,3              13:10
22:10,14            39:22             39:25
23:9 24:1,         40:25 47:9         40:1,3             operation
10,15                                 41:22                16:12
25:17 26:6         objections
27:3 30:13           4:11,17          OCDETF   3:17      opinion
33:4 34:7,                             15:8,12             50:23
22 40:9            obtain   29:21      22:19,20
41:2 43:1,                                               order   17:11
5 47:11            obtained           October              29:21
50:20 51:4           50:16             11:11,12            30:25
52:24                                  51:13,14            52:24 53:4
                   obtaining           52:7,12,14
normal   16:22       37:25 45:9                          ordered
46:13               47:21            offhand   14:8        35:14

note   14:6       occurred          office   13:4       organized
31:25               42:17             17:22               10:20
                                      19:24               24:18
notes   51:2      occurring           27:19 30:9          49:15
                    21:23             38:1
notify   50:6                                            organizing
                  occurs   38:25    officer               49:16
November                              7:17,21
11:12             OCD   22:19         8:21 9:11          original
                                      14:20,21            19:2
numbers           OCDEF   22:18       45:3,10
44:13                                 49:10,11          originals
                  OCDEFT   15:22                          17:3
        O           16:5,6,16       officer's
                    18:22             32:24             originates
oath   3:10         19:11                                 49:24
4:9                 21:22           officers              50:13
                    22:23,25          8:16 10:23
objection           23:6 24:18        14:22             outgoing
6:21,24             25:13             19:14 21:5          45:5,11
10:10               26:10,11          32:12,14           47:16 48:6
21:17               28:1,11,
23:7,24             15,16,17,       offices             overheard
24:4 25:15          22 31:16,         23:17               38:6
                    18 32:3,5,
                                                        oversees
                                                          29:6
```

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Captain Dennis Wrobbel on 01/05/2022   Index: overtime..prevented

overtime
  15:8 16:23
  31:9 32:15
  33:11

—————————
         P
—————————

packet   16:14
  45:15
  47:2,14

pages   26:7
  35:5

paid   33:10,
  12 34:4

Palm   5:13,
  16,25 7:12

paper   35:20

paperwork
  15:16
  17:10 18:4
  28:18
  31:23
  34:21

part   17:9
  19:21 31:5
  32:3,8
  34:11

participating
  4:6

parties   4:10

patrol   9:4,8
  28:6
  51:16,17,
  23,25
  52:3,6

pattern
  33:15

pause   49:6

pay   31:14,
  23 45:14

payments
  17:8

people   15:19
  17:5 29:7
  31:15,17,
  19 33:19
  37:22 49:1

percent
  31:10

period   21:2

permission
  17:25

person   19:12
  23:13

Phoenix
  19:21
  20:5,12

phone   11:17
  13:21,23,
  24 45:11
  46:20
  47:7,16,20
  48:9,12
  49:15,20,
  24,25
  50:7,12

phones   45:14

physically
  4:7

pick   46:14

piece   35:20

place   15:9
  18:18
  28:9,23
  44:8

placing
  49:20

Plaintiff
  3:3 4:15
  5:2

plaintiff's
  3:15,16
  22:12
  24:13

plan   27:1
  49:3,8

planned
  49:15
  50:15

playback
  50:3

point   7:22
  8:22 9:10
  10:14,21
  12:9,21
  15:6 24:3
  30:20
  33:16
  36:12
  38:3,16,23
  40:4,7
  41:7,17
  42:1,4,7,
  17 50:5,8

police   5:13,
  16 9:12
  10:5,15,20
  11:8 16:2,
  4 17:17
  18:23
  19:11
  20:20
  21:23
  22:8,25
  23:22
  25:19
  26:3,17
  27:6,15
  30:10
  35:13 45:3
  47:25

policy   45:12

pose   8:6

post   10:9

potentially
  15:8

prepared
  50:15

present   4:8
  35:9

presented
  14:10

pretty   32:8
  34:3 38:15
  44:5

prevent   27:2

prevented
  21:10

preventing
  33:7

previously
  30:2,15,17

printed   29:8
  35:3

prior   28:8
  44:6

problem   29:4
  36:9 37:7
  39:24
  40:15,23

procedure
  45:3 48:3

procedures
  44:8

proceeding
  4:7

process
  13:19
  39:14
  48:20

processing
  26:15

programs
  17:13

promoted
  52:4,5

proper   45:2

property
  10:15

protect   19:9

proud   36:23

provide   5:23
  12:23
  41:15
  42:18
  45:4,14
  47:6,13,15

provided
  26:16
  27:14,17
  29:24 48:4

providing
  9:24

public   44:2

pulled   35:5

purpose
  33:24

put   13:17,
  20 16:11,
  22,23
  19:15 20:6
  48:9

_____

Q
_____

question
  6:12,14,
  15,16,19,
  22 7:3

questions
  6:11 8:7
  14:19
  50:24 51:8
  52:23 53:1

quick   51:3

_____

R
_____

raise   4:21

ran   37:23

randomly
  45:23

Ravelo   7:17
  8:21 9:2,
  11 14:21

Ravelo's
  11:5 13:13

reached
  29:20

read   4:4
  8:4 10:1
  31:5 53:2,
  3

real   51:3

realized
  13:13

reason   6:12
  7:1

recall   14:6,
  10

receipt
  30:24

received
  10:14 30:7

recent   18:17
  20:12
  48:16

recently

17:20 43:7

recess   43:4
  51:7

recognize
  22:7 23:18

recommendation
s   27:10

record   4:4,
  14 5:10
  44:2 45:5
  46:5 47:16
  50:1 52:18

recorded
  45:22
  50:16

recording
  48:6,10

records   16:4
  31:24
  51:21

reference
  15:4

referencing
  18:18

reflect
  51:21

refunded
  17:6

regular
  32:14,17,
  18,20
  33:12

relationship

27:8

**relay** 34:14

**relayed**
29:23

**released**
19:7

**remember**
14:12,13,
15 15:10
18:25 19:2
35:2 38:4,
5 39:18,
19,20,23

**remotely** 4:9

**rent** 10:23
11:21

**rental** 9:22

**rentals**
11:21

**rented** 10:22

**replaced**
10:18
52:11

**report** 3:17
28:9 30:9
32:4,5
36:2,3
39:25
40:1,4,10,
11 41:14,
22

**reported**
18:6

**reporter**
3:10 4:2,
3,20,24

**Reporter's**
3:11

**reporting**
4:9,12

**reports**
32:11

**represent**
5:19

**representative**
22:18

**representing**
6:20

**request**
15:15

**requested**
42:18

**requirements**
32:17

**research**
37:16

**resignation**
10:13

**resigned**
10:9

**respond**
40:20,21

**rest** 13:20

**restricted**
21:1

**restructured**
10:25

**results**
27:23

**retired**
35:17

**review** 26:15
34:8 40:10

**reviewed**
30:24

**reviewing**
32:11

**Rideau** 5:19,
20 7:9,23
8:10 14:20
15:5,7
29:15 32:2
34:11
42:19,21

**Rideau's** 6:1
42:1

**role** 51:12,
14,24

**rooftop**
36:18

**room** 13:7
40:6

**rules** 6:10

_____

**S**

_____

**Sarah** 7:21

**sat** 43:23
44:3

**scan** 15:16

**scenario**
50:12

**scope** 20:8

**screen** 24:16

**section**
51:16

**send** 15:17,
19 17:2,4

**sending** 35:2

**sends** 19:11

**Senior** 9:2

**sense** 6:14

**separate**
43:10

**Sergeant**
42:21

**set** 34:6

**setting**
49:17

**sexual** 7:13,
16 14:19

**sexually**
8:11,18

**share** 21:25
24:11
43:25

**shared** 27:6

**sharing** 22:3

**sheet** 3:9
16:15,20,

21,25

**sheets** 16:25
19:13
21:5,11,
15,16
32:12,13,
21,24

**shift** 15:2

**short** 43:4

**shorter** 26:8

**show** 33:10
37:13

**showed** 35:6

**SID** 51:12,
13 52:9

**Signature**
3:8

**signatures**
16:10,14

**signed** 23:11
46:25

**signify**
25:13

**simply** 7:2

**sir** 4:21
5:6,14
6:6,18 7:7
10:7 19:10
24:20,24
29:22
41:23
44:21 45:7
47:23 48:2

49:18

**situation**
20:6

**situations**
49:19

**so-and-so**
50:7

**sole** 33:24

**someone's**
46:20

**someway** 7:22
17:25

**sort** 9:23,
25 13:17
17:1 25:6
27:1,12
46:2

**sound** 43:2

**sounded** 29:2

**space** 10:23

**speaker** 49:3

**speaking**
40:16

**special** 8:25
17:21 24:6
28:7 43:9,
15,22
44:20
48:22 52:1

**specific**
38:4 45:25
47:6

**specifically**
8:20 15:23
39:17,19,
20

**spell** 5:10

**spoken** 7:22

**staff** 17:17
27:15

**stands** 24:18

**started**
20:14

**starting**
4:14

**state** 4:13
5:9 7:2
27:11

**stated** 44:5
50:7

**states** 45:16

**status** 14:2

**stayed** 52:6

**staying**
19:25

**Steinberg**
44:25

**step** 31:10

**steps** 47:19

**Stipulations**
3:7

**stolen** 11:19

**stood** 11:18

**stopped**
11:24
40:2,5

**street** 10:25

**stuff** 9:24
10:2 11:3,
6,24
12:20,23
13:12
14:9,15
17:1,7
20:3 27:2,
12 28:16
29:12
31:6,25
35:6
36:11,24
44:11,13
48:11,12

**styles**
15:14,20

**successful**
44:14

**suggestions**
44:9

**supervisor**
8:23

**supposed**
31:12
33:21

**suspect**
49:21,23
50:10,13

**Swiderski**
10:19

GREGORY RIDEAU vs CITY OF WEST PALM BEACH
Captain Dennis Wrobbel on 01/05/2022
Index: Swiderski's..understanding

35:18
36:21
38:6,13,21
39:23
40:14
42:2,14,22
52:13

Swiderski's
52:20

sworn  4:22
5:3

―――――――――
        T
―――――――――

T2  45:23
46:8,18,21

T3  46:19,21

takes  13:5
46:14

talk  15:3
50:10

talked  9:19

talking
35:23
36:21 37:3
40:5

target  47:7
48:11

task  32:12

teams  10:25

tech  48:15

telephone
45:4

telling  25:4

tend  48:15

term  49:14

terms  20:25

testified
5:3 27:13

testimony
20:18
21:21 47:1

thing  11:17,
19 16:18
33:19,20
36:14 37:2
39:9

things  13:6
20:23
31:21
33:13,25
34:20 44:8

thought
38:17 40:7

three-way
46:6 49:5

thrown  11:2,
3

time  6:19,
22 7:9,11
8:9,23
9:3,11
10:14,19
12:6 14:1,
14,16 15:4
16:20,21
17:24

18:10
19:2,13
21:2,5,8,
11,15,16
24:5 26:2
29:15
30:9,20
31:3 32:7,
12,13,24
35:23
36:22
37:15,17
38:3 42:1,
4,7,16,19
50:21,25

timeline
25:23

times  33:19
39:12

today  4:4
5:7,23
44:1

Todd  4:16
5:18

told  31:15
34:17,18
36:6,8,24
41:19

totals  16:24

tracking
17:7

Traffic
24:19

transaction
45:17

transitioned
10:24

trouble  10:2
38:17

true  8:24
20:23

truth  9:24

turn  13:23
16:19,20,
24 50:25

turned  12:17
14:9,11

turnover
14:14

types  48:7

typical
25:23

typically
26:7 48:23
49:19

―――――――――
        U
―――――――――

Uh-huh  50:14

undercover
10:23

understand
25:8

understandable
8:5

understanding
5:12 6:4
7:8 8:8,22

**GREGORY RIDEAU vs CITY OF WEST PALM BEACH**
Captain Dennis Wrobbel on 01/05/2022 Index: undisclosed..yesterday

9:20 10:4
30:8,12
32:10
33:23
43:19
47:12,14
50:18

undisclosed
49:2

unit 8:23
31:17 32:9
43:7 44:22

unsure 14:2

up-to-date
48:17

upstairs
41:9 52:8

utilized
47:3

---

**V**

vehicle 10:2

verbal 6:11

verbalize
40:14

versus 32:24
46:21

video 46:21

visiting
23:22

visitor 3:15
22:7
23:21,25

void 46:12

---

**W**

W-R-O-B-B-E-L
5:11

wages 17:1

waive 4:11

waiver 47:5

walk 36:18,
19

walked 37:12
41:17

wanted 8:20
29:11,14
50:22

warrant 45:9
47:19

Watch 45:19

ways 48:24

week 20:15
39:11

West 5:13,
15,25 7:12
28:6 29:9,
14 30:6,25
34:15
35:14
36:8,24,25
37:19,21
38:15
40:1,6
41:5,6,19
42:10,14,

18

wife 46:12

wire 46:16,
19,22

wired 45:18

wires 46:10

word 15:11

words 40:15

work 10:20
15:8 16:22
19:20
32:19,20
33:12 39:7

worked 28:7

working 7:11
8:24 9:12
13:14 15:9
16:15
19:15
25:12 27:8
30:21
32:12,14
45:10 47:7

workings
20:20

worry 36:10
41:19

wrapped 44:4

Wrobbel 3:4
5:1,11
41:14 43:6

wrong 31:14
37:3 38:18

40:8,12
41:20

---

**Y**

year 8:2
11:14
21:3,6
25:8 26:12
28:12
31:2,9
32:3 34:10
36:16 44:4
51:18,22
52:9

years 5:17
6:7 31:17
47:25

yellow 22:16

yesterday
44:24